# EXHIBIT A

JANEAN ACEVEDO DANIELS, SBN 145707
Attorney at Law
Law Office of Janean Acevedo Daniels
1160 Via del Rey
Goleta, CA 93117
phone: (805) 284-4428  fax: (805) 456-2050
janean@jadanielslaw.com

Attorney for PLAINTIFF JANE DOE

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
11/2/2021 4:32 PM
By: Jazmine Killian, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| JANE DOE,<br><br>              Plaintiff,<br><br>       v.<br><br>SANTA YNEZ BAND OF MISSION INDIANS, an Indian tribe; RODOLFO RODRIGUEZ, an individual; and DOES 1-50, inclusive,<br><br>              Defendants. | Case No. 21CV04421<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>**1. Harassment on the Basis of Sex in Violation of FEHA [Gov. Code§12940(a)]**<br>**2. Intentional Infliction of Emotional Distress**<br>**3. Negligent Infliction of Emotional Distress**<br>**4. Assault & Battery**<br>**5. Sexual Battery**<br><br>**DEMAND FOR JURY TRIAL** |

PLAINTIFF JANE DOE alleges:

## GENERAL ALLEGATIONS

1.     At all times pertinent to this complaint, PLAINTIFF JANE DOE ("PLAINTIFF")

was a resident of the City of Lompoc, County of Santa Barbara, California, and was an employee

of Chumash Casino Resort, a gaming facility owned and operated by Defendant SANTA YNEZ

BAND OF MISSION INDIANS.

2.	At all times pertinent hereto, Defendant RODOLFO RODRIGUEZ ("RODRIGUEZ") was a resident of the City of Lompoc, County of Santa Barbara, California, was an employee of Chumash Casino Resort, a gaming facility owned and operated by Defendant SANTA YNEZ BAND OF MISSION INDIANS, and was PLAINTIFF'S supervisor.

3.	At all times pertinent hereto, Defendant SANTA YNEZ BAND OF MISSION INDIANS ("THE TRIBE") was a federally recognized Indian tribe located in the County of Santa Barbara, California, that owned and operated a gaming facility known as the Chumash Casino Resort pursuant to a 2015 Tribal-State Gaming Compact between THE TRIBE and the State of California ("the Tribal-State Compact"), a copy of which is attached hereto as Exhibit "A" and incorporated herein.

4.	In entering into the Tribal-State Compact, THE TRIBE and the State of California declared their "[shared] interest in mitigating the off-reservation impacts of the Gaming Facility, affording meaningful consumer and employee protections in connection with the operations of the Gaming Facility, fairly regulating the Gaming Activities conducted at the Gaming Facility, and fostering a good-neighbor relationship."  (See Ex. "A," p. 2, Preamble).

5.	Among the stated purposes and objectives of the Tribal-State Compact were and are to:

> Promote ethical practices in conjunction with Class III Gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Gaming Operation, protect against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming, and protect the patrons and employees of the Gaming Operation and the local communities. (See Ex. "A," p. 3, Sec. 1.0 Purposes and Objectives, subsection (c).)

6.	Pursuant to the Tribal-State Gaming Compact between THE TRIBE and the State of California, THE TRIBE shall "Adopt and comply with federal laws and state laws" forbidding

unlawful discrimination or harassment, including sexual harassment, in the workplace or "in connection with the employment of persons to work or working for the Gaming Operation or in the Gaming Facility." (See Ex. "A," p. 87, Sec. 12.3(f) Health and Safety Standards).

7.     Further pursuant to the Tribal-State Compact, THE TRIBE agreed and agrees to: *expressly waive, and also waive its right to assert, sovereign immunity and any and all defenses based thereon* up to the greater of three million dollars ($3,000,000) or the limits of the employment practices insurance policy [that THE TRIBE shall obtain and maintain], in accordance with the tribal ordinance referenced in subdivision (f)(2) below, in connection with any claim for harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the operation of, the Gaming Operation, Gaming Facility or Gaming Activities . . . (See Ex. "A," p. 88, Sec. 12.3(f)(1), *emphasis added*.)

8.     The Tribal-State Compact further provides that the standards governing unlawful discrimination or harassment involving TRIBE employees "shall be subject to enforcement pursuant to an employment discrimination complaint ordinance which shall be adopted by THE TRIBE" prior to the effective date of the Tribal-State Compact and which shall continuously provide, among other things:

(A) That California law shall govern all claims of harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the operation of, the Gaming Operation, Gaming Facility or Gaming Activities . . . (See Ex. "A," p. 88, Sec. 12.3(f)(2), emphasis added).

9.     At all times pertinent to this complaint, except as specifically provided herein, PLAINTIFF and RODRIGUEZ were employed by the same "employer," THE TRIBE, as defined

under California's Fair Employment and Housing Act (FEHA), Government Code **§**12920 *et seq.*, at its Gaming Facility/place of business located in the County of Santa Barbara, California: PLAINTIFF as a table games dealer, and RODRIGUEZ as the employer's Director of Table Games, Poker, and Bingo.  RODRIGUEZ was a "supervisor" for that employer as defined under FEHA.

10.     The true names and capacities of DOES 1-50, whether individual, corporate, associate or otherwise are unknown to PLAINTIFF at this time, who therefore sues these Defendants by such fictitious names.  When the true names and capacities of such Defendants are ascertained, PLAINTIFF will amend this complaint to insert the true names and capacities of said DOE Defendants.

11.     PLAINTIFF is informed and believes and on that basis alleges that Defendants are responsible for each and every act and obligation set forth in this complaint.

## FACTUAL BACKGROUND

12.     As described herein, RODRIGUEZ has subjected PLAINTIFF to:

    a.   Unwanted, offensive, and/or sexual touching of PLAINTIFF's body, including her breasts and vagina;

    b.   Unwanted and intimidating sexual attention and advances;

    c.   Unwanted, offensive and intimidating actions and verbal comments; and

    d.   Unlawful sexual harassment,

all of which caused PLAINTIFF extreme emotional distress, humiliation, severe emotional distress, panic, physical and emotional injury, and other harm.

/ / /

/ / /

13.     In October 2013, PLAINTIFF was hired by Defendant TRIBE to work as a table games dealer at the Chumash Casino Resort under the supervision of Defendant RUDY RODRIGUEZ, the Resort's Director of Table Games, Poker, and Bingo.

14.     For the next four-and-a-half years, PLAINTIFF conscientiously and competently performed her duties with enthusiasm and a positive, can-do attitude in order establish herself as a loyal and dedicated employee and a reliable, collaborative member of THE TRIBE team.

15.     In July 2015, PLAINTIFF's then future husband, John Doe ("Mr. Doe"), was hired by THE TRIBE and began working at the Chumash Casino Resort as a dealer under RODRIGUEZ's supervision.  RODRIGUEZ conducted the interview and offered Mr. Doe employment immediately following the audition.

16.     RODRIGUEZ supervised his employees in a direct, commanding, no-nonsense manner, making it clear that he had the final word with respect to the management of the Resort's gaming program and employees.  RODRIGUEZ also made it known to the employees under his supervision that he expected them to follow his directives without questioning him or his authority, and that he did not tolerate employees taking issue with him or pushing back on his instructions.

17.     Within the first year of Mr. Doe's employment, RODRIGUEZ began cultivating a friendship with Mr. Doe, and invited Mr. Doe to his (RODRIGUEZ's) home to socialize outside of work hours.  Believing he had no choice but to accept his boss's invitation, Mr. Doe went to RODRIGUEZ's home one evening, where they drank beer and discussed their mutual interest in golf.

18.     After Mr. Doe and RODRIGUEZ socialized on a few occasions together, RODRIGUEZ began inviting PLAINTIFF, who had been dating Mr. Doe, to join him and Mr.

Doe when they got together outside of work.  Like Mr. Doe, PLAINTIFF reasonably believed that she had no choice but to accept RODRIGUEZ's invitations, given his position as her supervisor, and the authority he maintained over her and her employment at the Resort, and based on her belief that refusing such invitations would anger RODRIGUEZ and have an adverse impact on her career at the Casino.

19.     Soon after PLAINTIFF acceded to RODRIGUEZ's initial invitations to join him and Mr. Doe in their get togethers outside work, RODRIGUEZ, Mr. Doe, and PLAINTIFF were socializing on the weekends on a regular basis, typically at the home that Mr. Doe and PLAINTIFF shared, and occasionally at RODRIGUEZ's home or other locations. RODRIGUEZ almost always initiated, organized, and directed the gatherings, which often included other TRIBE employees, and typically involved barbequing and/or sharing food and drinks.

20.     In addition to directing PLAINTIFF and Mr. Doe to host barbeque dinners and similar social events at their home, on numerous occasions from 2017 through 2019, RODRIGUEZ invited Mr. Doe to play with him in charity golf tournaments in which they represented THE TRIBE.

21.     Throughout the time that PLAINTIFF and Mr. Doe were employed by THE TRIBE, RODRIGUEZ boasted to them about his significant standing and position of influence within the Resort and THE TRIBE.  RODRIGUEZ bragged to Mr. Doe and PLAINTIFF that he was held in high regard by the Resort and THE TRIBE, and that he could easily advance further in the organization if he so desired.

22.     On numerous occasions during PLAINTIFF's and Mr. Doe' employment, RODRIGUEZ talked to them about his desire or plans to terminate TRIBE employees he did not like, and proudly informed them after he had effectuated the terminations.  These work-related

conversations often occurred while RODRIGUEZ was socializing with PLAINTIFF and Mr. Doe outside of work hours.

23.     In addition, RODRIGUEZ told Mr. Doe that he had connections with the Tribal Chairman, and could relay positive messages to the Chairman regarding Mr. Doe's golfing abilities, knowing that Mr. Doe had previously pursued golf seriously, enjoyed the sport, and was interested in being known to THE TRIBE, its Chairman, and others as a skilled golfer. RODRIGUEZ also knew that he himself would benefit from associating with such a distinguished player, and was always eager to golf with Mr. Doe in community events that generated favorable publicity and recognition.

24.     RODRIGUEZ further shored up his position of power and influence over PLAINTIFF and Mr. Doe by telling PLAINTIFF after she had married Mr. Doe and graduated from a professional educational program in which she was enrolled that he would serve as a reference in support of her application to a coveted post-graduation employment program in the Central Coast.

25.     RODRIGUEZ's messaging and manipulation of PLAINTIFF and Mr. Doe made it clear to them that he was in a position to influence their standing, reputation, future employment, and advancement at the Resort, and with other employers thereafter, and that their future careers-- including PLAINTIFF's future professional opportunities--were in his hands.

26.     As a result, PLAINTIFF and Mr. Doe reasonably believed that pleasing RODRIGUEZ by acceding to all of his requests and directives at work, and by socializing with him outside of work in the time, place, and manner that he directed, was a requirement of their continued employment with THE TRIBE, and was essential to their future career opportunities

thereafter.  PLAINTIFF in particular felt pressure to please RODRIGUEZ, given that he was acting as a reference for her as she pursued her professional career.

27.     Accordingly, PLAINTIFF and Mr. Doe did not feel they could question or refuse to follow any of RODRIGUEZ's directives, whether they were directly related to work, or involved RODRIGUEZ's increasing demands that PLAINTIFF and Mr. Doe socialize with RODRIGUEZ when they were not working together.

28.     In the Fall of 2018, RODRIGUEZ began playing an interactive video game with Mr. Doe and PLAINTIFF on an almost daily basis.  The game allows users to play together in a single location, or from multiple locations through Internet/wi fi connections.  RODRIGUEZ typically connected to the group gaming activity from his home while Mr. and Ms. Doe played from their home.  While playing the game, RODRIGUEZ, PLAINTIFF and Mr. Doe used headsets that permitted them to talk and converse for hours during these almost daily interactions.

29.     By 2019, RODRIGUEZ was organizing and directing Mr. Doe and PLAINTIFF to host barbeques and other social gatherings at PLAINTIFF's and Mr. Doe's home on almost a weekly basis.  The couple, RODRIGUEZ, and other friends would gather to talk, visit share food and drinks, and play video games together.

30.     The planning of these events was typically initiated by RODRIGUEZ, who would take PLAINTIFF and Mr. Doe off the Chumash Casino Resort work schedule multiple times each month so that they could play their shared video game and barbeque together.

31.     Because RODRIGUEZ was PLAINTIFF's and Mr. Doe' superior, who supervised them and his employees in the commanding manner described above, and made it clear that to PLAINTIFF and Mr. Doe that he held sway over their careers and advancement at and beyond the

Resort, both Mr. Doe and PLAINTIFF felt obligated to agree to RODRIGUEZ's continual "invitations" and "proposed" plans.

32.     As a result of RODRIGUEZ's position of authority and control over PLAINTIFF and Mr. Doe and the other employees who were invited and expected to attend these social events outside of work hours, the gatherings were planned, coordinated, and conducted in accordance with RODRIGUEZ's desires, schedule, and timeline, and PLAINTIFF and Mr. Doe (along with the other TRIBE employees in the group) felt under constant pressure to please and satisfy their boss and follow all of his directives.

33.     On the rare occasions that PLAINTIFF and Mr. Doe were unable to accommodate RODRIGUEZ's demands that they engage in various social activities with him outside of work, RODRIGUEZ would react in an angry, hostile, and disapproving manner, making it clear that he was upset and frustrated by their failure to accede to his directives and satisfy his needs.

34.     In March 2018, PLAINTIFF began a professional educational program and took a temporary leave from her position at the Chumash Casino Resort.  She returned to the Resort, and to her position as a dealer under RODRIGUEZ's supervision, in December 2018.  RODRIGUEZ allowed PLAINTIFF to resume her position without the need to re-interview.  RODRIGUEZ also had the ability to adjust PLAINTIFF's schedule frequently upon request. To have more flexibility with PLAINTIFF's schedule, RODRIGUEZ changed the shift from part time I to part time II. Part time II allowed RODRIGUEZ to take PLAINTIFF off the schedule whenever it was needed while remaining on payroll.

35.     In March 2019, PLAINTIFF and Mr. Doe were married.  RODRIGUEZ attended the wedding.  Thereafter, Mr. Doe, PLAINTIFF, and RODRIGUEZ continued to celebrate special occasions and holidays together outside work.

36.     In September 2019, RODRIGUEZ invited PLAINTIFF and Mr. Doe to participate in a TRIBE/Chumash Casino Resort employee golf tournament and play on his team.  As always, PLAINTIFF and Mr. Doe accepted RODRIGUEZ's "invitation" without question.

37.     In June 2020, RODRIGUEZ attended a small gathering at PLAINTIFF's and Mr. Doe's home following PLAINTIFF's graduation from her professional program.

38.     Later that year, as COVID-19 pandemic restrictions began to ease, PLAINTIFF and Mr. Doe hosted a small party at their house on the evening of November 2, 2020, to further celebrate PLAINTIFF's graduation from her professional program and subsequent licensure.  For the reasons discussed above, PLAINTIFF and Mr. Doe felt obligated to invite their supervisor, RODRIGUEZ, to the event.  They also invited several other TRIBE employees.

39.     Early in the evening of November 2, 2020, before sexually assaulting PLAINTIFF, RODRIGUEZ asked PLAINTIFF who was coming to the party.  When PLAINTIFF listed the various TRIBE/Resort co-workers whom she had invited to attend, RODRIGUEZ expressed displeasure with some of the guests, and told PLAINTIFF that he might have to leave early because two of the TRIBE employees she had invited were people he did not trust.

40.     RODRIGUEZ then told PLAINTIFF that he recently "talked to HR" about a different situation involving another employee. According to RODRIGUEZ, "HR asked questions that they shouldn't be asking" that were unfavorable to him, and lamented, "it's always people that I've helped that try to get me fired. People that I've done so much for and I don't get that."

41.     Later that evening, just prior to the assault, PLAINTIFF and RODRIGUEZ were in the kitchen of PLAINTIFF's and Mr. Doe's home talking while Mr. Doe and the remaining guests were socializing outside.  At one point, PLAINTIFF, who needed to use the restroom, left RODRIGUEZ in the kitchen and walked to a nearby bathroom of the home.

42.     As PLAINTIFF entered the bathroom and turned around to shut the door, she saw that RODRIGUEZ had followed her into the bathroom and had closed the door behind them.

43.     RODRIGUEZ, who is taller and significantly heavier than PLAINTIFF, suddenly reached toward PLAINTIFF, grabbed her bra, and forcefully pulled PLAINTIFF toward him while pulling her bra upwards over her breasts.  RODRIGUEZ quickly lifted PLAINTIFF's shirt, exposing her bare chest, and grabbed both of her breasts with his hands.  RODRIGUEZ then shoved one hand into PLAINTIFF's pants, touched the outside of her bare vaginal area, and attempted to kiss her.

44.     Stunned, fearful, and afraid that RODRIGUEZ was attempting to rape her, PLAINTIFF turned her face in an effort to avoid RODRIGUEZ's lips, pulled his hand out of her pants, readjusted her clothing and quickly exited the bathroom.

45.     Shocked by RODRIGUEZ's actions and unable to process what had occurred, PLAINTIFF wandered into the kitchen in a daze while feeling extreme emotional distress, disgust, betrayal, panic, and fear.

46.     After a few minutes, PLAINTIFF went to the sliding glass door between the dining room and backyard patio and called her husband, John Doe, over.  As Mr. Doe entered the house, RODRIGUEZ met him and proceeded to help Mr. Doe take PLAINTIFF to the couple's bedroom.

47.     After RODRIGUEZ left the room, PLAINTIFF asked Mr. Doe to lock the door. The couple then went into their bathroom, where PLAINTIFF began throwing up and crying. PLAINTIFF told Mr. Doe that RODRIGUEZ had touched her in an offensive manner and asked, "why did he do that?"  In response, Mr. Doe told PLAINTIFF that he would, "kick [RODRIGUEZ] out right now," and that he did not care if he lost his job for doing so.

PLAINTIFF then begged Mr. Doe not to leave her, and not to say anything about the attack to RODRIGUEZ or anyone else.

48.   At that point, RODRIGUEZ began knocking on the couple's locked bedroom door and calling for Mr. Doe to come out of the room.  PLAINTIFF was still crying and asked Mr. Doe not to leave her side.  Although RODRIGUEZ continued to knock on the door and call for Mr. Doe, saying, "[Mr. Doe], come out I want to talk to you man," Mr. Doe did not leave the room and stayed with PLAINTIFF.

49.   PLAINTIFF was still sitting on the bathroom floor with Mr. Doe when she heard RODRIGUEZ loudly vomiting in the other bathroom.  Mr. Doe then helped PLAINTIFF into bed and she fell asleep.  Eventually, RODRIGUEZ left the couple's home when another TRIBE/Resort employee gave him a ride home.

50.   During a subsequent encounter with PLAINTIFF, RODRIGUEZ admitted that he had sexually assaulted PLAINTIFF in the manner described herein.   After acknowledging his offensive actions, RODRIGUEZ repeatedly stated, "it was a mistake" and told PLAINTIFF that he "was drunk" and "was in the moment," then claimed that he cared about her and Mr. Doe, and asserted "I've done a lot for you--I've helped you."

51.   On December 6, 2020, PLAINTIFF worked her last shift at the Resort and resigned her employment.

52.   On August 19, 2021, PLAINTIFF filed a complaint of discrimination regarding DEFENDANT TRIBE'S and RODRIGUEZ'S unlawful actions against her in violation of FEHA as alleged herein with the California Department of Fair Employment and Housing (hereinafter, "DFEH").  Effective August 19, 2021, DFEH issued PLAINTIFF a Notice of Case Closure giving PLAINTIFF the right to file a private lawsuit based on the allegations in the complaint of

discrimination.  On September 14, 2021, PLAINTIFF filed an amended complaint of discrimination which related back to the initial complaint filing date of August 19, 2021.

## FIRST CAUSE OF ACTION

### (Harassment on the Basis of Sex In Violation of FEHA [Govt. Code § 12940(j)(1)] Against All Defendants)

53.     PLAINTIFF re-alleges and incorporates herein Paragraphs 1 through 52 as though set forth in full.

54.     Defendants TRIBE, RODRIGUEZ, DOES 1-50, and/or their agents and/or employees, engaged in the wrongful actions described herein, with the intent of harassing PLAINTIFF in account of her sex in violation of Government Code § 12940(j)(1).

55.     The unwelcome harassment of PLAINTIFF by Defendants as described herein was based on PLAINTIFF's sex.  The harassment was severe and pervasive, altered the conditions of PLAINTIFF's employment, caused PLAINTIFF panic, fear and distress, and created a hostile, abusive, and intimidating working environment.

56.     THE TRIBE is strictly liable for the wrongful actions described herein committed by RODRIGUEZ because, at all times pertinent to PLAINTIFF's complaint, RODRIGUEZ was PLAINTIFF's supervisor.

57.     As a proximate result of Defendants' wrongful actions, PLAINTIFF has suffered humiliation, severe emotional distress, panic, harm to her personal and professional reputation, mental anguish, and physical and mental injury in an amount to be shown according to proof at trial.

58.     As a further proximate result of Defendants' harassment, PLAINTIFF has incurred, and will continue to incur, medical and related expenses in an amount to be shown according to proof at trial.

59.     Defendant RODRIGUEZ'S and DOES 1-50's wrongful actions as alleged herein were done with malice and oppression, were despicable, and were made in conscious disregard of PLAINTIFF's rights, well-being, safety, and professional and personal reputation, thereby supporting an award of punitive damages against RODRIGUEZ to PLAINTIFF.

**SECOND CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress Against Defendants RODRIGUEZ and DOES 1-50)**

60.     PLAINTIFF re-alleges and incorporates herein Paragraphs 1 through 52 as though set forth in full.

61.     In committing the wrongful actions described herein, RODRIGUEZ and DOES 1-50 acted intentionally and maliciously and for the purpose of causing PLAINTIFF to suffer humiliation, severe emotional distress, panic, harm to her personhood, personal and professional reputations, mental anguish, and emotional and physical injury.  Defendants committed such wrongful acts against PLAINTIFF with knowledge that her emotional and physical injury would thereby increase, and did so with a wanton and reckless disregard of the consequences to PLAINTIFF.

62.     As a proximate result of Defendants' wrongful actions against PLAINTIFF, PLAINTIFF has suffered humiliation, severe emotional distress, panic, harm to her personal and professional reputation, mental anguish, and emotional and physical injury in an amount to be shown according to proof at trial.

63.     As a further proximate result of Defendants' wrongful acts, PLAINTIFF has incurred, and will continue to incur, medical and related expenses in an amount to be shown according to proof at trial.

64.     Defendants' wrongful actions as alleged herein were done with malice and oppression, were despicable, and were made in conscious disregard of PLAINTIFF's rights and physical and emotional well-being, thereby supporting an award of punitive damages to PLAINTIFF.

**THIRD CAUSE OF ACTION**

**(Negligent Infliction of Emotional Distress Against Defendants RODRIGUEZ and DOES 1-50)**

65.     PLAINTIFF realleges and incorporates herein Paragraphs 1 through 52 as though set forth in full.

66.     RODRIGUEZ and DOES 1-50 knew, or should have known, that their offensive, abusive and other wrongful actions toward PLAINTIFF described herein would cause PLAINTIFF severe emotional distress.

67.     Defendants nonetheless failed to exercise due care in their actions toward PLAINTIFF and in their working relationship with PLAINTIFF, thereby giving rise to PLAINTIFF's claims of harm as alleged herein.

68.     As a proximate result of Defendants' wrongful actions against PLAINTIFF, PLAINTIFF has suffered humiliation, severe emotional distress, panic, harm to her personal and professional reputation, mental anguish, and emotional and physical injury in an amount to be shown according to proof at trial.

69.     As a further proximate result of Defendants' wrongful acts, PLAINTIFF has incurred, and will continue to incur, medical and related expenses in an amount to be shown according to proof at trial.

70.     Defendant RODRIGUEZ'S and DOES 1-50's wrongful actions as alleged herein were done with malice and oppression, were despicable, and were made in conscious disregard of PLAINTIFF's rights and physical and emotional well-being, thereby supporting an award of punitive damages to PLAINTIFF.

### FOURTH CAUSE OF ACTION

### (Assault and Battery Against Defendants RODRIGUEZ and DOES 1-50)

71.     PLAINTIFF realleges and incorporates herein Paragraphs 1 through 52 as though set forth in full.

72.     As described herein, RODRIGUEZ and DOES 1-50 committed acts which resulted in the imminent apprehension of harmful and offensive contact by PLAINTIFF, and in actual harmful and offensive contact with PLAINTIFF'S person, to which PLAINTIFF did not consent. This imminent apprehension of harmful and offensive contact, and the contact itself, constitute assault and battery which caused PLAINTIFF injury, damage, loss, and harm as alleged herein.

73.     As a proximate result of Defendants' wrongful actions against PLAINTIFF, PLAINTIFF has suffered humiliation, severe emotional distress, panic, harm to her personal and professional reputation, mental anguish, and emotional and physical injury in an amount to be shown according to proof at trial.

74.     As a further proximate result of Defendants' wrongful acts, PLAINTIFF has incurred, and will continue to incur, medical and related expenses in an amount to be shown according to proof at trial.

75.     Defendant RODRIGUEZ'S and DOES 1-50's wrongful actions as alleged herein were done with malice and oppression, were despicable, and were made in conscious disregard of PLAINTIFF's rights and physical and emotional well-being, thereby supporting an award of punitive damages to PLAINTIFF.

**FIFTH CAUSE OF ACTION**

**(Sexual Battery Against Defendants RODRIGUEZ and DOES 1-50)**

76.     PLAINTIFF realleges and incorporates herein Paragraphs 1 through 52 as though set forth in full.

77.     In violation of Civil Code section 1708.5, RODRIGUEZ and DOES 1-50 intentionally caused an offensive contact with one or more intimate parts of PLAINTIFF'S body, including PLAINTIFF'S breasts and vagina, to which PLAINTIFF did not consent.

78.     As a proximate result of RODRIGUEZ's wrongful actions against PLAINTIFF, PLAINTIFF has suffered humiliation, severe emotional distress, panic, harm to her personal and professional reputation, mental anguish, and emotional and physical injury in an amount to be shown according to proof at trial.

79.     As a further proximate result of Defendants' wrongful acts, PLAINTIFF has incurred, and will continue to incur, medical and related expenses in an amount to be shown according to proof at trial.

80.     Defendant RODRIGUEZ'S and DOES 1-50's wrongful actions   as alleged herein were done with malice and oppression, were despicable, and were made in conscious disregard of PLAINTIFF's rights and physical and emotional well-being, thereby supporting an award of punitive damages to PLAINTIFF.

///

WHEREFORE, PLAINTIFF prays for judgment against Defendants as follows:

1.      For general damages and special damages according to proof;

2.      For general, presumed and special damages based upon damage to PLAINTIFF's professional and personal reputation;

3.      For attorney's fees as provided under any applicable statutory or contractual basis, and costs of suit;

4.      For punitive damages against Defendant RODRIGUEZ and DOES 1-50 in an amount appropriate to punish them for their wrongful conduct and set an example for others; and

5.      For such other and further relief as the Court may deem just and proper.


DATE: November 2, 2021                    __/s/ Janean Acevedo Daniels ____
                                          Janean Acevedo Daniels,
                                          Attorney for PLAINTIFF
                                          JANE DOE

# Exhibit A

# TRIBAL-STATE COMPACT

# BETWEEN

# THE STATE OF CALIFORNIA

# AND THE

# SANTA YNEZ BAND

# OF

# MISSION INDIANS

# TABLE OF CONTENTS

PREAMBLE                                                                                          1

Sec. 1.0.      Purpose and Objectives.                                                            2

Sec. 2.0.      Definitions.                                                                       3

Sec. 3.0.      Scope of Class III Gaming Authorized.                                              8

Sec. 3.1.      Authorized Class III Gaming.                                                       8

Sec. 4.0.      Authorized Location of Gaming Facility, Number of Gaming
               Devices, Cost Reimbursement, and Mitigation.                                       9

Sec. 4.1.      Authorized Number of Gaming Devices.                                               9

Sec. 4.2.      Authorized Gaming Facility.                                                        9

Sec. 4.3.      Special Distribution Fund.                                                         10

Sec. 4.3.1.    Use of Special Distribution Funds.                                                 12

Sec. 4.4.      Cost Reimbursement and Mitigation to Local Governments.                            12

Sec. 4.5.      Quarterly Payments.                                                                13

Sec. 4.6.      Exclusivity.                                                                       16

Sec. 5.0.      Revenue Sharing With Non-Gaming and Limited-Gaming
               Tribes.                                                                            17

Sec. 5.1.      Definitions.                                                                       17

Sec. 5.2.      Payments to the Revenue Sharing Trust Fund or the Tribal
               Nation Grant Fund.                                                                 19

Sec. 5.3.      Provision for Credits Related to Payments Due Under
               Section 5.2.                                                                       21

Sec. 6.0.       Licensing.                                                    23

Sec. 6.1.    Gaming Ordinance and Regulations.                                23

Sec. 6.2.    Tribal Ownership, Management, and Control of Gaming
             Operation.                                                       24

Sec. 6.3.    Prohibitions Regarding Minors.                                   24

Sec. 6.4.    Licensing Requirements and Procedures.                           24

Sec. 6.4.1.  Summary of Licensing Principles.                                 24

Sec. 6.4.2.  Gaming Facility.                                                 25

Sec. 6.4.3.  Gaming Employees.                                                30

Sec. 6.4.4.  Gaming Resource Suppliers.                                       31

Sec. 6.4.5.  Financial Sources.                                              34

Sec. 6.4.6.  Processing Tribal Gaming License Applications.                   38

Sec. 6.4.7.  Suitability Standard Regarding Gaming Licenses.                  39

Sec. 6.4.8.  Background Investigations of Applicants.                         40

Sec. 6.4.9.  Temporary Licensing of Gaming Employees.                         42

Sec. 6.5.0.  Tribal Gaming License Issuance.                                  43

Sec. 6.5.1.  Denial, Suspension, or Revocation of Licenses.                   43

Sec. 6.5.2.  Renewal of Licenses; Extensions; Further Investigation.          44

Sec. 6.5.3.  Identification Cards.                                            45

Sec. 6.5.4.  Fees for Tribal Gaming License.                                  45

Sec. 6.5.5.    Suspension of Tribal Gaming License.                                    45

Sec. 6.5.6.    State Determination of Suitability Process.                             46

Sec. 6.6.      Submission of New Application.                                          49

Sec. 7.0.      Approval and Testing of Gaming Devices.                                 50

Sec. 7.1.      Gaming Device Approval.                                                 50

Sec. 7.2.      Gaming Test Laboratory Selection.                                       51

Sec. 7.3.      Maintenance of Records of Testing Compliance.                           52

Sec. 7.4.      State Gaming Agency Inspections.                                        52

Sec. 7.5.      Technical Standards.                                                    53

Sec. 7.6.      Transportation of Gaming Devices.                                       53

Sec. 8.0.      Inspections.                                                            54

Sec. 8.1.      Investigation and Sanctions.                                            54

Sec. 8.2.      Assistance by State Gaming Agency.                                      55

Sec. 8.3.      Access to Premises by State Gaming Agency; Notification;
               Inspections.                                                            55

Sec. 8.4.      Inspection, Copying and Confidentiality of Documents.                   56

Sec. 8.5.      NIGC Audit Reports.                                                     59

Sec. 8.6.      Cooperation with Tribal Gaming Agency.                                  59

Sec. 8.7.      Compact Compliance Review.                                              59

Sec. 9.0.      Rules and Regulations for the Operation and Management
               of the Gaming Operation and Facility.                    60

Sec. 9.1.      Adoption of Regulations for Operation and Management;
               Minimum Standards.                                        60

Sec. 9.1.1.    Minimum Internal Control Standards (MICS).                63

Sec. 9.2.      Program to Mitigate Problem Gambling.                     66

Sec. 9.3.      Enforcement of Regulations.                              68

Sec. 9.4.      State Civil and Criminal Jurisdiction.                   68

Sec. 9.5.      Tribal Gaming Agency Members.                            68

Sec. 9.6.      Uniform Tribal Gaming Regulations.                       72

Sec. 10.0.     Patron Disputes.                                         73

Sec. 11.0.     Off-Reservation Environmental and Economic Impacts.      76

Sec. 11.1.     Tribal Environmental Impact Report.                      76

Sec. 11.2.     Notice of Preparation of Draft TEIR.                     79

Sec. 11.3.     Notice of Completion of Draft TEIR.                      79

Sec. 11.4.     Issuance of Final TEIR.                                  81

Sec. 11.5.     Cost Reimbursement to County.                           81

Sec. 11.6.     Failure to Prepare Adequate TEIR.                       81

Sec. 11.7.     Intergovernmental Agreement.                             81

Sec. 11.8.     Arbitration.                                            83

Sec. 12.0.    Public and Workplace Health, Safety, and Liability.                85

Sec. 12.1.    General Requirements.                                              85

Sec. 12.2.    Tobacco Smoke.                                                     85

Sec. 12.3.    Health and Safety Standards.                                       85

Sec. 12.4.    Tribal Gaming Facility Standards Ordinance.                        94

Sec. 12.5.    Insurance Coverage and Claims.                                     94

Sec. 12.6.    Participation in State Statutory Programs Related to
              Employment.                                                        99

Sec. 12.7.    Emergency Services Accessibility.                                  101

Sec. 12.8.    Alcoholic Beverage Service.                                        102

Sec. 12.9.    Possession of Firearms.                                            102

Sec. 12.10.   Labor Relations.                                                   102

Sec. 13.0.    Dispute Resolution Provisions.                                     102

Sec. 13.1.    Voluntary Resolution; Court Resolution.                            102

Sec. 13.2.    Arbitration Rules.                                                 104

Sec. 13.3.    No Waiver or Preclusion of Other Means of Dispute
              Resolution.                                                        104

Sec. 13.4.    Limited Waiver of Sovereign Immunity.                              105

Sec. 14.0.    Effective Date and Term of Compact.                               106

Sec. 14.1.    Effective Date.                                                    106

Sec. 14.2.    Term of Compact; Termination.                                      106

Sec. 15.0.    Amendments; Renegotiations.                                    107

Sec. 15.1.    Amendment by Agreement.                                        107

Sec. 15.2.    Negotiations for a New Compact.                                107

Sec. 15.3     Requests to Amend or to Negotiate a New Compact.               107

Sec. 16.0.    Notices.                                                       108

Sec. 17.0.    Changes to IGRA.                                               108

Sec. 18.0.    Miscellaneous.                                                 108

Sec. 18.1.    Third-Party Beneficiaries.                                     108

Sec. 18.2.    Complete Agreement.                                           109

Sec. 18.3.    Construction.                                                  109

Sec. 18.4.    Successor Provisions.                                          109

Sec. 18.5.    Ordinances and Regulations.                                    109

Sec. 18.6.    Calculation of Time.                                           109

Sec. 18.7.    Not a Model Compact.                                           110

Sec. 18.8.    Representations.                                               110

APPENDICES

   A.    Legal Description and Map of Santa Ynez Indian Reservation   A-1

   B.    Off-Reservation Environmental Impact Analysis Checklist      B-1

   C.    Tribal Labor Relations Ordinance                            C-1

   D.    Minimum Internal Control Standards                          D-1

# TRIBAL-STATE COMPACT
## BETWEEN THE STATE OF CALIFORNIA AND THE
## SANTA YNEZ BAND OF MISSION INDIANS

Santa Ynez Band of Mission Indians (Tribe), a federally recognized Indian tribe listed in the Federal Register as the Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California, and the State of California (State) enter into this tribal-state class III gaming compact pursuant to the Indian Gaming Regulatory Act of 1988 (IGRA).

## PREAMBLE

WHEREAS, the Tribe's current reservation was established prior to 1988, establishing a permanent home for the Tribe in Santa Barbara County, California; and

WHEREAS, in 1999, the Tribe and the State entered into the Tribal-State Compact Between the State of California and the Santa Ynez Band of Chumash Indians (1999 Compact), which enabled the Tribe, through revenues generated by its Gaming Operation, to improve the governance, environment, education, health, safety, and general welfare of its citizens, and to promote a strong tribal government, self-sufficiency, and the provide essential government services to its citizens; and

WHEREAS, the Tribe is committed to improving the environment, education status, and the health, safety and general welfare of its members and local residents; and

WHEREAS, the State and the Tribe recognize that the exclusive rights that the Tribe will enjoy under this Tribal-State Compact Between the State of California and the Santa Ynez Band of Mission Indians (Compact) create a unique opportunity for the Tribe to operate a Gaming Facility in an economic environment free of competition from the operation of slot machines and banked card games on non-Indian lands in California and that this unique economic environment is of great value to the Tribe; and

WHEREAS, in consideration of the exclusive rights enjoyed by the Tribe to engage in the Gaming Activities and to operate the number of Gaming Devices specified herein, and the other meaningful concessions offered by

1

the State in good faith negotiations, and pursuant to IGRA, the Tribe reaffirms its commitment, inter alia, to provide to the State, on a sovereign-to-sovereign basis, and to local jurisdictions, fair cost reimbursement and mitigation from revenues from the Gaming Devices operated pursuant to this Compact on a payment schedule; and

WHEREAS, the Tribe and the State share an interest in mitigating the off-reservation impacts of the Gaming Facility, affording meaningful consumer and employee protections in connection with the operations of the Gaming Facility, fairly regulating the Gaming Activities conducted at the Gaming Facility, and fostering a good-neighbor relationship; and

WHEREAS, the Tribe and the State share a joint sovereign interest in ensuring that Gaming Activities are free from criminal and other undesirable elements; and

WHEREAS, this Compact will afford the Tribe primary responsibility over the regulation of its Gaming Facility and will enhance the Tribe's economic development and self-sufficiency; and

WHEREAS, the State and the Tribe have therefore concluded that this Compact protects the interests of the Tribe and its members, the surrounding community, and the California public, and will promote and secure long-term stability, mutual respect, and mutual benefits; and

WHEREAS, the State and the Tribe agree that all terms of this Compact are intended to be binding and enforceable;

NOW, THEREFORE, the Tribe and the State agree as set forth herein:

## SECTION 1.0.  PURPOSES AND OBJECTIVES.

The terms of this Compact are designed and intended to:

(a)     Evidence the goodwill and cooperation of the Tribe and State in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the parties.

(b)     Enhance and implement a means of regulating Class III Gaming to ensure its fair and honest operation in a way that protects the

2

interests of the Tribe, the State, its citizens, and local communities in accordance with IGRA, and through that regulated Class III Gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and its governmental services and programs.

(c)     Promote ethical practices in conjunction with Class III Gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Gaming Operation, protect against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming, and protect the patrons and employees of the Gaming Operation and the local communities.

(d)     Achieve the objectives set forth in the preamble.

## SECTION 2.0.  DEFINITIONS.

**Sec. 2.1.**  "Applicable Codes" means the California Building Code and the California Public Safety Code applicable to the County, as set forth in titles 19 and 24 of the California Code of Regulations, as those regulations may be amended during the term of this Compact, including, but not limited to, codes for building, electrical, energy, mechanical, plumbing, fire and safety.

**Sec. 2.2.**  "Applicant" means an individual or entity that applies for a tribal gaming license or for a State Gaming Agency determination of suitability.

**Sec. 2.3.**  "Association" means an association of California tribal and state gaming regulators, the membership of which comprises up to two (2) representatives from each tribal gaming agency of those tribes with whom the State has a gaming compact under IGRA, and up to two (2) delegates each from the state Department of Justice, Bureau of Gambling Control and the California Gambling Control Commission.

**Sec. 2.4**     "Class III Gaming" means the forms of class III gaming defined in 25 U.S.C. § 2703(8) and by the regulations of the National Indian Gaming Commission.

**Sec. 2.5**.  "Commission" means the California Gambling Control Commission, or any successor agency of the State.

**Sec. 2.6.**  "Compact" means this Tribal-State Compact Between the State of California and the Santa Ynez Band of Mission Indians.

**Sec. 2.7.**  "County" means the County of Santa Barbara, California, a political subdivision of the State.

**Sec. 2.8.**  "Financial Source" means any person or entity who, directly or indirectly, extends financing in connection with the Tribe's Gaming Facility or Gaming Operation.

**Sec. 2.9.**  "Gaming Activity" or "Gaming Activities" means the Class III Gaming activities authorized under this Compact.

**Sec. 2.10.**  "Gaming Device" means any slot machine within the meaning of article IV, section 19, subdivision (f) of the California Constitution.  For purposes of calculating the number of Gaming Devices, each player station or terminal on which a game is played constitutes a separate Gaming Device, irrespective of whether it is part of an interconnected system to such terminals or stations.  "Gaming Device" includes, but is not limited to, video poker, but does not include electronic, computer, or other technological aids that qualify as class II gaming (as defined under IGRA).

**Sec. 2.11.**  "Gaming Employee" means any natural person who (a) conducts, operates, maintains, repairs, accounts for, or assists in any Gaming Activities, or is in any way responsible for supervising such Gaming Activities or persons who conduct, operate, maintain, repair, account for, assist, or supervise any such Gaming Activities, (b) is in a category under federal or tribal gaming law requiring licensing, (c) is an employee of the Tribal Gaming Agency with access to confidential information, or (d) is a person whose employment duties require or authorize access to areas of the Gaming Facility in which Gaming Activities are conducted that are not open to the public.

**Sec. 2.12.**   "Gaming Facility" or "Facility" means any building in which Class III Gaming Activities or Gaming Operations occur, or in which the business records, receipts, or funds of the Gaming Operation are maintained (but excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, buildings, and areas, including hotels, parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation rather than providing that operation with an incidental benefit, provided that nothing herein prevents the conduct of class II gaming (as defined under IGRA) therein.

**Sec. 2.13.**   "Gaming Operation" means the business enterprise that offers and operates Gaming Activities, whether exclusively or otherwise.

**Sec. 2.14.**   "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Gaming Activities on the Tribe's Indian lands in California and approved under IGRA.

**Sec. 2.15.**   "Gaming Resources" means any goods or services provided or used in connection with Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, Gaming Devices and ancillary equipment, implements of Gaming Activities such as playing cards, furniture designed primarily for Gaming Activities, maintenance or security equipment and services, and Class III Gaming consulting services.  "Gaming Resources" does not include professional accounting and legal services.

**Sec. 2.16.**   "Gaming Resource Supplier" means any person or entity who, directly or indirectly, does, or is deemed likely to, manufacture, distribute, supply, vend, lease, purvey, or otherwise provide, to the Gaming Operation or Gaming Facility, at least twenty-five thousand dollars ($25,000) in Gaming Resources in any twelve (12)-month period, or who, directly or indirectly, receives, or is deemed likely to receive, in connection with the Gaming Operation or Gaming Facility, at least twenty-five thousand dollars ($25,000) in any consecutive twelve (12)-month period, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if, but for the purveyance, the purveyor is not otherwise a Gaming Resource Supplier as defined herein, the compensation received by the purveyor is not grossly

5

disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gaming Operation.

**Sec. 2.17.** "IGRA" means the Indian Gaming Regulatory Act of 1988 (PL 100-497, 18 U.S.C. §§ 1166-1168 and 25 U.S.C. § 2701 et seq.), and any amendments thereto, as interpreted by all regulations promulgated thereunder.

**Sec. 2.18.** "Interested Persons" means (a) all local, state, and federal agencies, which, if a Project were not taking place on Indian lands, would have responsibility for approving the Project or would exercise authority over the natural resources that may be affected by the Project, (b) any incorporated city within eight (8) miles of the Project, and (c) persons, groups, or agencies that request in writing a notice of preparation of a draft tribal environmental impact report described in section 11.0, or have commented on the Project in writing to the Tribe or the County.

**Sec. 2.19.** "Management Contractor" means any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

**Sec. 2.20.** "Net Win" means drop from Gaming Devices, plus the redemption value of expired tickets, less fills, less payouts, less that portion of the Gaming Operation's payments to a third-party wide-area progressive jackpot system provider that is contributed only to the progressive jackpot amount.

**Sec. 2.21.** "NIGC" means the National Indian Gaming Commission.

**Sec. 2.22.** "Project" means (a) the construction of a proposed Gaming Facility, or (b) any renovation, expansion or modification of an existing Gaming Facility, a principal purpose of which is to serve the Gaming Facility rather than provide that Facility with an incidental benefit and which may cause a Significant Effect on the Off-Reservation Environment, or (c) any other activity occurring on the reservation, the principal purpose of which is to serve the Gaming Activities or Gaming Operation rather than provide that operation with an incidental benefit and which may cause a Significant Effect on the Off-Reservation Environment.  This definition shall

be understood to include the addition of Gaming Devices within an existing Gaming Facility if such additional Gaming Devices may cause either a direct or reasonably foreseeable indirect significant and adverse physical change in the off-reservation environment and the impacts of which have not previously been addressed in a tribal environmental impact report described in section 11.0 or an environmental evaluation/assessment under a previous compact.  For purposes of this definition, section 11.0, and Appendix B, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States.

Sec. 2.23.  "Significant Effect(s) on the Off-Reservation Environment" is the same as "Significant Effect(s) on the Environment" and occur(s) if any of the following conditions exist:

(a)    A proposed Project has the potential to degrade the quality of the off-reservation environment, curtail the range of the environment, or achieve short-term, to the disadvantage of long-term, environmental goals.

(b)    The possible effects of a Project on the off-reservation environment are individually limited but cumulatively considerable.  As used herein, "cumulatively considerable" means that the incremental effects of an individual Project are considerable when viewed in connection with the effects of past Projects, the effects of other current Projects, and the effects of probable future Projects.

(c)    The off-reservation environmental effects of a Project will cause substantial adverse effects on human beings, either directly or indirectly.

For purposes of this definition, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States.

Sec. 2.24.  "State" means the State of California or an authorized official or agency thereof designated by this Compact or by the Governor.

Sec. 2.25.  "State Gaming Agency" means the entities authorized to investigate, approve, regulate and license gaming pursuant to the Gambling

Control Act (chapter 5 (commencing with section 19800) of division 8 of the California Business and Professions Code), or any successor statutory scheme, and any entity or entities in which that authority may hereafter be vested.

**Sec. 2.26.** "State Designated Agency" means the entity or entities designated or to be designated by the Governor to exercise rights and fulfill responsibilities established by this Compact.

**Sec. 27.** "Tribe" means the Santa Ynez Band of Mission Indians, a federally recognized Indian tribe listed in the Federal Register as the Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California, or an authorized official or agency thereof.

**Sec. 2.28.** "Tribal Chair" means the person duly elected under the Tribe's constitution to perform the duties specified therein, including serving as the Tribe's official representative.

**Sec. 2.29.** "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill those functions by the NIGC, primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribe's Gaming Ordinance. No person employed in, or in connection with, the management, supervision, or conduct of any Gaming Activity may be a member or employee of the Tribal Gaming Agency.

## SECTION 3.0.  SCOPE OF CLASS III GAMING AUTHORIZED.

**Sec. 3.1.  Authorized Class III Gaming.**

(a)     The Tribe is hereby authorized and permitted to operate only the following Gaming Activities under the terms and conditions set forth in the Compact:

   (1)     Gaming Devices.

   (2)     Any banking or percentage card games.

(3)     Any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state not affiliated with or licensed by the California State Lottery are permitted to do so under state and federal law.

(b)     Nothing herein shall be construed to preclude the Tribe from offering class II gaming or preclude the negotiation of a separate compact governing the conduct of off-track wagering at the Tribe's Gaming Facility

(c)     Nothing herein shall be construed to authorize or permit the operation of any Class III Gaming that the State lacks the power to authorize or permit under article IV, section 19, subdivision (f), of the California State Constitution.  This includes, but is not limited to, the operation of the game known as roulette, whether or not played with or on a mechanical, electro-mechanical, electrical, or video device, or cards, or any combination of such devices.

(d)     The Tribe shall not engage in Class III Gaming that is not expressly authorized in this Compact.

## SECTION 4.0.  AUTHORIZED LOCATION OF GAMING FACILITY, NUMBER OF GAMING DEVICES, COST REIMBURSEMENT, AND MITIGATION.

### Sec. 4.1.  Authorized Number of Gaming Devices.

The Tribe is entitled to operate up to a total of two thousand five hundred (2500) Gaming Devices pursuant to the conditions set forth in section 3.1 and sections 4.2 through and including section 5.2.

### Sec. 4.2.  Authorized Gaming Facility.

The Tribe may establish and operate not more than two (2) Gaming Facilities, and only on those Indian lands located within the boundaries of the Tribe's reservation as those boundaries exist as of the execution date of this Compact, as legally described in and represented on the map at

9

Appendix A, and on which Class III Gaming may lawfully be conducted under IGRA.  If the Tribe chooses to operate more than one (1) Gaming Facility, then one (1) of the two (2) Gaming Facilities shall have no more than five hundred (500) Gaming Devices and shall have a primary purpose other than gaming authorized under IGRA.

### Sec. 4.3.  Special Distribution Fund.

The Tribe shall pay to the State on a pro rata basis the actual and reasonable 25 U.S.C. § 2710(d)(3)(C) costs the State incurs for the performance of all its duties under this Compact as determined by the monies appropriated in the annual Budget Act for the performance of their duties under Class III Gaming compacts each fiscal year for the Commission, the California Department of Justice, the Office of the Governor, the California Department of Public Health Programs, Office of Problem Gambling, the State Controller, the Department of Human Resources, and the Financial Information System for California, or any agency or agencies the State designates as a successor to them (Appropriation).  The Appropriation and the maximum number of Gaming Devices operated by all federally recognized tribes in California pursuant to tribal-state Class III Gaming compacts determined to be in operation during the previous State fiscal year shall be reported annually by the State Gaming Agency to the Tribe on December 15.  The term "operated" or "operation" as used in this Compact in relation to Gaming Devices describes each and every Gaming Device available to patrons (including slot contestants) for play at any given time.  The Tribe's pro rata share of the State's 25 U.S.C. § 2710(d)(3)(C) regulatory costs in any given year this Compact is in effect shall be calculated by the following equation:

> The maximum number of Gaming Devices operated in the Tribe's Gaming Facility during the previous State fiscal year as determined by the State Gaming Agency, divided by the maximum number of Gaming Devices operated by all federally recognized tribes in California pursuant to tribal-state Class III Gaming compacts during the previous State fiscal year, multiplied by the Appropriation, equals the Tribe's pro rata share.

> (a)     Beginning the first full quarter after Class III Gaming commences under this Compact, the Tribe shall pay its pro rata

10

share to the State Gaming Agency for deposit into the Indian Gaming Special Distribution Fund established by the Legislature (Special Distribution Fund).  The payment shall be made in four (4) equal quarterly installments due on the thirtieth (30th) day following the end of each calendar quarter, (i.e., by April 30 for the first quarter, July 30 for the second quarter, October 30 for the third quarter, and January 30 for the fourth quarter); provided, however, that in the event this Compact becomes effective during a calendar quarter, payment shall be prorated for the number of days remaining in that initial quarter, in addition to any remaining full quarters in the first calendar year of operation to obtain a full year of full quarterly payments of the Tribe's pro rata share specified above.  A payment year will run from January through December.  If any portion of the Tribe's quarterly pro rata share payment is overdue, the Tribe shall pay to the State for purposes of deposit into the appropriate fund, the amount overdue plus interest accrued thereon at the rate of one percent (1%) per month or the maximum rate permitted by state law for delinquent payments owed to the State, whichever is less.  All quarterly payments shall be accompanied by the Quarterly Contribution Report specified in section 4.5, subdivision (b).

(b)     If the Tribe objects to the State's determination of the Tribe's pro rata share, or to the amount of the Appropriation as including matters not consistent with IGRA, the matter shall be resolved in accordance with the dispute resolution provisions of section 13.0.  Any State determination of the Tribe's pro rata share challenged by the Tribe shall govern and must be paid by the Tribe to the State when due, and the Tribe's payment is a condition precedent to invoking the section 13.0 dispute resolution provisions; provided, however, that any such increase in the Tribe's pro rata share, or to the amount of the Appropriation shall not increase more than three percent (3%) from year to year.

(c)     The foregoing payments have been negotiated between the parties as a fair and reasonable contribution, based upon the State's costs of regulating and mitigating certain impacts of

11

tribal Class III Gaming Activities, as well as the Tribe's market conditions, its circumstances, and the rights afforded and consideration provided by this Compact.

### Sec. 4.3.1.  Use of Special Distribution Funds.

Revenue placed in the Special Distribution Fund shall be available for appropriation by the Legislature for the following purposes:

(a)     Grants, including any administrative costs, for programs designed to address and treat gambling addiction;

(b)     Grants, including any administrative costs and environmental review costs, for the support of State and local government agencies impacted by tribal government gaming;

(c)     Compensation for regulatory costs incurred by the State including, but not limited to, the State Gaming Agency, the State Department of Justice, and State Designated Agencies in connection with the implementation and administration of Class III Gaming compacts in California; and

(d)     Any other purposes specified by the Legislature that are consistent with IGRA.

### Sec. 4.4.  Cost Reimbursement and Mitigation to Local Governments.

The Tribe shall enter into agreements with local jurisdictions or state agencies, as appropriate, for such undertakings and services that mitigate the impacts of the Gaming Facility, further the purposes of section 5.3, and thereby benefit the Gaming Facility, the Tribe, or other affected jurisdictions.  Copies of all such agreements shall be provided to the State. The agreements with local jurisdictions or state agencies, as appropriate, required by this section are distinct from those agreements associated with a specific Project and required by section 11.0.

12

### Sec. 4.5.  Quarterly Payments.

(a)  (1)  The Tribe shall remit quarterly to the State Gaming Agency (i) the payments described in section 4.3, for deposit into the Special Distribution Fund and (ii) the payments described in section 5.2, for deposit into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.

(2)  If the Gaming Activities authorized by this Compact commence during a calendar quarter, the first payment shall be due on the thirtieth (30th) day following the end of the first full quarter of the Gaming Activities and shall cover the period from the commencement of the Gaming Activities to the end of the first full calendar quarter.

(3)  All quarterly payments shall be accompanied by the certification specified in subdivision (b).

(b)  At the time each quarterly payment is due, regardless of whether any monies are owed, the Tribe shall submit to the State Gaming Agency a certification (the "Quarterly Contribution Report") that specifies the following:

(1)  calculation of the maximum number of Gaming Devices operated in the Gaming Facility for each day during the given quarter;

(2)  the Net Win calculation reflecting the quarterly Net Win from the operation of all Gaming Devices in the Facility;

(3)  the amount due pursuant to section 4.3;

(4)  calculation of the amount due pursuant to section 5.2; and

(5)  the total amount of the quarterly payment paid to the State.

13

The Quarterly Contribution Report shall be prepared by the chief financial officer of the Gaming Operation.

(c)   (l)   At any time after the fourth quarter, but in no event later than April 30 of the following calendar year, the Tribe shall provide to the State Gaming Agency an audited annual certification of its Net Win calculation from the operation of Gaming Devices.  The audit shall be conducted in accordance with generally accepted auditing standards, as applied to audits for the gaming industry, by an independent certified public accountant who is not employed by the Tribe, the Tribal Gaming Agency, the Management Contractor, or the Gaming Operation, is only otherwise retained by any of these entities to conduct regulatory audits or independent audits of the Gaming Operation, and has no financial interest in any of these entities.  The auditor used by the Tribe for this purpose shall be approved by the State Gaming Agency, or other State Designated Agency, but the State shall not unreasonably withhold its consent.

(2)   If the audit shows that the Tribe made an overpayment from its Net Win to the State during the year covered by the audit, the Tribe's next quarterly payment may be reduced by the amount of the overage.  If the audit shows that the Tribe made an underpayment to the State during the year covered by the audit, the Tribe's next quarterly payment shall be increased by the amount of the underpayment.

(3)   The State Gaming Agency shall be authorized to confer with the auditor at the conclusion of the audit process and to review all of the independent certified public accountant's final work papers and documentation relating to the audit.  The Tribal Gaming Agency shall be notified of and provided the opportunity to participate in and attend any such conference or document review.

(d)   The State Gaming Agency may audit the calculations in subdivision (b) and Net Win calculations specified in the audit

14

provided pursuant to subdivision (c). The State Gaming Agency shall have access to all records deemed necessary by the State Gaming Agency to verify the calculations in subdivision (b) and Net Win calculations, including access to the Gaming Device accounting systems and server-based systems and software, and to the data contained therein on a read only basis. If the State Gaming Agency determines that the Net Win is understated or the deductions overstated, it will promptly notify the Tribe and provide a copy of the audit. The Tribe within twenty (20) days will either accept the difference or provide a reconciliation satisfactory to the State Gaming Agency. If the Tribe accepts the difference or does not provide a reconciliation satisfactory to the State Gaming Agency, the Tribe must immediately pay the amount of the resulting deficiency, plus accrued interest thereon at the rate of one percent (1%) per month or the maximum rate permitted by state law for delinquent payments owed to the State, whichever is less. If the Tribe does not accept the difference but does not provide a reconciliation satisfactory to the State Gaming Agency, the Tribe, once payment is made, may commence dispute resolution under section 13.0. The parties expressly acknowledge that the certifications provided for in subdivision (b) are subject to section 8.4, subdivision (h).

(e)     Notwithstanding anything to the contrary in section 13.0, any failure of the Tribe to remit the payments referenced in subdivision (a), will entitle the State to immediately seek injunctive relief in federal or state court, at the State's election, to compel the payments, plus accrued interest thereon at the rate of one percent (1%) per month, or the maximum rate permitted by State law for delinquent payments owed to the State, whichever is less; and further, the Tribe expressly consents to be sued in either court and waives its right to assert sovereign immunity against the State in any such proceeding. Failure to make timely payment shall be deemed a material breach of this Compact.

(f)     If any portion of the payments under subdivision (a) of this section is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an

opportunity to cure of at least fifteen (15) business days, and if more than sixty (60) calendar days have passed from the due date, then the Tribe shall cease operating all of its Gaming Devices until full payment is made.

**Sec. 4.6.  Exclusivity.**

In recognition of the Tribe's agreement to make the payments specified in sections 4.3 and 5.2, the Tribe shall have the following rights:

(a)　In the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a State statute or constitutional provision, or the conclusive and dispositive judicial construction of a statute or the State Constitution by a California appellate court after the effective date of this Compact that Gaming Devices may lawfully be operated by another person, organization, or entity (other than an Indian tribe) within California, the Tribe shall have the right to exercise one of the following options:

(1)　Terminate this Compact, in which case the Tribe will lose the right to operate Gaming Devices and other Class III Gaming authorized by this Compact; or

(2)　Continue under this Compact with an entitlement to a reduction of the rates specified in section 5.2 following the conclusion of negotiations, to provide for:  (A) compensation to the State for the costs of regulation, as set forth in section 4.3; (B) reasonable payments to local governments impacted by tribal government gaming, the amount to be determined based upon any intergovernmental agreement entered into pursuant to sections 4.4 or 11.7; (C) grants for programs designed to address and treat gambling addiction; and (D) such assessments as authorized at such time under federal law. Such negotiations shall commence within thirty (30) days after receipt of a written request by a party to enter into negotiations, unless both parties agree in writing to an extension of time.  If the Tribe and the State fail to reach

16

agreement on the amount of reduction of such payments within sixty (60) days following commencement of the negotiations specified in this section, the amount shall be determined by arbitration pursuant to section 13.2.

(b)     Nothing in this section is intended to preclude the California State Lottery from offering any lottery games or devices that are currently or may hereafter be authorized by state law.

## SECTION 5.0.  REVENUE SHARING WITH NON-GAMING AND LIMITED-GAMING TRIBES.

### Sec. 5.1.  Definitions.

For purposes of this section 5.0, the following definitions apply:

(a)     The "Revenue Sharing Trust Fund" is a fund created by the Legislature and administered by the State Gaming Agency that, as limited trustee, is not a trustee subject to the duties and liabilities contained in the California Probate Code, similar state or federal statutes, rules or regulations, or under state or federal common law or equitable principles, and has no duties, responsibilities, or obligations hereunder except for the receipt, deposit, and distribution of monies paid by gaming tribes for the benefit of Non-Gaming Tribes and Limited-Gaming Tribes. The State Gaming Agency shall allocate and disburse the Revenue Sharing Trust Fund monies on a quarterly basis as specified by the Legislature.  Each eligible Non-Gaming Tribe and Limited-Gaming Tribe in the State shall receive the sum of one million one hundred thousand dollars ($1,100,000) per year from the Revenue Sharing Trust Fund.  In the event there are insufficient monies in the Revenue Sharing Trust Fund to pay one million one hundred thousand dollars ($1,100,000) per year to each eligible Non-Gaming Tribe and Limited-Gaming Tribe, any available monies in that fund shall be distributed to eligible Non-Gaming Tribes and Limited-Gaming Tribes in equal shares.  Monies deposited into the Revenue Sharing Trust Fund in excess of the amount necessary to distribute one million one hundred thousand dollars ($1,100,000) to each eligible Non-Gaming Tribe and Limited-Gaming Tribe shall remain in the

Revenue Sharing Trust Fund available for disbursement in future years and shall not be diverted to any non-Revenue Sharing Trust Fund or any non-Tribal Nation Grant Fund use or purpose.  In no event shall the State's general fund be obligated to make up any shortfall in the Revenue Sharing Trust Fund or to pay any unpaid claims connected therewith, and, notwithstanding any provision of law, including any existing provision of law implementing the State Gaming Agency's obligations related to the Revenue Sharing Trust Fund under any Class III Gaming compact, Non-Gaming Tribes and Limited-Gaming Tribes are not third-party beneficiaries of this Compact and shall have no right to seek any judicial order compelling disbursement of any Revenue Sharing Trust Fund monies to them.

(b)     The "Tribal Nation Grant Fund" is a fund created by the Legislature to make discretionary distribution of funds to Non-Gaming Tribes and Limited-Gaming Tribes upon application of such tribes for purposes related to effective self-governance, self-determined community, and economic development.  The fiscal operations of the Tribal Nation Grant Fund are administered by the State Gaming Agency, which acts as a limited trustee, not subject to the duties and liabilities contained in the California Probate Code, similar state or federal statutes, rules or regulations, or under state or federal common law or equitable principles, and with no duties or obligations hereunder except for the receipt, deposit, and distribution of monies paid by gaming tribes for the benefit of Non-Gaming Tribes and Limited-Gaming Tribes, as those payments are directed by a State Designated Agency.  The State Gaming Agency shall allocate and disburse the Tribal Nation Grant Fund monies as specified by a State Designated Agency to one or more eligible Non-Gaming and Limited-Gaming Tribes upon a competitive application basis.  The State Gaming Agency shall exercise no discretion or control over, nor bear any responsibility arising from, the recipient tribes' use or disbursement of Tribal Nation Grant Fund monies.  The State Designated Agency shall perform any necessary audits to ensure that monies awarded to any tribe are being used in accordance with their disbursement in relation to the purpose of

18

the Tribal Nation Grant Fund.  In no event shall the State's general fund be obligated to pay any monies into the Tribal Nation Grant Fund or to pay any unpaid claims connected therewith, and, notwithstanding any provision of law, including any existing provision of law implementing the State's obligations related to the Tribal Nation Grant Fund or the Revenue Sharing Trust Fund under any Class III Gaming compact, Non-Gaming Tribes and Limited-Gaming Tribes are not third-party beneficiaries of this Compact and shall have no right to seek any judicial order compelling disbursement of any Tribal Nation Grant Fund monies to them.

(c)     A "Non-Gaming Tribe" is a federally recognized tribe in California, with or without a tribal-state Class III Gaming compact, that has not engaged in, or offered, class II gaming or Class III Gaming in any location whether within or without California, as of the date of distribution to such tribe from the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund, or during the immediately preceding three hundred sixty-five (365) days.

(d)     A "Limited-Gaming Tribe" is a federally recognized tribe in California that has a Class III Gaming compact with the State but is operating fewer than a combined total of three hundred fifty (350) Gaming Devices in all of its gaming operations wherever located, or does not have a Class III Gaming compact but is engaged in class II gaming, whether within or without California, during the immediately preceding three hundred sixty-five (365) days.

**Sec. 5.2.  Payments to the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.**

(a)     If the Tribe operates more than three hundred fifty (350) Gaming Devices at any time in a given calendar year, it shall thereafter, including that calendar year, pay to the State Gaming Agency, for deposit into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund, six percent (6%) of its Net Win from the operation of Gaming Devices in excess of three hundred fifty (350).

19

(b)     The Tribe shall remit the payments referenced in subdivision (a) to the State Gaming Agency in quarterly payments, which payments shall be due thirty (30) days following the end of each calendar quarter (i.e., by April 30 for the first quarter, July 30 for the second quarter, October 30 for the third quarter, and January 30 for the fourth quarter).

(c)     The quarterly payments referenced in subdivision (b) required by subdivision (a) and (b), as appropriate, shall be determined by first determining the total number of all Gaming Devices operated by the Tribe during a given quarter (Quarterly Device Base).  The Quarterly Device Base is equal to the sum total of the maximum number of Gaming Devices in operation for each day of the calendar quarter divided by the number of days in the calendar quarter that the Gaming Operation operates any Gaming Devices during the given calendar quarter.

(d)     If any portion of the payments under subdivision (b) is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure of at least fifteen (15) business days, and if more than sixty (60) calendar days have passed from the due date, then the Tribe shall cease operating all of its Gaming Devices until full payment is made.

(e)     All payments made by the Tribe to the State Gaming Agency pursuant to subdivision (b) shall be deposited into the Revenue Sharing Trust Fund and the Tribal Nation Grant Fund in a proportion to be determined by the Legislature, provided that if there are insufficient monies in the Revenue Sharing Trust Fund to pay one million one hundred thousand dollars ($1,100,000) per year to each eligible Non-Gaming Tribe and Limited-Gaming Tribe, the State Gaming Agency shall deposit all payments into the Revenue Sharing Trust Fund.

(f)     Either party may request a reopening of negotiations, limited exclusively to section 5.2, subdivision (a), if the balance of funds within the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund either exceeds or falls short of the amount

reasonably required to meet the long-term obligations of either fund.  Neither party is obligated to accept a request to reopen negotiations under this subdivision and either party may decline the request for any reason.

Notwithstanding any other provision of this Compact, in no event shall the State's general fund be obligated to make up any shortfall in the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund or to pay any unpaid claims connected therewith.  Notwithstanding any provision of law, including any existing provision of law implementing the State Gaming Agency's obligations related to the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund under any Class III Gaming compact, Non-Gaming Tribes and Limited-Gaming Tribes are not third-party beneficiaries of this Compact and shall have no right to seek any judicial order compelling negotiation under this subdivision or disbursement of any Revenue Sharing Trust Fund or Tribal Nation Grant Fund monies to them.

**Sec. 5.3.  Provision for Credits Related to Payments Due Under Section 5.2.**

Notwithstanding anything to the contrary in section 5.2, the State agrees to provide the Tribe with annual credits for up to sixty percent (60%) of the payments otherwise due under section 5.2 for the following:

(a)     Payments by the Tribe to the County and local jurisdictions operating facilities or providing services within the County for purposes of improved fire, law enforcement, public transit, education, tourism, and other services and infrastructure improvements intended to include serving off-reservation needs of County residents, and not otherwise required by section 11.0.  Such payments shall be subject to approval by the State or State Designated Agency.  At least twenty percent (20%) of the annual credits authorized by this section 5.3 shall be utilized for the purposes described in this subdivision (a);

(b)     Non-gaming related capital investments and economic development projects by the Tribe on or off tribal trust lands that the State or State Designated Agency agrees provides mutual benefits to the Tribe and the State because, for instance,

21

they have particular cultural, social or environmental value, or diversify the sources of revenue for the Tribe's general fund;

(c)   Investments by the Tribe and any funds paid to the State (not including direct or indirect state or federal funding) in renewable energy projects that, in part, serve the Gaming Facility or any improvements incorporating renewable energy technology on real property owned by the Tribe, or its members and lineal descendants, and projects that incorporate charging stations for electric or other zero emission vehicles that are available to patrons and employees of the Gaming Facility, and the Tribe, its members and lineal descendants.  For purposes of this subdivision (c), "renewable energy project" means a project that utilizes a technology other than a conventional power source, as defined in section 2805 of the Public Utilities Code, as it may be amended, and instead uses as a power source biomass, geothermal, small hydroelectric, solar, or wind, as those power sources are defined in section 1391, subdivision (c), of title 20 of the California Code of Regulations, as they may be amended.  The power source must not utilize more than twenty-five percent (25%) fossil fuel;

(d)   Payments (not including direct or indirect state or federal funding) to support capital improvements and operating expenses for facilities within California that provide health care services to tribal members, Indians, and non-Indians;

(e)   Investments by the Tribe and any funds paid to the State (not including direct or indirect state or federal funding) in water treatment or conservation projects that, in part, serve the Gaming Facility or any improvements incorporating water conservation or treatment technology on real property owned by the Tribe, or its members and lineal descendants; and,

(f)   Providing general welfare benefits for, among other things, educational, healthcare, cultural or vocational purposes, to non-enrolled members of the Tribe and other Native Americans in the community.

22

The Tribe shall provide notice to the State of its intent to exercise any of its options under this section 5.3. The State shall have the right to review proposals under this section, and in the exercise of its reasonable discretion disapprove it for receipt of credit under this section 5.3 within ninety (90) days of receipt of notice if the proposal does not meet the purposes set out above, with such disapproval subject to dispute resolution per section 13.0. Once approved, the State shall not withdraw any approval without the agreement of the Tribe or without going through dispute resolution per section 13.0. All excess credits that cannot be applied in any one (1) year shall carry forward to all following years until completely exhausted.

## SECTION 6.0.  LICENSING.

### Sec. 6.1.  Gaming Ordinance and Regulations.

(a)    All Gaming Activities conducted under this Compact shall, at a minimum, comply (i) with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, (ii) with all rules, regulations, procedures, specifications, and standards duly adopted by the NIGC, the Tribal Gaming Agency, and the State Gaming Agency, and (iii) with the provisions of this Compact.

(b)    The Tribal Gaming Agency shall transmit a copy of the Gaming Ordinance, and all of its rules, regulations, procedures, specifications, ordinances, or standards applicable to the Gaming Activities and Gaming Operation, to the State Gaming Agency within twenty (20) days following execution of this Compact, or within twenty (20) days following their adoption or amendment, whichever is later.

(c)    The Tribe and the Tribal Gaming Agency shall make available an electronic or hard copy of the following documents to any member of the public upon request and in the manner requested:  the Gaming Ordinance; the rules of each Class III game operated by the Tribe; the Tribe's constitution or other governing document(s) to the extent they impact the public in relation to the Gaming Activities or Gaming Operation; the tort ordinance specified in section 12.5, subdivision (b); the employment discrimination complaint ordinance specified in

23

section 12.3, subdivision (f); the regulations promulgated by the Tribal Gaming Agency concerning patron disputes pursuant to section 10.0; and the NIGC minimum internal control standards and this Compact, including all appendices hereto, in the event they are not available on the NIGC's or the Commission's website.

**Sec. 6.2.  Tribal Ownership, Management, and Control of Gaming Operation.**

The Gaming Operation authorized under this Compact shall be owned solely by the Tribe.

**Sec. 6.3.  Prohibitions Regarding Minors.**

(a)    The Tribe shall prohibit persons under the age of eighteen (18) years from being present in any room or area in which Gaming Activities are being conducted unless the person is en route to a non-gaming area of the Gaming Facility, or is employed at the Gaming Facility in a capacity other than as a Gaming Employee.

(b)    If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe shall prohibit persons under the age of twenty-one (21) years from purchasing, consuming, or possessing alcoholic beverages.  The Tribe shall also prohibit persons under the age of twenty-one (21) years from being present in any room or area in which alcoholic beverages may be consumed, except to the extent permitted by the State Department of Alcoholic Beverage Control for other commercial establishments serving alcoholic beverages.

**Sec. 6.4.  Licensing Requirements and Procedures.**

**Sec. 6.4.1.  Summary of Licensing Principles.**

All persons in any way connected with the Gaming Operation or Gaming Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under this Compact, including, without limitation, all Gaming

24

Employees, Gaming Resource Suppliers, Financial Sources, and any other person having a significant influence over the Gaming Operation, must be licensed by the Tribal Gaming Agency and cannot have had any determination of suitability denied or revoked by the State Gaming Agency. The parties intend that the licensing process provided for in this Compact shall involve joint cooperation between the Tribal Gaming Agency and the State Gaming Agency, as more particularly described herein.

### Sec. 6.4.2.  Gaming Facility.

(a)     The Gaming Facility authorized by this Compact shall be licensed by the Tribal Gaming Agency in conformity with the requirements of this Compact, the Tribe's Gaming Ordinance, IGRA, and any applicable regulations adopted by the NIGC. The license shall be reviewed and renewed every two (2) years thereafter.  Verification that this requirement has been met shall be provided by the Tribe to the State by sending a copy of the initial license and each renewal license to the State Gaming Agency within twenty (20) days after issuance of the license or renewal.  The Tribal Gaming Agency's certification that the Gaming Facility is being operated in conformity with these requirements shall be posted in a conspicuous and public place in the Gaming Facility at all times.

(b)     To assure the protection of the health and safety of all Gaming Facility patrons, guests, and employees, the Tribe shall adopt, or has already adopted, and shall maintain throughout the term of this Compact, an ordinance that requires any covered Gaming Facility construction to meet or exceed the Applicable Codes. The Gaming Facility and construction, expansion, improvement, modification, or renovation will also comply with the federal Americans with Disabilities Act, P.L. 101-336, as amended, 42 U.S.C. § 12101 et seq.  Notwithstanding the foregoing, the Tribe need not comply with any standard that specifically applies in name or in fact only to tribal facilities.  Without limiting the rights of the State under this section, reference to Applicable Codes is not intended to confer jurisdiction upon the State or its political subdivisions.  For purposes of this section, the terms "building official" and "code enforcement agency" as used in titles 19 and 24 of the California Code of Regulations mean the

25

Tribal Gaming Agency or such other tribal government agency or official as may be designated by the Tribe's law.

(c)     To assure compliance with the Applicable Codes, in all cases where those codes would otherwise require a permit, the Tribe shall employ for any Gaming Facility construction qualified plan checkers or review firms.  To be qualified as a plan checker or review firm for purposes of this Compact, plan checkers or review firms must be either California licensed architects or engineers with relevant experience, or California licensed architects or engineers on the list, if any, of approved plan checkers or review firms provided by the city or the County in which the Gaming Facility is located.  The Tribe shall also employ qualified project inspectors.  To be qualified as a project inspector for purposes of this Compact, project inspectors must be either approved as Class 1 certified inspectors by the Division of the State Architect, or approved as Class A certified inspectors by the Office of Statewide Health Planning and Development, or the agencies' successors.  The Tribe shall require the project inspectors to report in writing any failure to comply with the Applicable Codes to the Tribal Gaming Agency and the State Gaming Agency.  The plan checkers, review firms, and project inspectors shall hereinafter be referred to as "Inspector(s)."

(d)     The Tribe shall cause the design and construction calculations, and plans and specifications that form the basis for the construction (the "Design and Building Plans") to be available to the State Gaming Agency and the County for inspection and copying by the State Gaming Agency or the County upon its request.

(e)     In the event that material changes to a structural detail of the Design and Building Plans will result from contract change orders or any other changes in the Design and Building Plans, such changes shall be reviewed by a California licensed architect or engineer and field verified by the Inspectors for compliance with the Applicable Codes.

26

(f)     The Tribe shall maintain during construction all other contract change orders for inspection and copying by the State Gaming Agency or the County upon its request.

(g)     The Tribe shall maintain the Design and Building Plans depicting the as-built Gaming Facility, which shall be available to the State Gaming Agency and the County for inspection and copying by the State Gaming Agency or the County upon its request, for the term of this Compact.

(h)     Upon final certification by the Inspectors that the Gaming Facility meets the Applicable Codes, the Tribal Gaming Agency shall forward the Inspectors' certification to the State Gaming Agency and the County within ten (10) days of issuance.  If the State Gaming Agency objects to that certification, the Tribe shall make a good faith effort to address the State's concerns, but if the State Gaming Agency does not withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of section 13.0.

(i)     Any failure to remedy within a reasonable period of time any material and timely raised deficiency shall be deemed a violation of this Compact, and furthermore, any deficiency that poses a serious or significant risk to the health or safety of any occupant shall be grounds for the State Gaming Agency to prohibit occupancy of the affected portion of the Gaming Facility pursuant to a court order until the deficiency is corrected.  The Tribe shall not allow occupancy of any portion of the Gaming Facility that is constructed or maintained in a manner that endangers the health or safety of the occupants.

(j)     The Tribe shall also take all necessary steps to reasonably ensure the ongoing availability of sufficient and qualified fire suppression services to the Gaming Facility, and to reasonably ensure that the Gaming Facility satisfies all requirements of titles 19 and 24 of the California Code of Regulations applicable to similar facilities in the County as set forth below:

27

(1)     Not less than thirty (30) days before the commencement of the Gaming Activities, and not less than biennially thereafter, and upon at least ten (10) days' notice to the State Gaming Agency, the Gaming Facility shall be inspected, at the Tribe's expense, by an independent expert for purposes of certifying that the Gaming Facility meets a reasonable standard of fire safety and life safety.

(2)     The State Gaming Agency shall be entitled to designate and have a qualified representative or representatives, which may include local fire suppression entities, present during the inspection.  During such inspection, the State's representative(s) shall specify to the independent expert any condition which the representative(s) reasonably believes would preclude certification of the Gaming Facility as meeting a reasonable standard of fire safety and life safety.

(3)     The independent expert shall issue to the Tribal Gaming Agency, the County, and the State Gaming Agency a report on the inspection within fifteen (15) days after its completion, or within thirty (30) days after commencement of the inspection, whichever first occurs, identifying any deficiency in fire safety or life safety at the Gaming Facility or in the ability of the Tribe to meet reasonably expected fire suppression needs of the Gaming Facility.

(4)     Within twenty-one (21) days after the issuance of the report, the independent expert shall also require and approve a specific plan for correcting deficiencies, whether in fire safety or life safety, at the Gaming Facility or in the Tribe's ability to meet the reasonably expected fire suppression needs of the Gaming Facility, including those identified by the State Gaming Agency's representatives.  A copy of the report shall be delivered to the State Gaming Agency, the County, and the Tribal Gaming Agency.

(5)   Immediately upon correction of all deficiencies identified in the report, the independent expert shall certify in writing to the Tribal Gaming Agency and the State Gaming Agency that all deficiencies have been corrected.

(6)   Any failure to correct all deficiencies identified in the report within a reasonable period of time shall be deemed a violation of this Compact, and any failure to promptly correct those deficiencies that pose a serious or significant risk to the health or safety of any occupants shall be a violation of this Compact and grounds for the State Gaming Agency to prohibit occupancy of the affected portion of the Gaming Facility pursuant to court order until the deficiency is corrected.

(7)   Consistent with its obligation to ensure the safety of those within the Gaming Facility, the Tribe shall promptly notify the State Gaming Agency of circumstances that pose a serious and significant risk to the health or safety of occupants and take prompt action to correct such circumstances.  Any failure to remedy within a reasonable period of time any serious and significant risk to public safety shall be deemed a violation of this Compact, and furthermore, any circumstance that poses a serious or significant risk to the health or safety of any occupant shall be grounds for the State Gaming Agency to prohibit occupancy of the affected portion of the Gaming Facility pursuant to a court order until the deficiency is corrected.

(k)   Notwithstanding anything in section 6.4 or elsewhere in this Compact, any construction of any Project that has taken place or has commenced prior to the effective date of this Compact shall be subject to the facility license rules in section 6.4.2 of the 1999 Compact, provided that the Project was previously approved under section 6.4.2 of that compact.

29

### Sec. 6.4.3.  Gaming Employees.

(a)     Every Gaming Employee shall obtain, and thereafter maintain current, a valid tribal gaming license, and except as provided in subdivision (b), shall obtain, and thereafter maintain current, a State Gaming Agency determination of suitability, which license and determination shall be subject to biennial renewal; provided that in accordance with section 6.4.9, those persons may be employed on a temporary or conditional basis pending completion of the licensing process and the State Gaming Agency determination of suitability.

(b)     A Gaming Employee who is required to obtain and maintain current a valid tribal gaming license under subdivision (a) is not required to obtain or maintain a State Gaming Agency determination of suitability if any of the following applies:

(1)     The employee is subject to the licensing requirement of subdivision (a) solely because he or she is a person who conducts, operates, maintains, repairs, or assists in Gaming Activities, provided that this exception shall not apply if he or she supervises Gaming Activities or persons who conduct, operate, maintain, repair, assist, account for or supervise any such Gaming Activity, *and* is empowered to make discretionary decisions affecting the conduct of the Gaming Activities.

(2)     The employee is subject to the licensing requirement of subdivision (a) solely because he or she is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public, provided that this exception shall not apply if he or she supervises Gaming Activities or persons who conduct, operate, maintain, repair, assist, account for or supervise any such Gaming Activity, *and* is empowered to make discretionary decisions affecting the conduct of the Gaming Activities.

(3)     The State Gaming Agency, in consultation with the Tribal Gaming Agency, exempts the Gaming Employee

30

from the requirement to obtain or maintain current a State Gaming Agency determination of suitability.

(c)     Notwithstanding subdivision (b), where the State Gaming Agency determines it is reasonably necessary, the State Gaming Agency is authorized to review the tribal license application, and all materials and information received by the Tribal Gaming Agency in connection therewith, for any person whom the Tribal Gaming Agency has licensed, or proposes to license, as a Gaming Employee.  If the State Gaming Agency determines that the person would be unsuitable for issuance of a license or permit for a similar level of employment in a gambling establishment subject to the jurisdiction of the State, it shall notify the Tribal Gaming Agency of its determination and the reasons supporting its determination.  The Tribal Gaming Agency shall thereafter conduct a hearing in accordance with section 6.5.5 to reconsider issuance of the tribal gaming license and shall notify the State Gaming Agency of its determination immediately after the hearing, which shall be final unless made the subject of dispute resolution pursuant to section 13.0 within thirty (30) days of such notification.

(d)     The Tribe shall not employ, or continue to employ, any person whose application to the State Gaming Agency for a determination of suitability or for a renewal of such a determination has been denied, or whose determination of suitability has expired without renewal.

(e)     At any time after five (5) years following the effective date of this Compact, either party to this Compact may request renegotiation of the scope of coverage of subdivision (b).

(f)     This section shall not apply to members of the Tribal Gaming Agency.

**Sec. 6.4.4.  Gaming Resource Suppliers.**

(a)     Every Gaming Resource Supplier shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any Gaming Resources

31

to or in connection with the Tribe's Gaming Operation or Gaming Facility.  Unless the Tribal Gaming Agency licenses the Gaming Resource Supplier pursuant to subdivision (d), the Gaming Resource Supplier shall also apply to, and the Tribe shall require it to apply to, the State Gaming Agency for a determination of suitability at least thirty (30) days, unless such thirty (30) days is shortened by the Tribal Gaming Agency, prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any Gaming Resources to or in connection with the Tribe's Gaming Operation or Gaming Facility, except that for Gaming Devices the period specified under section 7.1, subdivision (a)(1), shall govern.  The period during which a determination of suitability as a Gaming Resource Supplier is valid expires on the earlier of (i) the date two (2) years following the date on which the determination is issued, unless a different expiration date is specified by the State Gaming Agency, or (ii) the date of its revocation by the State Gaming Agency.  If the State Gaming Agency denies or revokes a determination of suitability, the Tribal Gaming Agency shall immediately deny or revoke the license.  The license and determination of suitability shall be reviewed at least every two (2) years for continuing compliance.  For purposes of section 6.5.2, such a review shall be deemed to constitute an application for renewal.  In connection with such a review, the Tribal Gaming Agency shall require the Gaming Resource Supplier to update all information provided in the previous application.

(b)     Any agreement between the Tribe and a Gaming Resource Supplier shall include a provision for its termination without further liability on the part of the Tribe, except for the bona fide payment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or non-renewal of the Gaming Resource Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.  Except as set forth above, the Tribe shall not enter into, or continue to make payments to a Gaming Resource Supplier pursuant to, any contract or agreement for the provision of Gaming Resources with any person or entity

32

whose application to the State Gaming Agency for a determination of suitability has been denied or revoked or whose determination of suitability has expired without renewal.

(c)     Notwithstanding subdivision (a), the Tribal Gaming Agency may license a Management Contractor for a period of no more than seven (7) years, but the Management Contractor must still apply for renewal of a determination of suitability by the State Gaming Agency at least every two (2) years and where the State Gaming Agency denies or revokes a determination of suitability, the Tribal Gaming Agency shall immediately deny or revoke the license.  Except for where the State Gaming Agency has denied or revoked its determination of suitability, nothing in this subdivision shall be construed to bar the Tribal Gaming Agency from issuing additional new licenses to the same Management Contractor following the expiration of a seven (7)-year license.

(d)     The Tribal Gaming Agency may elect to license a person or entity as a Gaming Resource Supplier without requiring it to apply to the State Gaming Agency for a determination of suitability under subdivision (a) if the Gaming Resource Supplier has already been issued a determination of suitability that is then valid.  In that case, the Tribal Gaming Agency shall immediately notify the State Gaming Agency of its licensure of the person or entity as a Gaming Resource Supplier, and shall identify in its notification the State Gaming Agency determination of suitability on which the Tribal Gaming Agency has relied in proceeding under this subdivision (d). Subject to the Tribal Gaming Agency's compliance with the requirements of this subdivision, a Gaming Resource Supplier licensed under this subdivision may, during and only during the period in which the determination of suitability remains valid, engage in the sale, lease, or distribution of Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility, without applying to the State Gaming Agency for a determination of suitability.  The issuance of a license under this subdivision is in all cases subject to any later determination by the State Gaming Agency that the Gaming Resource Supplier is not suitable or to a tribal gaming license suspension

or revocation pursuant to section 6.5.1, and does not extend the time during which the determination of suitability relied on by the Tribal Gaming Agency is valid.  A license issued under this subdivision expires upon the revocation or expiration of the determination of suitability relied on by the Tribal Gaming Agency.  Nothing in this subdivision affects the obligations of the Tribal Gaming Agency, or of the Gaming Resource Supplier, under section 6.5.2 and section 6.5.6 of this Compact.

(e)     Except where subdivision (d) applies, within twenty-one (21) days of the issuance of a license to a Gaming Resource Supplier, the Tribal Gaming Agency shall transmit to the State Gaming Agency a copy of the license and a copy of all tribal license application materials and information received by it from the Applicant which is not otherwise prohibited or restricted from disclosure under applicable federal law or regulation.

**Sec. 6.4.5.  Financial Sources.**

(a)     Subject to subdivision (g) of this section 6.4.5, each Financial Source shall be licensed by the Tribal Gaming Agency prior to the Financial Source extending financing in connection with the Tribe's Gaming Facility or Gaming Operation.

(b)     Every Financial Source required to be licensed by the Tribal Gaming Agency shall, contemporaneously with the filing of its tribal license application, apply to the State Gaming Agency for a determination of suitability.  In the event the State Gaming Agency denies the determination of suitability, the Tribal Gaming Agency shall within thirty (30) days from State Gaming Agency notification deny or revoke the Financial Source's license.

(c)     A license issued under this section 6.4.5 shall be reviewed at least every two (2) years for continuing compliance.  In connection with that review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the Financial Source's previous application.  For purposes of

34

this section 6.5.2, that review shall be deemed to constitute an application for renewal.

(d)     Any agreement between the Tribe and a Financial Source shall include, and shall be deemed to include, a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.  The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of financing with any person whose application to the State Gaming Agency for a determination of suitability has been denied or revoked or has expired without renewal.

(e)     A Gaming Resource Supplier who provides financing exclusively in connection with the provision, sale, or lease of Gaming Resources obtained from that Gaming Resource Supplier may be licensed solely in accordance with licensing procedures applicable, if at all, to Gaming Resource Suppliers, and need not be separately licensed as a Financial Source under this section.

(f)     Within twenty-one (21) days of the issuance of a license to a Financial Source, the Tribal Gaming Agency shall transmit to the State Gaming Agency a copy of the license.  Upon issuance of a license, the Tribal Gaming Agency shall direct the Financial Source licensee to transmit to the State Gaming Agency a copy of all license application materials and information submitted to the Tribal Gaming Agency within twenty-one (21) days.

(g)     (1)     The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this section, the following Financial Sources under the circumstances stated.

35

(A) A federally-regulated or state-regulated bank, savings and loan association, or other federally- or state-regulated lending institution.

(B) An entity identified by Regulation CGCC-2, subdivision (f) (as in effect on July 1, 2006) of the Commission, when that entity is a Financial Source solely by reason of being (i) a purchaser or a holder of debt securities issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation or (ii) the owner of a participation interest in any amount of indebtedness for which a Financial Source described in subdivision (g)(1)(A), or any fund or other investment vehicle which is administered or managed by any such Financial Source, is the creditor.

(C) An investor who, alone or together with any person controlling, controlled by or under common control with such investor, holds less than ten percent (10%) of all outstanding debt securities issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation.

(D) An agency of the federal, State, tribal or local government providing financing, together with any person purchasing any debt securities of the agency to provide such financing.

(E) An entity or category of entities that the State Gaming Agency and the Tribal Gaming Agency jointly determine can be excluded from the licensing requirements of this section 6.4.5 without posing a threat to the public interest or the integrity of the Gaming Activities and Gaming Operation.

(2) In any case where the Tribal Gaming Agency elects to exclude a Financial Source from the licensing requirements of this section, the Tribal Gaming Agency

36

shall give reasonable advance notice of any extension of financing by the Financial Source in connection with the Tribe's Gaming Operation or Facility, and upon request of the State Gaming Agency, shall provide it with all documentation supporting the Tribal Gaming Agency's exclusion of the Financial Source from the licensing requirements of this section 6.4.5.  The Tribal Gaming Agency and the State Gaming Agency shall confer and make good faith efforts to promptly resolve any dispute regarding the Tribal Gaming Agency's decision to exclude a Financial Source from the licensing requirements of this section.  Any dispute regarding a decision to exclude a Financial Source from the licensing requirements of this section that cannot be promptly resolved by the Tribal Gaming Agency and the State Gaming Agency shall be resolved through the Dispute Resolution provisions in section 13.0.

(3)     Notwithstanding subdivision (g)(1), the Tribal Gaming Agency and the State Gaming Agency shall work collaboratively to resolve any reasonable concerns regarding the ongoing excludability of an individual or entity as a Financial Source.  Any dispute between the Tribal Gaming Agency and the State Gaming Agency pertaining to the excludability of an individual or entity as a Financial Source shall be resolved by the Dispute Resolution provisions in section 13.0.

(4)     The following are not Financial Sources for purposes of this section 6.4.5.

(A)     An entity identified by Regulation CGCC-2, subdivision (h) (as in effect on July 1, 2006) of the Commission.

(B)     A person or entity whose sole connection with a provision or extension of financing to the Tribe is to provide loan brokerage or debt servicing for a Financial Source at no cost to the Tribe or the Gaming Operation, provided that no portion of any

37

financing provided is an extension of credit to the Tribe or the Gaming Operation by that person or entity.

(h)     In recognition of changing financial circumstances, this section 6.4.5 shall be subject to good faith renegotiation upon request of either party in or after five (5) years from the effective date of this Compact; provided such renegotiation shall not retroactively affect transactions that have already taken place where the Financial Source has been excluded or exempted from licensing requirements.

## Sec. 6.4.6.  Processing Tribal Gaming License Applications.

(a)     Each Applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency.

(b)     At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including part 556.4 of title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees.

(c)     For Applicants that are business entities, these licensing provisions shall apply to the entity as well as:  (i) each of its officers and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager; (iii) each of its owners, members, or partners, if an unincorporated business; (iv) each of its shareholders who owns more than ten percent (10%) of the shares of the corporation, if a corporation, or who has a direct controlling interest in the Applicant; and (v) each person or entity (other than a Financial Source that the Tribal Gaming Agency has determined does not require a license under section 6.4.5) that, alone or in combination with others, has provided financing in connection with any Gaming Operation or Class III Gaming authorized under this Compact, if that person or entity provided more than

38

ten percent (10%) of either the start-up capital or the operating capital, or of a combination thereof, over a twelve (12)-month period.  For purposes of this subdivision, where there is any commonality of the characteristics identified in this section 6.4.6, subdivisions (c)(i) through (c)(v), inclusive, between any two (2) or more entities, those entities may be deemed to be a single entity.  For purposes of this subdivision, a direct controlling interest in the Applicant referred to in subdivision (c)(iv) excludes any passive investor or anyone who has an indirect or only a financial interest and does not have ability to control, manage or direct the management decisions of the Applicant.

(d)    Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

### Sec. 6.4.7.  Suitability Standard Regarding Gaming Licenses.

(a)    In reviewing an application for a tribal gaming license, and in addition to any standards set forth in the Tribe's Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license will undermine public trust that the Tribe's Gaming Operation is free from criminal and dishonest elements and would be conducted honestly.

(b)    A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the Applicant, and in the case of an entity, each individual identified in section 6.4.6, meets all the following requirements:

   (1)    The person is of good character, honesty, and integrity.

   (2)    The person's prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or

39

activities in the conduct of gaming, or in the carrying on of business and financial arrangements incidental thereto.

(3)     The person is in all other respects qualified to be licensed as provided, and meets the criteria established in this Compact, IGRA, NIGC regulations, the Tribe's Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe; provided, however, an Applicant shall not be found to be unsuitable solely on the ground that the Applicant was an employee of a tribal gaming operation in California that was conducted prior to May 16, 2000.

## Sec. 6.4.8.  Background Investigations of Applicants.

(a)     The Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the Applicant is qualified for a gaming license under the standards set forth in section 6.4.7, and to fulfill all requirements for licensing under IGRA, NIGC regulations, the Tribe's Gaming Ordinance, and this Compact. The Tribal Gaming Agency shall not issue a gaming license, other than a temporary license pursuant to section 6.4.9, until a determination is made that those qualifications have been met.

(b)     In lieu of completing its own background investigation, and to the extent that doing so does not conflict with or violate IGRA or the Tribe's Gaming Ordinance, the Tribal Gaming Agency may contract with the State Gaming Agency for the conduct of background investigations, may rely on a State determination of suitability previously issued under a Class III Gaming compact involving another tribe and the State, or may rely on a State Gaming Agency license previously issued to the Applicant, to fulfill some or all of the Tribal Gaming Agency's background investigation obligations.

(c)     An Applicant for a tribal gaming license shall be required to provide releases to the State Gaming Agency to make available to the Tribal Gaming Agency background information regarding the Applicant.  The State Gaming Agency shall

cooperate in furnishing to the Tribal Gaming Agency that information, unless doing so would violate state or federal law, would violate any agreement the State Gaming Agency has with a source of the information other than the Applicant, or would impair or impede a criminal investigation, or unless the Tribal Gaming Agency cannot provide sufficient safeguards to assure the State Gaming Agency that the information will remain confidential.

(d)     If the Tribe adopts an ordinance confirming that article 6 (commencing with section 11140) of chapter 1 of title 1 of part 4 of the California Penal Code is applicable to members, investigators, and staff of the Tribal Gaming Agency, and those members, investigators, and staff thereafter comply with that ordinance, then, for purposes of carrying out its obligations under this section, the Tribal Gaming Agency shall be eligible to be considered an entity entitled to request and receive state summary criminal history information, within the meaning of subdivision (b)(13) of section 11105 of the California Penal Code.

(e)     The information received shall be used by the requesting agency solely for the purpose for which it was requested and shall not be reproduced for secondary dissemination to any other employment or licensing agency.  The unauthorized access and misuse of criminal offender record information may affect an individual's civil rights.  Additionally, any person intentionally disclosing information obtained from personal or confidential records maintained by a state agency or from records within a system of records maintained by a governmental agency may be subject to prosecution.

(f)     The Tribal Gaming Agency shall submit to the California Department of Justice fingerprint images and related information required by the California Department of Justice of all Gaming Employees, as defined by section 2.11, for the purposes of obtaining information as to the existence and content of a record of state or federal convictions and state or federal arrests and also information as to the existence and content of a record of state or federal arrests for which the

41

Department of Justice establishes that the person is free on bail or on his or her recognizance pending trial or appeal.

(g)     When received, the California Department of Justice shall forward to the Federal Bureau of Investigation requests for federal summary criminal history information received pursuant to this section.  The California Department of Justice shall review the information returned from the Federal Bureau of Investigation and compile and disseminate a response to the Tribal Gaming Agency.

(h)     The California Department of Justice shall provide a state or federal level response to the Tribal Gaming Agency pursuant to Penal Code section 11105, subdivision (p)(1).

(i)     The Tribal Gaming Agency shall request from the California Department of Justice subsequent notification service, as provided pursuant to section 11105.2 of the Penal Code, for persons described in subdivision (f) above.

**Sec. 6.4.9.  Temporary Licensing of Gaming Employees.**

(a)     If the Applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the investigation or other information held by that agency does not indicate that the Applicant has a criminal history or other information in his or her background that would either automatically disqualify the Applicant from obtaining a tribal gaming license or cause a reasonable person to investigate further before issuing a license, or that the Applicant is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary tribal gaming license and may impose such specific conditions thereon pending completion of the Applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine.

(b)     Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary tribal gaming license.

42

(c)     A temporary tribal gaming license shall remain in effect until suspended or revoked, or a final determination is made on the application, or for a period of up to one (1) year, whichever comes first.

(d)     At any time after issuance of a temporary tribal gaming license, the Tribal Gaming Agency shall or may, as the case may be, suspend or revoke it in accordance with the provisions of sections 6.5.1 or 6.5.5, and the State Gaming Agency may request suspension or revocation before making a determination of unsuitability.

(e)     Nothing herein shall be construed to relieve the Tribe of any obligation under part 558 of title 25 of the Code of Federal Regulations.

**Sec. 6.5.0.  Tribal Gaming License Issuance.**

Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a tribal gaming license on a conditional or unconditional basis.  Nothing herein shall create a property or other right of an Applicant in an opportunity to be licensed, or in a tribal gaming license itself, both of which shall be considered to be privileges granted to the Applicant in the sole discretion of the Tribal Gaming Agency.

**Sec. 6.5.1.  Denial, Suspension, or Revocation of Licenses.**

(a)     Any Applicant's application for a tribal gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the Applicant is determined to be unsuitable or otherwise unqualified for a tribal gaming license.

(b)     Pending consideration of revocation, the Tribal Gaming Agency may suspend a tribal gaming license in accordance with section 6.5.5.

(c)     All rights to notice and hearing shall be governed by tribal law and comport with federal procedural due process.  The Applicant shall be notified in writing of the hearing and given

43

notice of any intent to suspend or revoke the tribal gaming license.

(d) Notwithstanding anything to the contrary herein, upon receipt of notice that the State Gaming Agency has determined that a person would be unsuitable for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency, the Tribal Gaming Agency shall deny that person a tribal gaming license and promptly, and in no event more than thirty (30) days from the State Gaming Agency notification, revoke any tribal gaming license that has theretofore been issued to that person; provided that the Tribal Gaming Agency may, in its discretion, reissue a tribal gaming license to the person following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court conducted pursuant to section 1085 of the California Code of Civil Procedure.

**Sec. 6.5.2. Renewal of Licenses; Extensions; Further Investigation.**

(a) Except as provided in section 6.4.4, subdivision (c), the term of a tribal gaming license shall not exceed two (2) years, and application for renewal of a license must be made prior to its expiration. Applicants for renewal of a license shall provide updated material, as requested, on the appropriate renewal forms, but, at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or which is otherwise available to the Tribal Gaming Agency. At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the Applicant's continuing suitability or eligibility for a license.

(b) Prior to renewing a license, the Tribal Gaming Agency shall deliver to the State Gaming Agency copies of all information and documents received in connection with the application for renewal of the tribal gaming license, which is not otherwise prohibited or restricted from disclosure under applicable federal

44

law or regulation, for purposes of the State Gaming Agency's consideration of renewal of its determination of suitability.

(c)     At the discretion of the State Gaming Agency, an additional background investigation may be required if the State Gaming Agency determines the need for further information concerning the Applicant's continuing suitability for a license.

### Sec. 6.5.3.  Identification Cards.

(a)     The Tribal Gaming Agency shall require that all persons who are required to be licensed wear, in plain view at chest height at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency.

(b)     Identification badges must display information, including, but not limited to, a photograph and the person's name, which is adequate to enable members of the public and agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

(c)     The Tribe shall monthly provide the State Gaming Agency with the name, badge identification number (if any), and job title of all Gaming Employees.

### Sec. 6.5.4.  Fees for Tribal Gaming License.

The fees for all tribal gaming licenses shall be set by the Tribal Gaming Agency.

### Sec. 6.5.5.  Suspension of Tribal Gaming License.

The Tribal Gaming Agency shall summarily suspend the tribal gaming license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person could constitute a threat to the public health or safety or may summarily suspend the license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person may violate the Tribal Gaming Agency's licensing or

45

other standards.  Any right to notice or hearing in regard thereto shall be governed by tribal law and comport with federal procedural due process.

### Sec. 6.5.6.  State Determination of Suitability Process.

(a) The State Gaming Agency and the Tribal Gaming Agency (together with tribal gaming agencies under other gaming compacts) shall cooperate in developing standard licensing forms for tribal Gaming Employee license applications, on a statewide basis, that reduce or eliminate duplicative or excessive paperwork, which forms and procedures shall take into account the Tribe's requirements under IGRA and the expense thereof.  To facilitate the State Gaming Agency's ability to obtain any criminal information that may relate to the Applicant, each application form shall be printed showing the State Gaming Agency's approval of its use, but the approval shall not be unreasonably withheld.

(b) With respect to Gaming Employees, upon receipt of an Applicant's completed license application and a determination to issue either a temporary or permanent license, the Tribal Gaming Agency shall transmit within twenty-one (21) days to the State Gaming Agency for a determination of suitability for licensure under the California Gambling Control Act a notice of intent to license the Applicant, together with all of the following:

    (1) A copy of all tribal license application materials and information received by the Tribal Gaming Agency from the Applicant, which is not otherwise restricted from disclosure under applicable federal law or regulation.

    (2) A complete set of fingerprint impressions, rolled by a certified fingerprint roller, transmitted electronically.

    (3) A current photograph.

    (4) Except to the extent waived by the State Gaming Agency, such releases of information, waivers, and other

46

completed and executed forms as have been obtained by the Tribal Gaming Agency.

(c)     Upon receipt of a written request from a Gaming Resource Supplier or a Financial Source for a determination of suitability, the State Gaming Agency shall transmit an application package to the Applicant to be completed and returned to the State Gaming Agency for purposes of allowing it to make a determination of suitability for licensure.

(d)     Investigation and disposition of applications for a determination of suitability shall be governed entirely by State law, and the State Gaming Agency shall determine whether the Applicant would be found suitable for licensure in a gambling establishment subject to the State Gaming Agency's jurisdiction.  Additional information may be required by the State Gaming Agency to assist it in its background investigation, to the extent permitted under State law for licensure in a gambling establishment subject to the State Gaming Agency's jurisdiction.

(e)     The Tribal Gaming Agency shall require a licensee to apply for renewal of a determination of suitability by the State Gaming Agency at such time as the licensee applies for renewal of a tribal gaming license.

(f)     Upon receipt of completed license or license renewal application information from the Tribal Gaming Agency, the State Gaming Agency may conduct a background investigation pursuant to state law to determine whether the Applicant is suitable to be licensed for association with Class III Gaming operations.  While the Tribal Gaming Agency shall ordinarily be the primary source of application information, the State Gaming Agency is authorized to directly seek application information from the Applicant.  The Tribal Gaming Agency shall provide to the State Gaming Agency reports of the background investigations conducted by the Tribal Gaming Agency and the NIGC and related applications, if any, for Gaming Employees, Gaming Resource Suppliers, and Financial Sources.  If further investigation is required to supplement the

47

investigation conducted by the Tribal Gaming Agency, the Applicant will be required to pay the application fee charged by the State Gaming Agency pursuant to California Business and Professions Code section 19951, subdivision (a), but any deposit requested by the State Gaming Agency pursuant to section 19867 of that Code shall take into account reports of the background investigation already conducted by the Tribal Gaming Agency and the NIGC, if any.  Failure to provide information reasonably required by the State Gaming Agency to complete its investigation under State law or failure to pay the application fee or deposit can constitute grounds for denial of the application by the State Gaming Agency.  The State Gaming Agency and Tribal Gaming Agency shall cooperate in sharing as much background information as possible, both to maximize investigative efficiency and thoroughness, and to minimize investigative costs.

(g)   Upon completion of the necessary background investigation or other verification of suitability, the State Gaming Agency shall issue a notice to the Tribal Gaming Agency certifying that the State has determined that the Applicant is suitable, or that the Applicant is unsuitable, for licensure in a Gaming Operation and, if unsuitable, stating the reasons therefore.  Issuance of a determination of suitability does not preclude the State Gaming Agency from a subsequent determination based on newly discovered information that a person or entity is unsuitable for the purpose for which the person or entity is licensed.  Upon receipt of notice that the State Gaming Agency has determined that a person or entity is or would be unsuitable for licensure, the Tribal Gaming Agency shall deny that person or entity a license and promptly, and in no event more than thirty (30) days from the issuance of the State Gaming Agency notification, revoke any tribal gaming license that has theretofore been issued to that person or entity; provided that the Tribal Gaming Agency may, in its discretion, reissue a tribal gaming license to the person or entity following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court conducted pursuant to section 1085 of the California Code of Civil Procedure.

(h)     Prior to denying an application for a determination of suitability, or to issuing notice to the Tribal Gaming Agency that a person or entity previously determined to be suitable had been determined unsuitable for licensure, the State Gaming Agency shall notify the Tribal Gaming Agency and afford the Tribe an opportunity to be heard.  If the State Gaming Agency denies an application for a determination of suitability, or issues notice that a person or entity previously determined suitable has been determined unsuitable for licensure, the State Gaming Agency shall provide that person or entity with written notice of all appeal rights available under state law.

(i)     The Commission, or its successor, shall maintain a roster of Gaming Resource Suppliers and Financial Sources that it has determined to be suitable pursuant to the provisions of this section, or through separate procedures to be adopted by the Commission.  Upon application to the Tribal Gaming Agency for a tribal gaming license, a Gaming Resource Supplier or Financial Source that appears on the Commission's suitability roster may be licensed by the Tribal Gaming Agency in the same manner as a Gaming Resource Supplier under subdivision (d) of section 6.4.4, subject to any later determination by the State Gaming Agency that the Gaming Resource Supplier or Financial Source is not suitable or to a tribal gaming license suspension or revocation pursuant to section 6.5.1; provided that nothing in this subdivision exempts the Gaming Resource Supplier or Financial Source from applying for a renewal of a State determination of suitability.

**Sec. 6.6.  Submission of New Application.**

Nothing in section 6.0 shall be construed to preclude an Applicant who has been determined to be unsuitable for licensure by the State Gaming Agency, or the Tribe on behalf of such Applicant, from later submitting a new application for a determination of suitability by the State Gaming Agency in accordance with section 6.0.

# SECTION 7.0.  APPROVAL AND TESTING OF GAMING DEVICES.

### Sec. 7.1.  Gaming Device Approval.

(a)     No Gaming Device may be offered for play unless all the following occurs:

    (l)     The manufacturer or distributor which sells, leases, or distributes such Gaming Device (i) has applied for a determination of suitability by the State Gaming Agency at least fifteen (15) days before it is offered for play, (ii) has not been found to be unsuitable by the State Gaming Agency, and (iii) has been licensed by the Tribal Gaming Agency;

    (2)     The software for the game authorized for play on the Gaming Device has been tested, approved and certified by an independent gaming test laboratory or state governmental gaming test laboratory (the "Gaming Test Laboratory") as operating in accordance with the standards of Gaming Laboratories International, Inc. known as GLI-11, GLI-12, GLI-13, GLI-21, and GLI-26, or the technical standards approved by the State of Nevada, or such other technical standards as the State Gaming Agency and the Tribal Gaming Agency shall agree upon, which agreement shall not be unreasonably withheld;

    (3)     A copy of the certification by the Gaming Test Laboratory, specified in subdivision (a)(2), is provided to the State Gaming Agency by electronic transmission or by mail, unless the State Gaming Agency waives receipt of copies of the certification;

    (4)     The software for the game authorized for play on the Gaming Device is tested by the Tribal Gaming Agency to ensure each game authorized for play on the Gaming Device has the correct electronic signature prior to operation of the Gaming Device by the public, or if

already inserted, tested prior to being made available for patron play on the gaming floor;

(5)  The hardware and associated equipment for each type of Gaming Device has been tested by the Gaming Test Laboratory prior to operation by the public to ensure operation in accordance with the applicable Gaming Test Laboratory standards; and

(6)  The hardware and associated equipment for the Gaming Device has been tested by the Tribal Gaming Agency to ensure operation in accordance with the manufacturer's specifications.

(b)  Where either the Tribe or the State Gaming Agency requests new standards for testing, approval, and certification of the software for the game authorized for play on the Gaming Device pursuant to subdivision (a)(2), and the State Gaming Agency and the Tribe fail to agree to new standards within one hundred twenty (120) days of the request, the technical standards shall be those approved by the State of Nevada.

### Sec. 7.2.  Gaming Test Laboratory Selection.

(a)  The Gaming Test Laboratory shall be an independent or state governmental gaming test laboratory recognized in the gaming industry which (1) is competent and qualified to conduct scientific tests and evaluations of Gaming Devices, and (2) is licensed or approved by any of the following states:  Arizona, California, Colorado, Illinois, Indiana, Iowa, Michigan, Missouri, Nevada, New Jersey, or Wisconsin.  The Tribal Gaming Agency shall submit to the State Gaming Agency documentation that demonstrates the Gaming Test Laboratory satisfies (1) and (2) herein at least thirty (30) days before the commencement of Gaming Activities pursuant to this Compact, or if such use follows the commencement of Gaming Activities, within fifteen (15) days prior to reliance thereon.  If, at any time, the Gaming Test Laboratory license and/or approval required by (2) herein is suspended or revoked by any of those states or the Gaming Test Laboratory is found unsuitable by the

51

State Gaming Agency, then the State Gaming Agency may reject the use of such Gaming Test Laboratory, and upon such rejection, the Tribal Gaming Agency shall ensure that such Gaming Test Laboratory discontinues its responsibilities under this section.

(b)     The Tribe and the State Gaming Agency shall inform the Gaming Test Laboratory in writing that irrespective of the source of payment of its fees, the Gaming Test Laboratory's duty of loyalty runs equally to the State and the Tribe.

### Sec. 7.3.  Maintenance of Records of Testing Compliance.

The Tribal Gaming Agency shall prepare and maintain records of its compliance with section 7.1 while any Gaming Device is on the gaming floor and for a period of one (1) year after the Gaming Device is removed from the gaming floor, and shall make those records available for inspection by the State Gaming Agency upon request.

### Sec. 7.4.  State Gaming Agency Inspections.

(a)     The State Gaming Agency, utilizing such consultants, if any, it deems appropriate, may inspect the Gaming Devices in operation at the Gaming Facility on a random basis not to exceed four (4) times annually to confirm that they operate and play properly pursuant to the manufacturer's technical standards.  The inspections may be conducted onsite or remotely and may include all Gaming Device software, hardware, associated equipment, software maintenance records, and components critical to the operation of the Gaming Device.  The Tribal Gaming Agency shall cooperate with the State Gaming Agency's reasonable efforts to obtain information that facilitates the conduct of remote but effective inspections that minimize disruption to Gaming Activities.  The random inspections conducted pursuant to this subdivision shall occur during normal business hours outside of weekends and holidays and shall not remove from play more than five percent (5%) of the Gaming Devices then in operation at the Gaming Facility, provided that the five percent (5%) limitation on removal of Gaming Devices shall not apply where a Gaming Device,

including but not limited to a progressive controller, makes limiting removal from play to no more than five percent (5%) infeasible or impossible.  Whenever practicable, the State Gaming Agency shall not require removal from play any Gaming Device that the State Gaming Agency determines may be fully and adequately tested while still in play.

(b)  The State Gaming Agency shall provide notice to the Tribal Gaming Agency of such inspection at or prior to the commencement of the random inspection, and the Tribal Gaming Agency may accompany the State Gaming Agency inspector(s).

(c)  The State Gaming Agency, utilizing such consultants, if any, it deems appropriate, may conduct additional inspections at additional times upon reasonable belief of any irregularity and after informing and consulting with the Tribal Gaming Agency regarding the factual basis for such belief.

**Sec. 7.5.  Technical Standards.**

The Tribal Gaming Agency shall provide to the State Gaming Agency copies of its regulations for technical standards applicable to the Tribe's Gaming Devices at least thirty (30) days before the commencement of the Gaming Operation and at least thirty (30) days before the effective date of any revisions to the regulations.

**Sec. 7.6.  Transportation of Gaming Devices.**

(a)  Subject to the provisions of subdivision (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's Indian lands except in accordance with procedures established by agreement between the State Gaming Agency and the Tribal Gaming Agency and upon at least ten (10) days' notice to the Sheriff's Department for the County.

(b)  Transportation of a Gaming Device from a Gaming Facility within California is permissible only if:

53

(1)     The final destination of the Gaming Device is a gaming facility of any tribe in California that has a compact with the State which makes lawful the receipt of such Gaming Device;

(2)     The final destination of the Gaming Device is any other state in which possession of the Gaming Device is made lawful by state law or by tribal-state compact;

(3)     The final destination of the Gaming Device is another country, or any state or province of another country, wherein possession of the Gaming Device is lawful; or

(4)     The final destination is a location within California for testing, repair, maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency and has been found suitable for licensure by the State Gaming Agency.

(c)     Any Gaming Device transported from or to the Tribe's Indian lands in violation of this section 7.6, or in violation of any permit issued pursuant thereto, is subject to summary seizure by California peace officers in accordance with California law.

## SECTION 8.0.  INSPECTIONS.

### Sec. 8.1.  Investigation and Sanctions.

(a)     The Tribal Gaming Agency shall investigate any reported violation of this Compact and shall require the Gaming Operation to correct the violation upon such terms and conditions as the Tribal Gaming Agency determines are necessary.

(b)     The Tribal Gaming Agency shall be empowered by the Gaming Ordinance to impose fines or other sanctions within the jurisdiction of the Tribe against gaming licensees who interfere with or violate the Tribe's gaming regulatory requirements and obligations under IGRA, NIGC gaming regulations, the

54

Gaming Ordinance, or this Compact as long as the fines or sanctions comport with federal due process.

(c)     The Tribal Gaming Agency shall report violations of this Compact that pose a substantial threat to gaming integrity, public health and safety or the environment, or continued violations that, if isolated might not require reporting, but cumulatively pose a substantial threat to gaming integrity, public health and safety or the environment, and any failures to comply with Tribal Gaming Agency's orders to the Commission and the Bureau of Gambling Control in the California Department of Justice within ten (10) days of discovery.

**Sec. 8.2.  Assistance by State Gaming Agency.**

The Tribe may request the assistance of the State Gaming Agency whenever it reasonably appears that such assistance may be necessary to carry out the purposes described in section 8.1, or otherwise to protect public health, safety, or welfare.

**Sec. 8.3.  Access to Premises by State Gaming Agency; Notification; Inspections.**

(a)     Notwithstanding that the Tribe and its Tribal Gaming Agency have the primary responsibility to administer and enforce the regulatory requirements of this Compact, the State Gaming Agency, including but not limited to any consultants retained by it, shall have the right to inspect the Tribe's Gaming Facility, and all Gaming Operation or Facility records relating to Class III Gaming as is reasonably necessary to ensure Compact compliance, including such records located in off-site facilities dedicated to their storage subject to the conditions in subdivisions (b), (c), and (d).

(b)     Except as provided in section 7.4, the State Gaming Agency may inspect public areas of the Gaming Facility at any time without prior notice during normal Gaming Facility business hours.

55

(c)     Inspection of areas of the Gaming Facility not normally accessible to the public may be made at any time the Gaming Facility is open to the public, immediately after the State Gaming Agency's authorized inspector notifies the Tribal Gaming Agency of his or her presence on the premises, presents proper identification, and requests access to the non-public areas of the Gaming Facility.  The Tribal Gaming Agency, in its sole discretion, may require a member of the Tribal Gaming Agency to accompany the State Gaming Agency inspector at all times that the State Gaming Agency inspector is in a non-public area of the Gaming Facility.  If the Tribal Gaming Agency imposes such a requirement, it shall require such member to be available at all times for those purposes and shall ensure that the member has the ability to gain immediate access to all non-public areas of the Gaming Facility.

(d)     Nothing in this Compact shall be construed to limit the State Gaming Agency to one inspector during inspections.

**Sec. 8.4.  Inspection, Copying and Confidentiality of Documents.**

(a)     Inspection and copying of Gaming Operation papers, books, and records may occur at any time, immediately after the State Gaming Agency gives notice to the Tribal Gaming Agency, during the hours from 8:00 a.m. to 5:00 p.m. Monday through Friday, and at any other time that a Tribal Gaming Agency employee, a Gaming Facility employee, or a Gaming Operation employee is available onsite with physical access to offices, including off-site facilities, where the papers, books, and records are kept.  The Tribe shall cooperate with, and cannot refuse, the inspection and copying, provided that the State Gaming Agency inspectors cannot require copies of papers, books, or records in such volume that it unreasonably interferes with the normal functioning of the Gaming Operation or Gaming Facility.

(b)     In lieu of onsite inspection and copying of Gaming Operation papers, books, and records by its inspectors, the State Gaming Agency may request in writing that the Tribal Gaming Agency provide copies of such papers, books, and records as the State

56

Gaming Agency deems necessary to ensure compliance with the terms of this Compact.  The State Gaming Agency's written request shall describe those papers, books, and records requested to be copied with sufficient specificity to reasonably identify the requested documents.  Within ten (10) days after it receives the request, or such other time as the State Gaming Agency may agree in writing, the Tribal Gaming Agency shall provide one (1) copy of the requested papers, books, and records to the requesting State Gaming Agency.  An electronic version of the requested papers, books, and records may be submitted to the State Gaming Agency in lieu of a paper copy so long as the software required to access the electronic version is reasonably available to the State Gaming Agency and the State Gaming Agency does not object.

(c)     Notwithstanding any other provision of California law, any confidential information and records, as defined in subdivision (d), that the State Gaming Agency obtains or copies pursuant to this Compact shall be, and remain, the property solely of the Tribe; provided that such confidential information and records and copies may be retained by the State Gaming Agency as is reasonably necessary to assure the Tribe's compliance with this Compact or to complete any investigation of suspected criminal activity; and provided further that the State Gaming Agency may provide such confidential information and records and copies to federal law enforcement and other state agencies or consultants that the State deems reasonably necessary in order to assure the Tribe's compliance with this Compact, in order to renegotiate any provision thereof, or in order to conduct or complete any investigation of suspected criminal activity in connection with the Gaming Activities or the operation of the Gaming Facility or the Gaming Operation.

(d)     For the purposes of this section 8.4, "confidential information and records" means any and all information and records received from the Tribe pursuant to the Compact, except for information and documents that are in the public domain.

(e)     The State Gaming Agency and all other state agencies and consultants to which it provides information and records

57

obtained pursuant to subdivisions (a) or (b) of this section, which are confidential pursuant to subdivision (d), will exercise care in the preservation of the confidentiality of such information and records and will apply the highest standards of confidentiality provided under California state law to preserve such information and records from disclosure until such time as the information or record is no longer confidential or disclosure is authorized by the Tribe, by mutual agreement of the Tribe and the State, or pursuant to the arbitration procedures under section 13.2. The State Gaming Agency and all other state agencies and consultants may disclose confidential information or records as necessary to fully adjudicate or resolve a dispute arising pursuant to the Compact, in which case the State Gaming Agency and all other state agencies and consultants agree to preserve confidentiality to the greatest extent feasible and available. Before the State Gaming Agency provides confidential information and records to a consultant as authorized under subdivision (c), it shall enter into a confidentiality agreement with that consultant that meets the standards of this subdivision.

(f)      The Tribe may avail itself of any and all remedies under State law for the improper disclosure of confidential information and records. In the case of any disclosure of confidential information and records compelled by judicial process, the State Gaming Agency will endeavor to give the Tribe prompt notice of the order compelling disclosure and a reasonable opportunity to interpose an objection thereto with the court.

(g)      The Tribal Gaming Agency and the State Gaming Agency shall confer regarding protocols for the release to law enforcement agencies of information obtained during the course of background investigations.

(h)      Confidential information and records received by the State Gaming Agency from the Tribe in compliance with this Compact, or information compiled by the State Gaming Agency from those confidential records, shall be exempt from disclosure under the California Public Records Act.

(i)     Notwithstanding any other provision of this Compact, the State Gaming Agency shall not be denied access to papers, books, records, equipment, or places where such access is reasonably necessary to ensure compliance with this Compact or to conduct or complete an investigation of suspected criminal activity in connection with the Gaming Activities or the operation of the Gaming Facility or the Gaming Operation.

## Sec. 8.5.  NIGC Audit Reports.

The Tribe shall provide to the State Gaming Agency, within twenty (20) days of their submission to the NIGC, copies of the audited financial statements of Class III Gaming and management letter(s), if any, provided to the NIGC.  All submissions to the State Gaming Agency made pursuant to this section 8.5 shall be subject to the confidentiality protections and assurances set forth in section 8.4, subdivision (h) of this Compact.

## Sec. 8.6.  Cooperation with Tribal Gaming Agency.

The State Gaming Agency shall meet periodically with the Tribal Gaming Agency and cooperate in all matters relating to the enforcement of the provisions of this Compact and its Appendices.

## Sec. 8.7.  Compact Compliance Review.

The State Gaming Agency is authorized to conduct an annual comprehensive Compact compliance review of the Gaming Operation, Gaming Facility, and Gaming Activities to ensure compliance with all provisions of this Compact, any appendices hereto, including, without limitation, minimum internal control standards set forth in Appendix D, and with all laws, ordinances, codes, rules, regulations, policies, internal controls, standards, and procedures that are required to be adopted, implemented, or complied with pursuant to this Compact.  Upon the discovery of an irregularity that the State Gaming Agency reasonably determines may be a threat to gaming integrity or public safety, and after consultation with the Tribal Gaming Agency, the State Gaming Agency may conduct additional periodic reviews of any part of the Gaming Operation, Gaming Facility, and Gaming Activities and other activities subject to this Compact in order to ensure compliance with all provisions of this Compact and its appendices.  Nothing in this section shall be construed to supersede

any other audits, inspections, investigations, and monitoring authorized by this Compact.

## SECTION 9.0.  RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE GAMING OPERATION AND FACILITY.

### Sec. 9.1.  Adoption of Regulations for Operation and Management; Minimum Standards.

It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Compact, of IGRA, of NIGC gaming regulations, of State Gaming Agency regulations, and of the Gaming Ordinance, to protect the integrity of the Gaming Activities and the Gaming Operation for honesty and fairness, and to maintain the confidence of patrons that tribal governmental gaming in California meets the highest standards of fairness and internal controls.  To meet those responsibilities, the Tribal Gaming Agency shall be vested with the authority to promulgate, and shall promulgate, rules and regulations governing, at a minimum, the following subjects pursuant to the standards and conditions set forth therein:

(a)     The enforcement of all relevant laws and rules with respect to the Gaming Activities, Gaming Operation and Gaming Facility, and the conduct of investigations and hearings with respect thereto, and to any other subject within its jurisdiction.

(b)     The physical safety of Gaming Facility patrons and employees, and any other person while in the Gaming Facility.  Except as provided in section 12.2, nothing herein shall be construed, however, to make applicable to the Tribe any State laws, regulations, or standards governing the use of tobacco.

(c)     The physical safeguarding of assets transported to, within, and from the Gaming Facility.

(d)     The prevention of illegal activity within the Gaming Facility or with regard to the Gaming Operation or Gaming Activities, including, but not limited to, the maintenance of employee

60

procedures and a surveillance system as provided in subdivision (e).

(e)     Maintenance of a closed-circuit television surveillance system consistent with industry standards for gaming facilities of the type and scale operated by the Tribe, which system shall be approved by, and may not be modified without the approval of, the Tribal Gaming Agency.  The Tribal Gaming Agency shall have current copies of the Gaming Facility floor plan and closed-circuit television system at all times.

(f)     The recording of any and all occurrences within the Gaming Facility that deviate from normal operating policies and procedures (hereinafter "incidents").  The regulations shall provide that the Tribal Gaming Agency shall transmit copies of incident reports that it reasonably believes concern a significant or continued threat to public safety or gaming integrity to the State Gaming Agency forthwith.  The procedure for recording incidents pursuant to the regulations shall also do all of the following:

(1)     Specify that security personnel record all incidents, regardless of an employee's determination that the incident may be immaterial (all incidents shall be identified in writing).

(2)     Require the assignment of a sequential number to each report.

(3)     Provide for permanent reporting in indelible ink in a bound notebook from which pages cannot be removed and in which entries are made on each side of each page and/or in electronic form, provided the information is recorded in a manner so that, once the information is entered, it cannot be deleted or altered and is available to the State Gaming Agency pursuant to sections 8.3 and 8.4.

(4)     Require that each report include, at a minimum, all of the following:

61

(A)   The record number.

(B)   The date.

(C)   The time.

(D)   The location of the incident.

(E)   A detailed description of the incident.

(F)   The persons involved in the incident.

(G)   The security department employee assigned to the incident.

(g)   The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like, consistent with industry practice.

(h)   Maintenance of a list of persons permanently excluded from the Gaming Facility who, because of their past behavior, criminal history, or association with persons or organizations, pose a threat to the integrity of the Gaming Activities of the Tribe or to the integrity of regulated gaming within the State.  The Tribal Gaming Agency shall transmit a copy of the list to the State Gaming Agency quarterly and shall make a copy of the current list available to the State Gaming Agency upon request. Notwithstanding anything in this Compact to the contrary, the State Gaming Agency is authorized to make the copies of the list available to other tribal gaming agencies, to licensees of the Commission, the California Horse Racing Board, and other law enforcement agencies.

(i)   The conduct of an audit, at the Tribe's expense, of the annual financial statements of the Gaming Operation.

(j)   Submission to, and prior approval by, the Tribal Gaming Agency of the rules and regulations of each Class III game to be operated by the Tribe, and of any changes in those rules and

regulations.  No Class III game may be played that has not received Tribal Gaming Agency approval.

(k)     The obligation of the Gaming Facility and the Gaming Operation to maintain a copy of the rules, regulations, and procedures for each game as played, including, but not limited to, the method of play and the odds and method of determining amounts paid to winners.

(l)     Specifications and standards to ensure that information regarding the method of play, odds, and payoff determinations is visibly displayed or available to patrons in written form in the Gaming Facility and to ensure that betting limits applicable to any gaming station is displayed at that gaming station.

(m)     Maintenance of a cashier's cage in accordance with industry standards for such facilities.

(n)     Specification of minimum staff and supervisory requirements for each Gaming Activity to be conducted.

(o)     Technical standards and specifications in conformity with the requirements of this Compact for the operation of Gaming Devices and other games authorized herein to be conducted by the Tribe.

**Sec. 9.1.1.  Minimum Internal Control Standards (MICS).**

(a)     The Tribe shall conduct its Gaming Activities pursuant to an internal control system that implements minimum internal control standards for Class III Gaming that are no less stringent than those contained in the Minimum Internal Control Standards of the NIGC (25 C.F.R. § 542), as they existed on October 19, 2006, and as they may thereafter be amended, without regard to the NIGC's authority to promulgate, enforce, or audit the standards.  This requirement is met through compliance with the provisions set forth in this section and in section 9.1 or in the alternative by compliance with the state-wide uniform regulation CGCC-8, as it exists currently and as it may hereafter be amended.

63

(b)    Before commencement of Gaming Operations, the Tribal Gaming Agency shall, in accordance with the Gaming Ordinance, establish written internal control standards for the Gaming Facility that shall:  (i) provide a level of control that equals or exceeds the minimum internal control standards set forth in Appendix D to this Compact, as it exists currently and as it may be revised; (ii) contain standards for currency transaction reporting that comply with title 31 Code of Federal Regulations part 103, as it exists currently and as it may hereafter be amended; (iii) satisfy the requirements of section 9.1; (iv) be consistent with this Compact; and (v) require the Gaming Operation to comply with the internal control standards.

(c)    The Gaming Operation shall operate the Gaming Facility pursuant to a written internal control system.  The internal control system shall comply with and implement the internal control standards established by the Tribal Gaming Agency pursuant to subdivision (b) of this section 9.1.1.  The internal control system, and any proposed changes to the system, must be approved by the Tribal Gaming Agency prior to implementation.  The internal control system shall be designed to reasonably assure that:  (i) assets are safeguarded and accountability over assets is maintained; (ii) liabilities are properly recorded and contingent liabilities are properly disclosed; (iii) financial records including records relating to revenues, expenses, assets, liabilities, and equity/fund balances are accurate and reliable; (iv) transactions are performed in accordance with the Tribal Gaming Agency's general or specific authorization; (v) access to assets is permitted only in accordance with the Tribal Gaming Agency's approved procedures; (vi) recorded accountability for assets is compared with actual assets at frequent intervals and appropriate action is taken with respect to any discrepancies; and (vii) functions, duties and responsibilities are appropriately segregated and performed in accordance with sound practices by qualified personnel.

(d)     The Tribal Gaming Agency shall provide a copy of its written internal control standards to comply with the minimum internal controls set forth in Appendix D, and any changes to those control standards, to the State Gaming Agency within thirty (30) days of approval by the Tribal Gaming Agency.  The State Gaming Agency will review and submit to the Tribal Gaming Agency written comments or objections, if any, to the internal control standards and any changes to the standards, within thirty (30) days of receiving them, or by another date agreed upon by the Tribal Gaming Agency and the State Gaming Agency.  The State Gaming Agency's review shall be for the purpose of determining whether the internal control standards and any changes to the standards provide a level of control which equals or exceeds the level of control required by the minimum internal control standards set forth in Appendix D, as it exists currently and as it may be revised, and are consistent with this Compact; provided, however, that the Tribal Gaming Agency need not provide, and the State Gaming Agency's review shall not apply to, internal controls approved by the Tribal Gaming Agency that are not applicable to the minimum internal control standards set forth in Appendix D.

(e)     The minimum internal control standards set forth in Appendix D to this Compact shall apply to all Gaming Activities, Gaming Facilities and the Gaming Operation; however, Appendix D is not applicable to any activities not expressly permitted in this Compact.  Should the terms in Appendix D be inconsistent with any terms addressed by this Compact, the terms in this Compact shall prevail.

(f)     The Tribal Gaming Agency and the State Gaming Agency shall, every three (3) years after this Compact is in effect, and not later than thirty (30) days after the three (3)-year period, discuss whether negotiations to amend Appendix D to this Compact are necessary to continue efficient regulation, foster statewide uniformity of regulation of Class III Gaming operations, or address future circumstances, including, without limitation, technological advancements and changes in industry standards.  If either the Tribal Gaming Agency or the State Gaming Agency requests negotiations pursuant to this

subdivision (f), those agencies shall promptly commence negotiations to amend Appendix D to this Compact  The Tribal Gaming Agency or the State Gaming Agency may, at any time, request negotiations to amend Appendix D to this Compact for the purposes described in this subdivision (f).  Such revisions to Appendix D shall not be considered to be an amendment to this Compact.  Any disputes regarding the contents of future amendments to Appendix D shall be resolved in the manner set forth in section 13.0 of this Compact.

(g)　　The Tribal Gaming Agency shall provide the State Gaming Agency with a copy of the "Agreed-Upon Procedures" report prepared annually pursuant to part 542.3, subdivision (f) in Appendix D, as may be amended from time to time, within thirty (30) days after the Tribal Gaming Agency's receipt of the report.  The "Agreed-Upon Procedures" report shall be prepared by an independent auditor, who for the purposes of this section, shall be a certified public accountant licensed in the state of California to practice as an independent certified public accountant or who holds a California practice privilege, as provided in the California Accountancy Act, California Business and Professions Code, section 5000 et seq., who is not employed by the Tribe, the Tribal Gaming Agency, the Management Contractor, or the Gaming Operation, has no financial interest in any of these entities, and is only otherwise retained by any of these entities to conduct regulatory audits, independent audits of the Gaming Operation, or audits under this section.

### Sec. 9.2.  Program to Mitigate Problem Gambling.

The Gaming Operation shall establish a program, approved by the Tribal Gaming Agency, to mitigate pathological and problem gambling by implementing the following measures:

(a)　　It shall train Gaming Facility supervisors and gaming floor employees on responsible gaming and to identify and manage problem gambling.

(b)     It shall make available to patrons at conspicuous locations and ATMs in the Gaming Facility educational and informational materials which aim at the prevention of problem gambling and that specify where to find assistance.

(c)     It shall establish self-exclusion programs whereby a self-identified problem gambler may request the halt of promotional mailings, the revocation of privileges for casino services, the denial or restraint on the issuance of credit and check cashing services, and exclusion from the Gaming Facility.

(d)     It shall establish an involuntary exclusion program that allows, but does not require, the Gaming Operation to halt promotional mailings, deny or restrain the issuance of credit and cash checking services, and deny access to the Gaming Facility to patrons who have exhibited signs of problem gambling.

(e)     It shall display at conspicuous locations and at ATMs within the Gaming Facility signage bearing a toll-free help-line number where patrons may obtain assistance for gambling problems.

(f)     It shall make diligent efforts to prevent underage individuals from loitering in the area of the Gaming Facility where the Gaming Activities take place.

(g)     It shall assure that advertising and marketing of the Gaming Activities at the Gaming Facility contain a responsible gambling message and a toll-free help-line number for problem gamblers, where practical, and that it make no false or misleading claims.

(h)     It shall adopt a code of conduct, derived, inter alia, from that of the American Gaming Association, that addresses responsible gambling and responsible advertising.

Nothing herein is intended to grant any third party the right to sue based on a perceived violation of these standards.

### Sec. 9.3.  Enforcement of Regulations.

The Tribal Gaming Agency shall ensure the enforcement of the rules, regulations, and specifications promulgated under this Compact, including under section 9.1.

### Sec. 9.4.  State Civil and Criminal Jurisdiction.

Nothing in this Compact expands, modifies or impairs the civil or criminal jurisdiction of the State, local law enforcement agencies and state courts under Public Law 280 (18 U.S.C. § 1162; 28 U.S.C. § 1360) or IGRA to the extent applicable.  Except as provided below, all State and local law enforcement agencies and state courts shall exercise jurisdiction to enforce the State's criminal laws on the Tribe's Indian lands, including the Gaming Facility and all related structures, in the same manner and to the same extent, and subject to the same restraints and limitations, imposed by the laws of the State and the United States, as is exercised by State and local law enforcement agencies and state courts elsewhere in the State.  The Tribe hereby consents to such criminal jurisdiction.  However, no Gaming Activity conducted by the Tribe pursuant to this Compact may be deemed to be a civil or criminal violation of any law of the State.  Except for such Gaming Activity conducted pursuant to this Compact, criminal jurisdiction to enforce State gambling laws on the Tribe's Indian lands, and to adjudicate alleged violations thereof, is hereby transferred to the State pursuant to 18 U.S.C. § 1166(d).

### Sec. 9.5.  Tribal Gaming Agency Members.

(a)     The Tribe shall take all reasonable steps to ensure that members of the Tribal Gaming Agency are free from corruption, undue influence, compromise, and conflicting interests in the conduct of their duties under this Compact; shall adopt a conflict-of-interest code to that end and shall ensure its enforcement; and shall ensure the prompt removal of any member of the Tribal Gaming Agency who is found to have acted in a corrupt or compromised manner or to have a conflict of interest.

(b)     The Tribe shall conduct a background investigation on each prospective member of the Tribal Gaming Agency, who shall meet the background requirements of a management contractor

68

under IGRA; provided that if such member is elected through a tribal election process, that member may not participate in any Tribal Gaming Agency matters under this Compact unless a background investigation has been concluded and the member has been found to be suitable.  If requested by the Tribe or the Tribal Gaming Agency, the State Gaming Agency may assist in the conduct of such a background investigation and may assist in the investigation of any possible corruption or compromise of a member of the Tribal Gaming Agency.

(c)     In the event that the Tribe requests the assistance of the State Gaming Agency pursuant to subdivision (b) of this section and the State Gaming Agency determines that a member of the Tribal Gaming Agency is unsuitable, the State Gaming Agency shall serve upon the Tribe a written notice of its finding of unsuitability and request the removal of the member.  Upon receipt of notice that the State Gaming Agency has determined the member to be unsuitable, the Tribe shall either immediately remove that member from the Tribal Gaming Agency or demand an expedited arbitration pursuant to section 13.2.

(d)     If the Tribe demands an expedited arbitration of the State Gaming Agency's determination of unsuitability, the arbitrator shall make a de novo determination as to whether the State Gaming Agency's determination of unsuitability is justified using the following bases for such determination.

(1)     To be found suitable, the member must be all of the following:

(A)     A person of good character, honesty, and integrity.

(B)     A person whose prior activities, criminal record, if any, reputation, habits, and associations do not pose a threat to the public interest of the State, or to the effective regulation and control of controlled gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of controlled

69

gambling or in the carrying on of the business and financial arrangements incidental thereto.

(C) A person that is in all other respects qualified to be licensed as provided in section 6.4.7 of this Compact.

(2) A member is deemed unsuitable if any of the following apply:

(A) The person, any partner, or any officer, director, or shareholder of any corporation in which the person has a controlling interest, has any financial interest in any business or organization that is engaged in any form of gambling prohibited by section 330 of the California Penal Code, whether within or without the State of California, unless such gambling is lawful within the jurisdiction in which it is being conducted.

(B) The person fails to clearly establish eligibility and qualification in accordance with section 6.4.7 of this Compact.

(C) The person fails to provide information, documentation, and assurances required by sections 6.4.7, 6.4.8, subdivision (c), or 6.5.6 of this Compact or requested by the Tribal Gaming Agency, or fails to reveal any fact material to qualification, or supplies information that is untrue or misleading as to a material fact pertaining to the qualification criteria.

(D) The person has been convicted of a felony in any state or federal court, including a conviction by a federal court or by a court in another state for a crime that would constitute a felony if committed in California.

(E)     The person has been convicted of any misdemeanor involving dishonesty or moral turpitude within the ten (10)-year period immediately preceding the beginning of his or her service on the Tribal Gaming Agency, unless the applicant has been granted relief pursuant to section 1203.4, 1203.4a, or 1203.45 of the California Penal Code; provided, however, that the granting of relief pursuant to section 1203.4, 1203.4a, or 1203.45 of the California Penal Code shall not constitute a limitation on the discretion of the arbitrator to determine the person's compliance with the requirements of sections 6.4.7 and 9.5, subdivision (d)(1), of this Compact.

(F)     The person has been associated with criminal profiteering activity or organized crime, as defined by section 186.2 of the California Penal Code.

(G)     The person has exhibited contumacious defiance of any legislative investigatory body, or other official investigatory body of any state or of the United States, when that body is engaged in the investigation of crimes relating to gambling, official corruption related to gambling activities, or criminal profiteering activity or organized crime, as defined by section 186.2 of the California Penal Code.

(H)     The person is less than twenty-one (21) years of age.

In all cases, in coming to a decision, the arbitrator must give due consideration for the proper protection of the health, safety and welfare of the residents of the State, and must take into account whether membership on the Tribal Gaming Agency would undermine public trust that the Gaming Operation is free from criminal and dishonest elements and would be conducted honestly.

**Sec. 9.6.  Uniform Tribal Gaming Regulations.**

(a)     Uniform Tribal Gaming Regulations CGCC-1, CGCC-2, CGCC-7, and CGCC-8 (as in effect on the date the parties execute this Compact), adopted by the State Gaming Agency and approved by the Association, shall apply to the Gaming Operation until amended or repealed, without further action by the State Gaming Agency, the Tribe, the Tribal Gaming Agency or the Association.

(b)     Any subsequent Uniform Tribal Gaming Regulations adopted by the State Gaming Agency and approved by the Association shall apply to the Gaming Operation until amended or repealed.

(c)     No State Gaming Agency regulation adopted pursuant to this section 9.6 shall be effective with respect to the Tribe's Gaming Operation unless it has first been approved by the Association and the Tribe has had an opportunity to review and comment on the proposed regulation.

(d)     Every State Gaming Agency regulation adopted pursuant to this section 9.6 that is intended to apply to the Tribe (other than a regulation proposed or previously approved by the Association) shall be submitted to the Association for consideration prior to submission of the regulation to the Tribe for comment as provided in subdivision (c).  A regulation adopted pursuant to this section 9.6 that is disapproved by the Association shall not be submitted to the Tribe for comment unless it is re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections.

(e)     Except as provided in subdivision (d), no regulation of the State Gaming Agency adopted pursuant to this section 9.6 shall be adopted as a final regulation with respect to the Tribe's Gaming Operation before the expiration of 30 (thirty) days after submission of the proposed regulation to the Tribe for comment as a proposed regulation, and after consideration of the Tribe's comments, if any.

(f)     In exigent circumstances (e.g., imminent threat to public health and safety), the State Gaming Agency may adopt a regulation that becomes effective immediately.  Any such regulation shall be accompanied by a detailed, written description of the exigent circumstances, and shall be submitted immediately to the Association for consideration.  If the regulation is disapproved by the Association, it shall cease to be effective, but may be re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections, and thereafter submitted to the Tribe for comment as provided in subdivision (e).

(g)     The Tribe may object to a State Gaming Agency regulation adopted pursuant to this section 9.6 on the ground that it is unnecessary, unduly burdensome, or unfairly discriminatory, and may seek repeal or amendment of the regulation through the dispute resolution process of section 13.0.

## SECTION 10.0.  PATRON DISPUTES.

The Tribal Gaming Agency shall promulgate regulations governing patron disputes over the play or operation of any game, including any refusal to pay to a patron any alleged winnings from any Gaming Activities, which regulations must meet the following minimum standards:

(a)     A patron who makes a written complaint to appropriate personnel of the Gaming Operation over the play or operation of any game within three (3) days of the play or operation at issue shall be notified in writing of the patron's right to request in writing, within fifteen (15) days of the Gaming Operation's written notification to the patron of that right, resolution of the dispute by the Tribal Gaming Agency, and if dissatisfied with the resolution, to seek resolution in either the Tribe's tribal court system, once a tribal court system is established, or through the tribal claims commission pursuant to the terms and provisions in subdivision (c).  If the patron is not provided with the aforesaid notification within thirty (30) days of the patron's complaint, the deadlines herein shall be removed, leaving only

73

the relevant statutes of limitations under California law that would otherwise apply.

(b)     Upon receipt of the patron's written request for a resolution of the patron's complaint pursuant to subdivision (a), the Tribal Gaming Agency shall conduct an appropriate investigation, shall provide to the patron a copy of its procedures concerning patron complaints, and shall render a decision in accordance with industry practice.  The decision shall be issued within sixty (60) days of the patron's request, shall be in writing, shall be based on the facts surrounding the dispute, and shall set forth the reasons for the decision.

(c)     If the patron is dissatisfied with the decision of the Tribal Gaming Agency issued pursuant to subdivision (b), or no decision is issued within the sixty (60)-day period, the patron may request that the dispute be settled either in the Tribe's tribal court system, once a tribal court system is established, or by a three (3)-member tribal claims commission consisting of a representative of the tribal government and at least one non-tribal commissioner.  No member of the commission may be employed by the Gaming Facility or Gaming Operation. Resolution of the dispute before the tribal court system or tribal claims commission shall be at no cost to the claimant (excluding claimant's attorney's fees).

(d)     The Tribe shall consent to tribal court or tribal claims commission adjudication, as provided in subdivision (f), to the extent of the limits of the Policy as defined in section 12.5, and discovery in the tribal court or claims commission proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure.

(e)     Any party dissatisfied with the award of the tribal court or tribal claims commission may, at the party's election, invoke the jurisdiction of the tribal appellate court, if one is established, or the JAMS Optional Arbitration Appeal Procedure (or if those rules no longer exist, the closest equivalent), provided that if there is a tribal appellate court, the party making the election of JAMS must bear all costs and expenses of JAMS and the JAMS

74

arbitrators associated with the JAMS Optional Arbitration Appeal Procedure, hereafter also known as the "JAMS appeal proceeding," regardless of the outcome. The JAMS appeal proceeding shall take place in Santa Barbara County, California, shall use one (1) arbitrator and shall not be a de novo review, but shall be based solely upon the record developed in the tribal court or tribal claims commission proceeding. The JAMS appeal proceeding shall review all determinations of the tribal court or tribal claims commission on matters of law, but shall not set aside any factual determinations of the tribal court or tribal claims commission if such determination is supported by substantial evidence. The JAMS Optional Arbitration Appeal Procedure arbitrator will review the decision of the tribal court or tribal claims commission under the substantial evidence standard. The JAMS appeal proceeding arbitrator does not take new evidence but reviews the record of the decision below to make sure there is substantial evidence that reasonably supports that decision. The JAMS appeal proceeding arbitrator's appellate function is not to decide whether the arbitrator would have reached the same factual conclusions but decides whether a reasonable fact-finder could have come to the same conclusion based on the facts in the record. If there is a conflict in the evidence and a reasonable fact-finder could have resolved the conflict either way, the decision of the tribal court or tribal claims commission will not be overturned on appeal. The JAMS Optional Arbitration Appeal Procedure arbitrator shall have no authority to award attorney's fees, costs or arbitration fees, regardless of outcome.

(f)    To effectuate its consent to the tribal court system or tribal claims commission, and the JAMS Optional Arbitration Appeal Procedure in the tribal ordinance, the Tribe shall, in the exercise of its sovereignty, expressly waive, and also waive its right to assert, sovereign immunity in connection with the jurisdiction of the tribal court, tribal claims commission or JAMS Optional Arbitration Appeal Procedure and in any suit to (i) enforce an obligation under this section 10.0, or (ii) enforce or execute a judgment based upon the award of the tribal court, claims

75

commission, or JAMS Optional Arbitration Appeal Procedure process.

## SECTION 11.0.  OFF-RESERVATION ENVIRONMENTAL AND ECONOMIC IMPACTS.

### Sec. 11.1.  Tribal Environmental Impact Report.

(a)    Before the commencement of any Project as defined in section 2.22, the Tribe shall cause to be prepared a comprehensive and adequate tribal environmental impact report (TEIR), analyzing the potentially significant off-reservation environmental impacts of the Project pursuant to the process set forth in this section 11.0; provided, however, that information or data which is relevant to such a TEIR and is a matter of public record or is generally available to the public need not be repeated in its entirety in the TEIR, but may be specifically cited as the source for conclusions stated therein; and provided further that such information or data shall be briefly described, that its relationship to the TEIR shall be indicated, and that the source thereof shall be reasonably available for inspection at a public place or public building.  The TEIR shall provide detailed information about the Significant Effect(s) on the Environment which the Project is likely to have, including each of the matters set forth in Appendix B, shall list ways in which the Significant Effects on the Environment might be minimized, and shall include a detailed statement setting forth all of the following:

    (1)    A description of the physical environmental conditions in the vicinity of the Project (the environmental setting and existing baseline conditions), as they exist at the time the notice of preparation is issued;

    (2)    All Significant Effects on the Environment of the proposed Project;

    (3)    In a separate section:

(A)   Any Significant Effect on the Environment that cannot be avoided if the Project is implemented;

(B)   Any Significant Effect on the Environment that would be irreversible if the Project is implemented;

(4)   Mitigation measures proposed to minimize Significant Effects on the Environment, including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary consumption of energy;

(5)   Alternatives to the Project; provided that the Tribe need not address alternatives that would cause it to forgo its right to engage in the Gaming Activities authorized by this Compact on its Indian lands;

(6)   Whether any proposed mitigation would be feasible;

(7)   Any direct growth-inducing impacts of the Project; and

(8)   Whether the proposed mitigation would be effective to substantially reduce the potential Significant Effects on the Environment.

(b)   In addition to the information required pursuant to subdivision (a), the TEIR shall also contain a statement indicating the reasons for determining that various effects of the Project on the off-reservation environment are not significant and consequently have not been discussed in detail in the TEIR.  In the TEIR, the direct and indirect Significant Effects on the Environment, including each of the items in Appendix B, shall be clearly identified and described, giving due consideration to both the short-term and long-term effects.  The discussion of mitigation measures shall describe feasible measures which could minimize significant adverse effects, and shall distinguish between the measures that are proposed by the Tribe and other measures proposed by others.  Where several measures are available to mitigate an effect, each should be discussed and the basis for selecting a particular measure should be identified.

Formulation of mitigation measures should not be deferred until some future time.  The TEIR shall also describe a range of reasonable alternatives to the Project or to the location of the Project, which would feasibly attain most of the basic objectives of the Project and which would avoid or substantially lessen any of the Significant Effects on the Environment, and evaluate the comparative merits of the alternatives; provided that the Tribe need not address alternatives that would cause it to forgo its right to engage in the Gaming Activities authorized by this Compact on its Indian lands.  The TEIR must include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison.  The TEIR shall also contain an index or table of contents and a summary, which shall identify each Significant Effect on the Environment with proposed measures and alternatives that would reduce or avoid that effect, and issues to be resolved, including the choice among alternatives and whether and how to mitigate the Significant Effects on the Environment.  Previously approved land use documents, including, but not limited to, general plans, specific plans, and local coastal plans, may be used in a cumulative impact analysis.  The Tribe shall consider any recommendations from the County concerning the person or entity to prepare the TEIR.

(c)     With regard to the Tribe's obligation to address the potentially significant off-reservation environmental impacts prior to commencing a Project, Projects that have commenced prior to the effective date of this Compact, including but not limited to the Hotel Expansion Project, as defined in the Final Environmental Evaluation dated September 2014 and the July 2015 addendum, will be subject to the relevant terms and conditions of the Tribe's 1999 Compact then in effect.  Notwithstanding the forgoing, changes to existing Facilities or ongoing Projects made after the effective date of this Compact, to the extent the environmental impacts were not considered as part of the Project under the Tribe's 1999 Compact, and Projects not identified in any TEIR issued before the effective date of this Compact, will be subject to the terms and conditions specified herein.

78

**Sec. 11.2.  Notice of Preparation of Draft TEIR.**

(a)     Upon commencing the preparation of the draft TEIR, the Tribe shall issue a Notice of Preparation to the State Clearinghouse in the State Office of Planning and Research (State Clearinghouse) and to the County for distribution to the public.  The Tribe shall also post the Notice of Preparation on its website.  The Notice of Preparation shall provide all Interested Persons, as defined in section 2.18, with information describing the Project and its potential Significant Effects on the Environment sufficient to enable Interested Persons to make a meaningful response or comment.  At a minimum, the Notice of Preparation shall include all of the following information:

(1)     A description of the Project;

(2)     The location of the Project shown on a detailed map, preferably topographical, and on a regional map; and

(3)     The probable off-reservation environmental effects of the Project.

(b)     The Notice of Preparation shall also inform Interested Persons of the preparation of the draft TEIR and shall inform them of the opportunity to provide comments to the Tribe within thirty (30) days of the date of the receipt of the Notice of Preparation by the State Clearinghouse and the County.  The Notice of Preparation shall also request Interested Persons to identify in their comments the off-reservation environmental issues and reasonable mitigation measures that the Tribe will need to have explored in the draft TEIR.

**Sec. 11.3.  Notice of Completion of Draft TEIR.**

(a)     Within no less than thirty (30) days following the receipt of the Notice of Preparation by the State Clearinghouse and the County, the Tribe shall file a copy of the draft TEIR and a Notice of Completion with the State Clearinghouse, the State Gaming Agency, the County, and the California Department of Justice, Office of the Attorney General.  The Tribe shall also

post the Notice of Completion and a copy of the draft TEIR on its website. The Notice of Completion shall include all of the following information:

    (1)    A brief description of the Project;

    (2)    The proposed location of the Project;

    (3)    An address where copies of the draft TEIR are available; and

    (4)    Notice of a period of forty-five (45) days during which the Tribe will receive comments on the draft TEIR.

(b)    The Tribe will submit ten (10) copies each of the draft TEIR and the Notice of Completion to the County, which will be asked to post public notice of the draft TEIR at the office of the County Board of Supervisors and to furnish the public notice to the public libraries serving the County. The County shall also be asked to serve in a timely manner the Notice of Completion to all Interested Persons, which Interested Persons shall be identified by the Tribe for the County, to the extent it can identify them. In addition, the Tribe will provide public notice by at least one of the procedures specified below:

    (1)    Publication at least one (1) time by the Tribe in a newspaper of general circulation in the area affected by the Project. If more than one (1) area is affected, the notice shall be published in the newspaper of largest circulation from among the newspapers of general circulation in those areas; or

    (2)    Direct mailing by the Tribe to the owners and occupants of property adjacent to, but outside, the Indian lands on which the Project is to be located. Owners of such property shall be identified as shown on the latest equalization assessment roll.

### Sec. 11.4  Issuance of Final TEIR.

The Tribe shall prepare, certify and make available to the County, the State Clearinghouse, the State Gaming Agency, and the California Department of Justice, Office of the Attorney General, at least fifty-five (55) days before the completion of negotiations pursuant to section 11.7 a Final TEIR, which shall consist of:

(a)     The draft TEIR or a revision of the draft;

(b)     Comments and recommendations received on the draft TEIR either verbatim or in summary;

(c)     A list of persons, organizations, and public agencies commenting on the draft TEIR;

(d)     The responses, which shall include good faith, reasoned analyses, of the Tribe to significant environmental points raised in the review and consultation process; and

(e)     Any other information added by the Tribe.

### Sec. 11.5.  Cost Reimbursement to County.

The Tribe shall reimburse the County for copying and mailing costs resulting from making the Notice of Preparation, Notice of Completion, and draft TEIR available to the public under this section 11.0.

### Sec. 11.6.  Failure to Prepare Adequate TEIR.

The Tribe's failure to prepare an adequate TEIR when required shall be deemed a breach of this Compact and furthermore shall be grounds for issuance of an injunction or other appropriate equitable relief.

### Sec. 11.7.  Intergovernmental Agreement.

(a)     Before the commencement of a Project, and no later than the issuance of the Final TEIR to the County, the Tribe shall offer to commence government-to-government negotiations with the County, and upon the County's acceptance of the Tribe's offer,

81

shall negotiate with the County on a government-to-government basis and shall enter into enforceable written agreements (hereinafter "intergovernmental agreements") with the County with respect to the matters set forth below:

(1)     The timely mitigation of any Significant Effect on the Environment (which effects, consistent with the policies and purposes of the National Environmental Policy Act and the California Environmental Quality Act, are described in Appendix B, Off-Reservation Environmental Impact Analysis Checklist), where such effect is attributable, in whole or in part, to the Project unless the parties agree that the particular mitigation is infeasible, taking into account economic, environmental, social, technological, or other considerations.

(2)     Compensation for law enforcement, fire protection, emergency medical services and any other public services to be provided by the County and its special districts to the Tribe for the purposes of the Gaming Operation, including the Gaming Facility, as a consequence of the Project.

(3)     Reasonable compensation for programs designed to address gambling addiction.

(4)     Mitigation of any effect on public safety attributable to the Project, including any compensation to the County as a consequence thereof.

(b)     The Tribe shall not commence a Project until the intergovernmental agreements with the County specified in subdivision (a) are executed by the parties or are effectuated pursuant to section 11.8.

(c)     If the Final TEIR identifies traffic impacts to the state highway system or facilities that are directly attributable in whole or in part to the Project, then before the commencement of the Project, the Tribe shall negotiate an intergovernmental agreement with the California Department of Transportation for

82

timely mitigation of all traffic impacts on the state highway system and facilities directly attributable to the Project, and payment of the Tribe's fair share of cumulative traffic impacts. Alternatively, the California Department of Transportation may agree in writing that the Tribe may negotiate and conclude, prior to commencement of the Project, an intergovernmental agreement with the County that mitigates the traffic impacts to the state highway system or facilities.

(d)    Nothing in this section 11.7 requires the Tribe to enter into any other intergovernmental agreements with a local governmental entity other than as set forth in subdivisions (a) and (c).

## Sec. 11.8.  Arbitration.

To foster good government-to-government relationships and to assure that the Tribe is not unreasonably prevented from commencing a Project and benefiting therefrom, if an intergovernmental agreement with the County, or the California Department of Transportation if required by section 11.7 subdivision (c), is not entered within seventy-five (75) days of the submission of the Final TEIR, or such further time as the Tribe and the County, or the California Department of Transportation (for purposes of this section "the parties"), may agree in writing, any party may demand binding arbitration before a JAMS arbitrator pursuant to JAMS Comprehensive Arbitration with respect to any remaining disputes arising from, connected with, or related to the negotiation:

(a)    The arbitration shall be conducted as follows:  Each party shall exchange with each other within five (5) days of the demand for arbitration its last, best written offer made during the negotiation pursuant to section 11.7.  The arbitrator shall schedule a hearing to be heard within thirty (30) days of his or her appointment unless the parties agree to a longer period.  The arbitrator shall be limited to awarding only one (1) of the offers submitted, without modification, based upon that proposal which best provides feasible mitigation of Significant Effects on the Environment and on public safety and most reasonably compensates for public services pursuant to section 11.7, without unduly interfering with the principal objectives of the Project or imposing environmental mitigation measures which

are different in nature or scale from the type of measures that have been required to mitigate impacts of a similar scale of other projects in the surrounding area, to the extent there are such other projects.  The arbitrator shall take into consideration whether the Final TEIR provides the data and information necessary to enable the County, or the California Department of Transportation if required by section 11.7, subdivision (c), to determine both whether the Project may result in a Significant Effect on the Environment and whether the proposed measures in mitigation are sufficient to mitigate any such effect.  If a party does not participate in the arbitration, the arbitrator shall nonetheless conduct the arbitration and issue an award, and the party initiating the arbitration shall submit such evidence as the arbitrator may require therefore.  Review of the resulting arbitration award is waived.

(b)     To effectuate this section, and in the exercise of its sovereignty, the Tribe agrees to expressly waive, and also waive its right to assert, sovereign immunity in connection with the arbitrator's jurisdiction and in any action to (i) enforce the other party's obligation to arbitrate, (ii) enforce or confirm any arbitral award rendered in the arbitration, or (iii) enforce or execute a judgment based upon the award.

(c)     The arbitral award will become part of the intergovernmental agreements with the County required under section 11.7.

(d)     An arbitral award entered pursuant to this section 11.8 as the result of arbitration between the Tribe and the California Department of Transportation, when an intergovernmental agreement is required by section 11.8, subdivision (c), will become the intergovernmental agreement with the California Department of Transportation.

## SECTION 12.0.  PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY.

### Sec. 12.1.  General Requirements.

The Tribe shall not conduct Class III Gaming in a manner that endangers the public health, safety, or welfare, provided, however, that nothing herein shall be construed to make applicable to the Tribe any State laws or regulations governing the use of tobacco.

### Sec. 12.2.  Tobacco Smoke.

Notwithstanding section 12.1, the Tribe agrees to provide a non-smoking area in the Gaming Facility and to utilize a ventilation system throughout the Gaming Facility that exhausts tobacco smoke to the extent reasonably feasible under state-of-the-art technology existing as of the date of the construction or significant renovation of the Gaming Facility, and further agrees not to offer or sell tobacco to anyone under eighteen (18) years of age.

### Sec. 12.3.  Health and Safety Standards.

To protect the health and safety of patrons and employees of the Gaming Facility, the Tribe shall, for the Gaming Facility:

(a)     Adopt and comply with State public health standards for food and beverage handling.  The Tribe will allow, during normal hours of operation, inspection of food and beverage services in the Gaming Facility by non-tribal governmental health inspectors who provide evidence of authority demonstrating that they would have jurisdiction but for the Gaming Facility being on Indian lands, to assess compliance with these standards, unless inspections are routinely made by an agency of the United States government to ensure compliance with equivalent standards of the United States Public Health Service. Any report subsequent to an inspection or visit by the non-tribal governmental, including federal, health inspectors shall be transmitted within seventy-two (72) hours to the State Gaming Agency and the Tribal Gaming Agency.  This includes any document that includes a citation or finding.  Nothing herein

85

shall be construed as submission of the Tribe to the jurisdiction of those non-tribal governmental health inspectors, but any violations of the standards may be the subject of dispute resolution per section 13.0.

(b)     Adopt and comply with federal water quality and safe drinking water standards applicable in California.  The Tribe will allow, during normal hours of operation, inspection and testing of water quality at the Gaming Facility by non-tribal governmental inspectors who provide evidence of authority demonstrating that would have jurisdiction but for the Gaming Facility being on Indian lands, to assess compliance with these standards, unless inspections and testing are routinely made by an agency of the United States pursuant to federal law to ensure compliance with federal water quality and safe drinking water standards.  Any report or other writings by the non-governmental, including federal, inspectors shall be transmitted within seventy-two (72) hours to the State Gaming Agency and the Tribal Gaming Agency.  Nothing herein may be construed as submission of the Tribe to the jurisdiction of those non-Tribal health inspectors, but any violations of the standards shall be treated as a violation of this Compact and may be subject to dispute resolution per section 13.0.

(c)     Comply with the building and safety standards set forth in section 6.4.2.

(d)     Adopt and comply with federal workplace and occupational health and safety standards.  The Tribe will allow inspection of Gaming Facility workplaces by State inspectors, during normal hours of operation, to assess compliance with these standards provided that there is no right to inspection by State inspectors where an inspection has been conducted by an agency of the United States pursuant to federal law during the previous calendar quarter and the Tribe has provided a copy of the federal agency's report to the State Gaming Agency within ten (10) days of the federal inspection.

(e)     Adopt and comply with tribal codes to the extent consistent with the provisions of this Compact and other applicable federal law regarding public health and safety.

(f)     Adopt and comply with federal laws and state laws forbidding harassment, including sexual harassment, in the workplace, forbidding employers from discrimination in connection with the employment of persons to work or working for the Gaming Operation or in the Gaming Facility on the basis of race, color, religion, ancestry, national origin, gender, marital status, medical condition, sexual orientation, age, or disability, and forbidding employers from retaliation against persons who oppose discrimination or participate in employment discrimination proceedings (hereinafter "harassment, retaliation, or employment discrimination"); provided that nothing herein shall preclude the Tribe from giving a preference in all employment matters to members and descendants of federally recognized Indian tribes pursuant to a duly adopted tribal ordinance.

(1)     The Tribe shall obtain and maintain an employment practices insurance policy consistent with industry standards for non-tribal casinos and underwritten by an insurer with an A.M. Best rating of A or higher which provides coverage of at least three million dollars ($3,000,000) per occurrence for unlawful harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the operation of, the Gaming Operation, Gaming Facility or Gaming Activities.  To effectuate the insurance coverage, the Tribe, in the exercise of its sovereignty, shall expressly waive, and also waive its right to assert, sovereign immunity and any and all defenses based thereon up to the greater of three million dollars ($3,000,000) or the limits of the employment practices insurance policy, in accordance with the tribal ordinance referenced in subdivision (f)(2) below, in connection with any claim for harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the

87

operation of, the Gaming Operation, Gaming Facility or Gaming Activities; provided, however, that nothing herein requires the Tribe to agree to liability for punitive damages or to waive its right to assert sovereign immunity in connection therewith. The employment practices insurance policy shall acknowledge in writing that the Tribe has expressly waived, and also waived its right to assert, sovereign immunity and any and all defenses based thereon for the purpose of arbitration of those claims for harassment, retaliation, or employment discrimination up to the limits of such policy and for the purpose of enforcement of any ensuing award or judgment and shall include an endorsement providing that the insurer shall not invoke tribal sovereign immunity up to the limits of such policy; however, such endorsement or acknowledgement shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds such policy limits or three million dollars ($3,000,000), whichever is greater. Nothing in this provision shall be interpreted to supersede any requirement in the Tribe's employment discrimination complaint ordinance that a claimant must exhaust administrative remedies as a prerequisite to the dispute resolution processes expressly authorized in this section 12.3, subdivision (f).

(2)     The standards shall be subject to enforcement pursuant to an employment discrimination complaint ordinance which shall be adopted by the Tribe prior to the effective date of this Compact and which shall continuously provide at least the following:

(A)     That California law shall govern all claims of harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the operation of, the Gaming Operation, Gaming Facility or Gaming Activities; provided that California law governing punitive damages need not be a part of the ordinance. Nothing in this

provision shall be construed as a submission of the Tribe to the jurisdiction of the California Department of Fair Employment and Housing or the California Fair Employment and Housing Commission, or any successor agencies thereto.

(B)     That a claimant shall have one hundred eighty (180) days from the date that an alleged discriminatory act occurred to file a written notice with the Tribe that he or she has suffered prohibited harassment, retaliation, or employment discrimination.

(C)     That, in the exercise of its sovereignty, the Tribe expressly waives, and also waives its right to assert, sovereign immunity with respect to the dispute resolution processes expressly authorized in this section 12.3, subdivision (f) relating to claims for harassment, retaliation, or employment discrimination, but only up to the greater of three million dollars ($3,000,000) or the limits of the employment practices insurance policy referenced in subdivision (f)(1) above; provided, however, such waiver shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds three million dollars ($3,000,000) or the insurance policy limits, whichever is greater.

(D)     The ordinance shall allow for the claim to be resolved either in the Tribe's tribal court system, once a tribal court system is established, or by a three (3)-member tribal claims commission consisting of a representative of the tribal government and at least one (1) non-tribal commissioner.  No member of the commission may be employed by the Gaming Facility or Gaming Operation.  Resolution of the dispute before the tribal court system or tribal claims

89

commission shall be at no cost to the claimant (excluding claimant's attorney's fees).

(3)    The Tribe shall consent to tribal court or tribal claims commission adjudication to the extent of the limits of the employment practices insurance policy as provided in section 12.3, subdivision (f)(1), and that discovery in the tribal court or claims commission proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure.

(4)    Any party dissatisfied with the award of the tribal court or tribal claims commission may, at the party's election, invoke the jurisdiction of the tribal appellate court, if one is established, or the JAMS Optional Arbitration Appeal Procedure (or if those rules no longer exist, the closest equivalent), provided that if there is a tribal appellate court, the party making the election of the JAMS Optional Arbitration Appeal Procedure, hereafter also known as the "JAMS appeal proceeding," must bear all costs and expenses of JAMS and the JAMS arbitrators associated with the JAMS Optional Arbitration Appeal Procedure, regardless of the outcome.  The applicable JAMS appeal proceeding shall take place in Santa Barbara County, California, shall use one (1) arbitrator and shall not be a de novo review, but shall be based solely upon the record developed in the tribal court or tribal claims commission proceeding.  The JAMS appeal proceeding shall review all determinations of the tribal court or tribal claims commission on matters of law, but shall not set aside any factual determinations of the tribal court or tribal claims commission if such determination is supported by substantial evidence.  The JAMS appeal proceeding arbitrator will review the decision of the tribal court or tribal claims commission under the substantial evidence standard.  The JAMS Optional Arbitration Appeal Procedure arbitrator does not take new evidence but reviews the record of the decision below to make sure there is substantial evidence that reasonably supports that decision.  The appellate function

90

is not to decide whether it would have reached the same factual conclusions but decides whether a reasonable fact-finder could have come to the same conclusion based on the facts in the record.  If there is a conflict in the evidence and a reasonable fact-finder could have resolved the conflict either way, the decision of the tribal court or tribal claims commission will not be overturned on appeal.  The JAMS Optional Arbitration Appeal Procedure arbitrator shall have no authority to award attorney's fees, costs or arbitration fees regardless of outcome.

(5)   To effectuate its consent to the tribal court system or tribal claims commission and the JAMS Optional Arbitration Appeal Procedure in the ordinance required under subdivision (f)(2), the Tribe shall, in the exercise of its sovereignty, expressly waive, and also waive its right to assert, sovereign immunity in connection with the jurisdiction of the tribal court, tribal claims commission and the JAMS Arbitration Appeal Procedure and in any suit to (i) enforce an obligation under this section 12.3, subdivision (f), or (ii) enforce or execute a judgment based upon the award of the tribal court, claims commission, or the JAMS Optional Arbitration Appeal Procedure.

(6)   The employment discrimination complaint ordinance required under subdivision (f)(2) may require, as a prerequisite to the use of the dispute resolution processes expressly authorized in this section 12.3, subdivision (f), that the claimant exhaust the Tribe's administrative remedies, if any exist, in the form of a tribal employment discrimination complaint resolution process, for resolving the claim in accordance with the following standards:

(A)   Upon written notice that the claimant alleges that he or she has suffered prohibited harassment, retaliation, or employment discrimination, the Tribe or its designee shall provide notice by

91

personal service or certified mail, return receipt requested, that the claimant is required to proceed with the Tribe's employment discrimination complaint resolution process in the event that the claimant wishes to pursue his or her claim.

(B)     The claimant must bring his or her claim within one hundred eighty (180) days of receipt of the written notice (limitation period) of the Tribe's employment discrimination complaint resolution process as long as the notice thereof is served personally on the claimant or by certified mail with an executed return receipt by the claimant and the one hundred eighty (180)-day limitation period is prominently displayed on the front page of the notice.

(C)     Other authorized dispute resolution processes may be stayed until the completion of the Tribe's employment discrimination complaint resolution process or one hundred eighty (180) days from the date the claim was filed, whichever first occurs, unless the parties mutually agree upon a longer period.

(D)     The decision of the Tribe's employment discrimination complaint resolution process shall be in writing, shall be based on the facts surrounding the dispute, shall be a reasoned decision, and shall be rendered within one hundred eighty (180) days from the date the claim was filed, unless the parties mutually agree upon a longer period.

(7)   Within fourteen (14) days following written notification that a claimant claims that he or she has suffered prohibited harassment, retaliation, or employment discrimination, the Tribe shall provide notice by personal service or certified mail, return receipt requested, that the claimant is required within the limitation period set forth

in subdivision (f)(6)(b) of this section to first exhaust the Tribe's employment discrimination complaint resolution process, if any exists, and if dissatisfied with the resolution, is entitled to proceed with a dispute resolution process expressly authorized under subdivision (f)(2)(D), at no cost to the claimant (except for the claimant's attorney's fees).

(8)     In the event the Tribe fails to adopt the ordinance specified in subdivision (f)(2), such failure shall constitute a breach of this Compact.

(9)     The Tribe shall provide written notice of the employment discrimination complaint ordinance and the procedures for bringing a complaint in its employee handbook.  The Tribe also shall post and keep posted in prominent and accessible places in the Gaming Facility where notices to employees and applicants for employment are customarily posted, a notice setting forth the existence of the employment discrimination complaint ordinance and information pertinent to the filing of a complaint.  Upon request by an employee, the Tribe shall provide a copy of its employment discrimination complaint ordinance.

(g)     Adopt and comply with standards that are no less stringent than State laws prohibiting a gambling enterprise from cashing any check drawn against a federal, state, county, or city fund, including but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments.

(h)     Adopt and comply with standards that are no less stringent than State laws, if any, prohibiting a gambling or other gaming enterprise from providing, allowing, contracting to provide, or arranging to provide alcoholic beverages, for no charge or at reduced prices at a gambling establishment as an incentive or enticement.

(i)     Adopt and comply with standards that are no less stringent than State laws, if any, prohibiting extensions of credit.

93

(j)     Comply with provisions of the Bank Secrecy Act, P.L. 91-508, October 26, 1970, 31 U.S.C. §§ 5311-5314, as amended, and all reporting requirements of the Internal Revenue Service, insofar as such provisions and reporting requirements are applicable to gambling establishments.

(k)     Adopt and comply with the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., the United States Department of Labor regulations implementing the Fair Labor Standards Act, 29 C.F.R. § 500 et seq., the State's minimum wage law set forth in California Labor Code section 1182.12, and the State Department of Industrial Relations regulations implementing the State's minimum wage law, Cal. Code Regs. tit. 8, § 1100 et seq.  Notwithstanding the foregoing, only the federal minimum wages laws set forth in the Fair Labor Standards Act, 29 C.F.R. § 500 et seq., shall apply to tipped employees.

## Sec. 12.4.  Tribal Gaming Facility Standards Ordinance.

The Tribe shall adopt in the form of an ordinance the standards described in subdivisions (a) through (k) of section 12.3 to which the Gaming Operation is held, and shall transmit the ordinance to the State Gaming Agency not later than thirty (30) days after the effective date of this Compact.  In the absence of a promulgated tribal standard in respect to a matter identified in those subdivisions, or the express adoption of an applicable federal and/or State statute or regulation, as the case may be, in respect of any such matter, the otherwise applicable federal and/or State statute or regulation shall be deemed to have been adopted by the Tribe as the applicable standard.

## Sec. 12.5.  Insurance Coverage and Claims.

(a)     The Tribe shall obtain and maintain commercial general liability insurance consistent with industry standards for non-tribal casinos in the United States underwritten by an insurer with an A.M. Best rating of A or higher which provides coverage of no less than ten million dollars ($10,000,000) per occurrence for bodily injury, personal injury, and property damage arising out of, connected with, or relating to the operation of the Gaming Facility or Gaming Activities (Policy).

94

To effectuate the insurance coverage, the Tribe shall expressly waive, and waive its right to assert, sovereign immunity up to the greater of ten million dollars ($10,000,000) or the limits of the Policy, in accordance with the tribal ordinance referenced in subdivision (b) below, in connection with any claim for bodily injury, personal injury, or property damage, arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including, but not limited to, injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility; provided, however, that nothing herein requires the Tribe to agree to liability for punitive damages or to waive its right to assert sovereign immunity in connection therewith.  The Policy shall acknowledge in writing that the Tribe has expressly waived, and waived its right to assert, sovereign immunity for the purpose of the dispute resolution processes authorized herein of those claims up to the greater of ten million dollars ($10,000,000) or the limits of the Policy referred to above and for the purpose of enforcement of any ensuing award or judgment and shall include an endorsement providing that the insurer shall not invoke tribal sovereign immunity up to the limits of the Policy; however, such endorsement or acknowledgement shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds ten million dollars ($10,000,000) or the Policy limits, whichever is greater.

(b)     The Tribe shall adopt, and at all times hereinafter shall maintain in continuous force, an ordinance that provides for all of the following:

(1)     The ordinance shall provide that the Tribe shall adopt California tort law to govern all claims of bodily injury, personal injury, or property damage arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including but not limited to injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or

95

services to the Gaming Facility, provided that California law authorizing punitive damages need not be a part of the ordinance.  Further, the Tribe may include in the ordinance required by this subdivision a requirement that a person with claims for money damages against the Tribe file those claims within the time periods applicable for the filing of claims for money damages against public entities under California Government Code section 810 et seq.  The ordinance may provide that under no circumstances shall there be any awards of attorney's fees, arbitration fees or costs in any proceeding authorized under this section 12.5.

(2)     The ordinance shall also expressly provide for waiver of the Tribe's sovereign immunity and its right to assert sovereign immunity with respect to the resolution of such claims in the Tribe's tribal court system, once a tribal court system is established, or in other dispute resolution procedures expressly authorized herein, but only up to the greater of ten million dollars ($10,000,000) or the limits of the Policy; provided, however, such waiver shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds ten million dollars ($10,000,000) or the Policy limits, whichever is greater.

(3)     The ordinance shall allow for the claim to be resolved either in the Tribe's tribal court system, once a tribal court system is established, or by a tribal three (3)-member tribal claims commission consisting of a representative of the tribal government and at least one (1) non-tribal commissioner.  No member of the commission may be employed by the Gaming Facility or Gaming Operation.  Resolution of the dispute before the tribal court system or tribal claims commission shall be at no cost to the claimant (excluding claimant's attorney's fees).

(4)     The Tribe shall consent to tribal court or tribal claims commission adjudication to the extent of the limits of the

96

Policy, and that discovery in the tribal court or claims commission proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure.

(5)    Any party dissatisfied with the award of the tribal court or tribal claims commission may, at the party's election, invoke the jurisdiction of the tribal appellate court, if one is established, or the JAMS Optional Arbitration Appeal Procedure (or if those rules no longer exist, the closest equivalent), provided that if there is a tribal appellate court, the party making the election of JAMS must bear all costs and expenses of JAMS and the JAMS arbitrators associated with the JAMS Optional Arbitration Appeal Procedure, regardless of the outcome.  The applicable JAMS Optional Arbitration Appeal Procedure, hereafter also known as the "JAMS appeal proceeding," shall take place in Santa Barbara County, California, shall use one (1) arbitrator and shall not be a de novo review, but shall be based solely upon the record developed in the tribal court or tribal claims commission proceeding.  The JAMS appeal proceeding shall review all determinations of the tribal court or tribal claims commission on matters of law, but shall not set aside any factual determinations of the tribal court or tribal claims commission if such determination is supported by substantial evidence.  The JAMS appeal proceeding will review the decision of the tribal court or tribal claims commission under the substantial evidence standard.  The JAMS Optional Arbitration Appeal Procedure arbitrator does not take new evidence but reviews the record of the decision below to make sure there is substantial evidence that reasonably supports that decision.  The JAMS Optional Arbitration Appeal Procedure arbitrator's appellate function is not to decide whether he or she would have reached the same factual conclusions but decide whether a reasonable fact-finder could have come to the same conclusion based on the facts in the record.  If there is a conflict in the evidence and a reasonable fact-finder could have resolved the conflict either way, the decision of the tribal court or tribal claims commission will not be

97

overturned on appeal.  The arbitrator shall have no authority to award attorney's fees, costs or arbitration fees, regardless of outcome.

(6)     To effectuate its consent to the tribal court system or tribal claims commission, and the JAMS Optional Arbitration Appeal Procedure in the ordinance, the Tribe shall, in the exercise of its sovereignty, expressly waive, and also waive its right to assert, sovereign immunity in connection with the jurisdiction of the tribal court, tribal claims commission, and JAMS Optional Arbitration Appeal Procedure, and in any suit to (i) enforce an obligation under this section 12.5, or (ii) enforce or execute a judgment based upon the award of the tribal court, tribal claims commission, or the JAMS Optional Arbitration Appeal Procedure arbitrator.

(7)     The ordinance may also require that the claimant first exhaust the Tribe's administrative remedies for resolving the claim (hereinafter the "Tribal Dispute Process") in accordance with the following standards:  The claimant must bring his or her claim within one hundred eighty (180) days of receipt of written notice of the Tribal Dispute Process as long as notice thereof is served personally on the claimant or by certified mail with an executed return receipt by the claimant and the one hundred eighty (180)-day limitation period is prominently displayed on the front page of the notice. The ordinance may provide that any other dispute resolution process shall be stayed until the completion of the Tribal Dispute Process or one hundred eighty (180) days from the date the claim is filed in the Tribal Dispute Process, whichever first occurs, unless the parties mutually agree to a longer period.

(c)     Upon written notice that a claimant claims to have suffered an injury or damage covered by this section, the Tribe shall provide notice by personal service or certified mail, return receipt requested, that the claimant is required within the one hundred eighty (180)-day limitation period to first exhaust the

Tribal Dispute Process, if any, and if dissatisfied with the resolution, is entitled to the appeal process described in subdivision (b)(5).

(d)    In the event the Tribe fails to adopt the ordinance specified in subdivision (b), such failure shall constitute a breach of this Compact.

(e)    The Tribe shall not invoke on behalf of any employee or authorized agent, the Tribe's sovereign immunity in connection with any claim for, or any judgment based on any claim for, intentional injury to persons or property committed by the employee or authorized agent of the Gaming Operation, without regard to the Tribe's liability insurance limits.  Nothing in this subdivision prevents the Tribe from invoking sovereign immunity on its own behalf or authorizes a claim against the Tribe or a tribally owned entity.

**Sec. 12.6.  Participation in State Statutory Programs Related to Employment.**

(a)    The Tribe agrees that it will participate in the State's workers' compensation program with respect to employees employed at the Gaming Operation or Gaming Facility.  The workers' compensation program includes, but is not limited to, state laws relating to the securing of payment of compensation through one or more insurers duly authorized to write workers' compensation insurance in this State or through self-insurance as permitted under the State's workers' compensation laws.  All disputes arising from the workers' compensation laws shall be heard by the Workers' Compensation Appeals Board pursuant to the California Labor Code.  The Tribe hereby consents to the jurisdiction of the State Workers' Compensation Appeals Board and the courts of the State of California for purposes of enforcement.  The parties agree that independent contractors doing business with the Tribe are bound by all state workers' compensation laws and obligations.

(b)    In lieu of permitting the Gaming Operation to participate in the State's statutory workers' compensation system, the Tribe may

99

create and maintain a system that provides redress for Gaming Facility employees' work-related injuries through requiring insurance or self-insurance, which system must include a scope of coverage, provision of up to ten thousand dollars ($10,000) in medical treatment for alleged injury until the date that liability for the claim is accepted or rejected, employee choice of physician (either after thirty (30) days from the date of the injury is reported or if a medical provider network has been established, within the medical provider network), quality and timely medical treatment provided comparable to the state's medical treatment utilization schedule, availability of an independent medical examination to resolve disagreements on appropriate treatment (by an Independent Medical Reviewer on the state's approved list, a Qualified Medical Evaluator on the state's approved list, or an Agreed Medical Examiner upon mutual agreement of the employer and employee), the right to notice, hearings before an independent tribunal, a means of enforcement against the employer, and benefits (including, but not limited to, disability, rehabilitation and return to work) comparable to those mandated for comparable employees under state law.  Not later than the effective date of this Compact, the Tribe will advise the State of its election to participate in the statutory workers' compensation system or, alternatively, forward to the State all relevant ordinances that have been adopted and all other documents establishing the system and demonstrating that the system is fully operational and compliant with the comparability standard set forth above.  The parties agree that independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

(c)     The Tribe agrees that it will participate in the State's program for providing unemployment compensation benefits and unemployment compensation disability benefits with respect to employees employed at the Gaming Operation or Gaming Facility, which participation shall include compliance with the provisions of the California Unemployment Insurance Code, and the Tribe consents to the jurisdiction of the State agencies charged with the enforcement of that Code and of the courts of the State of California for purposes of enforcement.

(d)    As a matter of comity, with respect to persons, including nonresidents of California, employed at the Gaming Operation or Gaming Facility, the Tribe shall withhold all taxes due to the State as provided in the California Unemployment Insurance Code except for tribal members living on the Tribe's reservation, as provided in the California Revenue and Taxation Code, and the regulations thereunder, and shall forward such amounts to the State.  The Tribe shall file with the Franchise Tax Board a copy of any information return filed with the Secretary of the Treasury, as provided in the California Revenue and Taxation Code and the regulations thereunder, except those pertaining to tribal members living on the Tribe's reservation.  For purposes of this subdivision, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States, and "tribal members" refers to enrolled members of the Tribe.

(e)    As a matter of comity, the Tribe shall, with respect to the earnings of any person employed at the Gaming Operation or Gaming Facility, comply with all earnings withholding orders for support of a child, or spouse or former spouse, and all other orders by which the earnings of an employee are required to be withheld by an employer pursuant to chapter 5 (commencing with section 706.010) of division 1 of title 9 of part 2 of the California Code of Civil Procedure, and with all earnings assignment orders for support made pursuant to chapter 8 (commencing with section 5200) of part 5 of division 9 of the California Family Code or section 3088 of the California Probate Code.

### Sec. 12.7.  Emergency Services Accessibility.

The Tribe shall make reasonable provisions for adequate emergency fire, medical, and related relief and disaster services for patrons and employees of the Gaming Facility.

### Sec. 12.8.  Alcoholic Beverage Service.

Purchase, sale, and service of alcoholic beverages shall be subject to state law.

### Sec. 12.9.  Possession of Firearms.

The possession of firearms by any person in the Gaming Facility is prohibited at all times, except for federal, state, or local law enforcement personnel, or tribal law enforcement or security personnel authorized by tribal law and federal or state law to possess firearms at the Gaming Facility.

### Sec. 12.10.  Labor Relations.

The Gaming Activities authorized by this Compact may only commence after the Tribe has adopted an ordinance identical to the Tribal Labor Relations Ordinance attached hereto as Appendix C, and the Gaming Activities may only continue as long as the Tribe maintains the ordinance. The Tribe shall provide written notice to the State that it has adopted the ordinance, along with a copy of the ordinance, within thirty (30) days after the effective date of this Compact.

## SECTION 13.0.  DISPUTE RESOLUTION PROVISIONS.

### Sec. 13.1.  Voluntary Resolution; Court Resolution.

In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that arise under this Compact by good faith negotiations whenever possible.  Therefore, except for the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the Tribe and the State shall seek to resolve disputes by first meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of the performance and compliance of the terms, provisions, and conditions of this Compact, as follows:

(a)     Either party shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth

the facts giving rise to the dispute and with specificity, the
issues to be resolved.

(b)      The other party shall respond in writing to the facts and issues
set forth in the notice within fifteen (15) days of receipt of the
notice, unless both parties agree in writing to an extension of
time.

(c)      The parties shall meet and confer in good faith by telephone or
in person in an attempt to resolve the dispute through
negotiation within thirty (30) days after receipt of the notice set
forth in subdivision (a), unless both parties agree in writing to
an extension of time.

(d)      If the dispute is not resolved to the satisfaction of the parties
after the first meeting, either party may propose to have the
dispute resolved by an arbitrator in accordance with section
13.2, but neither party shall be required to agree to submit to
arbitration.

(e)      Disputes that are not otherwise resolved by arbitration or other
mutually agreed means may be resolved in the United States
District Court in the judicial district where the Tribe's Gaming
Facility is located, or if those federal courts lack jurisdiction, in
any state court of competent jurisdiction in or over the County.
The disputes to be submitted to court action include, but are not
limited to, claims of breach of this Compact, provided that the
remedies expressly provided in section 13.4, subdivision (a)(ii)
are the sole and exclusive remedies available to either party for
issues arising out of this Compact and supersede any remedies
otherwise available, whether at law, tort, contract, or in equity
and, notwithstanding any other provision of law or this
Compact, neither the State nor the Tribe shall be liable for
damages or attorney fees in any action based in whole or in part
on the fact that the parties have either entered into this
Compact, or have obligations under this Compact.  The parties
are entitled to all rights of appeal permitted by law in the court
system in which the action is brought.

(f)     In no event may the Tribe be precluded from pursuing any arbitration or judicial remedy against the State on the ground that the Tribe has failed to exhaust its State administrative remedies, and in no event may the State be precluded from pursuing any arbitration or judicial remedy against the Tribe on the ground that the State has failed to exhaust any tribal administrative remedies.

## Sec. 13.2.  Arbitration Rules.

Arbitration pursuant to section 13.0 shall be conducted before a JAMS arbitrator in accordance with JAMS Comprehensive Arbitration, and discovery in arbitration proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure, provided that no discovery authorized by that section may be conducted without leave of the arbitrator. Each party shall share the cost of JAMS and the JAMS arbitrator, and under no circumstances may the arbitrator award costs, arbitration fees or attorneys' fees to the prevailing party.  In any JAMS arbitration under this section 13.2, the parties will bear their own attorney fees.  The arbitration shall take place within seventy-five (75) miles of the Gaming Facility, or as otherwise mutually agreed by the parties.  To effectuate their consent to the foregoing arbitration procedure, the Tribe and the State shall, in the exercise of their sovereignty, expressly waive, and also waive their right to assert, sovereign immunity in connection with the arbitrator's jurisdiction and in any state or federal court action to (i) enforce the parties' obligation to arbitrate, (ii) confirm, correct, or vacate the arbitral award rendered in the arbitration in accordance with section 1285 et seq. of the California Code of Civil Procedure, or (iii) enforce or execute a judgment based upon the award.  The Tribe and the State agree not to assert, and will waive, any defense alleging improper venue or forum non conveniens as to any state court located within the County or any federal court located in the Central District of California in any such action brought with respect to the arbitration award.

## Sec. 13.3.  No Waiver or Preclusion of Other Means of Dispute Resolution.

This section 13.0 may not be construed to waive, limit, or restrict any remedy to address issues not arising out of this Compact that is otherwise available to either party, nor may this section 13.0 be construed to preclude,

limit, or restrict the ability of the parties to pursue, by mutual agreement, any other method of Compact dispute resolution, including, but not limited to, mediation.

### Sec. 13.4.  Limited Waiver of Sovereign Immunity.

(a)     For the purpose of actions or arbitrations based on disputes between the State and the Tribe that arise under this Compact and the enforcement of any judgment or award resulting therefrom, the State and the Tribe expressly waive their right to assert their sovereign immunity from suit and enforcement of any ensuing judgment or arbitral award and consent to the arbitrator's jurisdiction and further consent to be sued in federal or state court, as the case may be, provided that (i) the dispute is limited solely to issues arising under this Compact, (ii) neither side makes any claim for monetary damages (except that payment of any money expressly required by the terms of this Compact may be sought), and solely injunctive relief, specific performance (including enforcement of a provision of this Compact expressly requiring the payment of money to one or another of the parties), and declaratory relief (limited to a determination of the respective obligations of the parties under the Compact) may be sought, and (iii) nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State with respect to any third party that is made a party or intervenes as a party to the action.

(b)     In the event that intervention, joinder, or other participation by any additional party in any action between the State and the Tribe would result in the waiver of the Tribe's or the State's sovereign immunity as to that additional party, the waivers of either the Tribe or the State provided herein may be revoked, except where joinder is required to preserve the court's jurisdiction, in which case the State and the Tribe may not revoke their waivers of sovereign immunity as to each other.

(c)     The waivers and consents to jurisdiction expressly provided for under this section 13.0 and elsewhere in the Compact shall extend to all arbitrations and civil actions authorized by this Compact, including, but not limited to, actions to compel

arbitration, any arbitration proceeding herein, any action to confirm, modify, or vacate any arbitral award or to enforce any judgment, and any appellate proceeding emanating from any such proceedings.  Except as stated herein or elsewhere in this Compact, no other waivers or consents to be sued are granted by either party, whether in state statute or otherwise, including but not limited to Government Code section 98005.

## SECTION 14.0.  EFFECTIVE DATE AND TERM OF COMPACT.

### Sec. 14.1.  Effective Date.

This Compact shall not be effective unless and until all of the following have occurred:

(a)    The Compact is ratified in accordance with State law; and

(b)    Notice of approval or constructive approval is published in the Federal Register as provided in 25 U.S.C. § 2710(d)(3)(B).

### Sec. 14.2.  Term of Compact; Termination.

(a)    Once effective, this Compact shall be in full force and effect for State law purposes for twenty-five (25) years following the effective date.

(b)    Either party may bring an action in federal court, after providing a thirty (30)-day written notice of an opportunity to cure any alleged breach of this Compact, for a declaratory judgment that the other party has materially breached this Compact or that a material part of this Compact has been invalidated.  Unless the declaratory judgment is stayed, upon issuance of such a final, non-appealable declaratory judgment by the court, and in the event that the acts or omissions that were the subject of the declaratory judgment continue after the declaratory judgment becomes final, then the complaining party may unilaterally terminate this Compact upon service of written notice on the other party.  In the event a federal court determines that it lacks jurisdiction over such an action, the action may be brought in the Superior Court for Santa Barbara

County.  The parties expressly waive, and also waive their right to assert, sovereign immunity from suit for purposes of an action under this subdivision, subject to the qualifications stated in section 13.4.

(c)    If this Compact does not take effect by September 1, 2017, it shall be deemed null and void unless the Tribe and the State agree in writing to extend the date.

## SECTION 15.0.  AMENDMENTS; RENEGOTIATIONS.

### Sec. 15.1.  Amendment by Agreement.

The terms and conditions of this Compact may be amended at any time by the mutual and written agreement of both parties during the term of this Compact set forth in section 14.2, provided that each party voluntarily consents to such negotiations in writing.  Any amendments to this Compact shall be deemed to supersede, supplant and extinguish all previous understandings and agreements on the subject.

### Sec. 15.2.  Negotiations for a New Compact.

No sooner than eighteen (18) months before the termination date of this Compact set forth in section 14.2, either party may request the other party to enter into negotiations to extend the term of this Compact or to enter into a new Class III Gaming compact.  If the parties have not agreed to extend the term of this Compact or have not entered into a new Class III Gaming compact by the termination date in section 14.2, but are engaged in negotiations that both parties agree in writing is proceeding towards conclusion of a new or amended compact, this Compact shall automatically be extended for an additional two (2) years.

### Sec. 15.3.  Requests to Amend or to Negotiate a New Compact.

All requests to amend this Compact or to negotiate to extend the term of this Compact or to negotiate for a new Class III Gaming compact shall be in writing, addressed to the Tribal Chair or the Governor, as the case may be, and shall include the activities or circumstances to be negotiated, together with a statement of the basis supporting the request.  If the request meets both the requirements of this section and section 15.1 for an amendment to

107

this Compact, or the requirements of this section and section 15.2 for a new Class III Gaming compact, and all parties agree in writing to negotiate, the parties shall confer promptly and determine within forty-five (45) days of the request a schedule for commencing negotiations, and both parties shall negotiate in good faith.  The Tribal Chair and the Governor of the State are hereby authorized to designate the person or agency responsible for conducting the negotiations, and shall execute any documents necessary to do so.

## SECTION 16.0.  NOTICES.

Unless otherwise indicated by this Compact, all notices required or authorized to be served shall be served by first-class mail or facsimile transmission to the following addresses, or to such other address as either party may designate by written notice to the other:

| | |
|---|---|
| Governor | Tribal Chair |
| Governor's Office | Santa Ynez Band of Mission Indians |
| State Capitol | P.O. Box 517 |
| Sacramento, CA 95814 | Santa Ynez, CA 93460 |

## SECTION 17.0.  CHANGES TO IGRA.

This Compact is intended to meet the requirements of IGRA as it reads on the effective date of this Compact, and, when reference is made to IGRA or to an implementing regulation thereof, the referenced provision is deemed to have been incorporated into this Compact as if set out in full. Subsequent changes to IGRA that diminish the rights of the State or the Tribe may not be applied retroactively to alter the terms of this Compact, except to the extent that federal law validly mandates retroactive application without the State's or the Tribe's respective consent.

## SECTION 18.0.  MISCELLANEOUS.

### Sec. 18.1.  Third-Party Beneficiaries.

Notwithstanding any provision of law, this Compact is not intended to, and shall not be construed to, create any right on the part of a third party to bring an action to enforce any of its terms.

### Sec. 18.2.  Complete Agreement.

This Compact, together with all appendices, sets forth the full and complete agreement of the parties and supersedes any prior agreements or understandings with respect to the subject matter hereof.

### Sec. 18.3.  Construction.

Neither the presence in another tribal-state Class III Gaming compact of language that is not included in this Compact, nor the absence in another tribal-state Class III Gaming compact of language that is present in this Compact shall be a factor in construing the terms of this Compact.  In the event of a dispute between the parties as to the language of this Compact or the construction or meaning of any term hereof, this Compact will be deemed to have been drafted by the parties in equal parts so that no presumptions or inferences concerning its terms or interpretation may be construed against any party to this Compact.

### Sec. 18.4.  Successor Provisions.

Wherever this Compact makes reference to a specific statutory provision, regulation, or set of rules, it also applies to the provision or rules, as they may be amended from time to time, and any successor provision or set of rules.

### Sec. 18.5.  Ordinances and Regulations.

Whenever the Tribe adopts or amends any ordinance or regulations required to be adopted and/or maintained under this Compact, in addition to any other Compact obligations to provide a copy to others, the Tribe shall provide a copy of such adopted or amended ordinance or regulations to the State Gaming Agency within thirty (30) days of the effective date of such ordinance or regulations.

### Sec. 18.6.  Calculation of Time.

In computing any period of time prescribed by this Compact, the day of the event from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday under the Tribe's laws,

State law, or federal law.  Unless otherwise specifically provided herein, the term "days" shall be construed as calendar days.

### Sec. 18.7.  Not A Model Compact

This Compact addresses the specific relationship between the Tribe and the State and is not intended to be, nor shall it be construed as, a model compact or a template for Class III Gaming compacts with other tribes.

### Sec. 18.8.  Representations.

(a) The Tribe expressly represents that as of the date of the undersigned's execution of this Compact the undersigned has the authority to execute this Compact on behalf of the Tribe, including any waiver of sovereign immunity and the right to assert sovereign immunity therein, and will provide written proof of such authority and of the ratification of this Compact by the tribal governing body to the Governor no later than thirty (30) days after the execution of this Compact by the undersigned.

(b) The Tribe further represents that it is (i) recognized as eligible by the Secretary of the Interior for special programs and services provided by the United States to Indians because of their status as Indians, and (ii) recognized by the Secretary of the Interior as possessing powers of self-government.

(c) In entering into this Compact, the State expressly relies upon the foregoing representations by the Tribe, and the State's entry into the Compact is expressly made contingent upon the truth of those representations as of the date of the Tribe's execution of this Compact through the undersigned.  If the Tribe fails to timely provide written proof of the undersigned's aforesaid authority to execute this Compact or written proof of ratification by the Tribe's governing body, the Governor shall have the right to declare this Compact null and void.

(d)     This Compact shall not be presented to the California State Legislature for a ratification vote until the Tribe has provided the written proof required in subdivision (a) to the Governor.

IN WITNESS WHEREOF, the undersigned sign this Compact on behalf of the State of California and the Santa Ynez Band of Mission Indians.

STATE OF CALIFORNIA

By Edmund G. Brown Jr.
Governor of the State of California

Executed this 26 day of August, 2015, Sacramento, California

SANTA YNEZ BAND OF MISSION INDIANS

By Vincent P. Armenta
Chairman of the Santa Ynez Band of Mission Indians

Executed this 24 day of August, 2015, Santa Ynez, California

**ATTEST:**

_____
Alex Padilla
Secretary of State, State of California

111

APPENDICES

A.      Legal Description and Map of Santa Ynez Band of Mission Indians
B.      Off-Reservation Environmental Impact Analysis Checklist
C.      Tribal Labor Relations Ordinance
D.      Minimum Internal Control Standards

## APPENDIX A

## LEGAL DESCRIPTION

Those certain parcels of land situated in the County of Santa Barbara, State of California, and being more particularly described as follows:

"Tract 1006 +/- 30.0 ACRES", "Tract 5061 +/- 85.0 ACRES", and "Tract 5196 +/- 25.0 ACRES", T 6 N, R 30 W and R 31 W, Sections 7, 12 & 13, MDM, Santa Barbara County, CA as shown and so designated upon that certain official map entitled RECORD OF SURVEY PROPERTY OF UNITED STATES OF AMERICA Dept. of Interior Bur. of Indian Affairs;
(APN 141-450-005, 141-450-006, & 141-450-010)

Approximately 7.0 acres, by Grant Deed dated June 17, 2014 and filed for record in the Office of the Recorder of Santa Barbara County as Instrument No. 2014-0031161 on July 11, 2014
(APN 143-241-03, 143-251-01, 143-251-05, 143-251-06, 143-251-08, 143-251-09,  & 143-241-02)



**LEGEND**

Reservation and Lands in Trust

**147 ACRES ±**

**APNs:**

| | | |
|---|---|---|
| 141-450-005 | 141-450-010 | 143-251-005 |
| 141-450-006 | 143-241-002 | 143-251-006 |
| 141-450-007 | 143-241-003 | 143-251-008 |
| 141-450-008 | 143-251-001 | 143-251-009 |

Feet

0    500    1,000

SOURCE: Santa Barbara County GIS Data, 2011; Microsoft aerial photograph, 5/8/2010; AES, 8/19/2015

*Santa Ynez Band of Chumash Indians / 201561* ∎

Reservation and Lands in Trust

# APPENDIX B

## Off-Reservation Environmental Impact Analysis Checklist

### I.    Aesthetics

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Have a substantial adverse effect on a scenic vista? | ☐ | ☐ | ☐ | ☐ |
| b)  Substantially damage off-reservation scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway? | ☐ | ☐ | ☐ | ☐ |
| c)  Create a new source of substantial light or glare, which would adversely affect day or nighttime views of historic buildings or views in the area? | ☐ | ☐ | ☐ | ☐ |

### II.    Agricultural and Forest Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Involve changes in the existing environment, which, due to their location or nature, could result in conversion of off-reservation farmland to non-agricultural use? | ☐ | ☐ | ☐ | ☐ |

### III.    Air Quality

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Conflict with or obstruct implementation of the applicable air quality plan? | ☐ | ☐ | ☐ | ☐ |
| b)  Violate any air quality standard or contribute to an existing or projected air quality violation? | ☐ | ☐ | ☐ | ☐ |
| c)  Result in a cumulatively considerable net increase of any criteria pollutant for which the project region is non-attainment under an applicable federal or state ambient air quality standard (including releasing emissions, which exceed quantitative thresholds for ozone precursors)? | ☐ | ☐ | ☐ | ☐ |
| d)  Expose off-reservation sensitive receptors to substantial pollutant concentrations? | ☐ | ☐ | ☐ | ☐ |

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| e) Create objectionable odors affecting a substantial number of people off-reservation? | ☐ | ☐ | ☐ | ☐ |

## IV.    Biological Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Have a substantial adverse impact, either directly or through habitat modifications, on any species in local or regional plans, policies, or regulations, or by the California Department of Fish and Game or U.S. Fish and Wildlife Service? | ☐ | ☐ | ☐ | ☐ |
| b) Have a substantial adverse effect on any off-reservation riparian habitat or other sensitive natural community identified in local or regional plans, policies, and regulations or by the California Department of Fish and Game or U.S. Fish and Wildlife Service? | ☐ | ☐ | ☐ | ☐ |
| c) Have a substantial adverse effect on federally protected off-reservation wetlands as defined by Section 404 of the Clean Water Act? | ☐ | ☐ | ☐ | ☐ |
| d) Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites? | ☐ | ☐ | ☐ | ☐ |
| e) Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan? | ☐ | ☐ | ☐ | ☐ |

## V.    Cultural Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Cause a substantial adverse change in the significance of an off-reservation historical or archeological resource? | ☐ | ☐ | ☐ | ☐ |

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| b) Directly or indirectly destroy a unique off-reservation paleontological resource or site or unique off-reservation geologic feature? | ☐ | ☐ | ☐ | ☐ |
| c) Disturb any off-reservation human remains, including those interred outside of formal cemeteries? | ☐ | ☐ | ☐ | ☐ |

## VI.    Geology and Soils

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Expose off-reservation people or structures to potential substantial adverse effects, including the risk of loss, injury, or death involving: | | | | |
|    i) Rupture of a known earthquake fault, as delineated on the most recent Alquist-Priolo Earthquake Fault Zoning Map issued by the State Geologist for the area or based on other substantial evidence of a known fault?  Refer to Division of Mines and Geology Special Publication 42. | ☐ | ☐ | ☐ | ☐ |
|    ii) Strong seismic ground shaking? | ☐ | ☐ | ☐ | ☐ |
|    iii) Seismic-related ground failure, including liquefaction? | ☐ | ☐ | ☐ | ☐ |
|    iv) Landslides? | ☐ | ☐ | ☐ | ☐ |
| b) Result in substantial off-reservation soil erosion or the loss of topsoil? | ☐ | ☐ | ☐ | ☐ |

## VII.    Hazards and Hazardous Materials

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Create a significant hazard to the off-reservation public or the off-reservation environment through the routine transport, use, or disposal of hazardous materials? | ☐ | ☐ | ☐ | ☐ |
| b) Create a significant hazard to the off-reservation public or the off-reservation environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment? | ☐ | ☐ | ☐ | ☐ |
| c) Emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within one-quarter mile of an existing or proposed off-reservation | ☐ | ☐ | ☐ | ☐ |

school?

d)  Expose off-reservation people or structures to a significant risk of loss, injury or death involving wildland fires.  ☐ ☐ ☐ ☐

## VIII.  Water Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Violate any water quality standards or waste discharge requirements? | ☐ | ☐ | ☐ | ☐ |
| b)  Substantially deplete off-reservation groundwater supplies or interfere substantially with groundwater recharge such that there should be a net deficit in aquifer volume or a lowering of the local groundwater table level (e.g., the production rate of pre-existing nearby wells would drop to a level which would not support existing land uses or planned uses for which permits have been granted)? | ☐ | ☐ | ☐ | ☐ |
| c)  Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion of siltation off-site? | ☐ | ☐ | ☐ | ☐ |
| d)  Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, or substantially increase the rate or amount of surface runoff in a manner which would result in flooding off-site? | ☐ | ☐ | ☐ | ☐ |
| e)  Create or contribute runoff water which would exceed the capacity of existing or planned storm water drainage systems or provide substantial additional sources of polluted runoff off-reservation? | ☐ | ☐ | ☐ | ☐ |
| f)  Place within a 100-year flood hazard area structures, which would impede or redirect off-reservation flood flows? | ☐ | ☐ | ☐ | ☐ |
| g)  Expose off-reservation people or structures to a significant risk of loss, injury or death involving flooding, including flooding as a result of the failure of a levee or dam? | ☐ | ☐ | ☐ | ☐ |

## IX.    Land Use

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Conflict with any off-reservation land use plan, policy, or regulation of an agency adopted for the purpose of avoiding | ☐ | ☐ | ☐ | ☐ |

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| or mitigating an environmental effect? | | | | |
| b) Conflict with any applicable habitat conservation plan or natural communities conservation plan covering off-reservation lands? | ☐ | ☐ | ☐ | ☐ |

## X.   Mineral Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Result in the loss of availability of a known off-reservation mineral resource classified MRZ-2 by the State Geologist that would be of value to the region and the residents of the state? | ☐ | ☐ | ☐ | ☐ |
| b) Result in the loss of availability of an off-reservation locally important mineral resource recovery site delineated on a local general plan, specific plan, or other land use plan? | ☐ | ☐ | ☐ | ☐ |

## XI.   Noise

| Would the project result in: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Exposure of off-reservation persons to noise levels in excess of standards established in the local general plan or noise ordinance, or applicable standards of other agencies? | ☐ | ☐ | ☐ | ☐ |
| b) Exposure of off-reservation persons to excessive groundborne vibration or groundborne noise levels? | ☐ | ☐ | ☐ | ☐ |
| c) A substantial permanent increase in ambient noise levels in the off-reservation vicinity of the project? | ☐ | ☐ | ☐ | ☐ |
| d) A substantial temporary or periodic increase in ambient noise levels in the off-reservation vicinity of the project? | ☐ | ☐ | ☐ | ☐ |

## XII.  Population and Housing

| **Would the project:** | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Induce substantial off-reservation population growth? | ☐ | ☐ | ☐ | ☐ |
| b) Displace substantial numbers of existing housing, necessitating the construction of replacement housing elsewhere off-reservation? | ☐ | ☐ | ☐ | ☐ |

## XIII.  Public Services

| **Would the project:** | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Result in substantial adverse physical impacts associated with the provision of new or physically altered off-reservation governmental facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios, response times, or other performance objectives for any of the off-reservation public services: | | | | |
| Fire protection? | ☐ | ☐ | ☐ | ☐ |
| Police protection? | ☐ | ☐ | ☐ | ☐ |
| Schools? | ☐ | ☐ | ☐ | ☐ |
| Parks? | ☐ | ☐ | ☐ | ☐ |
| Other public facilities? | ☐ | ☐ | ☐ | ☐ |

## XIV.  Recreation

| **Would the project:** | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Increase the use of existing off-reservation neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated? | ☐ | ☐ | ☐ | ☐ |

## XV.   Transportation / Traffic

| **Would the project:** | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Cause an increase in off-reservation traffic, which is substantial in relation to the existing traffic load and capacity of the street system (i.e., result in a substantial increase in either the number of vehicle trips, the volume-to-capacity ratio on roads, or congestion at intersections)? | ☐ | ☐ | ☐ | ☐ |
| b) Exceed, either individually or cumulatively, a level of service standard established by the county congestion management agency for designated off-reservation roads or highways? | ☐ | ☐ | ☐ | ☐ |
| c) Substantially increase hazards to an off-reservation design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment)? | ☐ | ☐ | ☐ | ☐ |
| d) Result in inadequate emergency access for off-reservation responders? | ☐ | ☐ | ☐ | ☐ |

## XVI.  Utilities and Service Systems

| **Would the project:** | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Exceed off-reservation wastewater treatment requirements of the applicable Regional Water Quality Control Board? | ☐ | ☐ | ☐ | ☐ |
| b) Require or result in the construction of new water or wastewater treatment facilities or expansion of existing facilities, the construction of which could cause significant off-reservation environmental effects? | ☐ | ☐ | ☐ | ☐ |
| c) Require or result in the construction of new storm water drainage facilities or expansion of existing facilities, the construction of which could cause significant off-reservation environmental effects? | ☐ | ☐ | ☐ | ☐ |
| d) Result in a determination by an off-reservation wastewater treatment provider (if applicable), which serves or may serve the project that it has inadequate capacity to serve the project's projected demand in addition to the provider's existing commitments? | ☐ | ☐ | ☐ | ☐ |

## XVII. Cumulative Effects

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Have impacts that are individually limited, but cumulatively considerable off-reservation?  "Cumulatively considerable" means that the incremental effects of a project are considerable when viewed in connection with the effects of past, current, or probable future projects. | ☐ | ☐ | ☐ | ☐ |

# Appendix C

## Tribal Labor Relations Ordinance

### Section 1:  Threshold of Applicability

(a)     If the Santa Ynez Band of Chumash Mission Indians (Tribe) employs 250 or more persons in a tribal casino and related facility, it shall adopt this Tribal Labor Relations Ordinance (TLRO or Ordinance).  For purposes of this Ordinance, a "tribal casino" is one in which class III gaming is conducted pursuant to the tribal-state compact.  A "related facility" is one for which the only significant purpose is to facilitate patronage of the class III gaming operations.

(b)     Upon the request of a labor union or organization (any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work), the Tribal Gaming Commission shall certify the number of employees in a tribal casino or other related facility as defined in subsection (a) of this Section 1. Either party may dispute the certification of the Tribal Gaming Commission to the Tribal  Labor Panel, which is defined in Section 13 herein.

### Section 2:  Definition of Eligible Employees

(a)     The provisions of this ordinance shall apply to any person (hereinafter "Eligible Employee") who is employed within a tribal casino in which class III gaming is  conducted pursuant to a tribal-state compact or other related facility, the only significant purpose of which is to facilitate patronage of the class III gaming operations, except for any of the following:

(1)     any employee who is a supervisor, defined as any individual having authority, in the interest of the Tribe and/or employer, to hire, transfer, suspend, lay off,

C-1

recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment;

(2)   any employee of the Tribal Gaming Commission;

(3)   any employee of the security or surveillance department, other than those who are responsible for the technical repair and maintenance of equipment;

(4)   any cash operations employee who is a "cage" employee or money counter; or

(5)   any dealer.

(b)   On [month] 1 of each year, the Tribal Gaming Commission shall certify the number of Eligible Employees employed by the Tribe to the administrator of the Tribal Labor Panel.

## Section 3:  Non-Interference with Regulatory or Security Activities

Operation of this Ordinance shall not interfere in any way with the duty of the Tribal Gaming Commission to regulate the gaming operation in accordance with the Tribe's National Indian Gaming Commission-approved gaming ordinance.  Furthermore, the exercise of rights hereunder shall in no way interfere with the tribal casino's surveillance/security systems, or any other internal controls system designed to protect the integrity of the Tribe's gaming operations.  The Tribal Gaming Commission is specifically excluded from the definition of Tribe and its agents.

## Section 4:  Eligible Employees Free to Engage in or Refrain From Concerted Activity

Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through

C-2

representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

## Section 5:  Unfair Labor Practices for the Tribe

It shall be an unfair labor practice for the Tribe and/or employer or their agents:

(a)    to interfere with, restrain or coerce Eligible Employees in the exercise of the  rights guaranteed herein;

(b)    to dominate or interfere with the formation or administration of any labor  organization or contribute financial or other support to it, but this does not restrict the Tribe and/or employer and a certified union from agreeing to union security or dues check off;

(c)    to discharge or otherwise discriminate against an Eligible Employee because s/he has filed charges or given testimony under this Ordinance; or

(d)    after certification of the labor organization pursuant to Section 10, to refuse to bargain collectively with the representatives of Eligible  Employees.

## Section 6:  Unfair Labor Practices for the Union

It shall be an unfair labor practice for a labor organization or its agents:

(a)    to interfere, restrain or coerce Eligible Employees in the exercise of the rights  guaranteed herein;

(b)    to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a primary or secondary boycott or a refusal in the course of his employment to use, manufacture, process, transport or

C-3

otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce or other terms and conditions of employment.  This section does not apply to Section 11;

(c)    to force or require the Tribe and/or employer to recognize or bargain with a particular labor organization as the representative of Eligible Employees if another labor organization has been certified as the representative of such Eligible Employees under the provisions of this TLRO;

(d)    to refuse to bargain collectively with the Tribe and/or employer, provided it is the representative of Eligible Employees subject to the provisions herein; or

(e)    to attempt to influence the outcome of a tribal governmental election, provided, however, that this section does not apply to tribal members.

### Section 7:  Tribe and Union Right to Free Speech

(a)    The Tribe's and union's expression of any view, argument or opinion or the dissemination thereof, whether in written, printed, graphic or visual form, shall not constitute or be evidence of interference with, restraint, or coercion if such expression contains no threat of reprisal or force or promise of benefit.

(b)    The Tribe agrees that if a union first offers in writing that it and its local affiliates will comply with (b)(1) and (b)(2), the Tribe shall comply with the provisions of (c) and (d).

(1)    For a period of three hundred sixty-five (365) days following delivery of a Notice of Intent to Organize (NOIO) to the Tribe:

(A)    not engage in strikes, picketing, boycotts, attack websites, or other economic activity at or in relation to the tribal casino or related facility; and

refrain from engaging in strike-related picketing on Indian lands as defined in 25 U.S.C. § 2703(4);

(B)     not disparage the Tribe for purposes of organizing Eligible Employees;

(C)     not attempt to influence the outcome of a tribal government election; and

(D)     during the three hundred sixty-five (365) days after the Tribe received the NOIO, the Union must collect dated and signed authorization cards pursuant to Section 10 herein and complete the secret ballot election also in Section 10 herein. Failure to complete the secret ballot election within the three hundred sixty five (365) days after the Tribe received the NOIO shall mean that the union shall not be permitted to deliver another NOIO for a period of two years (730 days).

(2)     Resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 13 herein.

(c)     Upon receipt of a NOIO, the Tribe shall:

(1)     within two (2) days provide to the union an election eligibility list containing the full first and last names of the Eligible Employees within the sought-after bargaining unit and the Eligible Employees' last known addresses, telephone numbers and email addresses;

(2)     for period of three hundred sixty-five (365) days thereafter, not act in any way which is or could reasonably be perceived to be anti-union. This includes refraining from making derisive comments about unions; publishing or posting pamphlets, fliers, letters, posters or any other communication which should be interpreted as criticism of the union or advises Eligible

Employees to vote "no" against the union.  However, the Tribe shall be free at all times to fully inform Eligible Employees about the terms and conditions of employment it provides to employees and the advantages of working for the Tribe; and

(3)   resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 13 herein.

(d)   The union's offer in subsection (b) of this Section 7 shall be deemed an offer to accept the entirety of this Ordinance as a bilateral contract between the Tribe and the union, and the Tribe agrees to accept such offer.  By entering into such bilateral contract, the union and Tribe mutually waive any right to file any form of action or proceeding with the National Labor Relations Board for the three hundred sixty-five (365)-day period following the NOIO.

(e)   The Tribe shall mandate that any entity responsible for all or part of the operation of the casino and related facility shall assume the obligations of the Tribe under this Ordinance.  If at the time of the management contract, the Tribe recognizes a labor organization as the representative of its employees, certified pursuant to this Ordinance, the labor organization will provide the contractor, upon request, the election officer's certification which constitutes evidence that the labor organization has been determined to be the majority representative of the Tribe's Eligible Employees.

## Section 8:  Access to Eligible Employees

(a)   Access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity shall not interfere with patronage of the casino or related facility or with the normal work routine of the Eligible Employees  and shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public.  The Tribe may require the union and or union organizers to be

subject to the same licensing rules applied to individuals or entities with similar levels of access to the casino or related facility, provided that such licensing shall not be unreasonable, discriminatory, or designed to impede access.

(b)     The Tribe, in its discretion, may also designate additional voluntary access to the Union in such areas as employee parking lots and non-casino facilities located on tribal lands.

(c)     In determining whether organizing activities potentially interfere with normal tribal work routines, the union's activities shall not be permitted if the Tribal Labor Panel determines that they compromise the operation of the casino:

(1)     security and surveillance systems throughout the casino, and reservation;

(2)     access limitations designed to ensure security;

(3)     internal controls designed to ensure security; or

(4)     other systems designed to protect the integrity of the Tribe's gaming operations, tribal property and/or safety of casino personnel, patrons, employees or tribal members, residents, guests or invitees.

(d)     The Tribe agrees to facilitate the dissemination of information from the union to Eligible Employees at the tribal casino by allowing posters, leaflets and other written materials to be posted in non-public employee break areas where the Tribe already posts announcements pertaining to Eligible Employees. Actual posting of such posters, notices, and other materials shall be by employees desiring to post such materials.

## Section 9:  Indian Preference Explicitly Permitted

Nothing herein shall preclude the Tribe from giving Indian preference in employment, promotion, seniority, lay-offs or retention to members of any federally recognized Indian tribe or shall in any way affect

the Tribe's right to follow tribal law, ordinances, personnel policies or the Tribe's customs or traditions regarding Indian preference in employment, promotion, seniority, lay-offs or retention.  Moreover, in the event of a conflict between tribal law, tribal ordinance or the Tribe's customs and traditions regarding Indian preference and this Ordinance, the tribal law, tribal ordinance, or the Tribe's customs and traditions shall govern.

## Section 10:  Secret Ballot Elections

(a)    The election officer shall be chosen within three (3) business days of notification by the labor organization to the Tribe of its intention to present authorization cards, and the same election officer shall preside thereafter for all proceedings under the request for recognition; provided, however, that if the election officer resigns, dies, or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.  Dated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer will result in a secret ballot election.  The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards.  If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election.  The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

(b)    Upon the showing of interest to the election officer pursuant to subsection (a), within two (2) working days the Tribe shall provide to the union an election eligibility list containing the full first and last names of the Eligible Employees within the sought after bargaining unit and the Eligible Employees' last known addresses, telephone numbers and email addresses. Nothing herein shall preclude a Tribe from voluntarily providing an election eligibility list at an earlier point of a union organizing campaign with or without an election.

(c)     The election shall be conducted by the election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1.  In the event either that a party refuses to enter into the consent election agreement or that the parties do not agree on the terms, the election officer shall issue an order that conforms to the terms of the form consent election agreement and shall have authority to decide any terms upon which the parties have not agreed, after giving the parties the opportunity to present their views in writing or in a telephonic conference call.  The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein.  All questions concerning representation of the Tribe and/or  Eligible Employees by a labor organization shall be resolved by the election officer.

(d)     The election officer shall certify the labor organization as the exclusive collective  bargaining representative of a unit of employees if the labor organization has received the support of a majority of the Eligible Employees in a secret ballot election that the election  officer determines to have been conducted fairly.  The numerical threshold for certification is fifty percent (50%) of the Eligible Employees plus one.  If the election officer determines that  the election was conducted unfairly due to misconduct by the Tribe and/or employer or union, the election officer may order a re-run election.  If the election officer determines  that there was the commission of serious Unfair Labor Practices by the Tribe, or in the event the union made the offer provided for in Section 7(b) that the Tribe violated its obligations under Section 7(c), that interferes with the election process and precludes the holding of a fair election, and the labor  organization is able to demonstrate that it had the support of a majority of the employees  in the unit at any time before or during the course of the Tribe's misconduct, the election  officer shall certify the labor organization as the exclusive bargaining representative.

(e)     The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election  by the election officer to a three (3) member panel of the Tribal

Labor Panel mutually chosen by both parties, provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

(f)     A union which loses an election and has exhausted all dispute remedies related to the election may not invoke any provisions of this ordinance at that particular casino or related facility until one (1) year after the election was lost.

## Section 11:  Collective Bargaining Impasse

(a)     Upon recognition, the Tribe and the union will negotiate in good faith for a collective bargaining agreement covering bargaining unit employees represented by the union.

(b)     Except where the union has made the written offer set forth in Section 7(b), if collective bargaining negotiations result in impasse, the union shall have the right to strike.  Strike-related picketing shall not be conducted on Indian lands as defined in 25 U.S.C. § 2703(4).

(c)     Where the union makes the offer set forth in Section 7(b), if collective bargaining negotiations result in impasse, the matter shall be resolved as set forth in Section 13(c).

## Section 12:  Decertification of Bargaining Agent

(a)     The filing of a petition signed by thirty percent (30%) or more of the Eligible Employees in a bargaining unit seeking the decertification of a certified union, will result in a secret ballot election.  The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards.  If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election.  The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

(b)     The election shall be conducted by an election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1.  The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein.  All questions concerning the decertification of the union shall be resolved by an election officer.  The election officer shall be chosen upon notification to the Tribe and the union of the intent of the Eligible Employees to present a decertification petition, and the same election officer shall preside thereafter for all proceedings under the request for decertification; provided however that if the election officer resigns, dies or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.

(c)     The election officer shall order the labor organization decertified as the exclusive collective bargaining representative if a majority of the Eligible Employees support decertification of the labor organization in a secret ballot election that the election officer determines to have been conducted fairly.  The numerical threshold for decertification is fifty percent (50%) of the Eligible Employees plus one (1).  If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or the union the election officer may order a re-run election or dismiss the decertification petition.

(d)     A decertification proceeding may not begin until one (1) year after the certification of a labor union if there is no collective bargaining agreement.  Where there is a collective bargaining agreement, a decertification petition may only be filed no more than ninety (90) days and no less than sixty (60) days prior to the expiration of a collective bargaining agreement.  A decertification petition may be filed any time after the expiration of a collective bargaining agreement.

(e)     The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election by the election

officer to a three (3) member panel of the Tribal Labor Panel chosen in accordance with Section 13(c), provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

## Section 13:  Binding Dispute Resolution Mechanism

(a)   All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein.

(b)   The method of binding dispute resolution shall be a resolution by the Tribal Labor Panel, consisting of ten (10) arbitrators appointed by mutual selection of the parties which panel shall serve all tribes that have adopted this ordinance.  The Tribal Labor Panel shall have authority to hire staff and take other actions necessary to conduct elections, determine units, determine scope of negotiations, hold hearings, subpoena witnesses, take testimony, and conduct all other activities needed to fulfill its obligations under this Ordinance.

(1)   Each member of the Tribal Labor Panel shall have relevant experience in federal labor law and/or federal Indian law with preference given to those with experience in both.  Names of individuals may be provided by such sources as, but not limited to, Indian Dispute Services, Federal Mediation and Conciliation Service, and the American Academy of Arbitrators.

(2)   One arbitrator from the Tribal Labor Panel will render a binding decision on the dispute under the Ordinance. Five (5) Tribal Labor Panel names shall be submitted to the parties and each party may strike no more than two (2) names.  A coin toss shall determine which party may strike the first name.  The arbitrator will generally follow the American Arbitration Association's procedural rules relating to labor dispute resolution. The arbitrator must render a written, binding decision that complies in all respects with the provisions of this Ordinance within thirty (30) days after a hearing.

C-12

(c)   (1)   Upon certification of a union in accordance with Section 10 of this Ordinance, the Tribe and union shall negotiate for a period of ninety (90) days after certification.  If, at the conclusion of the ninety (90)-day period, no collective bargaining agreement is reached and either the union and/or the Tribe believes negotiations are at an impasse, at the request of either party, the matter shall be submitted to mediation with the Federal Mediation and Conciliation Service.  The costs of mediation and conciliation shall be borne equally by the parties.

(2)   Upon appointment, the mediator shall immediately schedule meetings at a time and location reasonably accessible to the parties.  Mediation shall proceed for a period of thirty (30) days.  Upon expiration of the thirty (30)-day period, if the parties do not resolve the issues to their mutual satisfaction, the mediator shall certify that the mediation process has been exhausted.  Upon mutual agreement of the parties, the mediator may extend the mediation period.

(3)   Within twenty-one (21) days after the conclusion of mediation, the mediator shall file a report that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process.  With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination.  The mediator's determination shall be supported by the record.

(d)   In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings.

(e)   Either party may seek a motion to compel arbitration or a motion to confirm or vacate an arbitration award, under this Section 13, in the appropriate state superior court, unless a

C-13

bilateral contract has been created in accordance with Section 7, in which case either party may proceed in federal court.

The Tribe agrees to a limited waiver of its sovereign immunity for the sole purpose of compelling arbitration or confirming or vacating an arbitration award issued pursuant to the Ordinance in the appropriate state superior court or in federal court. The parties are free to put at issue whether or not the arbitration award exceeds the authority of the Tribal Labor Panel.

Attachment 1

## CONSENT ELECTION AGREEMENT PROCEDURES

Pursuant to the Tribal Labor Relations Ordinance adopted pursuant to section 10.7 of the compact, the undersigned parties hereby agree as follows:

1.     Jurisdiction.  The Santa Ynez Band of Chumash Mission Indians (Tribe) is an employer within the meaning of the Ordinance; and each employee organization named on the ballot is an employee organization within the meaning of the Ordinance; and the employees described in the voting unit are Eligible Employees within the meaning of the Ordinance.

2.     Election.  An election by secret ballot shall be held under the supervision of the elections officer among the Eligible Employees of the Tribe named above, and in the manner described below, to determine which employee organization, if any, shall be certified to represent such employees pursuant to the Ordinance.

3.     Voter Eligibility.  Unless otherwise indicated below, the eligible voters shall be all Eligible Employees who were employed on the eligibility cutoff date indicated below, and who are still employed on the date they cast their ballots in the election, i.e., the date the voted ballot is received by the elections officer.  Eligible Employees who are ill, on vacation, on leave of absence or sabbatical, temporarily laid off, and employees who are in the military service of the United States shall be eligible to vote.

4.     Voter Lists.  The Tribe shall electronically file with the elections officer a list of eligible voters within two (2) business days after receipt of a Notice of Election.

5.     Notice of Election.  The elections officer shall serve Notices of Election on the Tribe and on each party to the election.  The Notice shall contain a sample ballot, a description of the voting unit and information regarding the balloting process.  Upon receipt, the Tribe shall post such Notice of Election conspicuously on all employee bulletin boards in each facility of the employer in which members of the voting unit are employed.

Once a Notice of Election is posted, where the union has made the written offer set forth in Section 7(b) of the Tribal Labor Relations Ordinance, the Tribe shall continue to refrain from publishing or posting pamphlets, fliers, letters, posters or any other communication which should be interpreted as criticism of the union or advises employees to vote "no" against the union. The Tribe shall be free at all times to fully inform employees about the terms and conditions of employment it provides to employees and the advantages of working for the Tribe.

6.   Challenges.  The elections officer or an authorized agent of any party to the election may challenge, for good cause, the eligibility of a voter. Any challenges shall be made prior to the tally of the ballots.

7.   Tally of Ballots.  At the time and place indicated below, ballots shall be co-mingled and tabulated by the elections officer.  Each party shall be allowed to station an authorized agent at the ballot count to verify the tally of ballots.  At the conclusion of the counting, the elections officer shall serve a Tally of Ballots on each party.

8.   Objections and Post-election Procedures.  Objections to the conduct of the election may be filed with the elections officer within five (5) calendar days following the service of the Tally of Ballots.  Service and proof of service is required.

9.   Runoff Election.  In the event a runoff election is necessary, it shall be conducted at the direction of the elections officer.

10.   Wording on Ballot.  The choices on the ballot shall appear in the wording and order enumerated below.

FIRST:       [***]
SECOND:   [***]
THIRD:       [***]

11.   Cutoff Date for Voter Eligibility:  [***]

12.   Description of the Balloting Process.  A secret ballot election will take place within thirty (30) days after delivery of the voter list referenced in paragraph 4.  The employer will determine the location or locations of the polling places for the election.  There must be at least one

(1) neutral location (such as a high school, senior center, or similar facility) which is not within the gaming facility and employees must also be afforded the option of voting by mail through procedures established by the elections officer.  Only voters, designated observers and the election officer or supporting staff can be present in the polling area.  Neither employer nor union representatives may campaign in or near the polling area.  If the election officer or supporting staff questions an employee's eligibility to vote in the election, the ballot will be placed in a sealed envelope until your eligibility is determined.  The box will be opened under the supervision of the election officer when voting is finished.  Ballots submitted by mail must be received by the elections officer no later than the day of the election in order to be counted in the official tally of ballots.

13.    Voter List Format and Filing Deadline:  Not later than two (2) business days after receipt of the Notice of Election, the Tribe shall file with the elections officer, at [**address**], an alphabetical list of all eligible voters including their job titles, work locations and home addresses.

Copies of the list shall be served concurrently on the designated representative for the [***]; proof of service must be concurrently filed with elections officer.

In addition, the Tribe shall submit to the elections officer on or before [***], by electronic mail, a copy of the voter list in an Excel spreadsheet format, with columns labeled as follows: First Name, Last Name, Street Address, City, State, and Zip Code.  Work locations and job titles need not be included in the electronic file.  The file shall be sent to [***].

14.    Notices of Election:  Shall be posted by the Tribe no later than [***].

15.    Date, Time and Location of Counting of Ballots:  Beginning at [**time**] on [**date**], at the [**address**].

16.     Each signatory to this Agreement hereby declares under penalty of perjury that s/he is a duly authorized agent empowered to enter into this Consent Election Agreement.

| (Name of Party) | (Name of Party) |
|---|---|
| By | By |
| (Title)<br>(Date) | (Title)<br>(Date) |

| (Name of Party) | (Name of Party) |
|---|---|
| By | By |
| (Title)<br>(Date) | (Title)<br>(Date) |

Date approved: _____

[**Author**]
Elections Officer

# <u>APPENDIX D</u>

**MINIMUM INTERNAL CONTROL STANDARDS**

**(BASED ON CODE OF FEDERAL REGULATIONS (CFR), PART 542)**

**TABLE OF CONTENTS**

| Section | Contents | Page Number |
|---|---|---|
| § 542.1 | What does this part cover? | D-1 |
| § 542.2 | What are the definitions for this part? | D-1 |
| § 542.3 | How do I comply with this part? | D-8 |
| § 542.4 | Reserved | D-11 |
| § 542.5 | Reserved | D-11 |
| § 542.6 | Reserved | D-11 |
| § 542.7 | Reserved | D-12 |
| § 542.8 | Reserved | D-12 |
| § 542.9 | Reserved | D-12 |
| § 542.10 | Reserved | D-12 |
| § 542.11 | What are the minimum internal control standards for pari-mutuel wagering? | D-12 |
| § 542.12 | What are the minimum internal control standards for banking and percentage card games? | D-15 |
| § 542.13 | What are the minimum internal control standards for gaming devices? | D-22 |
| § 542.14 | What are the minimum internal control standards for the cage? | D-32 |
| § 542.15 | What are the minimum internal control standards for credit? | D-34 |
| § 542.16 | What are the minimum internal control standards for information technology? | D-37 |
| § 542.17 | What are the minimum internal control standards for complimentary services or items? | D-39 |
| § 542.18 | Reserved | D-40 |
| § 542.19 | What are the minimum internal control standards for accounting? | D-40 |
| § 542.20 | What is a Tier A gaming operation? | D-43 |
| § 542.21 | What are the minimum internal control standards for drop and count for Tier A gaming operations? | D-43 |
| § 542.22 | What are the minimum internal control standards for internal audit for Tier A gaming operations? | D-55 |
| § 542.23 | What are the minimum internal control standards for surveillance for Tier A gaming operations? | D-56 |
| § 542.30 | What is a Tier B gaming operation? | D-59 |
| § 542.31 | What are the minimum internal control standards for drop and count for Tier B gaming operations? | D-59 |
| § 542.32 | What are the minimum internal control standards for internal audit for Tier B gaming operations? | D-71 |
| § 542.33 | What are the minimum internal control standards for surveillance for Tier B gaming operations? | D-72 |
| § 542.40 | What is a Tier C gaming operation? | D-76 |
| § 542.41 | What are the minimum internal control standards for drop and count for Tier C gaming operations? | D-76 |
| § 542.42 | What are the minimum internal control standards for internal audit for Tier C gaming operations? | D-88 |
| § 542.43 | What are the minimum internal control standards for surveillance for a Tier C gaming operation? | D-90 |

# APPENDIX D

## MINIMUM INTERNAL CONTROL STANDARDS

<u>Compliance with Requirements of this Appendix</u>.  The following minimum internal control standards shall apply to all Tribal State Gaming Activities, Gaming Facilities and Gaming Operations; however, this Appendix is not applicable to any activities not expressly permitted in the Compact.  In addition, should the terms in this Appendix be inconsistent with the Compact, the terms in the Compact shall prevail.

### § 542.1     What does this part cover?

This part establishes the minimum internal control standards for gaming operations on Indian land.

### § 542.2     What are the definitions for this part?

The definitions in this section shall apply to all sections of this part unless otherwise noted.

*Account access card* means an instrument used to access customer accounts for wagering at a gaming device.  Account access cards are used in connection with a computerized account database.  Account access cards are not "smart cards."

*Accountability* means all items of cash, chips, coins, tokens, plaques, receivables, and customer deposits constituting the total amount for which the bankroll custodian is responsible at a given time.

*Accumulated credit payout* means credit earned in a gaming device that is paid to a customer manually in lieu of a gaming device payout.

*Actual hold percentage* means the percentage calculated by dividing the win by the drop or coin-in (number of credits wagered).  Can be calculated for individual banking or percentage card games or gaming devices, type of banking or percentage card games or gaming devices, on a per day or cumulative basis.

*Ante* means a player's initial wager or predetermined contribution to the pot before the dealing of the first hand.

*Banking card games* means games played with cards that are banked by the house whereby the house pays all winning bets and collects all losing bets.

*Betting station* means the area designated in a pari-mutuel area that accepts wagers and pays winning bets.

*Betting ticket* means a printed, serially numbered form used to record the event upon which a wager is made, the amount and date of the wager, and sometimes the line or spread (odds).

*Bill acceptor* means the device that accepts and reads cash by denomination in order to accurately register customer credits.

*Bill acceptor canister* means the box attached to the bill acceptor used to contain cash received by bill acceptors.

*Bill acceptor canister release key* means the key used to release the bill acceptor canister from the bill acceptor device.

*Bill acceptor canister storage rack key* means the key used to access the storage rack where bill acceptor canisters are secured.

*Bill acceptor drop* means cash contained in bill acceptor canisters.

D-1

*Bill-in meter* means a meter included on a gaming device accepting cash that tracks the number of bills put in the gaming device.

*Boxperson* means the first-level supervisor who is responsible for directly participating in and supervising the operation and conduct of any allowable banking card game based upon craps not using dice.

*Breakage* means the difference between actual bet amounts paid out by a racetrack to bettors and amounts won due to bet payments being rounded up or down.  For example, a winning bet that should pay $4.25 may be actually paid at $4.20 due to rounding.

*Cage* means a secure work area within the gaming operation for cashiers and a storage area for the gaming operation bankroll.

*Cage accountability form* means an itemized list of the components that make up the cage accountability.

*Cage credit* means advances in the form of cash or gaming chips made to customers at the cage.  Documented by the players signing an IOU or a marker similar to a counter check.

*Cage marker form* means a document, signed by the customer, evidencing an extension of credit at the cage to the customer by the gaming operation.

*Calibration module* means the section of a weigh scale used to set the scale to a specific amount or number of coins to be counted.

*Call bets* means a wager made without cash or chips, reserved for a known customer and includes marked bets (which are supplemental bets made during a hand of play).  For the purpose of settling a call bet, a hand of play in banking card game upon craps not using dice is defined as a natural winner (e.g., seven or eleven on the come-out deal ), a natural loser (e.g., a two, three or twelve on the come-out deal), a seven-out, or the player making his point, whichever comes first.

*Cash-out ticket* means an instrument of value generated by a gaming device representing a cash amount owed to a customer at a specific gaming device.  This instrument may be wagered at other gaming devices by depositing the cash-out ticket in the gaming device bill acceptor.

*Chips* means cash substitutes, in various denominations, issued by a gaming operation and used for wagering.

*Coin-in meter* means the meter that displays the total amount wagered in a gaming device that includes coins-in and credits played.

*Coin meter count device* means a device used in a coin room to count coin.

*Coin room* means an area where coins and tokens are stored.

*Coin room inventory* means coins and tokens stored in the coin room that are generally used for gaming device department operation.

*Commission* means the National Indian Gaming Commission (NIGC).

*Complimentary* means a service or item provided at no cost, or at a reduced cost, to a customer.

*Count* means the total funds counted for a particular game, gaming device, shift, or other period.

*Count room* means a room where the coin and cash drop from gaming devices, banking and percentage card games, or other games are transported to and counted.

*Count team* means personnel that perform either the count of the gaming device drop and/or the banking and percentage card game drop.

*Counter check* means a form provided by the gaming operation for the customer to use in lieu of a personal check.

*Credit* means the right granted by a gaming operation to a customer to defer payment of debt or to incur debt and defer its payment.

*Credit limit* means the maximum dollar amount of credit assigned to a customer by the gaming operation.

*Credit slip* means a form used to record either:

(1)  The return of chips from a banking or percentage card game table to the cage; or

(2)  The transfer of IOUs, markers, or negotiable checks from a banking and percentage card game table to a cage or bankroll.

*Customer deposits* means the amounts placed with a cage cashier by customers for the customers' use at a future time.

*Dealer* means an employee who operates a game, individually or as a part of a crew, administering house rules and making payoffs.

*Dedicated camera* means a video camera required to continuously record a specific activity.

*Drop (for gaming devices)* means the total amount of cash, cash-out tickets, coupons, coins, and tokens removed from drop buckets and/or bill acceptor canisters.

*Drop (for banking and percentage card games)* means the total amount of cash, chips, and tokens removed from drop boxes, plus the amount of credit issued at the banking and percentage card game tables.

*Drop box* means a locked container affixed to the banking and percentage card game table into which the drop is placed.  The game type, table number, and shift are indicated on the box.

*Drop box contents keys* means the key used to open drop boxes.

*Drop box release keys* means the key used to release drop boxes from banking and percentage card game tables.

*Drop box storage rack keys* means the key used to access the storage rack where drop boxes are secured.

*Drop bucket* means a container located in the drop cabinet (or in a secured portion of the gaming device in coinless/cashless configurations) for the purpose of collecting coins, tokens, cash-out tickets, and coupons from the gaming device.

*Drop cabinet* means the wooden or metal base of the gaming device that contains the gaming device drop bucket.

*Drop period* means the period of time that occurs between sequential drops.

*Earned and unearned take* means race bets taken on present and future race events.  Earned take means bets received on current or present events.  Unearned take means bets taken on future race events.

*EPROM* means erasable programmable read-only memory or other equivalent game software media.

*Fill* means a transaction whereby a supply of chips, coins, or tokens is transferred from a bankroll to a banking or percentage card game or gaming device.

D-3

*Fill slip* means a document evidencing a fill.

*Future wagers* means bets on races to be run in the future (e.g., Kentucky Derby).

*Game server* means an electronic selection device, utilizing a random number generator.

*Gaming device* means a gaming device as defined in the Compact.

*Gaming device analysis report* means a report prepared that compares theoretical to actual hold by a gaming device on a monthly or other periodic basis.

*Gaming device booths and change banks* means a booth or small cage in the gaming device area used to provide change to players, store change aprons and extra coin, and account for jackpot and other payouts.

*Gaming device count* means the total amount of coins, tokens, and cash removed from a gaming device. The amount counted is entered on the Gaming Device Count Sheet and is considered the drop. Also, the procedure of counting the coins, tokens, and cash or the process of verifying gaming device coin and token inventory.

*Gaming device pay table* means the reel strip combinations illustrated on the face of the gaming device that can identify payouts of designated coin amounts.

*Gaming operation accounts receivable (for gaming operation credit)* means credit extended to gaming operation customers in the form of markers, returned checks, or other credit instruments that have not been repaid.

*Gross gaming revenue* means annual total amount of cash wagered on class II and class III games and admission fees (including table or card fees), less any amounts paid out as prizes or paid for prizes awarded.

*Hold* means the relationship of win to coin-in for gaming devices and win to drop for banking and percentage card games.

*Hub* means the person or entity that is licensed to provide the operator of a pari-mutuel wagering operation information related to horse racing that is used to determine winners of races or payoffs on wagers accepted by the pari-mutuel wagering operation.

*Internal audit* means persons who perform an audit function of a gaming operation that are independent of the department subject to audit. Independence is obtained through the organizational reporting relationship, as the internal audit department shall not report to management of the gaming operation. Internal audit activities should be conducted in a manner that permits objective evaluation of areas examined. Internal audit personnel may provide audit coverage to more than one (1) operation within a Tribe's gaming operation holdings.

*Issue slip* means a copy of a credit instrument that is retained for numerical sequence control purposes.

*Jackpot payout* means the portion of a jackpot paid by gaming device personnel. The amount is usually determined as the difference between the total posted jackpot amount and the coins paid out by the gaming device. May also be the total amount of the jackpot.

*Lammer button* means a type of chip that is placed on a banking or percentage card game table to indicate that the amount of chips designated thereon has been given to the customer for wagering on credit before completion of the credit instrument.

*Marker* means a document, signed by the customer, evidencing an extension of credit to him by the gaming operation.

*Marker credit play* means that players are allowed to purchase chips using credit in the form of a marker.

D-4

*Marker inventory form* means a form maintained at banking and percentage card games or in the gaming operation pit that are used to track marker inventories at the individual table or pit.

*Marker transfer form* means a form used to document transfers of markers from the pit to the cage.

*Master credit record* means a form to record the date, time, shift, game, table, amount of credit given, and the signatures or initials of the persons extending the credit.

*Master game program number* means the game program number listed on a gaming device EPROM.

*Master game sheet* means a form used to record, by shift and day, each banking and percentage card game's winnings and losses.  This form reflects the opening and closing table inventories, the fills and credits, and the drop and win.

*Mechanical coin counter* means a device used to count coins that may be used in addition to or in lieu of a coin weigh scale.

*Meter* means an electronic (soft) or mechanical (hard) apparatus in a gaming device.  May record the number of coins wagered, the number of coins dropped, the number of times the handle was pulled, or the number of coins paid out to winning players.

*MICS* means minimum internal control standards in this part 542.

*Motion activated dedicated camera* means a video camera that, upon its detection of activity or motion in a specific area, begins to record the activity or area.

*Multi-game gaming device* means a gaming device that includes more than one (1) type of game option.

*On-line gaming device monitoring system* means a system used by a gaming operation to monitor gaming device meter readings and/or other activities on an on-line basis.

*Order for credit* means a form that is used to request the transfer of chips or markers from a banking or percentage card game table to the cage.  The order precedes the actual transfer transaction that is documented on a credit slip.

*Par percentage* means the percentage of each dollar wagered that the house wins (i.e., gaming operation advantage).

*Par sheet* means a specification sheet for a gaming device that provides gaming device hold percentage, model number, hit frequency, reel combination, number of reels, number of coins that can be accepted, and reel strip listing.

*Pari-mutuel wagering* means a system of wagering on horse races, jai-alai, greyhound, and harness racing, where the winners divide the total amount wagered, net of commissions and operating expenses, proportionate to the individual amount wagered.

*Payment slip* means that part of a marker form on which customer payments are recorded.

*Payout* means a transaction associated with a winning event.

*Percentage card games* means a card game in which the operator has no interest in the game's outcome but takes a percentage of all amounts wagered or won.

*PIN* means the personal identification number used to access a player's account.

*Pit podium* means a stand located in the middle of the banking and percentage card game tables used by gaming operation supervisory personnel as a workspace and a record storage area.

*Pit supervisor* means the employee who supervises all games in a pit.

*Player tracking system* means a system typically used in gaming device departments that can record the gaming device play of individual customers.

*Post time* means the time when a pari-mutuel track stops accepting bets in accordance with rules and regulations of the applicable jurisdiction.

*Primary and secondary jackpots* means promotional pools offered at certain banking or percentage card games that can be won in addition to the primary pot.

*Progressive gaming device* means a gaming device, with a payoff indicator, in which the payoff increases as it is played (i.e., deferred payout). The payoff amount is accumulated, displayed on a gaming device, and will remain until a player lines up the jackpot symbols that result in the progressive amount being paid.

*Progressive jackpot* means deferred payout from a progressive gaming device.

*Progressive banking or percentage card game* means banking or percentage card games that offer progressive jackpots.

*Promotional payout* means merchandise or awards given to players by the gaming operation based on a wagering activity.

*Random number generator* means a device that generates numbers in the absence of a pattern. Commonly used in gaming devices to generate game outcome.

*Reel symbols* means symbols listed on reel strips of gaming devices.

*Rim credit* means extensions of credit that are not evidenced by the immediate preparation of a marker and does not include call bets.

*Runner* means a gaming employee who transports chips/cash to or from a banking or percentage card game table and a cashier.

*SAM* means a screen-automated device used to accept pari-mutuel wagers. SAM's also pay winning tickets in the form of a voucher, which is redeemable for cash.

*Shift* means an eight-hour period, unless otherwise approved by the Tribal gaming agency, not to exceed twenty-four (24) hours.

*Shill* means an employee financed by the house and acting as a player for the purpose of starting or maintaining a sufficient number of players in a game.

*Short pay* means a payoff from a gaming device that is less than the listed amount.

*Soft count* means the count of the contents in a drop box or a bill acceptor canister.

*State gaming agency* means "State Gaming Agency," as defined in the Compact.

*Statistical drop* means total amount of money, chips and tokens contained in the drop boxes, plus pit credit issued, minus pit credit payments in cash in the pit.

*Statistical win* means closing bankroll, plus credit slips for cash, chips or tokens returned to the cage, plus drop, minus opening bankroll, minus fills to the banking or percentage card game table, plus marker credits.

*Sufficient clarity* means use of monitoring and recording at a minimum of 20 frames per second.  Multiplexer tape recordings are insufficient to satisfy the requirement of sufficient clarity.

*Surveillance room* means a secure location(s) in a gaming operation used primarily for casino surveillance.

*Surveillance system* means a system of video cameras, monitors, recorders, video printers, switches, selectors, and other ancillary equipment used for casino surveillance.

*Table inventory* means the total coins, chips, and markers at a banking or percentage card game table.

*Table inventory form* means the form used by gaming operation supervisory personnel to document the inventory of chips, coins, and tokens on a banking or percentage card game table at the beginning and ending of a shift.

*Table tray* means the container located on banking or percentage card game tables where chips, coins, or cash are stored that are used in the game.

*Take* means the same as earned and unearned take.

*Theoretical hold* means the intended hold percentage or win of an individual gaming device as computed by reference to its payout schedule and reel strip settings or EPROM.

*Theoretical hold worksheet* means a worksheet provided by the manufacturer for all gaming devices that indicate the theoretical percentages that the gaming device should hold based on adequate levels of coin-in.  The worksheet also indicates the reel strip settings, number of credits that may be played, the payout schedule, the number of reels and other information descriptive of the particular type of gaming device.

*Tier A* means gaming operations with annual gross gaming revenues of more than $1 million but not more than $5 million.

*Tier B* means gaming operations with annual gross gaming revenues of more than $5 million but not more than $15 million.

*Tier C* means gaming operations with annual gross gaming revenues of more than $15 million.

*Tokens* means a coin-like cash substitute, in various denominations, used for gambling transactions.

*Tribal gaming agency* means the "Tribal Gaming Agency," as defined in the Compact.

*Vault* means a secure area within the gaming operation where tokens, checks, cash, coins, and chips are stored.

*Weigh/count* means the value of coins and tokens counted by a weigh device.

*Weigh scale calibration module* means the device used to adjust a coin weigh scale.

*Weigh scale interface* means a communication device between the weigh scale used to calculate the amount of funds included in drop buckets and the computer system used to record the weigh data.

*Weigh tape* means the tape where weighed coin is recorded.

*Wide area progressive gaming device* means a progressive gaming device that is linked to gaming devices in other operations and play on the gaming devices affect the progressive amount.  As wagers are placed, the progressive meters on all of the linked gaming devices increase.

*Win* means the net win resulting from all gaming activities.

*Win-to-write hold percentage* means win divided by write to determine hold percentage.

D-7

*Wrap* means the method of storing coins after the count process has been completed, including, but not limited to, wrapping, racking, or bagging.  May also refer to the total amount or value of the counted and stored coins.

*Write* means the total amount wagered in pari-mutuel operations.

*Writer* means an employee who writes pari-mutuel tickets..

### § 542.3      How do I comply with this part?

(a)  *Compliance based upon tier.*  (1) Tier A gaming operations must comply with §§542.1 through 542.18, and §§542.20 through 542.23.

(2)  Tier B gaming operations must comply with §§542.1 through 542.18, and §§542.30 through 542.33.

(3)  Tier C gaming operations must comply with §§542.1 through 542.18, and §§542.40 through 542.43.

(b)  *Determination of tier.*  (1) The determination of tier level shall be made based upon the individual annual gross gaming revenues at each gaming facility, as indicated within the gaming operation's audited financial statements. Gaming operations moving from one tier to another shall have nine (9) months from the date of the independent certified public accountant's audit report to achieve compliance with the requirements of the new tier.

(2)  The Tribal gaming agency may extend the deadline by an additional six (6) months if written notice is provided to the State gaming agency no later than two (2) weeks before the expiration of the nine (9) month period.

(c)  Reserved.

(d)  Reserved.

(e)  Reserved.

(f)  *CPA testing.*  (1) An independent certified public accountant (CPA) shall be engaged to perform "Agreed-Upon Procedures" to verify that the gaming operation is in compliance with the minimum internal control standards (MICS) set forth in this part.   The CPA shall report each event and procedure discovered by or brought to the CPA's attention that the CPA believes does not satisfy the minimum standards.  The "Agreed-Upon Procedures" may be performed in conjunction with the annual audit.  The CPA shall report its findings to the Tribe, Tribal gaming agency, and management.  The Tribe shall submit two (2) copies of the report to the State gaming agency within 120 days of the gaming operation's fiscal year end.  This regulation is intended to communicate the Commission's position on the minimum agreed-upon procedures to be performed by the CPA.  Throughout these regulations, the CPA's engagement and reporting are based on Statements on Standards for Attestation Engagements (SSAEs) in effect as of December 31, 2003, specifically SSAE 10 ("Agreed-Upon Procedures Engagements.").  If future revisions are made to the SSAEs or new SSAEs are adopted that are applicable to this type of engagement, the CPA is to comply with any new or revised professional standards in conducting engagements pursuant to these regulations and the issuance of the agreed-upon procedures report.  The CPA shall perform the "Agreed-Upon Procedures" in accordance with the following:

(i)  As a prerequisite to the evaluation of the gaming operation's internal control systems, it is recommended that the CPA obtain and review an organization chart depicting segregation of functions and responsibilities, a description of the duties and responsibilities of each position shown on the organization chart, and an accurate, detailed narrative description of the gaming operation's procedures in effect that demonstrate compliance.

(ii)  Complete the CPA NIGC or State gaming agency MICS Compliance checklists or other comparable testing procedures.  The checklists should measure compliance on a sampling basis by performing walk-throughs, observations and substantive testing.  The CPA shall complete separate checklists for each gaming revenue center, cage and credit, internal audit, surveillance, information technology and complimentary services or items.  All

questions on each applicable checklist should be completed.  Work-paper references are suggested for all "no" responses for the results obtained during testing (unless a note in the "W/P Ref" can explain the exception).

(iii)  The CPA shall perform, at a minimum, the following procedures in conjunction with the completion of the checklists:

(A)  At least one (1) unannounced observation of each of the following:  Gaming device coin drop, gaming device currency acceptor drop, banking or percentage card games drop, gaming device coin count, gaming device currency acceptor count, and banking or percentage card games count.  The AICPA's "Audits of Casinos" Audit and Accounting Guide states that "observations of operations in the casino cage and count room should not be announced in advance * * *"  For purposes of these procedures, "unannounced" means that no officers, directors, or employees are given advance information regarding the dates or times of such observations.  The independent accountant should make arrangements with the gaming operation and Tribal gaming agency to ensure proper identification of the CPA's personnel and to provide for their prompt access to the count rooms.

(*1*)  The gaming device coin count observation would include a weigh scale test of all denominations using pre-counted coin.  The count would be in process when these tests are performed, and would be conducted prior to the commencement of any other walk-through procedures.  For computerized weigh scales, the test can be conducted at the conclusion of the count, but before the final totals are generated.

(*2*)  The checklists should provide for drop/count observations, inclusive of hard drop/count, soft drop/count and currency acceptor drop/count.  The count room would not be entered until the count is in process and the CPA would not leave the room until the monies have been counted and verified to the count sheet by the CPA and accepted into accountability.  If the drop teams are unaware of the drop observations and the count observations would be unexpected, the hard count and soft count rooms may be entered simultaneously.  Additionally, if the gaming device currency acceptor count begins immediately after the banking or percentage card games count in the same location, by the same count team, and using the same equipment, the currency acceptor count observation can be conducted on the same day as the banking and percentage card games count observation, provided the CPA remains until monies are transferred to the vault/cashier.

(B)  Observations of the gaming operation's employees as they perform their duties.

(C)  Interviews with the gaming operation's employees who perform the relevant procedures.

(D)  Compliance testing of various documents relevant to the procedures.  The scope of such testing should be indicated on the checklist where applicable.

(E)  For new gaming operations that have been in operation for three (3) months or less at the end of their business year, performance of this regulation, section 542.3(f), is not required for the partial period.

(*2*)  Alternatively, at the discretion of the Tribe, the Tribe may engage an independent certified public accountant (CPA) to perform the testing, observations and procedures reflected in paragraphs (f)(1)(i), (ii), and (iii) of this section utilizing the Tribal internal control standards adopted by the Tribal gaming agency.  Accordingly, the CPA will verify compliance by the gaming operation with the Tribal internal control standards.  Should the Tribe elect this alternative, as a prerequisite, the CPA will perform the following:

(i)  The CPA shall compare the Tribal internal control standards to the MICS to ascertain whether the criteria set forth in the MICS are adequately addressed.

(ii)  The CPA may utilize personnel of the Tribal gaming agency to cross-reference the Tribal internal control standards to the MICS, provided the CPA performs a review of the Tribal gaming agency personnel's work and assumes complete responsibility for the proper completion of the work product.

(iii)  The CPA shall report each procedure discovered by or brought to the CPA's attention that the CPA believes does not satisfy paragraph (f)(2)(i) of this section.

(3) *Reliance on Internal Auditors.* (i) The CPA may rely on the work of an internal auditor, to the extent allowed by the professional standards, for the performance of the recommended procedures specified in paragraphs (f)(1)(iii)(B), (C), and (D) of this section, and for the completion of the checklists as they relate to the procedures covered therein provided that the internal audit department can demonstrate to the satisfaction of the CPA that the requirements contained within §542.22, 542.32, or 542.42, as applicable, have been satisfied.

(ii)  Agreed-upon procedures are to be performed by the CPA to determine that the internal audit procedures performed for a past 12-month period (includes two 6-month periods) encompassing a portion or all of the most recent business year has been properly completed.  The CPA will apply the following Agreed-Upon Procedures to the gaming operation's written assertion:

(A)  Obtain internal audit department work-papers completed for a 12-month period (includes two 6-month periods) encompassing a portion or all of the most recent business year and determine whether the CPA NIGC MICS Compliance Checklists or other comparable testing procedures were included in the internal audit work-papers and all steps described in the checklists were initialed or signed by an internal audit representative.

(B)  For the internal audit work-papers obtained in paragraph (f)(3)(ii)(A) of this section, on a sample basis, reperform the procedures included in CPA NIGC MICS Compliance Checklists or other comparable testing procedures prepared by internal audit and determine if all instances of noncompliance noted in the sample were documented as such by internal audit.  The CPA NIGC MICS Compliance Checklists or other comparable testing procedures for the applicable Drop and Count procedures are not included in the sample reperformance of procedures because the CPA is required to perform the drop and count observations as required under paragraph (f)(1)(iii)(A) of this section of the Agreed-Upon Procedures.  The CPA's sample should comprise a minimum of three (3) percent of the procedures required in each CPA NIGC MICS Compliance Checklist or other comparable testing procedures for the gaming device and banking and percentage card game departments and five (5) percent for the other departments completed by internal audit in compliance with the internal audit MICS.  The reperformance of procedures is performed as follows:

(*1*)  For inquiries, the CPA should either speak with the same individual or an individual of the same job position as the internal auditor did for the procedure indicated in their checklist.

(*2*)  For observations, the CPA should observe the same process as the internal auditor did for the procedure as indicated in their checklist.

(*3*)  For document testing, the CPA should look at the same original document as tested by the internal auditor for the procedure as indicated in their checklist.  The CPA need only retest the minimum sample size required in the checklist.

(C)  The CPA is to investigate and resolve any differences between their reperformance results and the internal audit results.

(D)  Documentation is maintained for five (5) years by the CPA indicating the procedures reperformed along with the results.

(E)  When performing the procedures for paragraph (f)(3)(ii)(B) of this section in subsequent years, the CPA must select a different sample so that the CPA will reperform substantially all of the procedures after several years.

(F)  Any additional procedures performed at the request of the Commission, the Tribal gaming agency, State gaming agency, or management should be included in the Agreed-Upon Procedures report transmitted to the State gaming agency.

(4) *Report Format.* (i) The NIGC has concluded that the performance of these procedures is an attestation engagement in which the CPA applies such Agreed-Upon Procedures to the gaming operation's assertion that it is in compliance with the MICS and, if applicable under paragraph (f)(2) of this section, the Tribal internal control standards provide a level of control that equals or exceeds that of the MICS.  Accordingly, the Statements on Standards for Attestation Engagements (SSAE's), specifically SSAE 10, issued by the Auditing Standards Board is

currently applicable.  SSAE 10 provides current, pertinent guidance regarding agreed-upon procedure engagements, and the sample report formats included within those standards should be used, as appropriate, in the preparation of the CPA's agreed-upon procedures report.  If future revisions are made to this standard or new SSAEs are adopted that are applicable to this type of engagement, the CPA is to comply with any revised professional standards in issuing their agreed upon procedures report.  The Commission or State gaming agency will provide an Example Report and Letter Formats upon written request that may be used and contain all of the information discussed below:

(A)  The report must describe all instances of procedural noncompliance, regardless of materiality, with the MICS, and all instances where the Tribal gaming agency's regulations do not comply with the MICS.  When describing the agreed-upon procedures performed, the CPA should also indicate whether procedures performed by other individuals were utilized to substitute for the procedures required to be performed by the CPA.  For each instance of noncompliance noted in the CPA's agreed-upon procedures report, the following information must be included:

(*1*)  The citation of the applicable MICS for which the instance of noncompliance was noted.

(*2*)  A narrative description of the noncompliance, including the number of exceptions and sample size tested.

(5)  *Report Submission Requirements.*  (i) The CPA shall prepare a report of the findings for the Tribe and management.  The Tribe shall submit two (2) copies of the report to the State gaming agency no later than 120 days after the gaming operation's fiscal year end.  This report should be provided in addition to any other reports required to be submitted to the State gaming agency.

(ii)  The CPA should maintain the work-papers supporting the report for a minimum of five (5) years.  Digital storage is acceptable.  The Commission or State gaming agency may request access to these work-papers, through the Tribe.

(6)  *CPA NIGC MICS Compliance Checklists.*  In connection with the CPA testing pursuant to this section and as referenced therein, the Commission or State gaming agency will provide CPA MICS Compliance Checklists upon request.

**§ 542.4      Reserved.**

**§ 542.5      Reserved.**

**§ 542.6      Reserved.**

(a)  *Small gaming operations.*  This part shall not apply to small gaming operations provided that:

(1)  The Tribal gaming agency permits the operation to be exempt from this part;

(2)  The annual gross gaming revenue of the operation does not exceed $1 million; and

(3)  The Tribal gaming agency develops and the operation complies with alternate procedures that:

(i)  Protect the integrity of games offered; and

(ii)  Safeguard the assets used in connection with the operation.

(b)  *Charitable gaming operations.*  This part shall not apply to charitable gaming operations provided that:

(1)  All proceeds are for the benefit of a charitable organization;

(2)  The Tribal gaming agency permits the charitable organization to be exempt from this part;

(3)  The charitable gaming operation is operated wholly by the charitable organization's employees or volunteers;

D-11

(4)  The annual gross gaming revenue of the charitable gaming operation does not exceed $100,000;

(i)  Where the annual gross gaming revenues of the charitable gaming operation exceed $100,000, but are less than $1 million, paragraph (a) of this section shall also apply; and

(ii)  [Reserved]

(5)  The Tribal gaming agency develops and the charitable gaming operation complies with alternate procedures that:

(i)  Protect the integrity of the games offered; and

(ii)  Safeguard the assets used in connection with the gaming operation.

(c)  *Independent operators.*  Nothing in this section shall exempt gaming operations conducted by independent operators for the benefit of a charitable organization.

**§ 542.7    Reserved.**

**§ 542.8    Reserved.**

**§ 542.9    Reserved.**

**§ 542.10    Reserved.**

**§ 542.11    What are the minimum internal control standards for pari-mutuel wagering?**

(a)  *Exemptions.*  (1)  The requirements of this section shall not apply to gaming operations who house pari-mutuel wagering operations conducted entirely by a state licensed simulcast service provider pursuant to an approved tribal-state compact if:

(i)  The simulcast service provider utilizes its own employees for all aspects of the pari-mutuel wagering operation;

(ii)  The gaming operation posts, in a location visible to the public, that the simulcast service provider and its employees are wholly responsible for the conduct of pari-mutuel wagering offered at that location;

(iii)  The gaming operation receives a predetermined fee from the simulcast service provider; and

(iv)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with standards that ensure that the gaming operation receives, from the racetrack, its contractually guaranteed percentage of the handle.

(2)  Gaming operations that contract directly with a state regulated racetrack as a simulcast service provider, but whose on-site pari-mutuel operations are conducted wholly or in part by tribal gaming operation employees, shall not be required to comply with paragraphs (h)(5) thru (h)(9) of this section.

(i)  If any standard contained within this section conflicts with state law, a tribal-state compact, or a contract, then the gaming operation shall document the basis for noncompliance and shall maintain such documentation for inspection by the Tribal gaming agency and the Commission.

(ii)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with standards that ensure that the gaming operation receives, from the racetrack, its contractually guaranteed percentage of the handle.

(b)  *Computer applications.*  For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(c)  *Betting ticket and equipment standards.*  (1)  All pari-mutuel wagers shall be transacted through the pari-mutuel satellite system.  In case of computer failure between the pari-mutuel book and the hub, no tickets shall be manually written.

(2)  Whenever a betting station is opened for wagering or turned over to a new writer/cashier, the writer/cashier shall sign on and the computer shall document gaming operation name (or identification number), station number, the writer/cashier identifier, and the date and time.

(3)  A betting ticket shall consist of at least two (2) parts:

(i)  An original, which shall be transacted and issued through a printer and given to the customer; and

(ii)  A copy that shall be recorded concurrently with the generation of the original ticket either on paper or other storage media (e.g., tape or diskette).

(4)  Upon accepting a wager, the betting ticket that is created shall contain the following:

(i)  A unique transaction identifier;

(ii)  Gaming operation name (or identification number) and station number;

(iii)  Race track, race number, horse identification or event identification, as applicable;

(iv)  Type of bet(s), each bet amount, total number of bets, and total take; and

(v)  Date and time.

(5)  All tickets shall be considered final at post time.

(6)  If a gaming operation voids a betting ticket written prior to post time, it shall be immediately entered into the system.

(7)  Future wagers shall be accepted and processed in the same manner as regular wagers.

(d)  *Payout standards.*  (1)  Prior to making payment on a ticket, the writer/cashier shall input the ticket for verification and payment authorization.

(2)  The computer shall be incapable of authorizing payment on a ticket that has been previously paid, a voided ticket, a losing ticket, or an unissued ticket.

(e)  *Checkout standards.*  (1)  Whenever the betting station is closed or the writer/cashier is replaced, the writer/cashier shall sign off and the computer shall document the gaming operation name (or identification number), station number, the writer/cashier identifier, the date and time, and cash balance.

(2)  For each writer/cashier station a summary report shall be completed at the conclusion of each shift including:

(i)  Computation of cash turned in for the shift; and

(ii)  Signature of two (2) employees who have verified the cash turned in for the shift.  Unverified transfers of cash and/or cash equivalents are prohibited.

(f)  *Employee wagering.*  Pari-mutuel employees shall be prohibited from wagering on race events while on duty, including during break periods.

(g)  *Computer reports standards.*  (1)  Adequate documentation of all pertinent pari-mutuel information shall be generated by the computer system.

(2)  This documentation shall be restricted to authorized personnel.

(3)  The documentation shall be created for each day's operation and shall include, but is not limited to:

(i)  Unique transaction identifier;

(ii)  Date/time of transaction;

(iii)  Type of wager;

(iv)  Animal identification or event identification;

(v)  Amount of wagers (by ticket, writer/SAM, track/event, and total);

(vi)  Amount of payouts (by ticket, writer/SAM, track/event, and total);

(vii)  Tickets refunded (by ticket, writer, track/event, and total);

(viii)  Unpaid winners/vouchers ("outs") (by ticket/voucher, track/event, and total);

(ix)  Voucher sales/payments (by ticket, writer/SAM, and track/event);

(x)  Voids (by ticket, writer, and total);

(xi)  Future wagers (by ticket, date of event, total by day, and total at the time of revenue recognition);

(xii)  Results (winners and payout data);

(xiii)  Breakage data (by race and track/event);

(xiv)  Commission data (by race and track/event); and

(xv)  Purged data (by ticket and total).

(4)  The system shall generate the following reports:

(i)  A reconciliation report that summarizes totals by track/event, including write, the day's winning ticket total, total commission and breakage due the gaming operation, and net funds transferred to or from the gaming operation's bank account;

(ii)  An exception report that contains a listing of all system functions and overrides not involved in the actual writing or cashing of tickets, including sign-on/off, voids, and manually input paid tickets; and

(iii)  A purged ticket report that contains a listing of the unique transaction identifier(s), description, ticket cost and value, and date purged.

(h)  *Accounting and auditing functions.*  A gaming operation shall perform the following accounting and auditing functions:

(1)  The parimutuel audit shall be conducted by personnel independent of the parimutuel operation.

D-14

(2)  Documentation shall be maintained evidencing the performance of all parimutuel accounting and auditing procedures.

(3)  An accounting employee shall review handle, commission, and breakage for each day's play and recalculate the net amount due to or from the systems operator on a weekly basis.

(4)  The accounting employee shall verify actual cash/cash equivalents turned in to the system's summary report for each cashier's drawer (Beginning balance, (+) fills (draws), (+) net write (sold less voids), (−) payouts (net of IRS withholding), (−) cashbacks (paids), (=) cash turn-in).

(5)  An accounting employee shall produce a gross revenue recap report to calculate gross revenue for each day's play and for a month-to-date basis, including the following totals:

(i)  Commission;

(ii)  Positive breakage;

(iii)  Negative breakage;

(iv)  Track/event fees;

(v)  Track/event fee rebates; and

(vi)  Purged tickets.

(6)  All winning tickets and vouchers shall be physically removed from the SAM's for each day's play.

(7)  In the event a SAM does not balance for a day's play, the auditor shall perform the following procedures:

(i)  Foot the winning tickets and vouchers deposited and trace to the totals of SAM activity produced by the system;

(ii)  Foot the listing of cashed vouchers and trace to the totals produced by the system;

(iii)  Review all exceptions for propriety of transactions and unusual occurrences;

(iv)  Review all voids for propriety;

(v)  Verify the results as produced by the system to the results provided by an independent source;

(vi)  Regrade 1% of paid (cashed) tickets to ensure accuracy and propriety; and

(vii)  When applicable, reconcile the totals of future tickets written to the totals produced by the system for both earned and unearned take, and review the reports to ascertain that future wagers are properly included on the day of the event.

(8)  At least annually, the auditor shall foot the wagers for one (1) day and trace to the total produced by the system.

(9)  At least one (1) day per quarter, the auditor shall recalculate and verify the change in the unpaid winners to the total purged tickets.

### § 542.12    What are the minimum internal control standards for banking and percentage card games?

(a)  *Computer applications.*  For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(b) *Standards for drop and count.*  The procedures for the collection of the banking and percentage card game drop and the count thereof shall comply with §542.21, §542.31, or §542.41 (as applicable).

(c) *Fill and credit standards.*  (1) Fill slips and credit slips shall be in at least triplicate form, and in a continuous, prenumbered series.  Such slips shall be concurrently numbered in a form utilizing the alphabet and only in one (1) series at a time.  The alphabet need not be used if the numerical series is not repeated during the business year.

(2)  Unissued and issued fill/credit slips shall be safeguarded and adequate procedures shall be employed in their distribution, use, and control.  Personnel from the cashier or pit departments shall have no access to the secured (control) copies of the fill/credit slips.

(3)  When a fill/credit slip is voided, the cashier shall clearly mark "void" across the face of the original and first copy, the cashier and one (1) other person independent of the transactions shall sign both the original and first copy, and shall submit them to the accounting department for retention and accountability.

(4)  Fill transactions shall be authorized by pit supervisory personnel before the issuance of fill slips and transfer of chips, tokens, or cash equivalents.  The fill request shall be communicated to the cage where the fill slip is prepared.

(5)  At least three (3) parts of each fill slip shall be utilized as follows:

(i)  One (1) part shall be transported to the pit with the fill and, after the appropriate signatures are obtained, deposited in the appropriate banking and percentage card game drop box;

(ii)  One (1) part shall be retained in the cage for reconciliation of the cashier bank; and

(iii)  For computer systems, one (1) part shall be retained in a secure manner to insure that only authorized persons may gain access to it.  For manual systems, one (1) part shall be retained in a secure manner in a continuous unbroken form.

(6)  For Tier C gaming operations, the part of the fill slip that is placed in the appropriate banking and percentage card game drop box shall be of a different color for fills than for credits, unless the type of transaction is clearly distinguishable in another manner (checking a box on the form shall not be a clearly distinguishable indicator).

(7)  The table number, shift, and amount of fill by denomination and in total shall be noted on all copies of the fill slip.  The correct date and time shall be indicated on at least two (2) copies.

(8)  All fills shall be carried from the cashier's cage by a person who is independent of the cage or pit.

(9)  The fill slip shall be signed by at least the following persons (as an indication that each has counted the amount of the fill and the amount agrees with the fill slip):

(i)  Cashier who prepared the fill slip and issued the chips, tokens, or cash equivalent;

(ii)  Runner who carried the chips, tokens, or cash equivalents from the cage to the pit;

(iii)  Dealer or boxperson who received the chips, tokens, or cash equivalents at the gaming table; and

(iv)  Pit supervisory personnel who supervised the fill transaction.

(10)  Fills shall be broken down and verified by the dealer or boxperson in public view before the dealer or boxperson places the fill in the table tray.

(11)  A copy of the fill slip shall then be deposited into the drop box on the table by the dealer, where it shall appear in the soft count room with the cash receipts for the shift.

D-16

(12)  Table credit transactions shall be authorized by a pit supervisor before the issuance of credit slips and transfer of chips, tokens, or other cash equivalent.  The credit request shall be communicated to the cage where the credit slip is prepared.

(13)  At least three (3) parts of each credit slip shall be utilized as follows:

(i)  Two (2) parts of the credit slip shall be transported by the runner to the pit.  After signatures of the runner, dealer, and pit supervisor are obtained, one (1) copy shall be deposited in the appropriate banking and percentage card game drop box and the original shall accompany transport of the chips, tokens, markers, or cash equivalents from the pit to the cage for verification and signature of the cashier.

(ii)  For computer systems, one (1) part shall be retained in a secure manner to insure that only authorized persons may gain access to it.  For manual systems, one (1) part shall be retained in a secure manner in a continuous unbroken form.

(14)  The table number, shift, and the amount of credit by denomination and in total shall be noted on all copies of the credit slip.  The correct date and time shall be indicated on at least two (2) copies.

(15)  Chips, tokens, and/or cash equivalents shall be removed from the table tray by the dealer or boxperson and shall be broken down and verified by the dealer or boxperson in public view prior to placing them in racks for transfer to the cage.

(16)  All chips, tokens, and cash equivalents removed from the banking and percentage card game tables and markers removed from the pit shall be carried to the cashier's cage by a person who is independent of the cage or pit.

(17)  The credit slip shall be signed by at least the following persons (as an indication that each has counted or, in the case of markers, reviewed the items transferred):

(i)  Cashier who received the items transferred from the pit and prepared the credit slip;

(ii)  Runner who carried the items transferred from the pit to the cage;

(iii)  Dealer who had custody of the items prior to transfer to the cage; and

(iv)  Pit supervisory personnel who supervised the credit transaction.

(18)  The credit slip shall be inserted in the drop box by the dealer.

(19)  Chips, tokens, or other cash equivalents shall be deposited on or removed from gaming tables only when accompanied by the appropriate fill/credit or marker transfer forms.

(20)  Cross fills (the transfer of chips between banking and percentage card games) and even cash exchanges are prohibited in the pit.

(d)  *Table inventory forms.*  (1)  At the close of each shift, for those table banks that were opened during that shift:

(i)  The table's chip, token, coin, and marker inventory shall be counted and recorded on a table inventory form; or

(ii)  If the table banks are maintained on an imprest basis, a final fill or credit shall be made to bring the bank back to par.

(2)  If final fills are not made, beginning and ending inventories shall be recorded on the master game sheet for shift win calculation purposes.

(3)  The accuracy of inventory forms prepared at shift end shall be verified by the outgoing pit supervisor and the dealer.  Alternatively, if the dealer is not available, such verification may be provided by another pit supervisor or

another supervisor from another gaming department.  Verifications shall be evidenced by signature on the inventory form.

(4)  If inventory forms are placed in the drop box, such action shall be performed by a person other than a pit supervisor.

(e)  *Banking and percentage card games computer generated documentation standards.*  (1) The computer system shall be capable of generating adequate documentation of all information recorded on the source documents and transaction detail (e.g., fill/credit slips, markers, etc.).

(2)  This documentation shall be restricted to authorized personnel.

(3)  The documentation shall include, at a minimum:

(i)  System exception information ( *e.g.,* appropriate system parameter information, corrections, voids, etc.); and

(ii)  Personnel access listing, which includes, at a minimum:

(A)  Employee name or employee identification number (if applicable); and

(B)  Listing of functions employees can perform or equivalent means of identifying the same.

(f)  *Standards for playing cards.*  (1)  Playing cards shall be maintained in a secure location to prevent unauthorized access and to reduce the possibility of tampering.

(2)  Used cards shall be maintained in a secure location until marked, scored, or destroyed, in a manner as approved by the Tribal gaming agency, to prevent unauthorized access and reduce the possibility of tampering.

(3)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with a reasonable time period, which shall not exceed seven (7) days, within which to mark, cancel, or destroy cards from play.

(i)  This standard shall not apply where playing cards are retained for an investigation.

(4)  A card control log shall be maintained that documents when cards are received on site, distributed to and returned from tables and removed from play by the gaming operation.

(g)  *Plastic cards.*  Notwithstanding paragraph (f) of this section, if a gaming operation uses plastic cards (not plastic-coated cards), the cards may be used for up to three (3) months if the plastic cards are routinely inspected, and washed or cleaned in a manner and time frame approved by the Tribal gaming agency.

(h)  *Standards for supervision.*  Pit supervisory personnel (with authority equal to or greater than those being supervised) shall provide supervision of all banking and percentage card games.

(i)  *Analysis of banking and percentage card game performance standards.*  (1)  Records shall be maintained by day and shift indicating any single-deck blackjack games that were dealt for an entire shift.

(2)  Records reflecting hold percentage by table and type of game shall be maintained by shift, by day, cumulative month-to-date, and cumulative year-to-date.

(3)  This information shall be presented to and reviewed by management independent of the pit department on at least a monthly basis.

(4)  The management in paragraph (i)(3) of this section shall investigate any unusual fluctuations in hold percentage with pit supervisory personnel.

(5)  The results of such investigations shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(j)  *Accounting/auditing standards.*  (1)  The accounting and auditing procedures shall be performed by personnel who are independent of the transactions being audited/accounted for.

(2)  If a banking and percentage card game has the capability to determine drop ( *e.g.,* bill-in/coin-drop meters, bill acceptor, computerized record, etc.) the dollar amount of the drop shall be reconciled to the actual drop by shift.

(3)  Accounting/auditing employees shall review exception reports for all computerized table games systems at least monthly for propriety of transactions and unusual occurrences.

(4)  All noted improper transactions or unusual occurrences shall be investigated with the results documented.

(5)  Evidence of banking and percentage card games auditing procedures and any follow-up performed shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(6)  A daily recap shall be prepared for the day and month-to-date, which shall include the following information:

(i)  Drop;

(ii)  Win; and

(iii)  Gross revenue.

(k)  *Marker credit play.*  (1)  If a gaming operation allows marker credit play (exclusive of rim credit and call bets), the following standards shall apply:

(i)  A marker system shall allow for credit to be both issued and repaid in the pit.

(ii)  Prior to the issuance of gaming credit to a player, the employee extending the credit shall contact the cashier or other independent source to determine if the player's credit limit has been properly established and there is sufficient remaining credit available for the advance.

(iii)  Proper authorization of credit extension in excess of the previously established limit shall be documented.

(iv)  The amount of credit extended shall be communicated to the cage or another independent source and the amount documented within a reasonable time subsequent to each issuance.

(v)  The marker form shall be prepared in at least triplicate form (triplicate form being defined as three (3) parts performing the functions delineated in the standard in paragraph (k)(1)(vi) of this section), with a preprinted or concurrently printed marker number, and utilized in numerical sequence.  (This requirement shall not preclude the distribution of batches of markers to various pits.)

(vi)  At least three (3) parts of each separately numbered marker form shall be utilized as follows:

(A)  Original shall be maintained in the pit until settled or transferred to the cage;

(B)  Payment slip shall be maintained in the pit until the marker is settled or transferred to the cage.  If paid in the pit, the slip shall be inserted in the appropriate banking and percentage card game drop box.  If not paid in the pit, the slip shall be transferred to the cage with the original;

(C)  Issue slip shall be inserted into the appropriate banking and percentage card game drop box when credit is extended or when the player has signed the original.

(vii)  When marker documentation (e.g., issue slip and payment slip) is inserted in the drop box, such action shall be performed by the dealer or boxperson at the table.

(viii)  A record shall be maintained that details the following (e.g., master credit record retained at the pit podium):

(A)  The signature or initials of the person(s) approving the extension of credit (unless such information is contained elsewhere for each issuance);

(B)  The legible name of the person receiving the credit;

(C)  The date and shift of granting the credit;

(D)  The table on which the credit was extended;

(E)  The amount of credit issued;

(F)  The marker number;

(G)  The amount of credit remaining after each issuance or the total credit available for all issuances;

(H)  The amount of payment received and nature of settlement (e.g., credit slip number, cash, chips, etc.); and

(I)  The signature or initials of the person receiving payment/settlement.

(ix)  The forms required in paragraphs (k)(1)(v), (vi), and (viii) of this section shall be safeguarded, and adequate procedures shall be employed to control the distribution, use, and access to these forms.

(x)  All credit extensions shall be initially evidenced by lammer buttons, which shall be displayed on the table in public view and placed there by supervisory personnel.

(xi)  Marker preparation shall be initiated and other records updated within approximately one (1) hand of play following the initial issuance of credit to the player.

(xii)  Lammer buttons shall be removed only by the dealer or boxperson employed at the table upon completion of a marker transaction.

(xiii)  The original marker shall contain at least the following information:

(A)  Marker number;

(B)  Player's name and signature;

(C)  Date; and

(D)  Amount of credit issued.

(xiv)  The issue slip or stub shall include the same marker number as the original, the table number, date and time of issuance, and amount of credit issued.  The issue slip or stub shall also include the signature of the person extending the credit, and the signature or initials of the dealer or boxperson at the applicable table, unless this information is included on another document verifying the issued marker.

(xv)  The payment slip shall include the same marker number as the original.  When the marker is paid in full in the pit, it shall also include the table number where paid, date and time of payment, nature of settlement (cash, chips, etc.), and amount of payment.  The payment slip shall also include the signature of pit supervisory personnel acknowledging payment, and the signature or initials of the dealer or boxperson receiving payment, unless this information is included on another document verifying the payment of the marker.

D-20

(xvi)  When partial payments are made in the pit, a new marker shall be completed reflecting the remaining balance and the marker number of the marker originally issued.

(xvii)  When partial payments are made in the pit, the payment slip of the marker that was originally issued shall be properly cross-referenced to the new marker number, completed with all information required by paragraph (k)(1)(xv) of this section, and inserted into the drop box.

(xviii)  The cashier's cage or another independent source shall be notified when payments (full or partial) are made in the pit so that cage records can be updated for such transactions.  Notification shall be made no later than when the customer's play is completed or at shift end, whichever is earlier.

(xix)  All portions of markers, both issued and unissued, shall be safeguarded and procedures shall be employed to control the distribution, use and access to the forms.

(xx)  An investigation shall be performed to determine the cause and responsibility for loss whenever marker forms, or any part thereof, are missing.  These investigations shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(xxi)  When markers are transferred to the cage, marker transfer forms or marker credit slips (or similar documentation) shall be utilized and such documents shall include, at a minimum, the date, time, shift, marker number(s), table number(s), amount of each marker, the total amount transferred, signature of pit supervisory personnel releasing instruments from the pit, and the signature of cashier verifying receipt of instruments at the cage.

(xxii)  All markers shall be transferred to the cage within twenty-four (24) hours of issuance.

(xxiii)  Markers shall be transported to the cashier's cage by a person who is independent of the marker issuance and payment functions (pit clerks may perform this function).

(1)  *Name credit instruments accepted in the pit.*  (1)  For the purposes of this paragraph, name credit instruments means personal checks, payroll checks, counter checks, hold checks, traveler's checks, or other similar instruments that are accepted in the pit as a form of credit issuance to a player with an approved credit limit.

(2)  The following standards shall apply if name credit instruments are accepted in the pit:

(i)  A name credit system shall allow for the issuance of credit without using markers;

(ii)  Prior to accepting a name credit instrument, the employee extending the credit shall contact the cashier or another independent source to determine if the player's credit limit has been properly established and the remaining credit available is sufficient for the advance;

(iii)  All name credit instruments shall be transferred to the cashier's cage (utilizing a two-part order for credit) immediately following the acceptance of the instrument and issuance of chips (if name credit instruments are transported accompanied by a credit slip, an order for credit is not required);

(iv)  The order for credit (if applicable) and the credit slip shall include the customer's name, amount of the credit instrument, the date, time, shift, table number, signature of pit supervisory personnel releasing instrument from pit, and the signature of the cashier verifying receipt of instrument at the cage;

(v)  The procedures for transacting table credits at standards in paragraphs (c)(12) through (19) of this section shall be strictly adhered to; and

(vi)  The acceptance of payments in the pit for name credit instruments shall be prohibited.

(m)  *Call bets.*  (1)  The following standards shall apply if call bets are accepted in the pit:

D-21

(i)  A call bet shall be evidenced by the placement of a lammer button, chips, or other identifiable designation in an amount equal to that of the wager in a specific location on the table;

(ii)  The placement of the lammer button, chips, or other identifiable designation shall be performed by supervisory/boxperson personnel.  The placement may be performed by a dealer only if the supervisor physically observes and gives specific authorization;

(iii)  The call bet shall be settled at the end of each hand of play by the preparation of a marker, repayment of the credit extended, or the payoff of the winning wager.  Call bets extending beyond one hand of play shall be prohibited; and

(iv)  The removal of the lammer button, chips, or other identifiable designation shall be performed by the dealer/ boxperson upon completion of the call bet transaction.

(n)  *Rim credit.*  (1)  The following standards shall apply if rim credit is extended in the pit:

(i)  Rim credit shall be evidenced by the issuance of chips to be placed in a neutral zone on the table and then extended to the customer for the customer to wager, or to the dealer to wager for the customer, and by the placement of a lammer button or other identifiable designation in an amount equal to that of the chips extended; and

(ii)  Rim credit shall be recorded on player cards, or similarly used documents, which shall be:

(A)  Prenumbered or concurrently numbered and accounted for by a department independent of the pit;

(B)  For all extensions and subsequent repayments, evidenced by the initials or signatures of a supervisor and the dealer attesting to the validity of each credit extension and repayment;

(C)  An indication of the settlement method (e.g., serial number of marker issued, chips, cash);

(D)  Settled no later than when the customer leaves the table at which the card is prepared;

(E)  Transferred to the accounting department on a daily basis; and

(F)  Reconciled with other forms utilized to control the issuance of pit credit (e.g., master credit records, table cards).

(o)  *Foreign currency.*  (l)  The following standards shall apply if foreign currency is accepted in the pit:

(i)  Foreign currency transactions shall be authorized by a pit supervisor/ boxperson who completes a foreign currency exchange form before the exchange for chips or tokens;

(ii)  Foreign currency exchange forms include the country of origin, total face value, amount of chips/token extended ( *i.e.,* conversion amount), signature of supervisor/boxperson, and the dealer completing the transaction;

(iii)  Foreign currency exchange forms and the foreign currency shall be inserted in the drop box by the dealer; and

(iv)  Alternate procedures specific to the use of foreign valued gaming chips shall be developed by the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency.

### § 542.13    What are the minimum internal control standards for gaming devices?

(a)  *Standards for gaming devices.*  (1)  For this section only, credit or customer credit means a unit of value equivalent to cash or cash equivalents deposited, wagered, won, lost, or redeemed by a customer.

(2)  Coins shall include tokens.

(3)  For all computerized gaming device systems, a personnel access listing shall be maintained, which includes at a minimum:

(i)  Employee name or employee identification number (or equivalent); and

(ii)  Listing of functions employee can perform or equivalent means of identifying same.

(b)  *Computer applications.*  For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(c)  *Standards for drop and count.*  The procedures for the collection of the gaming device drop and the count thereof shall comply with §542.21, §542.31, or §542.41 (as applicable).

(d)  *Jackpot payouts, gaming device fills, short pays and accumulated credit payouts standards.*  (1) For jackpot payouts and gaming device fills, documentation shall include the following information:

(i)  Date and time;

(ii)  Gaming device number;

(iii)  Dollar amount of cash payout or gaming device fill (both alpha and numeric) or description of personal property awarded, including fair market value.  Alpha is optional if another unalterable method is used for evidencing the amount of the payout;

(iv)  Game outcome (including reel symbols, card values, suits, etc.) for jackpot payouts.  Game outcome is not required if a computerized jackpot/fill system is used;

(v)  Preprinted or concurrently printed sequential number; and

(vi)  Signatures of at least two (2) employees verifying and witnessing the payout or gaming device fill (except as otherwise provided in paragraphs (d)(1)(vi)(A), (B), and (C) of this section).

(A)  Jackpot payouts over a predetermined amount shall require the signature and verification of a supervisory or management employee independent of the gaming device department (in addition to the two (2) signatures required in paragraph (d)(1)(vi) of this section).  Alternatively, if an on-line accounting system is utilized, only two (2) signatures are required:  one (1) employee and one (1) supervisory or management employee independent of the gaming device department.  This predetermined amount shall be authorized by management (as approved by the Tribal gaming agency), documented, and maintained.

(B)  With regard to jackpot payouts and hopper fills, the signature of one (1) employee is sufficient if an on-line accounting system is utilized and the jackpot or fill is less than $1,200.

(C)  On graveyard shifts (eight-hour maximum) payouts/fills less than $100 can be made without the payout/fill being witnessed by a second person.

(2)  For short pays of $10.00 or more, and payouts required for accumulated credits, the payout form shall include the following information:

(i)  Date and time;

(ii)  Gaming device number;

(iii)  Dollar amount of payout (both alpha and numeric); and

(iv)  The signature of at least one (1) employee verifying and witnessing the payout.

D-23

(A)  Where the payout amount is $50 or more, signatures of at least two (2) employees verifying and witnessing the payout.  Alternatively, the signature of one (1) employee is sufficient if an on-line accounting system is utilized and the payout amount is less than $3,000.

(3)  Computerized jackpot/fill systems shall be restricted so as to prevent unauthorized access and fraudulent payouts by one person as required by §542.16(a).

(4)  Payout forms shall be controlled and routed in a manner that precludes any one person from producing a fraudulent payout by forging signatures or by altering the amount paid out subsequent to the payout and misappropriating the funds.

(e)  *Promotional payouts or awards.*  (1)  If a gaming operation offers promotional payouts or awards that are not reflected on the gaming device pay table, then the payout form/documentation shall include:

(i)  Date and time;

(ii)  Gaming device number and denomination;

(iii)  Dollar amount of payout or description of personal property ( *e.g.,* jacket, toaster, car, etc.), including fair market value;

(iv)  Type of promotion ( *e.g.,* double jackpots, four-of-a-kind bonus, etc.); and

(v)  Signature of at least one (1) employee authorizing and completing the transaction.

(2)  [Reserved]

(f)  *Gaming device department funds standards.*  (1) The gaming device booths and change banks that are active during the shift shall be counted down and reconciled each shift by two (2) employees utilizing appropriate accountability documentation.  Unverified transfers of cash and/or cash equivalents are prohibited.

(2)  The wrapping of loose gaming device booth and cage cashier coin shall be performed at a time or location that does not interfere with the hard count/wrap process or the accountability of that process.

(3)  A record shall be maintained evidencing the transfers of wrapped and unwrapped coins and retained for seven (7) days.

(g)  *EPROM control standards.*  (1)  At least annually, procedures shall be performed to insure the integrity of a sample of gaming device game program EPROMs, or other equivalent game software media, by personnel independent of the gaming device department or the gaming device being tested.

(2)  The Tribal gaming agency, or the gaming operation subject to the approval of the Tribal gaming agency, shall develop and implement procedures for the following:

(i)  Removal of EPROMs, or other equivalent game software media, from devices, the verification of the existence of errors as applicable, and the correction via duplication from the master game program EPROM, or other equivalent game software media;

(ii)  Copying one gaming device program to another approved program;

(iii)  Verification of duplicated EPROMs before being offered for play;

(iv)  Receipt and destruction of EPROMs, or other equivalent game software media; and

(v)  Securing the EPROM, or other equivalent game software media, duplicator, and master game EPROMs, or other equivalent game software media, from unrestricted access.

(3)  The master game program number, par percentage, and the pay table shall be verified to the par sheet when initially received from the manufacturer.

(4)  Gaming devices with potential jackpots in excess of $100,000 shall have the game software circuit boards locked or physically sealed.  The lock or seal shall necessitate the presence of a person independent of the gaming device department to access the device game program EPROM, or other equivalent game software media.  If a seal is used to secure the board to the frame of the gaming device, it shall be pre-numbered.

(5)  Records that document the procedures in paragraph (g)(2)(i) of this section shall include the following information:

(i)  Date;

(ii)  Gaming device number (source and destination);

(iii)  Manufacturer;

(iv)  Program number;

(v)  Personnel involved;

(vi)  Reason for duplication;

(vii)  Disposition of any permanently removed EPROM, or other equivalent game software media;

(viii)  Seal numbers, if applicable; and

(ix)  Approved testing lab approval numbers, if available.

(6)  EPROMS, or other equivalent game software media, returned to gaming devices shall be labeled with the program number.  Supporting documentation shall include the date, program number, information identical to that shown on the manufacturer's label, and initials of the person replacing the EPROM, or other equivalent game software media.

(h)  *Standards for evaluating theoretical and actual hold percentages.*

(1)  Accurate and current theoretical hold worksheets shall be maintained for each gaming device.

(2)  For multi-game/multi-denominational gaming devices, an employee or department independent of the gaming device department shall:

(i)  Weekly, record the total coin-in meter;

(ii)  Quarterly, record the coin-in meters for each paytable contained in the gaming device; and

(iii)  On an annual basis, adjust the theoretical hold percentage in the gaming device statistical report to a weighted average based upon the ratio of coin-in for each game pay table.

(3)  For those gaming operations that are unable to perform the weighted average calculation as required by paragraph (h)(2) of this section, the following procedures shall apply:

(i)  On at least an annual basis, calculate the actual hold percentage for each gaming device;

(ii)  On at least an annual basis, adjust the theoretical hold percentage in the gaming device statistical report for each gaming device to the previously calculated actual hold percentage; and

(iii)  The adjusted theoretical hold percentage shall be within the spread between the minimum and maximum theoretical payback percentages.

(4)  The adjusted theoretical hold percentage for multi-game/multi-denominational gaming devices may be combined for gaming devices with exactly the same game mix throughout the year.

(5)  The theoretical hold percentages used in the gaming device analysis reports should be within the performance standards set by the manufacturer.

(6)  Records shall be maintained for each gaming device indicating the dates and type of changes made and the recalculation of theoretical hold as a result of the changes.

(7)  Records shall be maintained for each gaming device that indicate the date the gaming device was placed into service, the date the gaming device was removed from operation, the date the gaming device was placed back into operation, and any changes in gaming device numbers and designations.

(8)  All of the gaming devices shall contain functioning meters that shall record coin-in or credit-in, or on-line gaming device monitoring system that captures similar data.

(9)  All gaming devices with bill acceptors shall contain functioning billing meters that record the dollar amounts or number of bills accepted by denomination.

(10)  Gaming device in-meter readings shall be recorded at least weekly (monthly for Tier A and Tier B gaming operations) immediately prior to or subsequent to a gaming device drop.  On-line gaming device monitoring systems can satisfy this requirement.  However, the time between readings may extend beyond one (1) week in order for a reading to coincide with the end of an accounting period only if such extension is for no longer than six (6) days.

(11)  The employee who records the in-meter reading shall either be independent of the hard count team or shall be assigned on a rotating basis, unless the in-meter readings are randomly verified quarterly for all gaming devices and bill acceptors by a person other than the regular in-meter reader.

(12)  Upon receipt of the meter reading summary, the accounting department shall review all meter readings for reasonableness using pre-established parameters.

(13)  Prior to final preparation of statistical reports, meter readings that do not appear reasonable shall be reviewed with gaming device department employees or other appropriate designees, and exceptions documented, so that meters can be repaired or clerical errors in the recording of meter readings can be corrected.

(14)  A report shall be produced at least monthly showing month-to-date, year-to-date (previous twelve (12) months data preferred), and if practicable, life-to-date actual hold percentage computations for individual gaming devices and a comparison to each gaming device's theoretical hold percentage previously discussed.

(15)  Each change to a gaming device's theoretical hold percentage, including progressive percentage contributions, shall result in that device being treated as a new gaming device in the statistical reports ( *i.e.* , not commingling various hold percentages), except for adjustments made in accordance with paragraph (h)(2) of this section.

(16)  If promotional payouts or awards are included on the gaming device statistical reports, it shall be in a manner that prevents distorting the actual hold percentages of the affected gaming device.

(17)  The statistical reports shall be reviewed by both gaming device department management and management employees independent of the gaming device department on at least a monthly basis.

(18)  For those gaming devices that have experienced at least 100,000 wagering transactions, large variances (three percent (3%) or more) between theoretical hold and actual hold shall be investigated and resolved by a department independent of the gaming device department with the findings documented and provided to the Tribal gaming agency upon request in a timely manner.

(19)  Maintenance of the on-line gaming device monitoring system data files shall be performed by a department independent of the gaming device department.  Alternatively, maintenance may be performed by gaming device supervisory employees if sufficient documentation is generated and it is randomly verified on a monthly basis by employees independent of the gaming device department.

(20)  Updates to the on-line gaming device monitoring system to reflect additions, deletions, or movements of gaming devices shall be made at least weekly prior to in-meter readings and the weigh process.

(i)  *Gaming device hopper contents standards.*  (1)  When gaming devices are temporarily removed from the floor, gaming device drop and hopper contents shall be protected to preclude the misappropriation of stored funds.

(2)  When gaming devices are permanently removed from the floor, the gaming device drop and hopper contents shall be counted and recorded by at least two (2) employees with appropriate documentation being routed to the accounting department for proper recording and accounting for initial hopper loads.

(j)  *Player tracking system.*  (1)  The following standards apply if a player tracking system is utilized:

(i)  The player tracking system shall be secured so as to prevent unauthorized access (e.g., changing passwords at least quarterly and physical access to computer hardware, etc.).

(ii)  The addition of points to members' accounts other than through actual gaming device play shall be sufficiently documented (including substantiation of reasons for increases) and shall be authorized by a department independent of the player tracking and gaming devices.  Alternatively, addition of points to members' accounts may be authorized by gaming device supervisory employees if sufficient documentation is generated and it is randomly verified by employees independent of the gaming device department on a quarterly basis.

(iii)  Booth employees who redeem points for members shall be allowed to receive lost players club cards, provided that they are immediately deposited into a secured container for retrieval by independent personnel.

(iv)  Changes to the player tracking system parameters, such as point structures and employee access, shall be performed by supervisory employees independent of the gaming device department.  Alternatively, changes to player tracking system parameters may be performed by gaming device supervisory employees if sufficient documentation is generated and it is randomly verified by supervisory employees independent of the gaming device department on a monthly basis.

(v)  All other changes to the player tracking system shall be appropriately documented.

(k)  *In-house progressive gaming device standards.*  (1)  A meter that shows the amount of the progressive jackpot shall be conspicuously displayed at or near the gaming devices to which the jackpot applies.

(2)  At least once each day, each gaming operation shall record the amount shown on each progressive jackpot meter at the gaming operation except for those jackpots that can be paid directly from the gaming device's hopper;

(3)  Explanations for meter reading decreases shall be maintained with the progressive meter reading sheets, and where the payment of a jackpot is the explanation for a decrease, the gaming operation shall record the jackpot payout number on the sheet or have the number reasonably available; and

(4)  Each gaming operation shall record the base amount of each progressive jackpot the gaming operation offers.

(5)  The Tribal gaming agency shall approve procedures specific to the transfer of progressive amounts in excess of the base amount to other gaming devices.  Such procedures may also include other methods of distribution that accrue to the benefit of the gaming public via an award or prize.

(l)  *Wide area progressive gaming device standards.*  (1)  A meter that shows the amount of the progressive jackpot shall be conspicuously displayed at or near the gaming devices to which the jackpot applies.

(2)  As applicable to participating gaming operations, the wide area progressive gaming device system shall be adequately restricted to prevent unauthorized access (e.g., changing passwords at least quarterly, restrict access to EPROMs or other equivalent game software media, and restrict physical access to computer hardware, etc.).

(3)  The Tribal gaming agency shall approve procedures for the wide area progressive system that:

(i)  Reconcile meters and jackpot payouts;

(ii)  Collect/drop gaming device funds;

(iii)  Verify jackpot, payment, and billing to gaming operations on pro-rata basis;

(iv)  System maintenance;

(v)  System accuracy; and

(vi)  System security.

(4)  Reports, where applicable, adequately documenting the procedures required in paragraph (l)(3) of this section shall be generated and retained.

(m)  *Accounting/auditing standards.*  (1)  Gaming device accounting/auditing procedures shall be performed by employees who are independent of the transactions being reviewed.

(2)  For on-line gaming device monitoring systems, procedures shall be performed at least monthly to verify that the system is transmitting and receiving data from the gaming devices properly and to verify the continuing accuracy of the coin-in meter readings as recorded in the gaming device statistical report.

(3)  For weigh scale and currency interface systems, for at least one (1) drop period per month accounting/auditing employees shall make such comparisons as necessary to the system generated count as recorded in the gaming device statistical report.  Discrepancies shall be resolved prior to generation/distribution of gaming device reports.

(4)  For each drop period, accounting/auditing personnel shall compare the coin-to-drop meter reading to the actual drop amount.  Discrepancies should be resolved prior to generation/distribution of on-line gaming device monitoring system statistical reports.

(5)  Follow-up shall be performed for any one (1) gaming device having an unresolved variance between actual coin drop and coin-to-drop meter reading in excess of three percent (3%) and over $25.00.  The follow-up performed and results of the investigation shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(6)  For each drop period, accounting/auditing employees shall compare the bill-in meter reading to the total bill acceptor drop amount for the period.  Discrepancies shall be resolved before the generation/distribution of gaming device statistical reports.

(7)  Follow-up shall be performed for any one (1) device having an unresolved variance between actual currency drop and bill-in meter reading in excess of an amount that is both more than $25 and at least three percent (3%) of the actual currency drop.  The follow-up performed and results of the investigation shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

D-28

(8)  At least annually, accounting/auditing personnel shall randomly verify that EPROM or other equivalent game software media changes are properly reflected in the gaming device analysis reports.

(9)  Accounting/auditing employees shall review exception reports for all computerized gaming device systems on a daily basis for propriety of transactions and unusual occurrences.

(10)  All gaming device auditing procedures and any follow-up performed shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(n)  *Cash-out tickets.*  For gaming device that utilize cash-out tickets, the following standards apply.  This standard is not applicable to Tiers A and B.  Tier A and B gaming operations shall develop adequate standards governing the security over the issuance of the cash-out paper to the gaming device and the redemption of cash-out slips.

(1)  In addition to the applicable auditing and accounting standards in paragraph (m) of this section, on a quarterly basis, the gaming operation shall foot all jackpot cash-out tickets equal to or greater than $1,200 and trace totals to those produced by the host validation computer system.

(2)  The customer may request a cash-out ticket from the gaming device that reflects all remaining credits.  The cash-out ticket shall be printed at the gaming device by an internal document printer.  The cash-out ticket shall be valid for a time period specified by the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency.  Cash-out tickets may be redeemed for payment or inserted in another gaming device and wagered, if applicable, during the specified time period.

(3)  The customer shall redeem the cash-out ticket at a change booth or cashiers' cage.  Alternatively, if a gaming operation utilizes a remote computer validation system, the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall develop alternate standards for the maximum amount that can be redeemed, which shall not exceed $2,999.99 per cash-out transaction.

(4)  Upon presentation of the cash-out ticket(s) for redemption, the following shall occur:

(i)  Scan the bar code via an optical reader or its equivalent; or

(ii)  Input the cash-out ticket validation number into the computer.

(5)  The information contained in paragraph (n)(4) of this section shall be communicated to the host computer.  The host computer shall verify the authenticity of the cash-out ticket and communicate directly to the redeemer of the cash-out ticket.

(6)  If valid, the cashier (redeemer of the cash-out ticket) pays the customer the appropriate amount and the cash-out ticket is electronically noted "paid" in the system.  The "paid" cash-out ticket shall remain in the cashiers" bank for reconciliation purposes.  The host validation computer system shall electronically reconcile the cashier's banks for the paid cashed-out tickets.

(7)  If invalid, the host computer shall notify the cashier (redeemer of the cash-out ticket).  The cashier (redeemer of the cash-out ticket) shall refuse payment to the customer and notify a supervisor of the invalid condition. The supervisor shall resolve the dispute.

(8)  If the host validation computer system temporarily goes down, cashiers may redeem cash-out tickets at a change booth or cashier's cage after recording the following:

(i)  Serial number of the cash-out ticket;

(ii)  Date and time;

(iii)  Dollar amount;

D-29

(iv)  Issuing gaming device number;

(v)  Marking ticket "paid"; and

(vi)  Ticket shall remain in cashier's bank for reconciliation purposes.

(9)  Cash-out tickets shall be validated as expeditiously as possible when the host validation computer system is restored.

(10)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures to control cash-out ticket paper, which shall include procedures that:

(i)  Mitigate the risk of counterfeiting of cash-out ticket paper;

(ii)  Adequately control the inventory of the cash-out ticket paper; and

(iii)  Provide for the destruction of all unused cash-out ticket paper.

(iv)  Alternatively, if the gaming operation utilizes a computer validation system, this standard shall not apply.

(11)  If the host validation computer system is down for more than four (4) hours, the gaming operation shall promptly notify the Tribal gaming agency or its designated representative.

(12)  These gaming device systems shall comply with all other standards (as applicable) in this part including:

(i)  Standards for bill acceptor drop and count;

(ii)  Standards for coin drop and count; and

(iii)  Standards concerning EPROMS or other equivalent game software media.

(o)  *Account access cards.*  For gaming devices that utilize account access cards to activate play of the gaming device, the following standards shall apply:

(1)  *Equipment.*  (i)  A central computer, with supporting hardware and software, to coordinate network activities, provide system interface, and store and manage a player/account database;

(ii)  A network of contiguous player terminals with touch-screen or button-controlled video monitors connected to an electronic selection device and the central computer via a communications network;

(iii)  One or more electronic selection devices, utilizing random number generators, each of which selects any combination or combinations of numbers, colors, and/or symbols for a network of player terminals.

(2)  *Player terminals standards.*  (i)  The player terminals are connected to a game server;

(ii)  The game server shall generate and transmit to the bank of player terminals a set of random numbers, colors, and/or symbols at regular intervals.  The subsequent game results are determined at the player terminal and the resulting information is transmitted to the account server;

(iii)  The game server shall be housed in a game server room or a secure locked cabinet.

(3)  *Customer account maintenance standards.*  (i)  A central computer acting as an account server shall provide customer account maintenance and the deposit/withdrawal function of those account balances;

(ii)  Customers may access their accounts on the computer system by means of an account access card at the player terminal.  Each player terminal may be equipped with a card reader and personal identification number (PIN) pad or touch screen array for this purpose;

(iii)  All communications between the player terminal, or bank of player terminals, and the account server shall be encrypted for security reasons.

(4)  *Customer account generation standards.*  (i)  A computer file for each customer shall be prepared by a clerk, with no incompatible functions, prior to the customer being issued an account access card to be utilized for device play.  The customer may select his/her PIN to be used in conjunction with the account access card.

(ii)  For each customer file, an employee shall:

(A)  Record the customer's name and current address;

(B)  The date the account was opened; and

(C)  At the time the initial deposit is made, account opened, or credit extended, the identity of the customer shall be verified by examination of a valid driver's license or other reliable identity credential.

(iii)  The clerk shall sign-on with a unique password to a terminal equipped with peripherals required to establish a customer account.  Passwords are issued and can only be changed by information technology personnel at the discretion of the department director.

(iv)  After entering a specified number of incorrect PIN entries at the cage or player terminal, the customer shall be directed to proceed to a clerk to obtain a new PIN.  If a customer forgets, misplaces or requests a change to their PIN, the customer shall proceed to a clerk for assistance.

(5)  *Deposit of credits standards.*  (i)  The cashier shall sign-on with a unique password to a cashier terminal equipped with peripherals required to complete the credit transactions.  Passwords are issued and can only be changed by information technology personnel at the discretion of the department director.

(ii)  The customer shall present cash, chips, coin or coupons along with their account access card to a cashier to deposit credits.

(iii)  The cashier shall complete the transaction by utilizing a card scanner that the cashier shall slide the customer's account access card through.

(iv)  The cashier shall accept the funds from the customer and enter the appropriate amount on the cashier terminal.

(v)  A multi-part deposit slip shall be generated by the point of sale receipt printer.  The cashier shall direct the customer to sign the deposit slip receipt.  One (1) copy of the deposit slip shall be given to the customer.  The other copy of the deposit slip shall be secured in the cashier's cash drawer.

(vi)  The cashier shall verify the customer's balance before completing the transaction.  The cashier shall secure the funds in their cash drawer and return the account access card to the customer.

(vii)  Alternatively, if a kiosk is utilized to accept a deposit of credits, the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures that safeguard the integrity of the kiosk system.

(6)  *Prize standards.*  (i)  Winners at the gaming devices may receive cash, prizes redeemable for cash or merchandise.

(ii)  If merchandise prizes are to be awarded, the specific type of prize or prizes that may be won shall be disclosed to the player before the game begins.

(iii)  The redemption period of account access cards, as approved by the Tribal gaming agency, shall be conspicuously posted in the gaming operation.

(7)  *Credit withdrawal.*  The customer shall present their account access card to a cashier to withdraw their credits. The cashier shall perform the following:

(i)  Scan the account access card;

(ii)  Request the customer to enter their PIN, if the PIN was selected by the customer;

(iii)  The cashier shall ascertain the amount the customer wishes to withdraw and enter the amount into the computer;

(iv)  A multi-part withdrawal slip shall be generated by the point of sale receipt printer.  The cashier shall direct the customer to sign the withdrawal slip;

(v)  The cashier shall verify that the account access card and the customer match by:

(A)  Comparing the customer to image on the computer screen;

(B)  Comparing the customer to image on customer's picture ID; or

(C)  Comparing the customer signature on the withdrawal slip to signature on the computer screen.

(vi)  The cashier shall verify the customer's balance before completing the transaction.  The cashier shall pay the customer the appropriate amount, issue the customer the original withdrawal slip and return the account access card to the customer;

(vii)  The copy of the withdrawal slip shall be placed in the cash drawer.  All account transactions shall be accurately tracked by the account server computer system.  The copy of the withdrawal slip shall be forwarded to the accounting department at the end of the gaming day; and

(viii)  In the event the imaging function is temporarily disabled, customers shall be required to provide positive ID for cash withdrawal transactions at the cashier stations.

(p)  *Smart cards.*  All smart cards (i.e., cards that possess the means to electronically store and retrieve data) that maintain the only source of account data are prohibited.

### § 542.14    What are the minimum internal control standards for the cage?

(a)  *Computer applications.*  For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(b)  *Personal checks, cashier's checks, payroll checks, and counter checks.*  (1) If personal checks, cashier's checks, payroll checks, or counter checks are cashed at the cage, the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with appropriate controls for purposes of security and integrity.

(2)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures for the acceptance of personal checks, collecting and recording checks returned to the gaming operation after deposit, re-deposit, and write-off authorization.

(3)  When counter checks are issued, the following shall be included on the check:

(i)  The customer's name and signature;

(ii)  The dollar amount of the counter check (both alpha and numeric);

(iii)  Customer's bank name and bank account number;

(iv)  Date of issuance; and

(v)  Signature or initials of the person approving the counter check transaction.

(4)  When traveler's checks or other guaranteed drafts such as cashier's checks are presented, the cashier shall comply with the examination and documentation procedures as required by the issuer.

(c)  *Customer deposited funds.*  If a gaming operation permits a customer to deposit funds with the gaming operation at the cage, the following standards shall apply.

(1)  The receipt or withdrawal of a customer deposit shall be evidenced by at least a two-part document with one (1) copy going to the customer and one (1) copy remaining in the cage file.

(2)  The multi-part receipt shall contain the following information:

(i)  Same receipt number on all copies;

(ii)  Customer's name and signature;

(iii)  Date of receipt and withdrawal;

(iv)  Dollar amount of deposit/withdrawal; and

(v)  Nature of deposit (cash, check, chips); however,

(vi)  Provided all of the information in paragraph (c)(2)(i) through (v) is available, the only required information for all copies of the receipt is the receipt number.

(3)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures that:

(i)  Maintain a detailed record by customer name and date of all funds on deposit;

(ii)  Maintain a current balance of all customer cash deposits that are in the cage/vault inventory or accountability; and

(iii)  Reconcile this current balance with the deposits and withdrawals at least daily.

(4)  The gaming operation, as approved by the Tribal gaming agency, shall describe the sequence of the required signatures attesting to the accuracy of the information contained on the customer deposit or withdrawal form ensuring that the form is signed by the cashier.

(5)  All customer deposits and withdrawal transactions at the cage shall be recorded on a cage accountability form on a per-shift basis.

(6)  Only cash, cash equivalents, chips, and tokens shall be accepted from customers for the purpose of a customer deposit.

D-33

(7)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures that verify the customer's identity, including photo identification.

(8)  A file for customers shall be prepared prior to acceptance of a deposit.

(d)  *Cage and vault accountability standards.*  (1) All transactions that flow through the cage shall be summarized on a cage accountability form on a per shift basis and shall be supported by documentation.

(2)  The cage and vault (including coin room) inventories shall be counted by the oncoming and outgoing cashiers. These employees shall make individual counts for comparison for accuracy and maintenance of individual accountability.  Such counts shall be recorded at the end of each shift during which activity took place.  All discrepancies shall be noted and investigated.  Unverified transfers of cash and/or cash equivalents are prohibited.

(3)  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with a minimum bankroll formula to ensure the gaming operation maintains cash or cash equivalents (on hand and in the bank, if readily accessible) in an amount sufficient to satisfy obligations to the gaming operation's customers as they are incurred.  A suggested bankroll formula will be provided by the Commission or State gaming agency upon request.

(e)  *Chip and token standards.*  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures for the receipt, inventory, storage, and destruction of gaming chips and tokens.

(f)  *Coupon standards.*  Any program for the exchange of coupons for chips, tokens, and/or another coupon program shall be approved by the Tribal gaming agency prior to implementation.  If approved, the gaming operation shall establish and comply with procedures that account for and control such programs.

(g)  *Accounting/auditing standards.*  (1)  The cage accountability shall be reconciled to the general ledger at least monthly.

(2)  A trial balance of gaming operation accounts receivable, including the name of the customer and current balance, shall be prepared at least monthly for active, inactive, settled or written-off accounts.

(3)  The trial balance of gaming operation accounts receivable shall be reconciled to the general ledger each month. The reconciliation and any follow-up performed shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(4)  On a monthly basis an evaluation of the collection percentage of credit issued to identify unusual trends shall be performed.

(5)  All cage and credit accounting procedures and any follow-up performed shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(h)  *Extraneous items.*  The Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures to address the transporting of extraneous items, such as coats, purses, and/or boxes, into and out of the cage, coin room, count room, and/or vault.

### § 542.15    What are the minimum internal control standards for credit?

(a)  *Computer applications.*  For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(b)  *Credit standards.* The following standards shall apply if the gaming operation authorizes and extends credit to customers:

(1)  At least the following information shall be recorded for customers that have credit limits or are issued credit (excluding personal checks, payroll checks, cashier's checks, and traveler's checks):

(i)  Customer's name, current address, and signature;

(ii)  Identification verifications;

(iii)  Authorized credit limit;

(iv)  Documentation of authorization by a person designated by management to approve credit limits; and

(v)  Credit issuances and payments.

(2)  Prior to extending credit, the customer's gaming operation credit record and/or other documentation shall be examined to determine the following:

(i)  Properly authorized credit limit;

(ii)  Whether remaining credit is sufficient to cover the credit issuance; and

(iii)  Identity of the customer (except for known customers).

(3)  Credit extensions over a specified dollar amount shall be approved by personnel designated by management.

(4)  Proper approval of credit extensions over ten percent (10%) of the previously established limit shall be documented.

(5)  The job functions of credit approval (i.e., establishing the customer's credit worthiness) and credit extension (*i.e.,* advancing customer's credit) shall be segregated for credit extensions to a single customer of $10,000 or more per day (applies whether the credit is extended in the pit or the cage).

(6)  If cage credit is extended to a single customer in an amount exceeding $2,500, appropriate gaming personnel shall be notified on a timely basis of the customers playing on cage credit, the applicable amount of credit issued, and the available balance.

(7)  Cage marker forms shall be at least two (2) parts (the original marker and a payment slip), prenumbered by the printer or concurrently numbered by the computerized system, and utilized in numerical sequence.

(8)  The completed original cage marker shall contain at least the following information:

(i)  Marker number;

(ii)  Player's name and signature; and

(iii)  Amount of credit issued (both alpha and numeric).

(9)  The completed payment slip shall include the same marker number as the original, date and time of payment, amount of payment, nature of settlement (cash, chips, etc.), and signature of cashier receiving the payment.

(c)  *Payment standards.*  (1)  All payments received on outstanding credit instruments shall be recorded in ink or other permanent form of recordation in the gaming operation's records.

(2)  When partial payments are made on credit instruments, they shall be evidenced by a multi-part receipt (or another equivalent document) that contains:

(i)  The same preprinted number on all copies;

(ii)  Customer's name;

(iii)  Date of payment;

(iv)  Dollar amount of payment (or remaining balance if a new marker is issued), and nature of settlement (cash, chips, etc.);

(v)  Signature of employee receiving payment; and

(vi)  Number of credit instrument on which partial payment is being made.

(3)  Unless account balances are routinely confirmed on a random basis by the accounting or internal audit departments, or statements are mailed by a person independent of the credit transactions and collections thereon, and the department receiving payments cannot access cash, then the following standards shall apply:

(i)  The routing procedures for payments by mail require that they be received by a department independent of credit instrument custody and collection;

(ii)  Such receipts by mail shall be documented on a listing indicating the customer's name, amount of payment, nature of payment (if other than a check), and date payment received; and

(iii)  The total amount of the listing of mail receipts shall be reconciled with the total mail receipts recorded on the appropriate accountability form by the accounting department on a random basis (for at least three (3) days per month).

(d)  *Access to credit documentation.*  (1)  Access to credit documentation shall be restricted as follows:

(i)  The credit information shall be restricted to those positions that require access and are so authorized by management;

(ii)  Outstanding credit instruments shall be restricted to persons authorized by management; and

(iii)  Written-off credit instruments shall be further restricted to persons specified by management.

(e)  *Maintenance of credit documentation.*  (1)  All extensions of cage credit, pit credit transferred to the cage, and subsequent payments shall be documented on a credit instrument control form.

(2)  Records of all correspondence, transfers to and from outside agencies, and other documents related to issued credit instruments shall be maintained.

(f)  *Write-off and settlement standards.*  (1)  Written-off or settled credit instruments shall be authorized in writing.

(2)  Such authorizations shall be made by at least two (2) management officials who are from departments independent of the credit transaction.

(g)  *Collection agency standards.*  (1)  If credit instruments are transferred to collection agencies or other collection representatives, a copy of the credit instrument and a receipt from the collection representative shall be obtained and maintained until the original credit instrument is returned or payment is received.

(2)  A person independent of credit transactions and collections shall periodically review the documents in paragraph (g)(1) of this section.

(h)  *Accounting/auditing standards.*  (1)  A person independent of the cage, credit, and collection functions shall perform all of the following at least three (3) times per year:

D-36

(i)  Ascertain compliance with credit limits and other established credit issuance procedures;

(ii)  Randomly reconcile outstanding balances of both active and inactive accounts on the accounts receivable listing to individual credit records and physical instruments;

(iii)  Examine credit records to determine that appropriate collection efforts are being made and payments are being properly recorded; and

(iv)  For a minimum of five (5) days per month, partial payment receipts shall be subsequently reconciled to the total payments recorded by the cage for the day and shall be numerically accounted for.

### § 542.16    What are the minimum internal control standards for information technology?

(a)  *General controls for gaming hardware and software.*  (1)  Management shall take an active role in making sure that physical and logical security measures are implemented, maintained, and adhered to by personnel to prevent unauthorized access that could cause errors or compromise data or processing integrity.

(i)  Management shall ensure that all new gaming vendor hardware and software agreements/contracts contain language requiring the vendor to adhere to tribal internal control standards applicable to the goods and services the vendor is providing.

(ii)  Physical security measures shall exist over computer, computer terminals, and storage media to prevent unauthorized access and loss of integrity of data and processing.

(iii)  Access to systems software and application programs shall be limited to authorized personnel.

(iv)  Access to computer data shall be limited to authorized personnel.

(v)  Access to computer communications facilities, or the computer system, and information transmissions shall be limited to authorized personnel.

(vi)  Standards in paragraph (a)(1) of this section shall apply to each applicable department within the gaming operation.

(2)  The main computers (i.e., hardware, software, and data files) for each gaming application ( *e.g.,* gaming devices, pari-mutuel wagering, banking and percentage card games, etc.) shall be in a secured area with access restricted to authorized persons, including vendors.

(3)  Access to computer operations shall be restricted to authorized personnel to reduce the risk of loss of integrity of data or processing.

(4)  Incompatible duties shall be adequately segregated and monitored to prevent error in general information technology procedures to go undetected or fraud to be concealed.

(5)  Non-information technology personnel shall be precluded from having unrestricted access to the secured computer areas.

(6)  The computer systems, including application software, shall be secured through the use of passwords or other approved means where applicable.  Management personnel or persons independent of the department being controlled shall assign and control access to system functions.

(7)  Passwords shall be controlled as follows unless otherwise addressed in the standards in this section.

(i)  Each user shall have their own individual password;

(ii)  Passwords shall be changed at least quarterly with changes documented; and

(iii)  For computer systems that automatically force a password change on a quarterly basis, documentation shall be maintained listing the systems and the date the user was given access.

(8)  Adequate backup and recovery procedures shall be in place that include:

(i)  Frequent backup of data files;

(ii)  Backup of all programs;

(iii)  Secured off-site storage of all backup data files and programs, or other adequate protection; and

(iv)  Recovery procedures, which are tested on a sample basis at least annually with documentation of results.

(9)  Adequate information technology system documentation shall be maintained, including descriptions of hardware and software, operator manuals, etc.

(b)  *Independence of information technology personnel.*  (1)  The information technology personnel shall be independent of the gaming areas ( *e.g.,* cage, pit, count rooms, etc.).  Information technology personnel procedures and controls should be documented and responsibilities communicated.

(2)  Information technology personnel shall be precluded from unauthorized access to:

(i)  Computers and terminals located in gaming areas;

(ii)  Source documents; and

(iii)  Live data files (not test data).

(3)  Information technology personnel shall be restricted from:

(i)  Having unauthorized access to cash or other liquid assets; and

(ii)  Initiating general or subsidiary ledger entries.

(c)  *Gaming program changes.*  (1)  Program changes for in-house developed systems should be documented as follows:

(i)  Requests for new programs or program changes shall be reviewed by the information technology supervisor. Approvals to begin work on the program shall be documented;

(ii)  A written plan of implementation for new and modified programs shall be maintained, and shall include, at a minimum, the date the program is to be placed into service, the nature of the change, a description of procedures required in order to bring the new or modified program into service (conversion or input of data, installation procedures, etc.), and an indication of who is to perform all such procedures;

(iii)  Testing of new and modified programs shall be performed and documented prior to implementation; and

(iv)  A record of the final program or program changes, including evidence of user acceptance, date in service, programmer, and reason for changes, shall be documented and maintained.

(d)  *Security logs.*  (1)  If computer security logs are generated by the system, they shall be reviewed by information technology supervisory personnel for evidence of:

(i)  Multiple attempts to log-on, or alternatively, the system shall deny user access after three (3) attempts to log-on;

(ii)  Unauthorized changes to live data files; and

(iii)  Any other unusual transactions.

(2)  This paragraph shall not apply to personal computers.

(e)  *Remote dial-up.*  (1)  If remote dial-up to any associated equipment is allowed for software support, the gaming operation shall maintain an access log that includes:

(i)  Name of employee authorizing modem access;

(ii)  Name of authorized programmer or manufacturer representative;

(iii)  Reason for modem access;

(iv)  Description of work performed; and

(v)  Date, time, and duration of access.

(f)  *Document storage.*  (1)  Documents may be scanned or directly stored to an unalterable storage medium under the following conditions.

(i)  The storage medium shall contain the exact duplicate of the original document.

(ii)  All documents stored on the storage medium shall be maintained with a detailed index containing the gaming operation department and date.  This index shall be available upon request by the Commission or State gaming agency.

(iii)  Upon request and adequate notice by the Commission or State gaming agency, hardware (terminal, printer, etc.) shall be made available in order to perform auditing procedures.

(iv)  Controls shall exist to ensure the accurate reproduction of records up to and including the printing of stored documents used for auditing purposes.

(v)  The storage medium shall be retained for a minimum of five (5) years.

### § 542.17    What are the minimum internal control standards for complimentary services or items?

(a)  Each Tribal gaming agency or gaming operation shall establish and the gaming operation shall comply with procedures for the authorization, issuance, and tracking of complimentary services and items, including cash and non-cash gifts.  Such procedures must be approved by the Tribal gaming agency and shall include, but shall not be limited to, the procedures by which the gaming operation delegates to its employees the authority to approve the issuance of complimentary services and items, and the procedures by which conditions or limits, if any, which may apply to such authority are established and modified (including limits based on relationships between the authorizer and recipient), and shall further include effective provisions for audit purposes.

(b)  At least monthly, accounting, information technology, or audit personnel that cannot grant or receive complimentary privileges shall prepare reports that include the following information for all complimentary items and services equal to or exceeding $100 or an amount established by the Tribal gaming agency, which shall not be greater than $100:

(1)  Name of customer who received the complimentary service or item;

(2)  Name(s) of authorized issuer of the complimentary service or item;

(3)  The actual cash value of the complimentary service or item;

(4)  The type of complimentary service or item (i.e., food, beverage, etc.); and

(5)  Date the complimentary service or item was issued.

(c)  The internal audit or accounting departments shall review the reports required in paragraph (b) of this section at least monthly.  These reports shall be made available to the Tribe, Tribal gaming agency, audit committee, other entity designated by the Tribe, and the Commission and State gaming agency upon request.

**§ 542.18    Reserved.**

**§ 542.19    What are the minimum internal control standards for accounting?**

(a)  Each gaming operation shall prepare accurate, complete, legible, and permanent records of all transactions pertaining to revenue and gaming activities.

(b)  Each gaming operation shall prepare general accounting records according to Generally Accepted Accounting Principles on a double-entry system of accounting, maintaining detailed, supporting, subsidiary records, including, but not limited to:

(1)  Detailed records identifying revenues, expenses, assets, liabilities, and equity for each gaming operation;

(2)  Detailed records of all markers, IOU's, returned checks, hold checks, or other similar credit instruments;

(3)  Individual and statistical game records to reflect statistical drop, statistical win, and the percentage of statistical win to statistical drop by each table game, and to reflect statistical drop, statistical win, and the percentage of statistical win to statistical drop for each type of table game, by shift, by day, cumulative month-to-date and year-to-date, and individual and statistical game records reflecting similar information for all other games;

(4)  Gaming device analysis reports which, by each gaming device, compare actual hold percentages to theoretical hold percentages;

(5)  The records required by this part and by the Tribal internal control standards;

(6)  Journal entries prepared by the gaming operation and by its independent accountants; and

(7)  Any other records specifically required to be maintained.

(c)  Each gaming operation shall establish administrative and accounting procedures for the purpose of determining effective control over a gaming operation's fiscal affairs.  The procedures shall be designed to reasonably ensure that:

(1)  Assets are safeguarded;

(2)  Financial records are accurate and reliable;

(3)  Transactions are performed only in accordance with management's general and specific authorization;

(4)  Transactions are recorded adequately to permit proper reporting of gaming revenue and of fees and taxes, and to maintain accountability of assets;

(5)  Recorded accountability for assets is compared with actual assets at reasonable intervals, and appropriate action is taken with respect to any discrepancies; and

(6)  Functions, duties, and responsibilities are appropriately segregated in accordance with sound business practices.

(d) *Gross gaming revenue computations.* (1)  For banking and percentage card games, gross revenue equals the closing table bankroll, plus credit slips for cash, chips, tokens or personal/payroll checks returned to the cage, plus drop, less opening table bankroll and fills to the table, and money transfers issued from the game through the use of a cashless wagering system.

(2)  For gaming devices, gross revenue equals drop, less fills, jackpot payouts and personal property awarded to patrons as gambling winnings.  Additionally, the initial hopper load is not a fill and does not affect gross revenue.  The difference between the initial hopper load and the total amount that is in the hopper at the end of the gaming operation's fiscal year should be adjusted accordingly as an addition to or subtraction from the drop for the year.

(3)  Reserved.

(4) (i)  Reserved.

(ii)  In computing gross revenue for gaming devices, the actual cost to the gaming operation of any personal property distributed as losses to patrons may be deducted from winnings (other than costs of travel, lodging, services, food, and beverages), if the gaming operation maintains detailed documents supporting the deduction.

(e)  Each gaming operation shall establish internal control systems sufficient to ensure that currency (other than tips or gratuities) received from a patron in the gaming area is promptly placed in a locked box in the table, or, in the case of a cashier, in the appropriate place in the cashier's cage, or on those games which do not have a locked drop box, or on card game tables, in an appropriate place on the table, in the cash register or in another approved repository.

(f)  If the gaming operation provides periodic payments to satisfy a payout resulting from a wager, the initial installment payment, when paid, and the actual cost of a payment plan, which is funded by the gaming operation, may be deducted from winnings.  The gaming operation is required to obtain the approval of all payment plans from the Tribal gaming agency.  For any funding method which merely guarantees the gaming operation's performance, and under which the gaming operation makes payments out of cash flow (e.g. irrevocable letters of credits, surety bonds, or other similar methods), the gaming operation may only deduct such payments when paid to the patron.

(g)  For payouts by wide-area progressive gaming device systems, a gaming operation may deduct from winnings only its pro rata share of a wide-area gaming device system payout.

(h)  Cash-out tickets issued at a gaming device shall be deducted from gross revenue as jackpot payouts in the month the tickets are issued by the gaming device.  Tickets deducted from gross revenue that are not redeemed within a period, not to exceed 180 days of issuance, shall be included in gross revenue.  An unredeemed ticket previously included in gross revenue may be deducted from gross revenue in the month redeemed.

(i)  A gaming operation may not deduct from gross revenues the unpaid balance of a credit instrument extended for purposes other than gaming.

(j)  A gaming operation may deduct from gross revenue the unpaid balance of a credit instrument if the gaming operation documents, or otherwise keeps detailed records of, compliance with the following requirements.  Such records confirming compliance shall be made available to the Tribal gaming agency, State gaming agency, or the Commission upon request, and demonstrate, without limitation, the following:

(1)  The gaming operation can document that the credit extended was for gaming purposes;

(2)  The gaming operation has established procedures and relevant criteria to evaluate a patron's credit reputation or financial resources and to then determine that there is a reasonable basis for extending credit in the amount or sum placed at the patron's disposal;

(3)  In the case of personal checks, the gaming operation has established procedures to examine documentation, which would normally be acceptable as a type of identification when cashing checks, and has recorded the patron's

D-41

bank check guarantee card number or credit card number, or has satisfied paragraph (j)(2) of this section, as management may deem appropriate for the check-cashing authorization granted;

(4)  In the case of third-party checks for which cash, chips, or tokens have been issued to the patron, or which were accepted in payment of another credit instrument, the gaming operation has established procedures to examine documentation, normally accepted as a means of identification when cashing checks, and has, for the check's maker or drawer, satisfied paragraph (j)(2) of this section, as management may deem appropriate for the check-cashing authorization granted;

(5)  In the case of guaranteed drafts, procedures should be established to ensure compliance with the issuance and acceptance procedures prescribed by the issuer;

(6)  The gaming operation has established procedures to ensure that the credit extended is appropriately documented, not least of which would be the patron's identification and signature attesting to the authenticity of the individual credit transactions.  The authorizing signature shall be obtained at the time credit is extended.

(7)  The gaming operation has established procedures to effectively document its attempt to collect the full amount of the debt.  Such documentation would include, but not be limited to, letters sent to the patron, logs of personal or telephone conversations, proof of presentation of the credit instrument to the patron's bank for collection, settlement agreements, or other documents which demonstrate that the gaming operation has made a good faith attempt to collect the full amount of the debt.  Such records documenting collection efforts shall be made available to the Tribal gaming agency, State gaming agency, or the commission upon request.

(k)  Maintenance and preservation of books, records and documents.  (1)  All original books, records and documents pertaining to the conduct of wagering activities shall be retained by a gaming operation in accordance with the following schedule.  A record that summarizes gaming transactions is sufficient, provided that all documents containing an original signature(s) attesting to the accuracy of a gaming related transaction are independently preserved.  Original books, records or documents shall not include copies of originals, except for copies that contain original comments or notations on parts of multi-part forms.  The following original books, records and documents shall be retained by a gaming operation for a minimum of five (5) years:

(i)  Casino cage documents;

(ii)  Documentation supporting the calculation of banking and percentage card game win;

(iii)  Documentation supporting the calculation of gaming device win;

(iv)  Documentation supporting the calculation of revenue received from gaming devices, pari-mutuel wagering, and banking and percentage card games;

(v)  Banking and percentage card games statistical analysis reports;

(vi)  Gaming device statistical analysis reports;

(vii)  Reserved;

(viii)  Internal audit documentation and reports;

(ix)  Documentation supporting the write-off of gaming credit instruments and named credit instruments;

(x)  All other books, records and documents pertaining to the conduct of wagering activities that contain original signature(s) attesting to the accuracy of the gaming related transaction.

(2)  Unless otherwise specified in this part, all other books, records, and documents shall be retained until such time as the accounting records have been audited by the gaming operation's independent certified public accountants.

D-42

(3)  The above definition shall apply without regards to the medium by which the book, record or document is generated or maintained (paper, computer-generated, magnetic media, etc.).

### § 542.20    What is a Tier A gaming operation?

A Tier A gaming operation is one with annual gross gaming revenues of more than $1 million but not more than $5 million.

### § 542.21    What are the minimum internal control standards for drop and count for Tier A gaming operations?

(a)  *Computer applications.*  For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(b)  *Banking and percentage card game drop standards.*  (1)  The setting out of empty banking and percentage card game drop boxes and the drop shall be a continuous process.

(2)  At the end of each shift:

(i)  All locked banking and percentage card game drop boxes shall be removed from the banking and percentage card game tables by a person independent of the pit shift being dropped;

(ii)  A separate drop box shall be placed on each banking and percentage card game table opened at any time during each shift or a gaming operation may utilize a single drop box with separate openings and compartments for each shift; and

(iii)  Upon removal from the banking and percentage card game tables, banking and percentage card game drop boxes shall be transported directly to the count room or other equivalently secure area with comparable controls and locked in a secure manner until the count takes place.

(3)  If drop boxes are not placed on all banking and percentage card game tables, then the pit department shall document which tables were open during the shift.

(4)  The transporting of banking and percentage card game drop boxes shall be performed by a minimum of two (2) persons, at least one (1) of whom is independent of the pit shift being dropped.

(5)  All banking and percentage card game drop boxes shall be posted with a number corresponding to a permanent number on the gaming table and marked to indicate game, table number, and shift.

(c)  *Soft count room personnel.*  (1)  The banking and percentage card game soft count and the gaming device bill acceptor count shall be performed by a minimum of two (2) employees.

(2)  Count room personnel shall not be allowed to exit or enter the count room during the count except for emergencies or scheduled breaks.  At no time during the count, shall there be fewer than two (2) employees in the count room until the drop proceeds have been accepted into cage/vault accountability.

(3)  Count team members shall be rotated on a routine basis such that the count team is not consistently the same two (2) persons more than four (4) days per week.  This standard shall not apply to gaming operations that utilize a count team of more than two (2) persons.

(4)  The count team shall be independent of transactions being reviewed and counted.  The count team shall be independent of the cage/vault departments, however, a dealer or a cage cashier may be used if this person is not allowed to perform the recording function.  An accounting representative may be used if there is an independent audit of all soft count documentation.

D-43

(d) *Banking and percentage card game soft count standards.* (1) The banking and percentage card game soft count shall be performed in a soft count room or other equivalently secure area with comparable controls.

(2) Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(3) If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(4) The banking and percentage card game drop boxes shall be individually emptied and counted in such a manner to prevent the commingling of funds between boxes until the count of the box has been recorded.

(i) The count of each box shall be recorded in ink or other permanent form of recordation.

(ii) A second count shall be performed by an employee on the count team who did not perform the initial count.

(iii) Corrections to information originally recorded by the count team on soft count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change, unless the count team only has two (2) members in which case the initials of only one (1) verifying member is required.

(5) If cash counters are utilized and the count room table is used only to empty boxes and sort/stack contents, a count team member shall be able to observe the loading and unloading of all cash at the cash counter, including rejected cash.

(6) Banking and percentage card game drop boxes, when empty, shall be shown to another member of the count team, or to another person who is observing the count, or to surveillance.

(7) Orders for fill/credit (if applicable) shall be matched to the fill/credit slips. Fills and credits shall be traced to or recorded on the count sheet.

(8) Pit marker issue and payment slips (if applicable) removed from the banking and percentage card game drop boxes shall either be:

(i) Traced to or recorded on the count sheet by the count team; or

(ii) Totaled by shift and traced to the totals documented by the computerized system. Accounting personnel shall verify the issue/payment slip for each table is accurate.

(9) Foreign currency exchange forms (if applicable) removed from the banking and percentage card game drop boxes shall be reviewed for the proper daily exchange rate and the conversion amount shall be recomputed by the count team. Alternatively, this may be performed by accounting/auditing employees.

(10) The opening/closing banking and percentage card game table and marker inventory forms (if applicable) shall either be:

(i) Examined and traced to or recorded on the count sheet; or

(ii) If a computerized system is used, accounting personnel can trace the opening/closing banking and percentage card game table and marker inventory forms to the count sheet. Discrepancies shall be investigated with the findings documented and maintained for inspection.

(11) The count sheet shall be reconciled to the total drop by a count team member who shall not function as the sole recorder.

(12)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(13)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(14)  The count sheet, with all supporting documents, shall be delivered to the accounting department by a count team member or a person independent of the cashiers department.  Alternatively, it may be adequately secured ( *e.g.,* locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(15)  Access to stored, full banking and percentage card game drop boxes shall be restricted to authorized members of the drop and count teams.

(e)  *Gaming device bill acceptor drop standards.*  (1)  A minimum of two (2) employees shall be involved in the removal of the gaming device drop, at least one (1) of who is independent of the gaming device department.

(2)  All bill acceptor canisters shall be removed only at the time previously designated by the gaming operation and reported to the Tribal gaming agency, except for emergency drops.

(3)  The bill acceptor canisters shall be removed by a person independent of the gaming device department then transported directly to the count room or other equivalently secure area with comparable controls and locked in a secure manner until the count takes place.

(i)  Security shall be provided over the bill acceptor canisters removed from the gaming devices and awaiting transport to the count room.

(ii)  The transporting of bill acceptor canisters shall be performed by a minimum of two (2)  persons, at least one (1) of whom is independent of the gaming device department.

(4)  All bill acceptor canisters shall be posted with a number corresponding to a permanent number on the gaming device.

(f)  *Gaming device bill acceptor count standards.*  (1)  The gaming device bill acceptor count shall be performed in a soft count room or other equivalently secure area with comparable controls.

(2)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(3) If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(4)  The bill acceptor canisters shall be individually emptied and counted in such a manner to prevent the commingling of funds between canisters until the count of the canister has been recorded.

(i)  The count of each canister shall be recorded in ink or other permanent form of recordation.

(ii)  Corrections to information originally recorded by the count team on soft count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change.

(5)  If cash counters are utilized and the count room table is used only to empty canisters and sort/stack contents, a count team member shall be able to observe the loading and unloading of all cash at the cash counter, including rejected cash.

(6)  Canisters, when empty, shall be shown to another member of the count team, or to another person who is observing the count, or to surveillance.

(7)  The count sheet shall be reconciled to the total drop by a count team member who shall not function as the sole recorder.

(8)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(9)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(10)  The count sheet, with all supporting documents, shall be delivered to the accounting department by a count team member or a person independent of the cashiers department.  Alternatively, it may be adequately secured (e.g., locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(11)  Access to stored bill acceptor canisters, full or empty, shall be restricted to:

(i)  Authorized members of the drop and count teams; and

(ii)  Authorized personnel in an emergency for resolution of a problem.

(g)  *Gaming device coin drop standards.*  (1)  A minimum of two (2) employees shall be involved in the removal of the gaming device drop, at least one (1) of whom is independent of the gaming device department.

(2)  All drop buckets shall be removed only at the time previously designated by the gaming operation and reported to the Tribal gaming agency, except for emergency drops.

(3)  Security shall be provided over the buckets removed from the gaming device drop cabinets and awaiting transport to the count room.

(4)  As each gaming device is opened, the contents shall be tagged with its respective gaming device number if the bucket is not permanently marked with the gaming device number.  The contents shall be transported directly to the area designated for the counting of such drop proceeds.  If more than one (1) trip is required to remove the contents of the gaming devices, the filled carts of coins shall be securely locked in the room designed for counting or in another equivalently secure area with comparable controls.  There shall be a locked covering on any carts in which the drop route includes passage out of doors.

(i)  Alternatively, a smart bucket system that electronically identifies and tracks the gaming device number, and facilitates the proper recognition of gaming revenue, shall satisfy the requirements of this paragraph.

(5)  Each drop bucket in use shall be:

(i)  Housed in a locked compartment separate from any other compartment of the gaming device and keyed differently than other gaming device compartments; and

(ii)  Identifiable to the gaming device from which it is removed.  If the gaming device is identified with a removable tag that is placed in the bucket, the tag shall be placed on top of the bucket when it is collected.

(6)  Each gaming device shall have drop buckets into which coins or tokens that are retained by the gaming device are collected.  Drop bucket contents shall not be used to make change or pay hand-paid payouts.

(7)  The collection procedures may include procedures for dropping gaming devices that have trays instead of drop buckets.

D-46

(h)  *Hard count room personnel.*  (1)  The weigh/count shall be performed by a minimum of two (2) employees.

(2)  At no time during the weigh/count shall there be fewer than two (3) employees in the count room until the drop proceeds have been accepted into cage/vault accountability.

(i)  If the gaming device count is conducted with a continuous mechanical count meter that is not reset during the count and is verified in writing by at least two (2) employees at the start and end of each denomination count, then one (1) employee may perform the wrap.

(3)  Count team members shall be rotated on a routine basis such that the count team is not consistently the same two (2) persons more than four (4) days per week.  This standard shall not apply to gaming operations that utilize a count team of more than two (2) persons.

(4)  The count team shall be independent of transactions being reviewed and counted.  The count team shall be independent of the cage/vault departments, unless they are non-supervisory gaming device employees and perform the laborer function only (A non-supervisory gaming device employee is defined as a person below the level of gaming device shift supervisor).  A cage cashier may be used if this person is not allowed to perform the recording function.  An accounting representative may be used if there is an independent audit of all count documentation.

(i)  *Gaming device coin count and wrap standards.*  (1)  Coins shall include tokens.

(2)  The gaming device coin count and wrap shall be performed in a count room or other equivalently secure area with comparable controls.

(i)  Alternatively, an on-the-floor drop system utilizing a mobile scale shall satisfy the requirements of this paragraph, subject to the following conditions:

(A)  The gaming operation shall utilize and maintain an effective on-line gaming device monitoring system, as described in §542.13(m)(3);

(B)  Components of the on-the-floor drop system shall include, but not be limited to, a weigh scale, a laptop computer through which weigh/count applications are operated, a security camera available for the mobile scale system, and a VCR or other video recording device to be housed within the video compartment of the mobile scale.  The system may include a mule cart used for mobile weigh scale system locomotion.

(C)  The gaming operation must obtain the security camera available with the system, and this camera must be added in such a way as to eliminate tampering.

(D)  Prior to the drop, the drop/count team shall ensure the scale batteries are charged;

(E)  Prior to the drop, a videotape or other video recording media shall be inserted into the VCR or other video recording device used to record the drop in conjunction with the security camera system and the VCR or other video recording device shall be activated;

(F)  The weigh scale test shall be performed prior to removing the unit from the hard count room for the start of the weigh/drop/count;

(G)  Surveillance shall be notified when the weigh/drop/count begins and shall be capable of monitoring the entire process;

(H)  An observer independent of the weigh/drop/count teams (independent observer) shall remain by the weigh scale at all times and shall observe the entire weigh/drop/count process;

(I)  Physical custody of the key(s) needed to access the laptop and video compartment shall require the involvement of two (2) persons, one (1) of whom is independent of the drop and count team;

(J)  The mule key (if applicable), the laptop and video compartment keys, and the remote control for the VCR or other video recording device shall be maintained by a department independent of the gaming device department. The appropriate personnel shall sign out these keys;

(K)  A person independent of the weigh/drop/count teams shall be required to accompany these keys while they are checked out, and observe each time the laptop compartment is opened;

(L)  The laptop access panel shall not be opened outside the hard count room, except in instances when the laptop must be rebooted as a result of a crash, lock up, or other situation requiring immediate corrective action;

(M)  User access to the system shall be limited to those employees required to have full or limited access to complete the weigh/drop/count; and

(N)  When the weigh/drop/count is completed, the independent observer shall access the laptop compartment, end the recording session, eject the videotape, or other video recording media, and deliver the videotape or other video recording media to surveillance.

(3)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(4)  If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(5)  The following functions shall be performed in the counting of the gaming device drop:

(i)  Recorder function, which involves the recording of the gaming device count; and

(ii)  Count team supervisor function, which involves the control of the gaming device weigh and wrap process.  The supervisor shall not perform the initial recording of the weigh/count unless a weigh scale with a printer is used.

(6)  The gaming device drop shall be counted, wrapped, and reconciled in such a manner to prevent the commingling of gaming device drop coin with coin (for each denomination) from the next gaming device drop until the count of the gaming device drop has been recorded.  If the coins are not wrapped immediately after being weighed or counted, they shall be secured and not commingled with other coins.

(i)  The amount of the gaming device drop from each gaming device shall be recorded in ink or other permanent form of recordation on a gaming device count document by the recorder or mechanically printed by the weigh scale.

(ii)  Corrections to information originally recorded by the count team on gaming device count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change.

(A)  If a weigh scale interface is used, corrections to gaming device count data shall be made using either of the following:

(*1*)  Drawing a single line through the error on the gaming device document, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team employees.  If this procedure is used, an employee independent of the gaming device department and count team shall enter the correct figure into the computer system prior to the generation of related gaming device reports; or

(*2*)  During the count process, correct the error in the computer system and enter the passwords of at least two (2) count team employees.  If this procedure is used, an exception report shall be generated by the computer system identifying the gaming device number, the error, the correction, and the count team employees attesting to the correction.

D-48

(7)  If applicable, the weight shall be converted to dollar amounts prior to the reconciliation of the weigh to the wrap.

(8)  If a coin meter is used, a count team member shall convert the coin count for each denomination into dollars and shall enter the results on a summary sheet.

(9)  The recorder and at least one (1) other count team member shall sign the weigh tape and the gaming device count document attesting to the accuracy of the weigh/count.

(10)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(11)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(12)  All gaming device count and wrap documentation, including any applicable computer storage media, shall be delivered to the accounting department by a count team member or a person independent of the cashier's department. Alternatively, it may be adequately secured (*e.g.,* locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(13)  If the coins are transported off the property, a second (alternative) count procedure shall be performed before the coins leave the property.  Any variances shall be documented.

(14)  Variances.  Large (by denomination, either $1,000 or 2% of the drop, whichever is less) or unusual (*e.g.,* zero for weigh/count or patterned for all counts) variances between the weigh/count and wrap shall be investigated by management personnel independent of the gaming device department, count team, and the cage/vault functions on a timely basis.  The results of such investigation shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(j)  *Security of the coin room inventory during the gaming device coin count and wrap.*  (1)  If the count room serves as a coin room and coin room inventory is not secured so as to preclude access by the count team, then the following standards shall apply:

(i)  At the commencement of the gaming device count the following requirements shall be met:

(A)  The coin room inventory shall be counted by at least two (2) employees, one of whom is a member of the count team and the other is independent of the weigh/count and wrap procedures;

(B)  The count in paragraph (j)(1)(i)(A) of this section shall be recorded on an appropriate inventory form;

(ii)  Upon completion of the wrap of the gaming device drop:

(A)  At least two (2) members of the count team (wrap team), independently from each other, shall count the ending coin room inventory;

(B)  The counts in paragraph (j)(1)(ii)(A) of this section shall be recorded on a summary report(s) that evidences the calculation of the final wrap by subtracting the beginning inventory from the sum of the ending inventory and transfers in and out of the coin room;

(C)  The same count team members shall compare the calculated wrap to the weigh/count, recording the comparison and noting any variances on the summary report;

(D)  A member of the cage/vault department shall count the ending coin room inventory by denomination and shall reconcile it to the beginning inventory, wrap, transfers, and weigh/count; and

D-49

(E)  At the conclusion of the reconciliation, at least two (2) count/wrap team members and the verifying employee shall sign the summary report(s) attesting to its accuracy.

(iii)  The functions described in paragraph (j)(1)(ii)(A) and (C) of this section may be performed by only one (1) count team member.  That count team member must then sign the summary report, along with the verifying employee, as required under paragraph (j)(1)(ii)(E).

(2)  If the count room is segregated from the coin room, or if the coin room is used as a count room and the coin room inventory is secured to preclude access by the count team, all of the following requirements shall be completed, at the conclusion of the count:

(i)  At least two (2) members of the count/wrap team shall count the final wrapped gaming device drop independently from each other;

(ii)  The counts shall be recorded on a summary report;

(iii)  The same count team members (or the accounting department) shall compare the final wrap to the weigh/count, recording the comparison, and noting any variances on the summary report;

(iv)  A member of the cage/vault department shall count the wrapped gaming device drop by denomination and reconcile it to the weigh/count;

(v)  At the conclusion of the reconciliation, at least two (2) count team members and the cage/vault employee shall sign the summary report attesting to its accuracy; and

(vi)  The wrapped coins (exclusive of proper transfers) shall be transported to the cage, vault or coin vault after the reconciliation of the weigh/count to the wrap.

(k)  *Transfers during the gaming device coin count and wrap.*  (1)  Transfers may be permitted during the count and wrap only if permitted under the internal control standards approved by the Tribal gaming agency.

(2)  Each transfer shall be recorded on a separate multi-part form with a preprinted or concurrently-printed form number (used solely for gaming device count transfers) that shall be subsequently reconciled by the accounting department to ensure the accuracy of the reconciled gaming device drop.

(3)  Each transfer must be counted and signed for by at least two (2) members of the count team and by a person independent of the count team who is responsible for authorizing the transfer.

(l)  *Gaming device drop key control standards.*  (1)  Gaming device coin drop cabinet keys, including duplicates, shall be maintained by a department independent of the gaming device department.

(2)  The physical custody of the keys needed to access gaming device coin drop cabinets, including duplicates, shall require the involvement of two (2) persons, one (1) of whom is independent of the gaming device department.

(3)  Two (2) employees (separate from key custodian) shall be required to accompany such keys while checked out and observe each time gaming device drop cabinets are accessed.

(m)  *Banking and percentage card game drop box key control standards.*  (1)  Tier A gaming operations shall be exempt from compliance with this paragraph if the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, establishes and the gaming operation complies with procedures that maintain adequate key control and restricts access to the keys.

(2)  Procedures shall be developed and implemented to insure that unauthorized access to empty banking and percentage card game drop boxes shall not occur from the time the boxes leave the storage racks until they are placed on the tables.

(3)  The involvement of at least two (2) persons independent of the cage department shall be required to access stored empty banking and percentage card game drop boxes.

(4)  The release keys shall be separately keyed from the contents keys.

(5)  At least two (2) count team members are required to be present at the time count room and other count keys are issued for the count.

(6)  All duplicate keys shall be maintained in a manner that provides the same degree of control as is required for the original keys.  Records shall be maintained for each key duplicated that indicate the number of keys made and destroyed.

(7)  Logs shall be maintained by the custodian of sensitive keys to document authorization of personnel accessing keys.

(n)  *Banking and percentage card game drop box release keys.*  (1) Tier A gaming operations shall be exempt from compliance with this paragraph if the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, establishes and the gaming operation complies with procedures that maintain adequate key control and restricts access to the keys.

(2)  The banking and percentage card game drop box release keys shall be maintained by a department independent of the pit department.

(3)  Only the person(s) authorized to remove banking and percentage card game drop boxes from the banking and percentage card game tables shall be allowed access to the banking and percentage card game drop box release keys; however, the count team members may have access to the release keys during the soft count in order to reset the banking and percentage card game drop boxes.

(4)  Persons authorized to remove the banking and percentage card game drop boxes shall be precluded from having simultaneous access to the banking and percentage card game drop box contents keys and release keys.

(5)  For situations requiring access to a banking and percentage card game drop box at a time other than the scheduled drop, the date, time, and signature of employee signing out/in the release key must be documented.

(o)  *Bill acceptor canister release keys.*  (1) Tier A gaming operations shall be exempt from compliance with this paragraph if the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, establishes and the gaming operation complies with procedures that maintain adequate key control and restricts access to the keys.

(2)  The bill acceptor canister release keys shall be maintained by a department independent of the gaming device department.

(3)  Only the person(s) authorized to remove bill acceptor canisters from the gaming devices shall be allowed access to the release keys.

(4)  Persons authorized to remove the bill acceptor canisters shall be precluded from having simultaneous access to the bill acceptor canister contents keys and release keys.

(5)  For situations requiring access to a bill acceptor canister at a time other than the scheduled drop, the date, time, and signature of employee signing out/in the release key must be documented.

(p)  *Banking and percentage card game drop box storage rack keys.*  (1) Tier A gaming operations shall be exempt from compliance with this paragraph if the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, establishes and the gaming operation complies with procedures that maintain adequate key control and restricts access to the keys.

(2)  Persons authorized to obtain banking and percentage card game drop box storage rack keys shall be precluded from having simultaneous access to banking and percentage card game drop box contents keys, with the exception of the count team.

(q)  *Bill acceptor canister storage rack keys.*  (1) Tier A gaming operations shall be exempt from compliance with this paragraph if the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, establishes and the gaming operation complies with procedures that maintain adequate key control and restricts access to the keys.

(2)  Persons authorized to obtain bill acceptor canister storage rack keys shall be precluded from having simultaneous access to bill acceptor canister contents keys, with the exception of the count team.

(r)  *Banking and percentage card game drop box contents keys.*  (1) Tier A gaming operations shall be exempt from compliance with this paragraph if the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, establishes and the gaming operation complies with procedures that maintain adequate key control and restricts access to the keys.

(2)  The physical custody of the keys needed for accessing stored, full banking and percentage card game drop box contents shall require the involvement of persons from at least two (2) separate departments, with the exception of the count team.

(3)  Access to the banking and percentage card game drop box contents key at other than scheduled count times shall require the involvement of at least two (2) persons from separate departments, including management.  The reason for access shall be documented with the signatures of all participants and observers.

(4)  Only count team members shall be allowed access to banking and percentage card game drop box contents keys during the count process.

(s)  *Bill acceptor canister contents keys.*  (1) Tier A gaming operations shall be exempt from compliance with this paragraph if the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, establishes and the gaming operation complies with procedures that maintain adequate key control and restricts access to the keys.

(2)  The physical custody of the keys needed for accessing stored, full bill acceptor canister contents shall require involvement of persons from two separate departments, with the exception of the count team.

(3)  Access to the bill acceptor canister contents key at other than scheduled count times shall require the involvement of at least two (2) persons from separate departments, one (1) of whom must be a supervisor.  The reason for access shall be documented with the signatures of all participants and observers.

(4)  Only the count team members shall be allowed access to bill acceptor canister contents keys during the count process.

(t)  *Gaming device computerized key security systems.*  (1) Computerized key security systems which restrict access to the gaming device drop and count keys through the use of passwords, keys or other means, other than a key custodian, must provide the same degree of control as indicated in the aforementioned key control standards; refer to paragraphs (l), (o), (q) and (s) of this section.  Note:  This standard does not apply to the system administrator.  The system administrator is defined in paragraph (t)(2)(i) of this section.

(2)  For computerized key security systems, the following additional gaming device key control procedures apply:

(i)  Management personnel independent of the gaming device department assign and control user access to keys in the computerized key security system (*i.e.*, system administrator) to ensure that gaming device drop and count keys are restricted to authorized employees.

D-52

(ii)  In the event of an emergency or the key box is inoperable, access to the emergency manual key(s) (a.k.a. override key), used to access the box containing the gaming device drop and count keys, requires the physical involvement of at least three (3) persons from separate departments, including management.  The date, time, and reason for access, must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(iii) The custody of the keys issued pursuant to paragraph (t)(2)(ii) of this section requires the presence of two (2) persons from separate departments from the time of their issuance until the time of their return.

(iv)  Routine physical maintenance that requires accessing the emergency manual key(s) (override key) and does not involve the accessing of the gaming device drop and count keys, only requires the presence of two (2) persons from separate departments.  The date, time and reason for access must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(3)  For computerized key security systems controlling access to gaming device drop and count keys, accounting/audit personnel, independent of the system administrator, will perform the following procedures:

(i)  Daily, review the report generated by the computerized key security system indicating the transactions performed by the individual(s) that adds, deletes, and changes user's access within the system (*i.e.* , system administrator).  Determine whether the transactions completed by the system administrator provide an adequate control over the access to the gaming device drop and count keys.  Also, determine whether any gaming device drop and count key(s) removed or returned to the key cabinet by the system administrator was properly authorized.

(ii)  For at least one (1) day each month, review the report generated by the computerized key security system indicating all transactions performed to determine whether any unusual gaming device drop and count key removals or key returns occurred.

(iii)  At least quarterly, review a sample of users that are assigned access to the gaming device drop and count keys to determine that their access to the assigned keys is adequate relative to their job position.

(iv)  All noted improper transactions or unusual occurrences are investigated with the results documented.

(4)  Quarterly, an inventory of all count room, drop box release, storage rack and contents keys is performed, and reconciled to records of keys made, issued, and destroyed.  Documented investigations shall be performed for all unaccounted keys.

(u) *Banking and percentage card games computerized key security systems.*  (1)  Computerized key security systems which restrict access to the banking and percentage card game drop and count keys through the use of passwords, keys or other means, other than a key custodian, must provide the same degree of control as indicated in the aforementioned key control standards; refer to paragraphs (m), (n), (p) and (r) of this section.  Note:  This standard does not apply to the system administrator.  The system administrator is defined in paragraph (u)(2)(ii) of this section.

(2)  For computerized key security systems, the following additional banking and percentage card game key control procedures apply:

(i)  Management personnel independent of the banking and percentage card game department shall assign and control user access to keys in the computerized key security system (*i.e.* , system administrator) to ensure that banking and percentage card game drop and count keys are restricted to authorized employees.

(ii)  In the event of an emergency or the key box is inoperable, access to the emergency manual key(s) (a.k.a. override key), used to access the box containing the banking and percentage card game drop and count keys, requires the physical involvement of at least three (3) persons from separate departments, including management.  The date, time, and reason for access, must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(iii)  The custody of the keys issued pursuant to paragraph (u)(2)(ii) of this section requires the presence of two (2) persons from separate departments from the time of their issuance until the time of their return.

(iv)  Routine physical maintenance that requires accessing the emergency manual key(s) (a.k.a. override key) and does not involve the accessing of the banking and percentage card game drop and count keys, only requires the presence of two (2) persons from separate departments.  The date, time and reason for access must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(3)  For computerized key security systems controlling access to banking and percentage card game drop and count keys, accounting/audit personnel, independent of the system administrator, will perform the following procedures:

(i)  Daily, review the report generated by the computerized key security system indicating the transactions performed by the individual(s) that adds, deletes, and changes user's access within the system (*i.e.* , system administrator).  Determine whether the transactions completed by the system administrator provide an adequate control over the access to the banking and percentage card game drop and count keys.  Also, determine whether any banking and percentage card game drop and count key(s) removed or returned to the key cabinet by the system administrator was properly authorized.

(ii)  For at least one (1) day each month, review the report generated by the computerized key security system indicating all transactions performed to determine whether any unusual banking and percentage card game drop and count key removals or key returns occurred.

(iii)  At least quarterly, review a sample of users that are assigned access to the banking and percentage card game drop and count keys to determine that their access to the assigned keys is adequate relative to their job position.

(iv)  All noted improper transactions or unusual occurrences are investigated with the results documented.

(4)  Quarterly, an inventory of all count room, banking and percentage card game drop box release, storage rack and contents keys is performed, and reconciled to records of keys made, issued, and destroyed.  Documented investigations shall be performed for all unaccounted keys.

(v)  *Emergency drop procedures.*  Emergency drop procedures shall be developed by the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency.

(w)  *Equipment standards for gaming device count.*  (1)  A weigh scale calibration module shall be secured so as to prevent unauthorized access (e.g., prenumbered seal, lock and key, etc.).

(2)  A person independent of the cage, vault, gaming device, and count team functions shall be required to be present whenever the calibration module is accessed.  Such access shall be documented and maintained.

(3)  If a weigh scale interface is used, it shall be adequately restricted so as to prevent unauthorized access (passwords, keys, etc.).

(4)  If the weigh scale has a zero adjustment mechanism, it shall be physically limited to minor adjustments ( *e.g.,* weight of a bucket) or physically situated such that any unnecessary adjustments to it during the weigh process would be observed by other count team members.

(5)  The weigh scale and weigh scale interface (if applicable) shall be tested by a person or persons independent of the cage, vault, and gaming device departments and count team at least quarterly.  At least annually, this test shall be performed by internal audit in accordance with the internal audit standards.  The result of these tests shall be documented and signed by the person or persons performing the test.

(6)  Prior to the gaming device count, at least two (2) employees shall verify the accuracy of the weigh scale with varying weights or with varying amounts of previously counted coin for each denomination to ensure the scale is properly calibrated (varying weights/coin from drop to drop is acceptable).

D-54

(7)  If a mechanical coin counter is used (instead of a weigh scale), the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply, with procedures that are equivalent to those described in paragraphs (u)(4), (u)(5), and (u)(6) of this section.

(8)  If a coin meter count device is used, the count team member shall record the device number denomination and number of coins in ink on a source document, unless the meter device automatically records such information.

(i)  A count team member shall test the coin meter count device prior to the actual count to ascertain if the metering device is functioning properly with a predetermined number of coins for each denomination.

### § 542.22    What are the minimum internal control standards for internal audit for Tier A gaming operations?

(a)  *Internal audit personnel.*  (1)  For Tier A gaming operations, a separate internal audit department must be maintained.  Alternatively, designating personnel (who are independent with respect to the departments/procedures being examined) to perform internal audit work satisfies the requirements of this paragraph.

(2)  The internal audit personnel shall report directly to the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe in accordance with the definition of internal audit in §542.2.

(b)  *Audits.*  (1)  Internal audit personnel shall perform audits of all major gaming areas of the gaming operation. The following shall be reviewed at least annually:

(i)  Reserved;

(ii)  Reserved;

(iii)  Reserved;

(iv)  Reserved;

(v)  Pari-mutuel wagering, including write and payout procedures, and pari-mutuel auditing procedures;

(vi)  Banking and percentage card games, including but not limited to, fill and credit procedures, pit credit play procedures, rim credit procedures, soft drop/count procedures and the subsequent transfer of funds, unannounced testing of count room currency counters and/or currency interface, location and control over sensitive keys, the tracing of source documents to summarized documentation and accounting records, and reconciliation to restricted copies;

(vii)  Gaming devices, including but not limited to, jackpot payout and gaming device fill procedures, gaming device drop/count and bill acceptor drop/count and subsequent transfer of funds, unannounced testing of weigh scale and weigh scale interface, unannounced testing of count room currency counters and/or currency interface, gaming device drop cabinet access, tracing of source documents to summarized documentation and accounting records, reconciliation to restricted copies, location and control over sensitive keys, compliance with EPROM duplication procedures, and compliance with MICS procedures for gaming devices that accept currency or coin(s) and issue cash-out tickets or gaming devices that do not accept currency or coin(s) and do not return currency or coin(s);

(viii)  Cage and credit procedures including all cage, credit, and collection procedures, and the reconciliation of trial balances to physical instruments on a sample basis.  Cage accountability shall be reconciled to the general ledger;

(ix)  Information technology functions, including review for compliance with information technology standards;

(x)  Complimentary service or item, including but not limited to, procedures whereby complimentary service items are issued, authorized, and redeemed; and

(xi)  Any other internal audits as required by the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe.

(2)  In addition to the observation and examinations performed under paragraph (b)(1) of this section, follow-up observations and examinations shall be performed to verify that corrective action has been taken regarding all instances of noncompliance cited by internal audit, the independent accountant, and/or the Commission or State gaming agency.  The verification shall be performed within six (6) months following the date of notification.

(3)  Internal audit observations shall be performed on an unannounced basis (i.e., without the employees being forewarned that their activities will be observed).  Additionally, if the independent accountant also performs the internal audit function, the accountant shall perform separate observations of the table games/gaming device drops and counts to satisfy the internal audit observation requirements and independent accountant tests of controls as required by the American Institute of Certified Public Accountants guide.

(c)  *Documentation.*  (1)  Documentation (*e.g.,* checklists, programs, reports, etc.) shall be prepared to evidence all internal audit work performed as it relates to the requirements in this section, including all instances of noncompliance.

(2)  The internal audit department shall operate with audit programs, which, at a minimum, address the MICS.  Additionally, the department shall properly document the work performed, the conclusions reached, and the resolution of all exceptions.  Institute of Internal Auditors standards are recommended but not required.

(d)  *Reports.*  (1)  Reports documenting audits performed shall be maintained and made available to the Commission and State gaming agency upon request.

(2)  Such audit reports shall include the following information:

(i)  Audit objectives;

(ii)  Audit procedures and scope;

(iii)  Findings and conclusions;

(iv)  Recommendations, if applicable; and

(v)  Management's response.

(e)  *Material exceptions.*  All material exceptions resulting from internal audit work shall be investigated and resolved with the results of such being documented and retained for five (5) years.

(f)  *Role of management.*  (1)  Internal audit findings shall be reported to management.

(2)  Management shall be required to respond to internal audit findings stating corrective measures to be taken to avoid recurrence of the audit exception.

(3)  Such management responses shall be included in the internal audit report that will be delivered to management, the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe.

(g)  *Internal Audit Guidelines.*  In connection with the internal audit testing pursuant to paragraph (b)(1) of this section, the Commission or State gaming agency shall develop recommended Internal Audit Guidelines, which shall be available upon request.

### § 542.23   What are the minimum internal control standards for surveillance for Tier A gaming operations?

(a)  Tier A gaming operations must, at a minimum, maintain and operate an unstaffed surveillance system in a secured location whereby the areas under surveillance are continually recorded.

(b)  The entrance to the secured location shall be located so that it is not readily accessible by either gaming operation employees who work primarily on the casino floor, or the general public.

(c)  Access to the secured location shall be limited to surveillance personnel, designated employees, and other persons authorized in accordance with the surveillance department policy.  Such policy shall be approved by the Tribal gaming agency.

(d)  The surveillance system shall include date and time generators that possess the capability to display the date and time of recorded events on video and/or digital recordings.  The displayed date and time shall not significantly obstruct the recorded view.

(e)  The surveillance department shall strive to ensure staff is trained in the use of the equipment, knowledge of the games, and house rules.

(f)  Each camera required by the standards in this section shall be installed in a manner that will prevent it from being readily obstructed, tampered with, or disabled by customers or employees.

(g)  Each camera required by the standards in this section shall possess the capability of having its picture recorded. The surveillance system shall include sufficient numbers of recorders to simultaneously record multiple gaming and count room activities, and record the views of all dedicated cameras and motion activated dedicated cameras.

(h)  Reasonable effort shall be made to repair each malfunction of surveillance system equipment required by the standards in this section within seventy-two (72) hours after the malfunction is discovered.  The Tribal gaming agency shall be notified of any camera(s) that has malfunctioned for more than twenty-four (24) hours.

(1)  In the event of a dedicated camera malfunction, the gaming operation and/or the surveillance department shall, upon identification of the malfunction, provide alternative camera coverage or other security measures, such as additional supervisory or security personnel, to protect the subject activity.

(i)  Reserved.

(j)  Reserved.

(k)  Reserved.

(l)  *Banking and percentage card games* —(1)  *Operations with four (4) or more banking and percentage card games.*  Except as otherwise provided in paragraphs (l)(3), (l)(4), and (l)(5) of this section, the surveillance system of gaming operations operating four (4) or more banking and percentage card game shall provide at a minimum one (1) pan-tilt-zoom camera per two (2) tables and surveillance must be capable of taping:

(i)  With sufficient clarity to identify customers and dealers; and

(ii)  With sufficient coverage and clarity to simultaneously view the table bank and determine the configuration of wagers, card values, and game outcome.

(iii)  One (1) dedicated camera per table and one (1) pan-tilt-zoom camera per four (4) tables may be an acceptable alternative procedure to satisfy the requirements of this paragraph.

(2)  *Operations with three (3) or fewer banking and percentage card games.* The surveillance system of gaming operations operating three (3) or fewer banking and percentage card games shall:

(i)  Comply with the requirements of paragraph (l)(1) of this section; or

(ii)  Have one (1) overhead camera at each table.

(3) *Craps.* All banking card games based upon craps not using dice shall have two (2) dedicated cross view cameras covering both ends of the table.

(4) Reserved.

(5) Reserved.

(m) *Progressive banking and percentage card games.* (1) Progressive banking and percentage card games with a progressive jackpot of $25,000 or more shall be recorded by dedicated cameras that provide coverage of:

(i) The table surface, sufficient that the card values and card suits can be clearly identified;

(ii) An overall view of the entire table with sufficient clarity to identify customers and dealer; and

(iii) A view of the progressive meter jackpot amount. If several tables are linked to the same progressive jackpot meter, only one meter need be recorded.

(n) *Gaming devices.* (1) Except as otherwise provided in paragraphs (n)(2) and (n)(3) of this section, gaming devices offering a payout of more than $250,000 shall be recorded by a dedicated camera(s) to provide coverage of:

(i) All customers and employees at the gaming device; and

(ii) The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(2) *In-house progressive gaming device.* In-house progressive gaming devices offering a base payout amount (jackpot reset amount) of more than $100,000 shall be recorded by a dedicated camera(s) to provide coverage of:

(i) All customers and employees at the gaming device; and

(ii) The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(3) *Wide-area progressive gaming device.* Wide-area progressive gaming devices offering a base payout amount of $1 million or more and monitored by an independent vendor utilizing an on-line progressive computer system shall be recorded by a dedicated camera(s) to provide coverage of:

(i) All customers and employees at the gaming device; and

(ii) The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(4) Notwithstanding paragraph (n)(1) of this section, if the gaming device is a multi-game device, the Tribal gaming agency, or the gaming operation subject to the approval of the Tribal gaming agency, may develop and implement alternative procedures to verify payouts.

(o) *Currency and coin.* The surveillance system shall record a general overview of all areas where currency or coin may be stored or counted.

(p) *Video recording and/or digital record retention.* (1) All video recordings and/or digital records of coverage provided by the dedicated cameras or motion-activated dedicated cameras required by the standards in this section shall be retained for a minimum of seven (7) days.

(2) Recordings involving suspected or confirmed gaming crimes, unlawful activity, or detentions by security personnel, must be retained for a minimum of thirty (30) days.

(3) Duly authenticated copies of video recordings and/or digital records shall be provided to the Commission or State gaming agency upon request.

D-58

(q)  *Video library log.*  A video library log, or comparable alternative procedure approved by the Tribal gaming agency, shall be maintained to demonstrate compliance with the storage, identification, and retention standards required in this section.

(r)  *Malfunction and repair log.*  (1)  Surveillance personnel shall maintain a log or alternative procedure approved by the Tribal gaming agency that documents each malfunction and repair of the surveillance system as defined in this section.

(2)  The log shall state the time, date, and nature of each malfunction, the efforts expended to repair the malfunction, and the date of each effort, the reasons for any delays in repairing the malfunction, the date the malfunction is repaired, and where applicable, any alternative security measures that were taken.

### § 542.30    What is a Tier B gaming operation?

A Tier B gaming operation is one with gross gaming revenues of more than $5 million but not more than $15 million.

### § 542.31    What are the minimum internal control standards for drop and count for Tier B gaming operations?

(a)  *Computer applications.*  For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(b)  *Banking and percentage card game drop standards.*  (1)  The setting out of empty table game drop boxes and the drop shall be a continuous process.

(2)  At the end of each shift:

(i)  All locked banking and percentage card game drop boxes shall be removed from the tables by a person independent of the pit shift being dropped;

(ii)  A separate drop box shall be placed on each table opened at any time during each shift or a gaming operation may utilize a single drop box with separate openings and compartments for each shift; and

(iii)  Upon removal from the tables, banking and percentage card game drop boxes shall be transported directly to the count room or other equivalently secure area with comparable controls and locked in a secure manner until the count takes place.

(3)  If drop boxes are not placed on all tables, then the pit department shall document which tables were open during the shift.

(4)  The transporting of banking and percentage card game drop boxes shall be performed by a minimum of two (2) persons, at least one (1) of whom is independent of the pit shift being dropped.

(5)  All banking and percentage card game drop boxes shall be posted with a number corresponding to a permanent number on the gaming table and marked to indicate game, table number, and shift.

(6)  Surveillance shall be notified when the drop is to begin so that surveillance may monitor the activities.

(c)  *Soft count room personnel.*  (1)  The banking and percentage card game soft count and the gaming device bill acceptor count shall be performed by a minimum of two (2) employees.

(i)  The count shall be viewed live, or on video recording and/or digital record, within seven (7) days by an employee independent of the count.

(2)  Count room personnel shall not be allowed to exit or enter the count room during the count except for emergencies or scheduled breaks.  At no time during the count, shall there be fewer than two (2) employees in the count room until the drop proceeds have been accepted into cage/vault accountability.  Surveillance shall be notified whenever count room personnel exit or enter the count room during the count.

(3)  Count team members shall be rotated on a routine basis such that the count team is not consistently the same two (2) persons more than four (4) days per week.  This standard shall not apply to gaming operations that utilize a count team of more than two (2) persons.

(4)  The count team shall be independent of transactions being reviewed and counted.  The count team shall be independent of the cage/vault departments, however, a dealer or a cage cashier may be used if this person is not allowed to perform the recording function.  An accounting representative may be used if there is an independent audit of all soft count documentation.

(d)  *Banking and percentage card game soft count standards.*  (1)  The banking and percentage card game soft count shall be performed in a soft count room or other equivalently secure area with comparable controls.

(2)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(3)  If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(4)  The banking and percentage card game drop boxes shall be individually emptied and counted in such a manner to prevent the commingling of funds between boxes until the count of the box has been recorded.

(i)  The count of each box shall be recorded in ink or other permanent form of recordation.

(ii)  A second count shall be performed by an employee on the count team who did not perform the initial count.

(iii)  Corrections to information originally recorded by the count team on soft count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change, unless the count team only has two (2) members in which case the initials of only one (1) verifying count team member is required.

(5)  If currency counters are utilized and the count room table is used only to empty boxes and sort/stack contents, a count team member shall be able to observe the loading and unloading of all currency at the currency counter, including rejected currency.

(6)  Banking and percentage card game drop boxes, when empty, shall be shown to another member of the count team, or to another person who is observing the count, or to surveillance, provided the count is monitored in its entirety by a person independent of the count.

(7)  Orders for fill/credit (if applicable) shall be matched to the fill/credit slips. Fills and credits shall be traced to or recorded on the count sheet.

(8)  Pit marker issue and payment slips (if applicable) removed from the banking and percentage card game drop boxes shall either be:

(i)  Traced to or recorded on the count sheet by the count team; or

(ii)  Totaled by shift and traced to the totals documented by the computerized system.  Accounting personnel shall verify the issue/payment slip for each banking and percentage card game table is accurate.

(9)  Foreign currency exchange forms (if applicable) removed from the banking and percentage card game drop boxes shall be reviewed for the proper daily exchange rate and the conversion amount shall be recomputed by the count team.  Alternatively, this may be performed by accounting/auditing employees.

(10)  The opening/closing banking and percentage card game table and marker inventory forms (if applicable) shall either be:

(i)  Examined and traced to or recorded on the count sheet; or

(ii)  If a computerized system is used, accounting personnel can trace the opening/closing banking and percentage card game table and marker inventory forms to the count sheet.  Discrepancies shall be investigated with the findings documented and maintained for inspection.

(11)  The count sheet shall be reconciled to the total drop by a count team member who shall not function as the sole recorder.

(12)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(13)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(14)  The count sheet, with all supporting documents, shall be delivered to the accounting department by a count team member or a person independent of the cashiers department.  Alternatively, it may be adequately secured (e.g., locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(15)  Access to stored, full banking and percentage card game drop boxes shall be restricted to authorized members of the drop and count teams.

(e)  *Gaming device bill acceptor drop standards.*  (1)  A minimum of two (2) employees shall be involved in the removal of the gaming device drop, at least one (1) of who is independent of the gaming device department.

(2)  All bill acceptor canisters shall be removed only at the time previously designated by the gaming operation and reported to the Tribal gaming agency, except for emergency drops.

(3)  Surveillance shall be notified when the drop is to begin so that surveillance may monitor the activities.

(4)  The bill acceptor canisters shall be removed by a person independent of the gaming device department then transported directly to the count room or other equivalently secure area with comparable controls and locked in a secure manner until the count takes place.

(i)  Security shall be provided over the bill acceptor canisters removed from the gaming devices and awaiting transport to the count room.

(ii)  The transporting of bill acceptor canisters shall be performed by a minimum of two (2) persons, at least one of who is independent of the gaming device department.

(5)  All bill acceptor canisters shall be posted with a number corresponding to a permanent number on the gaming device.

(f)  *Gaming device bill acceptor count standards.*  (1)  The gaming device bill acceptor count shall be performed in a soft count room or other equivalently secure area with comparable controls.

(2)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(3)  If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(4)  The bill acceptor canisters shall be individually emptied and counted in such a manner to prevent the commingling of funds between canisters until the count of the canister has been recorded.

(i)  The count of each canister shall be recorded in ink or other permanent form of recordation.

(ii)  Corrections to information originally recorded by the count team on soft count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change.

(5)  If currency counters are utilized and the count room table is used only to empty canisters and sort/stack contents, a count team member shall be able to observe the loading and unloading of all currency at the currency counter, including rejected currency.

(6)  Canisters, when empty, shall be shown to another member of the count team, to another person who is observing the count, or to surveillance, provided that the count is monitored in its entirety by a person independent of the count.

(7)  The count sheet shall be reconciled to the total drop by a count team member who shall not function as the sole recorder.

(8)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(9)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(10)  The count sheet, with all supporting documents, shall be delivered to the accounting department by a count team member or a person independent of the cashiers department.  Alternatively, it may be adequately secured (e.g., locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(11)  Access to stored bill acceptor canisters, full or empty, shall be restricted to:

(i)  Authorized members of the drop and count teams; and

(ii)  Authorized personnel in an emergency for the resolution of a problem.

(g)  *Gaming device coin drop standards.*  (1)  A minimum of two (2) employees shall be involved in the removal of the gaming device drop, at least one (1) of who is independent of the gaming device department.

(2)  All drop buckets shall be removed only at the time previously designated by the gaming operation and reported to the Tribal gaming agency, except for emergency drops.

(3)  Surveillance shall be notified when the drop is to begin in order that surveillance may monitor the activities.

(4)  Security shall be provided over the buckets removed from the gaming device drop cabinets and awaiting transport to the count room.

D-62

(5)  As each gaming device is opened, the contents shall be tagged with its respective gaming device number if the bucket is not permanently marked with the gaming device number.  The contents shall be transported directly to the area designated for the counting of such drop proceeds.  If more than one (1) trip is required to remove the contents of the gaming devices, the filled carts of coins shall be securely locked in the room designed for counting or in another equivalently secure area with comparable controls.  There shall be a locked covering on any carts in which the drop route includes passage out of doors.

(i)  Alternatively, a smart bucket system that electronically identifies and tracks the gaming device number, and facilitates the proper recognition of gaming revenue, shall satisfy the requirements of this paragraph.

(6)  Each drop bucket in use shall be:

(i)  Housed in a locked compartment separate from any other compartment of the gaming device and keyed differently than other gaming device compartments; and

(ii)  Identifiable to the gaming device from which it is removed.  If the gaming device is identified with a removable tag that is placed in the bucket, the tag shall be placed on top of the bucket when it is collected.

(7)  Each gaming device shall have drop buckets into which coins or tokens that are retained by the gaming device are collected.  Drop bucket contents shall not be used to make change or pay hand-paid payouts.

(8)  The collection procedures may include procedures for dropping gaming devices that have trays instead of drop buckets.

(h)  *Hard count room personnel.*  (1)  The weigh/count shall be performed by a minimum of two (2) employees.

(i)  The count shall be viewed either live, or on video recording and/or digital record within seven (7) days by an employee independent of the count.

(2)  At no time during the weigh/count shall there be fewer than two (2) employees in the count room until the drop proceeds have been accepted into cage/vault accountability.  Surveillance shall be notified whenever count room personnel exit or enter the count room during the count.

(i)  If the gaming device count is conducted with a continuous mechanical count meter that is not reset during the count and is verified in writing by at least two (2) employees at the start and end of each denomination count, then one (1) employee may perform the wrap.

(3)  Count team members shall be rotated on a routine basis such that the count team is not consistently the same two (2) persons more than four (4) days per week.  This standard shall not apply to gaming operations that utilize a count team of more than two (2) persons.

(4)  The count team shall be independent of transactions being reviewed and counted.  The count team shall be independent of the cage/vault departments, unless they are non-supervisory gaming device employees and perform the laborer function only (a non-supervisory gaming device employee is defined as a person below the level of gaming device shift supervisor).  A cage cashier may be used if this person is not allowed to perform the recording function.  An accounting representative may be used if there is an independent audit of all count documentation.

(i)  *Gaming device coin count and wrap standards.*  (1)  Coins shall include tokens.

(2)  The gaming device coin count and wrap shall be performed in a count room or other equivalently secure area with comparable controls.

(i)  Alternatively, an on-the-floor drop system utilizing a mobile scale shall satisfy the requirements of this paragraph, subject to the following conditions:

D-63

(A)  The gaming operation shall utilize and maintain an effective on-line gaming device monitoring system, as described in §542.13(m)(3);

(B)  Components of the on-the-floor drop system shall include, but not be limited to, a weigh scale, a laptop computer through which weigh/count applications are operated, a security camera available for the mobile scale system, and a VCR or other video recording device to be housed within the video compartment of the mobile scale. The system may include a mule cart used for mobile weigh scale system locomotion.

(C)  The gaming operation must obtain the security camera available with the system, and this camera must be added in such a way as to eliminate tampering.

(D)  Prior to the drop, the drop/count team shall ensure the scale batteries are charged;

(E)  Prior to the drop, a videotape or other video recording media shall be inserted into the VCR or other video recording device used to record the drop in conjunction with the security camera system and the VCR or other video recording device shall be activated;

(F)  The weigh scale test shall be performed prior to removing the unit from the hard count room for the start of the weigh/drop/count;

(G)  Surveillance shall be notified when the weigh/drop/count begins and shall be capable of monitoring the entire process;

(H)  An observer independent of the weigh/drop/count teams (independent observer) shall remain by the weigh scale at all times and shall observe the entire weigh/drop/count process;

(I)  Physical custody of the key(s) needed to access the laptop and video compartment shall require the involvement of two (2) persons, one (1) of whom is independent of the drop and count team;

(J)  The mule key (if applicable), the laptop and video compartment keys, and the remote control for the VCR or other video recording device shall be maintained by a department independent of the gaming device department. The appropriate personnel shall sign out these keys;

(K)  A person independent of the weigh/drop/count teams shall be required to accompany these keys while they are checked out, and observe each time the laptop compartment is opened;

(L)  The laptop access panel shall not be opened outside the hard count room, except in instances when the laptop must be rebooted as a result of a crash, lock up, or other situation requiring immediate corrective action;

(M)  User access to the system shall be limited to those employees required to have full or limited access to complete the weigh/drop/count; and

(N)  When the weigh/drop/count is completed, the independent observer shall access the laptop compartment, end the recording session, eject the videotape or other video recording media, and deliver the videotape or other video recording media to surveillance.

(3)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(4)  If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(5)  The following functions shall be performed in the counting of the gaming device drop:

(i)  Recorder function, which involves the recording of the gaming device count; and

(ii)  Count team supervisor function, which involves the control of the gaming device weigh and wrap process.  The supervisor shall not perform the initial recording of the weigh/count unless a weigh scale with a printer is used.

(6)  The gaming device drop shall be counted, wrapped, and reconciled in such a manner to prevent the commingling of gaming device drop coin with coin (for each denomination) from the next gaming device drop until the count of the gaming device drop has been recorded.  If the coins are not wrapped immediately after being weighed or counted, they shall be secured and not commingled with other coin.

(i)  The amount of the gaming device drop from each gaming device shall be recorded in ink or other permanent form of recordation on a gaming device count document by the recorder or mechanically printed by the weigh scale.

(ii)  Corrections to information originally recorded by the count team on gaming device count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two count team members who verified the change.

(A)  If a weigh scale interface is used, corrections to gaming device count data shall be made using either of the following:

(*1*)  Drawing a single line through the error on the gaming device document, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team employees.  If this procedure is used, an employee independent of the gaming device department and count team shall enter the correct figure into the computer system prior to the generation of related gaming device reports; or

(*2*)  During the count process, correct the error in the computer system and enter the passwords of at least two (2) count team employees.  If this procedure is used, an exception report shall be generated by the computer system identifying the gaming device number, the error, the correction, and the count team employees attesting to the correction.

(7)  If applicable, the weight shall be converted to dollar amounts before the reconciliation of the weigh to the wrap.

(8)  If a coin meter is used, a count team member shall convert the coin count for each denomination into dollars and shall enter the results on a summary sheet.

(9)  The recorder and at least one (1) other count team member shall sign the weigh tape and the gaming device count document attesting to the accuracy of the weigh/count.

(10)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(11)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(12)  All gaming device count and wrap documentation, including any applicable computer storage media, shall be delivered to the accounting department by a count team member or a person independent of the cashier's department.  Alternatively, it may be adequately secured (e.g., locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(13)  If the coins are transported off the property, a second (alternative) count procedure shall be performed before the coins leave the property.  Any variances shall be documented.

(14)  Variances.  Large (by denomination, either $1,000 or 2% of the drop, whichever is less) or unusual (e.g., zero for weigh/count or patterned for all counts) variances between the weigh/count and wrap shall be investigated by management personnel independent of the gaming device department, count team, and the cage/vault functions on a

timely basis. The results of such investigation shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(j) *Security of the coin room inventory during the gaming device coin count and wrap.* (1) If the count room serves as a coin room and coin room inventory is not secured so as to preclude access by the count team, then the following standards shall apply:

(i) At the commencement of the gaming device count the following requirements shall be met:

(A) The coin room inventory shall be counted by at least two (2) employees, one (1) of whom is a member of the count team and the other is independent of the weigh/count and wrap procedures;

(B) The count in paragraph (j)(1)(i)(A) of this section shall be recorded on an appropriate inventory form;

(ii) Upon completion of the wrap of the gaming device drop:

(A) At least two (2) members of the count team (wrap team), independently from each other, shall count the ending coin room inventory;

(B) The counts in paragraph (j)(1)(ii)(A) of this section shall be recorded on a summary report(s) that evidences the calculation of the final wrap by subtracting the beginning inventory from the sum of the ending inventory and transfers in and out of the coin room;

(C) The same count team members shall compare the calculated wrap to the weigh/count, recording the comparison and noting any variances on the summary report;

(D) A member of the cage/vault department shall count the ending coin room inventory by denomination and shall reconcile it to the beginning inventory, wrap, transfers and weigh/count; and

(E) At the conclusion of the reconciliation, at least two (2) count/wrap team members and the verifying employee shall sign the summary report(s) attesting to its accuracy.

(iii) The functions described in paragraph (j)(1)(ii)(A) and (C) of this section may be performed by only one (1) count team member. That count team member must then sign the summary report, along with the verifying employee, as required under paragraph (j)(1)(ii)(E).

(2) If the count room is segregated from the coin room, or if the coin room is used as a count room and the coin room inventory is secured to preclude access by the count team, all of the following requirements shall be completed, at the conclusion of the count:

(i) At least two (2) members of the count/wrap team shall count the final wrapped gaming device drop independently from each other;

(ii) The counts shall be recorded on a summary report;

(iii) The same count team members (or the accounting department) shall compare the final wrap to the weigh/count, recording the comparison, and noting any variances on the summary report;

(iv) A member of the cage/vault department shall count the wrapped gaming device drop by denomination and reconcile it to the weigh/count;

(v) At the conclusion of the reconciliation, at least two (2) count team members and the cage/vault employee shall sign the summary report attesting to its accuracy; and

(vi) The wrapped coins (exclusive of proper transfers) shall be transported to the cage, vault or coin vault after the reconciliation of the weigh/count to the wrap.

(k)  *Transfers during the gaming device coin count and wrap.*  (1)  Transfers may be permitted during the count and wrap only if permitted under the internal control standards approved by the Tribal gaming agency.

(2)  Each transfer shall be recorded on a separate multi-part form with a preprinted or concurrently-printed form number (used solely for gaming device count transfers) that shall be subsequently reconciled by the accounting department to ensure the accuracy of the reconciled gaming device drop.

(3)  Each transfer must be counted and signed for by at least two (2) members of the count team and by a person independent of the count team who is responsible for authorizing the transfer.

(l)  *Gaming device drop key control standards.*  (1) Gaming device coin drop cabinet keys, including duplicates, shall be maintained by a department independent of the gaming device department.

(2)  The physical custody of the keys needed to access gaming device coin drop cabinets, including duplicates, shall require the involvement of two (2) persons, one (1) of whom is independent of the gaming device department.

(3)  Two employees (separate from key custodian) shall be required to accompany such keys while checked out and observe each time gaming device drop cabinets are accessed, unless surveillance is notified each time keys are checked out and surveillance observes the person throughout the period the keys are checked out.

(m)  *Banking and percentage card game drop box key control standards.*  (1)  Procedures shall be developed and implemented to insure that unauthorized access to empty banking and percentage card game drop boxes shall not occur from the time the boxes leave the storage racks until they are placed on the tables.

(2)  The involvement of at least two (2) persons independent of the cage department shall be required to access stored empty banking and percentage card game drop boxes.

(3)  The release keys shall be separately keyed from the contents keys.

(4)  At least two (2) count team members are required to be present at the time count room and other count keys are issued for the count.

(5)  All duplicate keys shall be maintained in a manner that provides the same degree of control as is required for the original keys.  Records shall be maintained for each key duplicated that indicate the number of keys made and destroyed.

(6)  Logs shall be maintained by the custodian of sensitive keys to document authorization of personnel accessing keys.

(n)  *Banking and percentage card game drop box release keys.*  (1)  The banking and percentage card game drop box release keys shall be maintained by a department independent of the pit department.

(2)  Only the person(s) authorized to remove banking and percentage card game drop boxes from the banking and percentage card game tables shall be allowed access to the banking and percentage card game drop box release keys; however, the count team members may have access to the release keys during the soft count in order to reset the banking and percentage card game drop boxes.

(3)  Persons authorized to remove the banking and percentage card game drop boxes shall be precluded from having simultaneous access to the banking and percentage card game drop box contents keys and release keys.

(4)  For situations requiring access to a banking and percentage card game drop box at a time other than the scheduled drop, the date, time, and signature of employee signing out/in the release key must be documented.

(o)  *Bill acceptor canister release keys.*  (1)  The bill acceptor canister release keys shall be maintained by a department independent of the gaming device department.

(2)  Only the person(s) authorized to remove bill acceptor canisters from the gaming devices shall be allowed access to the release keys.

(3)  Persons authorized to remove the bill acceptor canisters shall be precluded from having simultaneous access to the bill acceptor canister contents keys and release keys.

(4)  For situations requiring access to a bill acceptor canister at a time other than the scheduled drop, the date, time, and signature of employee signing out/in the release key must be documented.

(p)  *Banking and percentage card game drop box storage rack keys.*  Persons authorized to obtain banking and percentage card game drop box storage rack keys shall be precluded from having simultaneous access to banking and percentage card game drop box contents keys with the exception of the count team.

(q)  *Bill acceptor canister storage rack keys.*  Persons authorized to obtain bill acceptor canister storage rack keys shall be precluded from having simultaneous access to bill acceptor canister contents keys with the exception of the count team.

(r)  *Banking and percentage card game drop box contents keys.*  (1)  The physical custody of the keys needed for accessing stored, full banking and percentage card game drop box contents shall require the involvement of persons from at least two (2) separate departments, with the exception of the count team.

(2)  Access to the banking and percentage card game drop box contents key at other than scheduled count times shall require the involvement of at least two (2) persons from separate departments, including management.  The reason for access shall be documented with the signatures of all participants and observers.

(3)  Only count team members shall be allowed access to banking and percentage card game drop box contents keys during the count process.

(s)  *Bill acceptor canister contents keys.*  (1)  The physical custody of the keys needed for accessing stored, full bill acceptor canister contents shall require involvement of persons from two (2) separate departments, with the exception of the count team.

(2)  Access to the bill acceptor canister contents key at other than scheduled count times shall require the involvement of at least two (2) persons from separate departments, one (1) of whom must be a supervisor.  The reason for access shall be documented with the signatures of all participants and observers.

(3)  Only the count team members shall be allowed access to bill acceptor canister contents keys during the count process.

(t)  *Gaming device computerized key security systems.*  (1)  Computerized key security systems which restrict access to the gaming device drop and count keys through the use of passwords, keys or other means, other than a key custodian, must provide the same degree of control as indicated in the aforementioned key control standards; refer to paragraphs (l), (o), (q) and (s) of this section.  Note:  This standard does not apply to the system administrator.  The system administrator is defined in paragraph (t)(2)(i) of this section.

(2)  For computerized key security systems, the following additional gaming device key control procedures apply:

(i)  Management personnel independent of the gaming device department assign and control user access to keys in the computerized key security system (*i.e.*, system administrator) to ensure that gaming device drop and count keys are restricted to authorized employees.

(ii)  In the event of an emergency or the key box is inoperable, access to the emergency manual key(s) (a.k.a. override key), used to access the box containing the gaming device drop and count keys, requires the physical involvement of at least three (3) persons from separate departments, including management.  The date, time, and

reason for access, must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(iii)  The custody of the keys issued pursuant to paragraph (t)(2)(ii) of this section, requires the presence of two (2) persons from separate departments from the time of their issuance until the time of their return.

(iv)  Routine physical maintenance that requires accessing the emergency manual key(s) (a.k.a. override key) and does not involve the accessing of the gaming device drop and count keys, only requires the presence of two (2) persons from separate departments.  The date, time and reason for access must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(3)  For computerized key security systems controlling access to gaming device drop and count keys, accounting/audit personnel, independent of the system administrator, will perform the following procedures:

(i)  Daily, review the report generated by the computerized key security system indicating the transactions performed by the individual(s) that adds, deletes, and changes user's access within the system (*i.e.*, system administrator).  Determine whether the transactions completed by the system administrator provide an adequate control over the access to the gaming device drop and count keys.  Also, determine whether any gaming device drop and count key(s) removed or returned to the key cabinet by the system administrator was properly authorized.

(ii)  For at least one (1) day each month, review the report generated by the computerized key security system indicating all transactions performed to determine whether any unusual gaming device drop and count key removals or key returns occurred.

(iii)  At least quarterly, review a sample of users that are assigned access to the gaming device drop and count keys to determine that their access to the assigned keys is adequate relative to their job position.

(iv)  All noted improper transactions or unusual occurrences are investigated with the results documented.

(4)  Quarterly, an inventory of all count room, drop box release, storage rack and contents keys is performed, and reconciled to records of keys made, issued, and destroyed.  Documented investigations shall be performed for all unaccounted keys.

(u)  *Banking and percentage card games computerized key security systems.*  (1)  Computerized key security systems which restrict access to the banking and percentage card game drop and count keys through the use of passwords, keys or other means, other than a key custodian, must provide the same degree of control as indicated in the aforementioned key control standards, refer to paragraphs (m), (n), (p) and (r) of this section.  Note:  This standard does not apply to the system administrator.  The system administrator is defined in paragraph (u)(2)(ii) of this section.

(2)  For computerized key security systems, the following additional banking and percentage card game key control procedures apply:

(i)  Management personnel independent of the banking and percentage card game department assign and control user access to keys in the computerized key security system (*i.e.*, system administrator) to ensure that banking and percentage card game drop and count keys are restricted to authorized employees.

(ii)  In the event of an emergency or the key box is inoperable, access to the emergency manual key(s) (a.k.a. override key), used to access the box containing the banking and percentage card game drop and count keys, requires the physical involvement of at least three (3) persons from separate departments, including management. The date, time, and reason for access, must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(iii)  The custody of the keys issued pursuant to paragraph (u)(2)(ii) of this section, requires the presence of two (2) persons from separate departments from the time of their issuance until the time of their return.

(iv)  Routine physical maintenance that requires accessing the emergency manual key(s) (a.k.a. override key) and does not involve the accessing of the banking and percentage card game drop and count keys, requires the presence of two (2) persons from separate departments.  The date, time and reason for access must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(3)  For computerized key security systems controlling access to banking and percentage card game drop and count keys, accounting/audit personnel, independent of the system administrator, will perform the following procedures:

(i)  Daily, review the report generated by the computerized key security system indicating the transactions performed by the individual(s) that adds, deletes, and changes user's access within the system (*i.e.*, system administrator).  Determine whether the transactions completed by the system administrator provide an adequate control over the access to the banking and percentage card game drop and count keys.  Also, determine whether any banking and percentage card game drop and count key(s) removed or returned to the key cabinet by the system administrator was properly authorized.

(ii)  For at least one (1) day each month, review the report generated by the computerized key security system indicating all transactions performed to determine whether any unusual banking and percentage card games drop and count key removals or key returns occurred.

(iii)  At least quarterly, review a sample of users that are assigned access to the banking and percentage card games drop and count keys to determine that their access to the assigned keys is adequate relative to their job position.

(iv)  All noted improper transactions or unusual occurrences are investigated with the results documented.

(4)  Quarterly, an inventory of all count room, banking and percentage card game drop box release, storage rack and contents keys is performed, and reconciled to records of keys made, issued, and destroyed.  Documented investigations shall be performed for all unaccounted keys.

(v)  *Emergency drop procedures.*  Emergency drop procedures shall be developed by the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency.

(w)  *Equipment standards for gaming device count.* (1)  A weigh scale calibration module shall be secured so as to prevent unauthorized access (e.g., prenumbered seal, lock and key, etc.).

(2)  A person independent of the cage, vault, gaming device, and count team functions shall be required to be present whenever the calibration module is accessed.  Such access shall be documented and maintained.

(3)  If a weigh scale interface is used, it shall be adequately restricted so as to prevent unauthorized access (passwords, keys, etc.).

(4)  If the weigh scale has a zero adjustment mechanism, it shall be physically limited to minor adjustments (e.g., weight of a bucket) or physically situated such that any unnecessary adjustments to it during the weigh process would be observed by other count team members.

(5)  The weigh scale and weigh scale interface (if applicable) shall be tested by a person or persons independent of the cage, vault, and gaming device departments and count team at least quarterly.  At least annually, this test shall be performed by internal audit in accordance with the internal audit standards.  The result of these tests shall be documented and signed by the person or persons performing the test.

(6)  Prior to the gaming device count, at least two (2) employees shall verify the accuracy of the weigh scale with varying weights or with varying amounts of previously counted coin for each denomination to ensure the scale is properly calibrated (varying weights/coin from drop to drop is acceptable).

(7)  If a mechanical coin counter is used (instead of a weigh scale), the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures that are equivalent to those described in paragraphs (u)(4), (u)(5), and (u)(6) of this section.

(8)  If a coin meter count machine is used, the count team member shall record the machine number denomination and number of coins in ink on a source document, unless the meter machine automatically records such information.

(i)  A count team member shall test the coin meter count machine before the actual count to ascertain if the metering device is functioning properly with a predetermined number of coins for each denomination.

## § 542.32    What are the minimum internal control standards for internal audit for Tier B gaming operations?

(a)  *Internal audit personnel.*  (1)  For Tier B gaming operations, a separate internal audit department must be maintained.  Alternatively, designating personnel (who are independent with respect to the departments/procedures being examined) to perform internal audit work satisfies the requirements of this paragraph.

(2)  The internal audit personnel shall report directly to the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe in accordance with the definition of internal audit in §542.2.

(b)  *Audits.*  (1)  Internal audit personnel shall perform audits of all major gaming areas of the gaming operation. The following shall be reviewed at least annually:

(i)  Reserved;

(ii)  Reserved;

(iii)  Reserved;

(iv)  Reserved;

(v)  Pari-mutual wagering, including write and payout procedures, and pari-mutual auditing procedures;

(vi)  Banking and percentage card games, including but not limited to, fill and credit procedures, pit credit play procedures, rim credit procedures, soft drop/count procedures and the subsequent transfer of funds, unannounced testing of count room currency counters and/or currency interface, location and control over sensitive keys, the tracing of source documents to summarized documentation and accounting records, and reconciliation to restricted copies;

(vii)  Gaming devices, including but not limited to, jackpot payout and gaming device fill procedures, gaming device drop/count and bill acceptor drop/count and subsequent transfer of funds, unannounced testing of weigh scale and weigh scale interface, unannounced testing of count room currency counters and/or currency interface, gaming device drop cabinet access, tracing of source documents to summarized documentation and accounting records, reconciliation to restricted copies, location and control over sensitive keys, compliance with EPROM duplication procedures, and compliance with MICS procedures for gaming devices that accept currency or coin(s) and issue cash-out tickets or gaming devices that do not accept currency or coin(s) and do not return currency or coin(s);

(viii)  Cage and credit procedures including all cage, credit, and collection procedures, and the reconciliation of trial balances to physical instruments on a sample basis.  Cage accountability shall be reconciled to the general ledger;

(ix)  Information technology functions, including review for compliance with information technology standards;

(x)  Complimentary service or item, including but not limited to, procedures whereby complimentary service items are issued, authorized, and redeemed; and

(xi)  Any other internal audits as required by the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe.

(2)  In addition to the observation and examinations performed under paragraph (b)(1) of this section, follow-up observations and examinations shall be performed to verify that corrective action has been taken regarding all instances of noncompliance cited by internal audit, the independent accountant, and/or the Commission or State gaming agency.  The verification shall be performed within six (6) months following the date of notification.

(3)  Internal audit observations shall be performed on an unannounced basis (i.e., without the employees being forewarned that their activities will be observed).  Additionally, if the independent accountant also performs the internal audit function, the accountant shall perform separate observations of the table games/gaming device drops and counts to satisfy the internal audit observation requirements and independent accountant tests of controls as required by the American Institute of Certified Public Accountants guide.

(c)  *Documentation.*  (1)  Documentation (*e.g.,* checklists, programs, reports, etc.) shall be prepared to evidence all internal audit work performed as it relates to the requirements in this section, including all instances of noncompliance.

(2)  The internal audit department shall operate with audit programs, which, at a minimum, address the MICS.  Additionally, the department shall properly document the work performed, the conclusions reached, and the resolution of all exceptions.  Institute of Internal Auditors standards are recommended but not required.

(d)  *Reports.*  (1)  Reports documenting audits performed shall be maintained and made available to the Commission and State gaming agency upon request.

(2)  Such audit reports shall include the following information:

(i)  Audit objectives;

(ii)  Audit procedures and scope;

(iii)  Findings and conclusions;

(iv)  Recommendations, if applicable; and

(v)  Management's response.

(e)  *Material exceptions.*  All material exceptions resulting from internal audit work shall be investigated and resolved with the results of such being documented and retained for five (5) years.

(f)  *Role of management.*  (1)  Internal audit findings shall be reported to management.

(2)  Management shall be required to respond to internal audit findings stating corrective measures to be taken to avoid recurrence of the audit exception.

(3)  Such management responses shall be included in the internal audit report that will be delivered to management, the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe.

(g)  *Internal Audit Guidelines.*  In connection with the internal audit testing pursuant to paragraph (b)(1) of this section, the Commission or State gaming agency shall develop recommended Internal Audit Guidelines, which shall be available upon request.

### § 542.33    What are the minimum internal control standards for surveillance for Tier B gaming operations?

(a)  The surveillance system shall be maintained and operated from a staffed surveillance room and shall provide surveillance over gaming areas.

(b)  The entrance to the surveillance room shall be located so that it is not readily accessible by either gaming operation employees who work primarily on the casino floor, or the general public.

(c)  Access to the surveillance room shall be limited to surveillance personnel, designated employees, and other persons authorized in accordance with the surveillance department policy.  Such policy shall be approved by the Tribal gaming agency.  The surveillance department shall maintain a sign-in log of other authorized persons entering the surveillance room.

(d)  Surveillance room equipment shall have total override capability over all other satellite surveillance equipment located outside the surveillance room.

(e)  The surveillance system shall include date and time generators that possess the capability to display the date and time of recorded events on video and/or digital recordings.  The displayed date and time shall not significantly obstruct the recorded view.

(f)  The surveillance department shall strive to ensure staff is trained in the use of the equipment, knowledge of the games, and house rules.

(g)  Each camera required by the standards in this section shall be installed in a manner that will prevent it from being readily obstructed, tampered with, or disabled by customers or employees.

(h)  Each camera required by the standards in this section shall possess the capability of having its picture displayed on a monitor and recorded.  The surveillance system shall include sufficient numbers of monitors and recorders to simultaneously display and record multiple gaming and count room activities, and record the views of all dedicated cameras and motion activated dedicated cameras.

(i)  Reasonable effort shall be made to repair each malfunction of surveillance system equipment required by the standards in this section within seventy-two (72) hours after the malfunction is discovered.  The Tribal gaming agency shall be notified of any camera(s) that has malfunctioned for more than twenty-four (24) hours.

(1)  In the event of a dedicated camera malfunction, the gaming operation and/or surveillance department shall immediately provide alternative camera coverage or other security measures, such as additional supervisory or security personnel, to protect the subject activity.

(j)  Reserved.

(k)  Reserved.

(l)  Reserved.

(m)  Reserved.

(n)  *Pari-mutuel.*  The surveillance system shall monitor and record general activities in the pari-mutuel area, to include the ticket writer and cashier areas, with sufficient clarity to identify the employees performing the different functions.

(o)  *Banking and percentage games* —(1)  *Operations with four (4) or more banking and percentage card games.* Except as otherwise provided in paragraphs (o)(3), (o)(4), and (o)(5) of this section, the surveillance system of gaming operations operating four (4) or more banking and percentage card games shall provide at a minimum one (1) pan-tilt-zoom camera per two (2) tables and surveillance must be capable of taping:

(i)  With sufficient clarity to identify customers and dealers; and

(ii)  With sufficient coverage and clarity to simultaneously view the table bank and determine the configuration of wagers, card values, and game outcome.

(iii)  One (1) dedicated camera per table and one (1) pan-tilt-zoom camera per four (4) tables may be an acceptable alternative procedure to satisfy the requirements of this paragraph.

(2) *Operations with three (3) or fewer banking or percentage card games.*  The surveillance system of gaming operations operating three (3) or fewer banking and percentage card games shall:

(i)  Comply with the requirements of paragraph (o)(1) of this section; or

(ii)  Have one (1) overhead camera at each table.

(3)  *Craps.*  All banking card games based upon craps not using dice shall have two (2) dedicated cross view cameras covering both ends of the table.

(4)  Reserved.

(5)  Reserved.

(p)  *Progressive banking and percentage card games.*  (1)  Progressive banking and percentage card games with a progressive jackpot of $25,000 or more shall be monitored and recorded by dedicated cameras that provide coverage of:

(i)  The table surface, sufficient that the card values and card suits can be clearly identified;

(ii)  An overall view of the entire table with sufficient clarity to identify customers and dealer; and

(iii)  A view of the progressive meter jackpot amount.  If several tables are linked to the same progressive jackpot meter, only one meter need be recorded.

(q)  *Gaming devices.*  (1)  Except as otherwise provided in paragraphs (q)(2) and (q)(3) of this section, gaming devices offering a payout of more than $250,000 shall be monitored and recorded by a dedicated camera(s) to provide coverage of:

(i)  All customers and employees at the gaming device, and

(ii)  The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(2)  *In-house progressive gaming device.*  In-house progressive gaming devices offering a base payout amount (jackpot reset amount) of more than $100,000 shall be monitored and recorded by a dedicated camera(s) to provide coverage of:

(i)  All customers and employees at the gaming device; and

(ii)  The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(3)  *Wide-area progressive gaming device.*  Wide-area progressive gaming devices offering a base payout amount of $1 million or more and monitored by an independent vendor utilizing an on-line progressive computer system shall be recorded by a dedicated camera(s) to provide coverage of:

(i)  All customers and employees at the gaming device; and

(ii)  The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(4)  Notwithstanding paragraph (q)(1) of this section, if the gaming device is a multi-game device, the Tribal gaming agency, or the gaming operation subject to the approval of the Tribal gaming agency, may develop and implement alternative procedures to verify payouts.

(r)  *Cage and vault.*  (1)  The surveillance system shall monitor and record a general overview of activities occurring in each cage and vault area with sufficient clarity to identify employees within the cage and customers and employees at the counter areas.

(2)  Each cashier station shall be equipped with one (1) dedicated overhead camera covering the transaction area.

(3)  The surveillance system shall provide an overview of cash transactions.  This overview should include the customer, the employee, and the surrounding area.

(s)  *Fills and credits.*  (1) The cage or vault area in which fills and credits are transacted shall be monitored and recorded by a dedicated camera or motion activated dedicated camera that provides coverage with sufficient clarity to identify the chip values and the amounts on the fill and credit slips.

(2)  Controls provided by a computerized fill and credit system may be deemed an adequate alternative to viewing the fill and credit slips.

(t)  *Currency and coin.*  (1)  The surveillance system shall monitor and record with sufficient clarity all areas where currency or coin may be stored or counted.

(2)  The surveillance system shall provide for:

(i)  Coverage of scales shall be sufficiently clear to view any attempted manipulation of the recorded data.

(ii)  Monitoring and recording of the banking and percentage card game drop box storage rack or area by either a dedicated camera or a motion-detector activated camera.

(iii)  Monitoring and recording of all areas where coin may be stored or counted, including the hard count room, all doors to the hard count room, all scales and wrapping machines, and all areas where uncounted coin may be stored during the drop and count process.

(iv)  Monitoring and recording of soft count room, including all doors to the room, all banking and percentage card game boxes, safes, and counting surfaces, and all count team personnel.  The counting surface area must be continuously monitored and recorded by a dedicated camera during the soft count.

(v)  Monitoring and recording of all areas where currency is sorted, stacked, counted, verified, or stored during the soft count process.

(u)  Change booths.  The surveillance system shall monitor and record a general overview of the activities occurring in each gaming device change booth.

(v)  *Video recording and/or digital record retention.*  (1)  All video recordings and/or digital records of coverage provided by the dedicated cameras or motion-activated dedicated cameras required by the standards in this section shall be retained for a minimum of seven (7) days.

(2)  Recordings involving suspected or confirmed gaming crimes, unlawful activity, or detentions by security personnel, must be retained for a minimum of thirty (30) days.

(3)  Duly authenticated copies of video recordings and/or digital records shall be provided to the Commission and State gaming agency upon request.

(w)  *Video library log.*  A video library log, or comparable alternative procedure approved by the Tribal gaming agency, shall be maintained to demonstrate compliance with the storage, identification, and retention standards required in this section.

(x) *Malfunction and repair log.* (1) Surveillance personnel shall maintain a log or alternative procedure approved by the Tribal gaming agency that documents each malfunction and repair of the surveillance system as defined in this section.

(2) The log shall state the time, date, and nature of each malfunction, the efforts expended to repair the malfunction, and the date of each effort, the reasons for any delays in repairing the malfunction, the date the malfunction is repaired, and where applicable, any alternative security measures that were taken.

(y) *Surveillance log.* (1) Surveillance personnel shall maintain a log of all surveillance activities.

(2) Such log shall be maintained by surveillance room personnel and shall be stored securely within the surveillance department.

(3) At a minimum, the following information shall be recorded in a surveillance log:

(i) Date;

(ii) Time commenced and terminated;

(iii) Activity observed or performed; and

(iv) The name or license credential number of each person who initiates, performs, or supervises the surveillance.

(4) Surveillance personnel shall also record a summary of the results of the surveillance of any suspicious activity. This summary may be maintained in a separate log.

### § 542.40    What is a Tier C gaming operation?

A Tier C gaming operation is one with annual gross gaming revenues of more than $15 million.

### § 542.41    What are the minimum internal control standards for drop and count for Tier C gaming operations?

(a) *Computer applications.* For any computer applications utilized, alternate documentation and/or procedures that provide at least the level of control described by the standards in this section, as approved by the Tribal gaming agency, will be acceptable.

(b) *Banking and percentage card game drop standards.* (1) The setting out of empty banking and percentage card game drop boxes and the drop shall be a continuous process.

(2) At the end of each shift:

(i) All locked banking and percentage card game drop boxes shall be removed from the banking and percentage card game tables by a person independent of the pit shift being dropped;

(ii) A separate drop box shall be placed on each banking and percentage card game table opened at any time during each shift or a gaming operation may utilize a single drop box with separate openings and compartments for each shift; and

(iii) Upon removal from the tables, banking and percentage card game drop boxes shall be transported directly to the count room or other equivalently secure area with comparable controls and locked in a secure manner until the count takes place.

(3) If drop boxes are not placed on all tables, then the pit department shall document which tables were open during the shift.

(4)  The transporting of banking and percentage card game drop boxes shall be performed by a minimum of two (2) persons, at least one (1) of whom is independent of the pit shift being dropped.

(5)  All banking and percentage card game drop boxes shall be posted with a number corresponding to a permanent number on the gaming table and marked to indicate game, table number, and shift.

(6)  Surveillance shall be notified when the drop is to begin so that surveillance may monitor the activies.

(c)  *Soft count room personnel.*  (1)  The banking and percentage card game soft count and the gaming device bill acceptor count shall be performed by a minimum of three (3) employees.

(2)  Count room personnel shall not be allowed to exit or enter the count room during the count except for emergencies or scheduled breaks.  At no time during the count, shall there be fewer than three (3) employees in the count room until the drop proceeds have been accepted into cage/vault accountability.  Surveillance shall be notified whenever count room personnel exit or enter the count room during the count.

(3)  Count team members shall be rotated on a routine basis such that the count team is not consistently the same three (3) persons more than four (4) days per week.  This standard shall not apply to gaming operations that utilize a count team of more than three (3) persons.

(4)  The count team shall be independent of transactions being reviewed and counted.  The count team shall be independent of the cage/vault departments, however, an accounting representative may be used if there is an independent audit of all soft count documentation.

(d)  *Banking and percentage card game soft count standards.*  (1)  The banking and percentage card game soft count shall be performed in a soft count room or other equivalently secure area with comparable controls.

(2)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(3)  If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(4)  The banking and percentage card game drop boxes shall be individually emptied and counted in such a manner to prevent the commingling of funds between boxes until the count of the box has been recorded.

(i)  The count of each box shall be recorded in ink or other permanent form of recordation.

(ii)  A second count shall be performed by an employee on the count team who did not perform the initial count.

(iii)  Corrections to information originally recorded by the count team on soft count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change.

(5)  If cash counters are utilized and the count room table is used only to empty boxes and sort/stack contents, a count team member shall be able to observe the loading and unloading of all currency at the currency counter, including rejected currency.

(6)  Banking and percentage card game drop boxes, when empty, shall be shown to another member of the count team, or to another person who is observing the count, or to surveillance, provided the count is monitored in its entirety by a person independent of the count.

(7)  Orders for fill/credit (if applicable) shall be matched to the fill/credit slips.  Fills and credits shall be traced to or recorded on the count sheet.

D-77

(8)  Pit marker issue and payment slips (if applicable) removed from the banking and percentage card game drop boxes shall either be:

(i)  Traced to or recorded on the count sheet by the count team; or

(ii)  Totaled by shift and traced to the totals documented by the computerized system.  Accounting personnel shall verify the issue/payment slip for each table is accurate.

(9)  Foreign currency exchange forms (if applicable) removed from the banking and percentage card game drop boxes shall be reviewed for the proper daily exchange rate and the conversion amount shall be recomputed by the count team.  Alternatively, this may be performed by accounting/auditing employees.

(10)  The opening/closing banking and percentage card game table and marker inventory forms (if applicable) shall either be:

(i)  Examined and traced to or recorded on the count sheet; or

(ii)  If a computerized system is used, accounting personnel can trace the opening/closing banking and percentage card game table and marker inventory forms to the count sheet.  Discrepancies shall be investigated with the findings documented and maintained for inspection.

(11)  The count sheet shall be reconciled to the total drop by a count team member who shall not function as the sole recorder.

(12)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(13)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(14)  The count sheet, with all supporting documents, shall be delivered to the accounting department by a count team member or a person independent of the cashiers department.  Alternatively, it may be adequately secured (*e.g.,* locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(15)  Access to stored, full banking and percentage card game drop boxes shall be restricted to authorized members of the drop and count teams.

(e)  *Gaming device bill acceptor drop standards.*  (1)  A minimum of two (2) employees shall be involved in the removal of the gaming device drop, at least one (1) of who is independent of the gaming device department.

(2)  All bill acceptor canisters shall be removed only at the time previously designated by the gaming operation and reported to the Tribal gaming agency, except for emergency drops.

(3)  Surveillance shall be notified when the drop is to begin so that surveillance may monitor the activities.

(4)  The bill acceptor canisters shall be removed by a person independent of the gaming device department then transported directly to the count room or other equivalently secure area with comparable controls and locked in a secure manner until the count takes place.

(i)  Security shall be provided over the bill acceptor canisters removed from the gaming devices and awaiting transport to the count room.

(ii)  The transporting of bill acceptor canisters shall be performed by a minimum of two (2) persons, at least one (1) of who is independent of the gaming device department.

(5)  All bill acceptor canisters shall be posted with a number corresponding to a permanent number on the gaming device.

(f)  *Gaming device bill acceptor count standards.*  (1)  The gaming device bill acceptor count shall be performed in a soft count room or other equivalently secure area with comparable controls.

(2)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(3)  If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(4)  The bill acceptor canisters shall be individually emptied and counted in such a manner to prevent the commingling of funds between canisters until the count of the canister has been recorded.

(i)  The count of each canister shall be recorded in ink or other permanent form of recordation.

(ii)  Corrections to information originally recorded by the count team on soft count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change.

(5)  If currency counters are utilized and the count room table is used only to empty canisters and sort/stack contents, a count team member shall be able to observe the loading and unloading of all currency at the currency counter, including rejected currency.

(6)  Canisters, when empty, shall be shown to another member of the count team, or to another person who is observing the count, or to surveillance, provided that the count is monitored in its entirety by a person independent of the count.

(7)  The count sheet shall be reconciled to the total drop by a count team member who shall not function as the sole recorder.

(8)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(9)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(10)  The count sheet, with all supporting documents, shall be delivered to the accounting department by a count team member or a person independent of the cashiers department.  Alternatively, it may be adequately secured (e.g., locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(11)  Access to stored bill acceptor canisters, full or empty, shall be restricted to:

(i)  Authorized members of the drop and count teams; and

(ii)  Authorized personnel in an emergency for the resolution of a problem.

(g)  *Gaming device coin drop standards.*  (1)  A minimum of three (3) employees shall be involved in the removal of the gaming device drop, at least one of who is independent of the gaming device department.

(2)  All drop buckets shall be removed only at the time previously designated by the gaming operation and reported to the Tribal gaming agency, except for emergency drops.

D-79

(3)  Surveillance shall be notified when the drop is to begin in order that surveillance may monitor the activities.

(4)  Security shall be provided over the buckets removed from the gaming device drop cabinets and awaiting transport to the count room.

(5)  As each gaming device is opened, the contents shall be tagged with its respective gaming device number if the bucket is not permanently marked with the gaming device number.  The contents shall be transported directly to the area designated for the counting of such drop proceeds.  If more than one (1) trip is required to remove the contents of the gaming devices, the filled carts of coins shall be securely locked in the room designed for counting or in another equivalently secure area with comparable controls.  There shall be a locked covering on any carts in which the drop route includes passage out of doors.

(i)  Alternatively, a smart bucket system that electronically identifies and tracks the gaming device number, and facilitates the proper recognition of gaming revenue, shall satisfy the requirements of this paragraph.

(6)  Each drop bucket in use shall be:

(i)  Housed in a locked compartment separate from any other compartment of the gaming device and keyed differently than other gaming device compartments; and

(ii)  Identifiable to the gaming device from which it is removed.  If the gaming device is identified with a removable tag that is placed in the bucket, the tag shall be placed on top of the bucket when it is collected.

(7)  Each gaming device shall have drop buckets into which coins or tokens that are retained by the gaming device are collected.  Drop bucket contents shall not be used to make change or pay hand-paid payouts.

(8)  The collection procedures may include procedures for dropping gaming devices that have trays instead of drop buckets.

(h)  *Hard count room personnel.*  (1)  The weigh/count shall be performed by a minimum of three (3) employees.

(2)  At no time during the weigh/count shall there be fewer than three (3) employees in the count room until the drop proceeds have been accepted into cage/vault accountability.  Surveillance shall be notified whenever count room personnel exit or enter the count room during the count.

(i)  If the gaming device count is conducted with a continuous mechanical count meter that is not reset during the count and is verified in writing by at least three (3) employees at the start and end of each denomination count, then one (1) employee may perform the wrap.

(3)  Count team members shall be rotated on a routine basis such that the count team is not consistently the same three (3) persons more than four (4) days per week.  This standard shall not apply to gaming operations that utilize a count team of more than three (3) persons.

(4)  The count team shall be independent of transactions being reviewed and counted.  The count team shall be independent of the cage/vault departments, unless they are non-supervisory gaming device employees and perform the laborer function only (a non-supervisory gaming device employee is defined as a person below the level of gaming device shift supervisor).  A cage cashier may be used if this person is not allowed to perform the recording function.  An accounting representative may be used if there is an independent audit of all count documentation.

(i)  *Gaming device coin count and wrap standards.* (1)  Coins shall include tokens.

(2)  The gaming device coin count and wrap shall be performed in a count room or other equivalently secure area with comparable controls.

D-80

(i)  Alternatively, an on-the-floor drop system utilizing a mobile scale shall satisfy the requirements of this paragraph, subject to the following conditions:

(A)  The gaming operation shall utilize and maintain an effective on-line gaming device monitoring system, as described in §542.13(m)(3);

(B)  Components of the on-the-floor drop system shall include, but not be limited to, a weigh scale, a laptop computer through which weigh/count applications are operated, a security camera available for the mobile scale system, and a VCR or other video recording device to be housed within the video compartment of the mobile scale. The system may include a mule cart used for mobile weigh scale system locomotion.

(C)  The gaming operation must obtain the security camera available with the system, and this camera must be added in such a way as to eliminate tampering.

(D)  Prior to the drop, the drop/count team shall ensure the scale batteries are charged;

(E)  Prior to the drop, a videotape or other video recording media shall be inserted into the VCR or other video recording device used to record the drop in conjunction with the security camera system and the VCR or other video recording device shall be activated;

(F)  The weigh scale test shall be performed prior to removing the unit from the hard count room for the start of the weigh/drop/count;

(G)  Surveillance shall be notified when the weigh/drop/count begins and shall be capable of monitoring the entire process;

(H)  An observer independent of the weigh/drop/count teams (independent observer) shall remain by the weigh scale at all times and shall observe the entire weigh/drop/count process;

(I)  Physical custody of the key(s) needed to access the laptop and video compartment shall require the involvement of two (2) persons, one (1) of whom is independent of the drop and count team;

(J)  The mule key (if applicable), the laptop and video compartment keys, and the remote control for the VCR or other video recording device shall be maintained by a department independent of the gaming device department. The appropriate personnel shall sign out these keys;

(K)  A person independent of the weigh/drop/count teams shall be required to accompany these keys while they are checked out, and observe each time the laptop compartment is opened;

(L)  The laptop access panel shall not be opened outside the hard count room, except in instances when the laptop must be rebooted as a result of a crash, lock up, or other situation requiring immediate corrective action;

(M)  User access to the system shall be limited to those employees required to have full or limited access to complete the weigh/drop/count; and

(N)  When the weigh/drop/count is completed, the independent observer shall access the laptop compartment, end the recording session, eject the videotape or other video recording media, and deliver the videotape or other video recording media to surveillance.

(3)  Access to the count room during the count shall be restricted to members of the drop and count teams, with the exception of authorized observers, supervisors for resolution of problems, and authorized maintenance personnel.

(4)  If counts from various revenue centers occur simultaneously in the count room, procedures shall be in effect that prevent the commingling of funds from different revenue centers.

(5)  The following functions shall be performed in the counting of the gaming device drop:

D-81

(i)  Recorder function, which involves the recording of the gaming device count; and

(ii)  Count team supervisor function, which involves the control of the gaming device weigh and wrap process.  The supervisor shall not perform the initial recording of the weigh/count unless a weigh scale with a printer is used.

(6)  The gaming device drop shall be counted, wrapped, and reconciled in such a manner to prevent the commingling of gaming device drop coin with coin (for each denomination) from the next gaming device drop until the count of the gaming device drop has been recorded.  If the coins are not wrapped immediately after being weighed or counted, they shall be secured and not commingled with other coin.

(i)  The amount of the gaming device drop from each device shall be recorded in ink or other permanent form of recordation on a gaming device count document by the recorder or mechanically printed by the weigh scale.

(ii)  Corrections to information originally recorded by the count team on gaming device count documentation shall be made by drawing a single line through the error, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team members who verified the change.

(A)  If a weigh scale interface is used, corrections to gaming device count data shall be made using either of the following:

(*1*)  Drawing a single line through the error on the gaming device document, writing the correct figure above the original figure, and then obtaining the initials of at least two (2) count team employees.  If this procedure is used, an employee independent of the gaming device department and count team shall enter the correct figure into the computer system prior to the generation of related gaming device reports; or

(*2*)  During the count process, correct the error in the computer system and enter the passwords of at least two (2) count team employees.  If this procedure is used, an exception report shall be generated by the computer system identifying the gaming device number, the error, the correction, and the count team employees attesting to the correction.

(7)  If applicable, the weight shall be converted to dollar amounts before the reconciliation of the weigh to the wrap.

(8)  If a coin meter is used, a count team member shall convert the coin count for each denomination into dollars and shall enter the results on a summary sheet.

(9)  The recorder and at least one (1) other count team member shall sign the weigh tape and the gaming device count document attesting to the accuracy of the weigh/count.

(10)  All members of the count team shall sign the count document or a summary report to attest to their participation in the count.

(11)  All drop proceeds and cash equivalents that were counted shall be turned over to the cage or vault cashier (who shall be independent of the count team) or to an authorized person/employee independent of the revenue generation and the count process for verification.  Such person shall certify by signature as to the accuracy of the drop proceeds delivered and received.

(12)  All gaming device count and wrap documentation, including any applicable computer storage media, shall be delivered to the accounting department by a count team member or a person independent of the cashier's department.  Alternatively, it may be adequately secured (*e.g.,* locked container to which only accounting personnel can gain access) until retrieved by the accounting department.

(13)  If the coins are transported off the property, a second (alternative) count procedure shall be performed before the coins leave the property.  Any variances shall be documented.

(14)  Variances.  Large (by denomination, either $1,000 or 2% of the drop, whichever is less) or unusual (*e.g.,* zero for weigh/count or patterned for all counts) variances between the weigh/count and wrap shall be investigated by management personnel independent of the gaming device department, count team, and the cage/vault functions on a timely basis.  The results of such investigation shall be documented, maintained for inspection, and provided to the Tribal gaming agency upon request.

(j)  *Security of the count room inventory during the gaming device coin count and wrap.*  (1)  If the count room serves as a coin room and coin room inventory is not secured so as to preclude access by the count team, then the following standards shall apply:

(i)  At the commencement of the gaming device count the following requirements shall be met:

(A)  The coin room inventory shall be counted by at least two (2) employees, one (1) of whom is a member of the count team and the other is independent of the weigh/count and wrap procedures;

(B)  The count in paragraph (j)(1)(i)(A) of this section shall be recorded on an appropriate inventory form;

(ii)  Upon completion of the wrap of the gaming device drop:

(A)  At least two (2) members of the count team (wrap team), independently from each other, shall count the ending coin room inventory;

(B)  The counts in paragraph (j)(1)(ii)(A) of this section shall be recorded on a summary report(s) that evidences the calculation of the final wrap by subtracting the beginning inventory from the sum of the ending inventory and transfers in and out of the coin room;

(C)  The same count team members shall compare the calculated wrap to the weigh/count, recording the comparison and noting any variances on the summary report;

(D)  A member of the cage/vault department shall count the ending coin room inventory by denomination and shall reconcile it to the beginning inventory, wrap, transfers, and weigh/count; and

(E)  At the conclusion of the reconciliation, at least two (2) count/wrap team members and the verifying employee shall sign the summary report(s) attesting to its accuracy.

(2)  If the count room is segregated from the coin room, or if the coin room is used as a count room and the coin room inventory is secured to preclude access by the count team, all of the following requirements shall be completed, at the conclusion of the count:

(i)  At least two members of the count/wrap team shall count the final wrapped gaming device drop independently from each other;

(ii)  The counts shall be recorded on a summary report;

(iii)  The same count team members (or the accounting department) shall compare the final wrap to the weigh/count, recording the comparison and noting any variances on the summary report;

(iv)  A member of the cage/vault department shall count the wrapped gaming device drop by denomination and reconcile it to the weigh/count;

(v)  At the conclusion of the reconciliation, at least two (2) count team members and the cage/vault employee shall sign the summary report attesting to its accuracy; and

(vi)  The wrapped coins (exclusive of proper transfers) shall be transported to the cage, vault or coin vault after the reconciliation of the weigh/count to the wrap.

(k)  *Transfers during the gaming device coin count and wrap.*  (1)  Transfers may be permitted during the count and wrap only if permitted under the internal control standards approved by the Tribal gaming agency.

(2)  Each transfer shall be recorded on a separate multi-part form with a preprinted or concurrently-printed form number (used solely for gaming device count transfers) that shall be subsequently reconciled by the accounting department to ensure the accuracy of the reconciled gaming device drop.

(3)  Each transfer must be counted and signed for by at least two (2) members of the count team and by a person independent of the count team who is responsible for authorizing the transfer.

(l)  *Gaming device drop key control standards.*  (1)  Gaming device coin drop cabinet keys, including duplicates, shall be maintained by a department independent of the gaming device department.

(2)  The physical custody of the keys needed to access gaming device coin drop cabinets, including duplicates, shall require the involvement of two (2) persons, one (1) of whom is independent of the gaming device department.

(3)  Two (2) employees (separate from key custodian) shall be required to accompany such keys while checked out and observe each time gaming device drop cabinets are accessed, unless surveillance is notified each time keys are checked out and surveillance observes the person throughout the period the keys are checked out.

(m)  *Banking and percentage card game drop box key control standards.*  (1)  Procedures shall be developed and implemented to insure that unauthorized access to empty banking and percentage card game drop boxes shall not occur from the time the boxes leave the storage racks until they are placed on the tables.

(2)  The involvement of at least two (2) persons independent of the cage department shall be required to access stored empty banking and percentage card game drop boxes.

(3)  The release keys shall be separately keyed from the contents keys.

(4)  At least three (3) (two (2) for banking and percentage card game drop box keys in operations with three (3) tables or fewer) count team members are required to be present at the time count room and other count keys are issued for the count.

(5)  All duplicate keys shall be maintained in a manner that provides the same degree of control as is required for the original keys.  Records shall be maintained for each key duplicated that indicate the number of keys made and destroyed.

(6)  Logs shall be maintained by the custodian of sensitive keys to document authorization of personnel accessing keys.

(n)  *Banking and percentage card game drop box release keys.*  (1)  The banking and percentage card game drop box release keys shall be maintained by a department independent of the pit department.

(2)  Only the person(s) authorized to remove banking and percentage card game drop boxes from the tables shall be allowed access to the banking and percentage card game drop box release keys; however, the count team members may have access to the release keys during the soft count in order to reset the banking and percentage card game drop boxes.

(3)  Persons authorized to remove the banking and percentage card game drop boxes shall be precluded from having simultaneous access to the banking and percentage card game drop box contents keys and release keys.

(4)  For situations requiring access to a banking and percentage card game drop box at a time other than the scheduled drop, the date, time, and signature of employee signing out/in the release key must be documented.

(o)  *Bill acceptor canister release keys.*  (1)  The bill acceptor canister release keys shall be maintained by a department independent of the gaming device department.

D-84

(2)  Only the person(s) authorized to remove bill acceptor canisters from the gaming devices shall be allowed access to the release keys.

(3)  Persons authorized to remove the bill acceptor canisters shall be precluded from having simultaneous access to the bill acceptor canister contents keys and release keys.

(4)  For situations requiring access to a bill acceptor canister at a time other than the scheduled drop, the date, time, and signature of employee signing out/in the release key must be documented.

(p)  *Banking and percentage card game drop box storage rack keys.* (1)  A person independent of the pit department shall be required to accompany the banking and percentage card game drop box storage rack keys and observe each time banking and percentage card game drop boxes are removed from or placed in storage racks.

(2)  Persons authorized to obtain banking and percentage card game drop box storage rack keys shall be precluded from having simultaneous access to banking and percentage card game drop box contents keys with the exception of the count team.

(q)  *Bill acceptor canister storage rack keys.*  (1)  A person independent of the gaming device department shall be required to accompany the bill acceptor canister storage rack keys and observe each time canisters are removed from or placed in storage racks.

(2)  Persons authorized to obtain bill acceptor canister storage rack keys shall be precluded from having simultaneous access to bill acceptor canister contents keys with the exception of the count team.

(r)  *Banking and percentage card game drop box contents keys.*  1)  The physical custody of the keys needed for accessing stored, full banking and percentage card game drop box contents shall require the involvement of persons from at least two (2) separate departments, with the exception of the count team.

(2)  Access to the banking and percentage card game drop box contents key at other than scheduled count times shall require the involvement of at least three (3) persons from separate departments, including management.  The reason for access shall be documented with the signatures of all participants and observers.

(3)  Only count team members shall be allowed access to banking and percentage card game drop box content keys during the count process.

(s)  *Bill acceptor canister contents keys.*  (1)  The physical custody of the keys needed for accessing stored, full bill acceptor canister contents shall require involvement of persons from two (2) separate departments, with the exception of the count team.

(2)  Access to the bill acceptor canister contents key at other than scheduled count times shall require the involvement of at least three (3) persons from separate departments, one (1) of whom must be a supervisor.  The reason for access shall be documented with the signatures of all participants and observers.

(3)  Only the count team members shall be allowed access to bill acceptor canister contents keys during the count process.

(t)  *Gaming device computerized key security systems.*  (1)  Computerized key security systems which restrict access to the gaming device drop and count keys through the use of passwords, keys or other means, other than a key custodian, must provide the same degree of control as indicated in the aforementioned key control standards; refer to paragraphs (l), (o), (q) and (s) of this section.  Note:  This standard does not apply to the system administrator.  The system administrator is defined in paragraph (t)(2)(i) of this section.

(2)  For computerized key security systems, the following additional gaming device key control procedures apply:

D-85

(i)  Management personnel independent of the gaming device department assign and control user access to keys in the computerized key security system (*i.e.*, system administrator) to ensure that gaming device drop and count keys are restricted to authorized employees.

(ii)  In the event of an emergency or the key box is inoperable, access to the emergency manual key(s) (a.k.a. override key), used to access the box containing the gaming device drop and count keys, requires the physical involvement of at least three (3) persons from separate departments, including management.  The date, time, and reason for access, must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(iii)  The custody of the keys issued pursuant to paragraph (t)(2)(ii) of this section requires the presence of two (2) persons from separate departments from the time of their issuance until the time of their return.

(iv)  Routine physical maintenance that requires accessing the emergency manual key(s) (a.k.a. override key) and does not involve the accessing of the gaming device drop and count keys, only requires the presence of two (2) persons from separate departments.  The date, time and reason for access must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(3)  For computerized key security systems controlling access to gaming device drop and count keys, accounting/audit personnel, independent of the system administrator, will perform the following procedures:

(i)  Daily, review the report generated by the computerized key security system indicating the transactions performed by the individual(s) that adds, deletes, and changes user's access within the system (*i.e.*, system administrator).  Determine whether the transactions completed by the system administrator provide an adequate control over the access to the gaming device drop and count keys.  Also, determine whether any gaming device drop and count key(s) removed or returned to the key cabinet by the system administrator was properly authorized.

(ii)  For at least one (1) day each month, review the report generated by the computerized key security system indicating all transactions performed to determine whether any unusual gaming device drop and count key removals or key returns occurred.

(iii)  At least quarterly, review a sample of users that are assigned access to the gaming device drop and count keys to determine that their access to the assigned keys is adequate relative to their job position.

(iv)  All noted improper transactions or unusual occurrences are investigated with the results documented.

(4)  Quarterly, an inventory of all count room, drop box release, storage rack and contents keys is performed, and reconciled to records of keys made, issued, and destroyed.  Documented investigations shall be performed for all unaccounted keys.

(u)  *Banking and percentage card games computerized key security systems.*  (1)  Computerized key security systems which restrict access to the banking and percentage card game drop and count keys through the use of passwords, keys or other means, other than a key custodian, must provide the same degree of control as indicated in the aforementioned key control standards; refer to paragraphs (m), (n), (p) and (r) of this section.  Note: This standard does not apply to the system administrator.  The system administrator is defined in paragraph (u)(2)(ii) of this section.

(2)  For computerized key security systems, the following additional banking and percentage card game key control procedures apply:

(i)  Management personnel independent of the banking and percentage card game department assign and control user access to keys in the computerized key security system (*i.e.*, system administrator) to ensure that banking and percentage card game drop and count keys are restricted to authorized employees.

(ii)  In the event of an emergency or the key box is inoperable, access to the emergency manual key(s) (a.k.a. override key), used to access the box containing the banking and percentage card game drop and count keys,

requires the physical involvement of at least three (3) persons from separate departments, including management. The date, time, and reason for access, must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(iii)  The custody of the keys issued pursuant to paragraph (u)(2)(ii) of this section requires the presence of two (2) persons from separate departments from the time of their issuance until the time of their return.

(iv)  Routine physical maintenance that requires accessing the emergency manual key(s) (a.k.a. override key) and does not involve the accessing of the banking and percentage card game drop and count keys, only requires the presence of two (2) persons from separate departments.  The date, time and reason for access must be documented with the signatures of all participating employees signing out/in the emergency manual key(s).

(3)  For computerized key security systems controlling access to banking and percentage card game drop and count keys, accounting/audit personnel, independent of the system administrator, will perform the following procedures:

(i)  Daily, review the report generated by the computerized key security system indicating the transactions performed by the individual(s) that adds, deletes, and changes user's access within the system (*i.e.*, system administrator).  Determine whether the transactions completed by the system administrator provide an adequate control over the access to the banking and percentage card game drop and count keys.  Also, determine whether any banking and percentage card game drop and count key(s) removed or returned to the key cabinet by the system administrator was properly authorized.

(ii)  For at least one (1) day each month, review the report generated by the computerized key security system indicating all transactions performed to determine whether any unusual banking and percentage card game drop and count key removals or key returns occurred.

(iii)  At least quarterly, review a sample of users that are assigned access to the banking and percentage card game drop and count keys to determine that their access to the assigned keys is adequate relative to their job position.

(iv)  All noted improper transactions or unusual occurrences are investigated with the results documented.

(4)  Quarterly, an inventory of all count room, banking and percentage card game drop box release, storage rack and contents keys is performed, and reconciled to records of keys made, issued, and destroyed.  Documented investigations shall be performed for all unaccounted keys.

(v)  *Emergency drop procedures.*  Emergency drop procedures shall be developed by the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency.

(w)  *Equipment standards for gaming device count.*  (1)  A weigh scale calibration module shall be secured so as to prevent unauthorized access (e.g., prenumbered seal, lock and key, etc.).

(2)  A person independent of the cage, vault, gaming device, and count team functions shall be required to be present whenever the calibration module is accessed.  Such access shall be documented and maintained.

(3)  If a weigh scale interface is used, it shall be adequately restricted so as to prevent unauthorized access (passwords, keys, etc.).

(4)  If the weigh scale has a zero adjustment mechanism, it shall be physically limited to minor adjustments (*e.g.,* weight of a bucket) or physically situated such that any unnecessary adjustments to it during the weigh process would be observed by other count team members.

(5)  The weigh scale and weigh scale interface (if applicable) shall be tested by a person or persons independent of the cage, vault, and gaming device departments and count team at least quarterly.  At least annually, this test shall be performed by internal audit in accordance with the internal audit standards.  The result of these tests shall be documented and signed by the person or persons performing the test.

(6)  Prior to the gaming device count, at least two (2) employees shall verify the accuracy of the weigh scale with varying weights or with varying amounts of previously counted coin for each denomination to ensure the scale is properly calibrated (varying weights/coin from drop to drop is acceptable).

(7)  If a mechanical coin counter is used (instead of a weigh scale), the Tribal gaming agency, or the gaming operation as approved by the Tribal gaming agency, shall establish and the gaming operation shall comply with procedures that are equivalent to those described in paragraphs (u)(4), (u)(5), and (u)(6) of this section.

(8)  If a coin meter count machine is used, the count team member shall record the machine number denomination and number of coins in ink on a source document, unless the meter machine automatically records such information.

(i)  A count team member shall test the coin meter count machine before the actual count to ascertain if the metering device is functioning properly with a predetermined number of coins for each denomination.

### § 542.42    What are the minimum internal control standards for internal audit for Tier C gaming operations?

(a)  *Internal audit personnel.*  (1)  For Tier C gaming operations, a separate internal audit department shall be maintained whose primary function is performing internal audit work and that is independent with respect to the departments subject to audit.

(2)  The internal audit personnel shall report directly to the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe in accordance with the definition of internal audit in §542.2.

(b)  *Audits.*  (1)  Internal audit personnel shall perform audits of all major gaming areas of the gaming operation. The following shall be reviewed at least annually:

(i)  Reserved;

(ii)  Reserved;

(iii)  Reserved;

(iv)  Reserved;

(v)  Pari-mutual wagering, including write and payout procedures, and pari-mutual auditing procedures;

(vi)  Banking and percentage card games, including without limitation, fill and credit procedures, pit credit play procedures, rim credit procedures, soft drop/count procedures and the subsequent transfer of funds, unannounced testing of count room currency counters and/or currency interface, location and control over sensitive keys, the tracing of source documents to summarized documentation and accounting records, and reconciliation to restricted copies;

(vii)  Gaming devices, including without limitation, jackpot payout and gaming device fill procedures, gaming device drop/count and bill acceptor drop/count and subsequent transfer of funds, unannounced testing of weigh scale and weigh scale interface, unannounced testing of count room currency counters and/or currency interface, gaming device drop cabinet access, tracing of source documents to summarized documentation and accounting records, reconciliation to restricted copies, location and control over sensitive keys, compliance with EPROM duplication procedures, and compliance with MICS procedures for gaming devices that accept currency or coin(s) and issue cash-out tickets or gaming devices that do not accept currency or coin(s) and do not return currency or coin(s);

(viii)  Cage and credit procedures including all cage, credit, and collection procedures, and the reconciliation of trial balances to physical instruments on a sample basis.  Cage accountability shall be reconciled to the general ledger;

(ix)  Information technology functions, including review for compliance with information technology standards;

(x)  Complimentary service or item, including but not limited to, procedures whereby complimentary service items are issued, authorized, and redeemed; and

(xi)  Any other internal audits as required by the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe.

(2)  In addition to the observation and examinations performed under paragraph (b)(1) of this section, follow-up observations and examinations shall be performed to verify that corrective action has been taken regarding all instances of noncompliance cited by internal audit, the independent accountant, and/or the Commission or State gaming agency.  The verification shall be performed within six (6) months following the date of notification.

(3)  Internal audit observations shall be performed on an unannounced basis (i.e., without the employees being forewarned that their activities will be observed).  Additionally, if the independent accountant also performs the internal audit function, the accountant shall perform separate observations of the banking and percentage card games/gaming device drops and counts to satisfy the internal audit observation requirements and independent accountant tests of controls as required by the American Institute of Certified Public Accountants guide.

(c)  *Documentation.*  (1)  Documentation (*e.g.,* checklists, programs, reports, etc.) shall be prepared to evidence all internal audit work performed as it relates to the requirements in this section, including all instances of noncompliance.

(2)  The internal audit department shall operate with audit programs, which, at a minimum, address the MICS.  Additionally, the department shall properly document the work performed, the conclusions reached, and the resolution of all exceptions.  Institute of Internal Auditors standards are recommended but not required.

(d)  *Reports.*  (1)  Reports documenting audits performed shall be maintained and made available to the Commission and the State gaming agency upon request.

(2)  Such audit reports shall include the following information:

(i)  Audit objectives;

(ii)  Audit procedures and scope;

(iii)  Findings and conclusions;

(iv)  Recommendations, if applicable; and

(v)  Management's response.

(e)  *Material exceptions.*  All material exceptions resulting from internal audit work shall be investigated and resolved with the results of such being documented and retained for five (5) years.

(f)  *Role of management.*  (1)  Internal audit findings shall be reported to management.

(2)  Management shall be required to respond to internal audit findings stating corrective measures to be taken to avoid recurrence of the audit exception.

(3)  Such management responses shall be included in the internal audit report that will be delivered to management, the Tribe, Tribal gaming agency, audit committee, or other entity designated by the Tribe.

(g)  *Internal Audit Guidelines.*  In connection with the internal audit testing pursuant to paragraph (b)(1) of this section, the Commission or State gaming agency shall develop recommended Internal Audit Guidelines, which shall be available upon request.

**§ 542.43      What are the minimum internal control standards for surveillance for a Tier C gaming operation?**

(a)  The surveillance system shall be maintained and operated from a staffed surveillance room and shall provide surveillance over gaming areas.

(b)  The entrance to the surveillance room shall be located so that it is not readily accessible by either gaming operation employees who work primarily on the casino floor, or the general public.

(c)  Access to the surveillance room shall be limited to surveillance personnel, designated employees, and other persons authorized in accordance with the surveillance department policy.  Such policy shall be approved by the Tribal gaming agency.  The surveillance department shall maintain a sign-in log of other authorized persons entering the surveillance room.

(d)  Surveillance room equipment shall have total override capability over all other satellite surveillance equipment located outside the surveillance room.

(e)  In the event of power loss to the surveillance system, an auxiliary or backup power source shall be available and capable of providing immediate restoration of power to all elements of the surveillance system that enable surveillance personnel to observe the table games remaining open for play and all areas covered by dedicated cameras.  Auxiliary or backup power sources such as a UPS System, backup generator, or an alternate utility supplier, satisfy this requirement.

(f)  The surveillance system shall include date and time generators that possess the capability to display the date and time of recorded events on video and/or digital recordings.  The displayed date and time shall not significantly obstruct the recorded view.

(g)  The surveillance department shall strive to ensure staff is trained in the use of the equipment, knowledge of the games, and house rules.

(h)  Each camera required by the standards in this section shall be installed in a manner that will prevent it from being readily obstructed, tampered with, or disabled by customers or employees.

(i)  Each camera required by the standards in this section shall possess the capability of having its picture displayed on a monitor and recorded.  The surveillance system shall include sufficient numbers of monitors and recorders to simultaneously display and record multiple gaming and count room activities, and record the views of all dedicated cameras and motion activated dedicated cameras.

(j)  Reasonable effort shall be made to repair each malfunction of surveillance system equipment required by the standards in this section within seventy-two (72) hours after the malfunction is discovered.  The Tribal gaming agency shall be notified of any camera(s) that has malfunctioned for more than twenty-four (24) hours.

(1)  In the event of a dedicated camera malfunction, the gaming operation and/or the surveillance department shall immediately provide alternative camera coverage or other security measures, such as additional supervisory or security personnel, to protect the subject activity.

(k)  Reserved;

(l)  Reserved;

(m)  Reserved;

(n)  Reserved;

(o)  *Pari-mutuel.*  The surveillance system shall monitor and record general activities in the pari-mutuel area, to include the ticket writer and cashier areas, with sufficient clarity to identify the employees performing the different functions.

(p)  *Banking and percentage games* —(1) *Operations with four (4) or more banking or percentage card games.* Except as otherwise provided in paragraphs (p)(3), (p)(4), and (p)(5) of this section, the surveillance system of gaming operations operating four (4) or more banking and percentage card games shall provide at a minimum one (1) pan-tilt-zoom camera per two (2) tables and surveillance must be capable of taping:

(i)  With sufficient clarity to identify customers and dealers; and

(ii)  With sufficient coverage and clarity to simultaneously view the table bank and determine the configuration of wagers, card values, and game outcome.

(iii)  One (1) dedicated camera per table and one (1) pan-tilt-zoom camera per four (4) tables may be an acceptable alternative procedure to satisfy the requirements of this paragraph.

(2)  *Operations with three (3) or fewer banking and percentage card games.*  The surveillance system of gaming operations operating three (3) or fewer banking and percentage card games shall:

(i)  Comply with the requirements of paragraph (p)(1) of this section; or

(ii)  Have one (1) overhead camera at each table.

(3)  *Craps.*  All banking card games based upon craps not using dice shall have two (2) dedicated cross view cameras covering both ends of the table.

(4)  Reserved;

(5)  Reserved;

(q)  *Progressive banking and percentage card games.*  (1)  Progressive banking and percentage card games with a progressive jackpot of $25,000 or more shall be monitored and recorded by dedicated cameras that provide coverage of:

(i)  The table surface, sufficient that the card values and card suits can be clearly identified;

(ii)  An overall view of the entire table with sufficient clarity to identify customers and dealer; and

(iii)  A view of the progressive meter jackpot amount.  If several tables are linked to the same progressive jackpot meter, only one meter need be recorded.

(r)  *Gaming devices.*  (1)  Except as otherwise provided in paragraphs (r)(2) and (r)(3) of this section, gaming devices offering a payout of more than $250,000 shall be monitored and recorded by a dedicated camera(s) to provide coverage of:

(i)  All customers and employees at the gaming device, and

(ii)  The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(2)  *In-house progressive gaming device.*  In-house progressive gaming devices offering a base payout amount (jackpot reset amount) of more than $100,000 shall be monitored and recorded by a dedicated camera(s) to provide coverage of:

(i)  All customers and employees at the gaming device; and

(ii)  The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(3)  *Wide-area progressive gaming device.*  Wide-area progressive gaming devices offering a base payout amount of $1 million or more and monitored by an independent vendor utilizing an on-line progressive computer system shall be recorded by a dedicated camera(s) to provide coverage of:

(i)  All customers and employees at the gaming device; and

(ii)  The face of the gaming device, with sufficient clarity to identify the payout line(s) of the gaming device.

(4)  Notwithstanding paragraph (r)(1) of this section, if the gaming device is a multi-game device, the Tribal gaming agency, or the gaming operation subject to the approval of the Tribal gaming agency, may develop and implement alternative procedures to verify payouts.

(s)  *Cage and vault.*  (1)  The surveillance system shall monitor and record a general overview of activities occurring in each cage and vault area with sufficient clarity to identify employees within the cage and customers and employees at the counter areas.

(2)  Each cashier station shall be equipped with one (1) dedicated overhead camera covering the transaction area.

(3)  The surveillance system shall provide an overview of cash transactions.  This overview should include the customer, the employee, and the surrounding area.

(t)  *Fills and credits.*  (1)  The cage or vault area in which fills and credits are transacted shall be monitored and recorded by a dedicated camera or motion activated dedicated camera that provides coverage with sufficient clarity to identify the chip values and the amounts on the fill and credit slips.

(2)  Controls provided by a computerized fill and credit system maybe deemed an adequate alternative to viewing the fill and credit slips.

(u)  *Currency and coin.*  (1)  The surveillance system shall monitor and record with sufficient clarity all areas where currency or coin may be stored or counted.

(2)  Audio capability of the soft count room shall also be maintained.

(3)  The surveillance system shall provide for:

(i)  Coverage of scales shall be sufficiently clear to view any attempted manipulation of the recorded data.

(ii)  Monitoring and recording of the banking and percentage card game drop box storage rack or area by either a dedicated camera or a motion-detector activated camera.

(iii)  Monitoring and recording of all areas where coin may be stored or counted, including the hard count room, all doors to the hard count room, all scales and wrapping devices, and all areas where uncounted coin may be stored during the drop and count process.

(iv)  Monitoring and recording of soft count room, including all doors to the room, all banking and percentage card game drop boxes, safes, and counting surfaces, and all count team personnel.  The counting surface area must be continuously monitored and recorded by a dedicated camera during the soft count.

(v)  Monitoring and recording of all areas where currency is sorted, stacked, counted, verified, or stored during the soft count process.

(v)  *Change booths.*  The surveillance system shall monitor and record a general overview of the activities occurring in each gaming device change booth.

D-92

(w) *Video recording and/or digital record retention.*  (1)  All video recordings and/or digital records of coverage provided by the dedicated cameras or motion-activated dedicated cameras required by the standards in this section shall be retained for a minimum of seven (7) days.

(2)  Recordings involving suspected or confirmed gaming crimes, unlawful activity, or detentions by security personnel, must be retained for a minimum of thirty (30) days.

(3)  Duly authenticated copies of video recordings and/or digital records shall be provided to the Commission and State gaming agency upon request.

(x) *Video library log.*  A video library log, or comparable alternative procedure approved by the Tribal gaming agency, shall be maintained to demonstrate compliance with the storage, identification, and retention standards required in this section.

(y) *Malfunction and repair log.*  (1)  Surveillance personnel shall maintain a log or alternative procedure approved by the Tribal gaming agency that documents each malfunction and repair of the surveillance system as defined in this section.

(2)  The log shall state the time, date, and nature of each malfunction, the efforts expended to repair the malfunction, and the date of each effort, the reasons for any delays in repairing the malfunction, the date the malfunction is repaired, and where applicable, any alternative security measures that were taken.

(z) *Surveillance log.*  (1)  Surveillance personnel shall maintain a log of all surveillance activities.

(2)  Such log shall be maintained by surveillance room personnel and shall be stored securely within the surveillance department.

(3)  At a minimum, the following information shall be recorded in a surveillance log:

(i)  Date;

(ii)  Time commenced and terminated;

(iii)  Activity observed or performed; and

(iv)  The name or license credential number of each person who initiates, performs, or supervises the surveillance.

(4)  Surveillance personnel shall also record a summary of the results of the surveillance of any suspicious activity. This summary may be maintained in a separate log.